REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   Suzanne K. Toller (CA State Bar No. 129903)
    Martin L. Fineman (CA State Bar No. 104413)
2   DAVIS WRIGHT TREMAINE LLP
    505 Montgomery Street, Suite 800
3   San Francisco, California 94111
    Telephone:     (415) 276-6500
4   Facsimile:     (415) 276-6599
    Email: martinfineman@dwt.com
5           suzannetoller@dwt.com

6   Peter Karanjia (admitted *pro hac vice*)
    Geoffrey S. Brounell (admitted *pro hac vice*)
7   DAVIS WRIGHT TREMAINE LLP
    1919 Pennsylvania Avenue, NW, Suite 800
8   Washington, D.C. 20006
    Telephone:     (202) 973-4200
9   Email: peterkaranjia@dwt.com
            geoffreybrounell@dwt.com
10
    Attorneys for Plaintiff
11  MetroPCS California, LLC

12              IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                   SAN FRANCISCO DIVISION

15  METROPCS CALIFORNIA, LLC,              Case No. 3:17-cv-05959-SI
16              Plaintiff,
17         v.                              SECOND AMENDED COMPLAINT FOR
                                           DECLARATORY AND INJUNCTIVE
18  MICHAEL PICKER, President of the California   RELIEF
    Public Utilities Commission, in his official
19  capacity; MARTHA GUZMAN ACEVES,
    Commissioner of the California Public Utilities   TRIAL BY JURY DEMANDED
20  Commission, in her official capacity; CARLA J.
    PETERMAN, Commissioner of the
21  California Public Utilities Commission, in her official
    capacity; LIANE M. RANDOLPH,
22  Commissioner of the California Public Utilities
    Commission, in her official capacity;
23  CLIFFORD RECHTSCHAFFEN, Commissioner
    of the California Public Utilities Commission, in
24  his official capacity,
25              Defendants.
26
27
28

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

## SUMMARY OF COMPLAINT

1.     This lawsuit challenges an unprecedented and unconstitutional effort by the California Public Utilities Commission ("CPUC") to require prepaid wireless carriers to assess surcharges on revenues that they earn from providing *interstate* services that are "bundled" with *intrastate* services in their prepaid wireless plans.  These prepaid plans offer consumers the convenience of paying for wireless service up-front, without annual (or long-term) contractual commitments and early-termination fees, and without having to undergo a credit check.  Plaintiff MetroPCS California, LLC ("MetroPCS") is a provider of prepaid wireless service that operates nationally, including in California.  It offers consumers a variety of prepaid plans to meet their individual needs, including voice, data, and text plans ranging from $30 to $60 per month.  These plans allow MetroPCS's prepaid customers to make wireless voice calls within the State of California, call outside the state, send and receive text messages, and use interstate data services that allow them to go online and use other popular features.

2.     The CPUC uses the surcharges at issue to finance its six "Universal Service" funds—which have more than $1 billion in public money devoted to California-specific programs for 2016-2017—as well as the agency's operating budget.  For years, the CPUC properly limited the imposition of its surcharges to assessments on revenues carriers derive from providing *intrastate* telecommunications services, such as voice calls that originate and terminate within the State of California, as opposed to calls that cross state lines ("interstate voice service") or other interstate services, such as mobile broadband internet access service ("mobile broadband").  And for years, MetroPCS assessed, collected and remitted to the CPUC—and continues to assess, collect and remit—the surcharges associated with the intrastate components of its prepaid wireless plans.

3.     This longstanding approach was consistent with—and dictated by—both federal and state law.  California law not only limits the imposition of the various surcharges to intrastate telecommunications services, but federal laws preempt any state effort to impose surcharges on interstate services, such as interstate voice or mobile broadband service.

4.     In September 2014, the California Legislature enacted the "Prepaid Mobile

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

Telephony Services Surcharge Collection Act" (the "Prepaid Collection Act" or the "Act"), effective January 1, 2016.  The Act was designed to address the lack of a comprehensive mechanism for collecting the pre-existing state surcharges directly from customers of prepaid wireless service.  (Although MetroPCS has consistently assessed and collected the requisite surcharges for its prepaid services from its customers, most other prepaid service providers and all third-party retailers were not doing so.)  The Act did not purport to impose any new surcharges on purchases of prepaid wireless services in California.  Rather, it merely aggregated those surcharges and created a single point-of-sale collection mechanism for the various surcharges that the CPUC already imposed on *intrastate* wireless telecommunications service.  *See* Cal. Rev. & Tax. Code § 42002(e).

5.      In November 2015, the CPUC issued its first resolution to implement the Prepaid Collection Act, effective January 1, 2016.  Resolution T-17504 (the "2016 Resolution").  In compliance with both federal and state law, and consistent with the CPUC's prior practice, the 2016 Resolution limited the imposition of the various state surcharges to revenues prepaid carriers derive from providing intrastate service.  Specifically, it required those carriers to assess a flat-rate combined surcharge "on prepaid wireless telephone service *intrastate revenues subject to surcharge* and collected from end-users in California."  *Id.* at 1 (emphasis added).  The CPUC recognized that "[t]he Act … supports the adoption of a rate that is *only applied to intrastate* services."  *Id.* at 14 (emphasis added).

6.      In November 2016, however, the CPUC abruptly changed course.  For the first time, the CPUC required prepaid carriers to impose a surcharge "*on the total sales price*" of prepaid wireless service bundles, effective January 1, 2017.  *See* Resolution T-17542 (the "2017 Resolution") at 1 (emphasis added).  By definition, therefore, the 2017 Resolution impermissibly required MetroPCS and other prepaid carriers to impose a surcharge on MetroPCS's *interstate* revenues (including revenues attributable to the broadband and interstate voice service components of its prepaid bundles).  In October 2017, the CPUC denied MetroPCS's request to modify the 2017 Resolution.  *See* Resolution T-17568 (the "2017 Reaffirming Resolution").  The CPUC again reaffirmed this novel approach in November 2017, after this lawsuit commenced,

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

when it made only a "slight" revision to the 2017 Resolution for calendar year 2018.  *See* Resolution T-17579 (the "2018 Resolution," and collectively with the 2017 Resolution and 2017 Reaffirming Resolution, the "Contested Resolutions").

7.       The Contested Resolutions are preempted both on their face and as applied to MetroPCS.  By imposing a surcharge on interstate services (including mobile broadband and interstate voice service), the Contested Resolutions directly conflict with federal law, including the Communications Act of 1934, the Mobile Telecommunications Sourcing Act of 2000, and various orders of the Federal Communications Commission ("FCC").  In addition, the Contested Resolutions run afoul of the Constitution's dormant Commerce Clause.

8.       The CPUC conceded that it may not impose its surcharge on interstate revenues: "The Commission agrees … that[] service[] which has been classified as interstate and/or international [is] not subject to California's intrastate service surcharges."  2017 Resolution at 17; *see also* 2017 Reaffirming Resolution at 12 n.43 ("We do not disagree that the CPUC may not impose a state surcharge on interstate or non-surchargeable services.").  The CPUC therefore attempted to salvage its unprecedented approach of imposing a surcharge "on the total sales price" of prepaid service by applying an "intrastate allocation factor" as a proxy for determining the percentage of each prepaid carrier's intrastate revenues.  Specifically, the CPUC adopted a *single* 72.75% adjustment factor in the 2017 Resolution (for calendar year 2017) and a 69.45% adjustment factor in the 2018 Resolution (for calendar year 2018) that it applies to *all* prepaid plans to determine the amount of carrier revenues that are surchargeable (i.e., the revenues purportedly derived from the sale of purely intrastate services).  Under this unlawful approach, the CPUC multiplies the base surcharge rate by the intrastate factor to arrive at an "adjusted" rate that the agency then requires carriers to assess on *all revenues* derived from the sale of a prepaid plan.  This is mathematically identical to applying the surcharge to the entire price of a prepaid plan and multiplying that total price by the intrastate factor to arrive at the revenues base to which the surcharge is applied.  For example, pursuant to the 2017 Resolution's adjustment factor, for a $60 prepaid plan of voice, broadband data, and other services, the CPUC deems $43.65 ($60 x 72.75%) to be the surchargeable portion of the plan.  In other words, under the 2017 Resolution,

DAVIS WRIGHT TREMAINE LLP

3

the CPUC simply assumes that, for *every* prepaid plan sold during 2017, 72.75% of each prepaid carrier's revenues is attributable to intrastate voice service or other surchargeable intrastate telecommunications service.  Similarly, under the 2018 Resolution, the CPUC assumes that, for *every* prepaid plan sold during 2018, 69.45% of each prepaid carrier's revenues is attributable to intrastate voice service or other surchargeable intrastate telecommunications service.  The CPUC made these assumptions even though intrastate vs. interstate revenue allocations vary among carriers and among prepaid plans (some plans, for example, have a larger broadband data allotment than others, so a larger percentage of revenues from those plans are interstate).

9.      The CPUC's attempt to justify its unlawful assessment of interstate revenues is fatally flawed for several reasons.  *First*, a mandatory one-size-fits-all revenue allocation is irreconcilable with the Mobile Telecommunications Sourcing Act and the FCC's Universal Service rules and procedures.  In particular, the FCC has prescribed in detail how carriers may allocate their interstate vs. intrastate revenues for federal Universal Service reporting, including electing to report those allocations on an *individualized* basis (either reporting "actual" interstate revenues or reporting those revenues based on auditable traffic studies or analyses).  The CPUC mandate that all carriers must assess and remit surcharges based on a single, unsupported allocation for purposes of its own Universal Service programs—the other side of the same coin—upends that carefully drawn federal scheme.

10.     *Second*, even apart from the flaws inherent in a mandatory one-size-fits-all adjustment factor, the specific adjustment factors (72.75% for 2017 and 69.45% for 2018) that the CPUC adopted dramatically *overestimate* the allocation of surchargeable *intrastate* revenues and, by the same token, dramatically *underestimate* the portion of non-surchargeable *interstate* revenues for MetroPCS and other prepaid carriers.  In particular, MetroPCS's responses to the CPUC's data requests showed that both the CPUC's 72.75% and 69.45% intrastate factors woefully underestimate the significant portion of revenues attributable to mobile broadband service—an interstate service—for all four of MetroPCS's core prepaid plans.  For example, for MetroPCS's $60 "Unlimited" high-speed data plan, fully **[BEGIN CONFIDENTIAL]** ███ **[END CONFIDENTIAL]** of the revenues are attributable to broadband.  As a result, even

4

DAVIS WRIGHT TREMAINE LLP

ignoring the revenues attributable to other non-surchargeable components of the Unlimited data plan (e.g., interstate voice service), the CPUC has its analysis almost exactly **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮ **[END CONFIDENTIAL]**:  While the revenues attributable to *interstate* broadband service account for **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮ **[END CONFIDENTIAL]** of the Unlimited data plan's total price, the CPUC forces MetroPCS to assume that almost three-quarters of its revenues are *intrastate*.

11.     The fact that the CPUC has dramatically underestimated the percentage of revenues attributable to interstate broadband service (and other interstate services included in MetroPCS's prepaid plans) is surprising given that the agency has recognized the rapidly growing volume of data usage (as compared with voice usage) for mobile devices.  In a recent decision examining competition in the telephony market, for example, the CPUC acknowledged that "[t]he data to voice ratio on smartphones has soared to roughly 10:1."  CPUC Decision 16-12-025 at p. 32.  And the FCC has similarly observed in recent years that mobile broadband usage is "surging" and is increasingly "important" to consumers as they surf the internet, use social media, apps, and location-based mobile services.[1]  The CPUC's imposition of a uniform adjustment factor simply closes its eyes to this modern-day reality.  In short, the adjustment factor does not cure any conflicts with federal law and still results in an unlawful assessment of revenues attributable to interstate service.

12.     MetroPCS repeatedly pointed out these legal flaws to the CPUC and urged it to

---

[1] *See, e.g., Amendments to Part 4 of the Commission's Rules Concerning Disruptions to Communications*, 31 FCC Rcd 5817, 5904 ¶ 111 n.331 (2016) ("Based on the current widespread use of mobile broadband for communications, information access, location based services, and social media and business networking, … mobile broadband is now an important component of advanced telecommunications services and will play an increasingly important role in the future.") (citation and internal quotation marks omitted); *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans*, 31 FCC Rcd 9140, 9141 ¶ 3 (2016) (recognizing "the increasing importance of mobile broadband to American consumers"); *Policies Regarding Spectrum Holdings*, 27 FCC Rcd 11710, 11711 ¶ 2 (2012) (referring to the "surge in consumer demand for mobile broadband services"); *see also In re Expanding Flexible Use in Mid-Band Spectrum Between 3.7 And 24 GHZ*, 2017 WL 3381027, at *15 (2017) (statement of Commissioner Mignon L. Clyburn) ("There is no question that the demand for wireless broadband services is increasing at a very fast clip.").

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

allow carriers to rely on their individualized allocation methodologies, as required by federal law. The CPUC, however, rejected those arguments at every turn and doubled down on its intrastate adjustment factor as an adequate solution to MetroPCS's concerns.  Unable to obtain relief from the CPUC, MetroPCS now seeks from this Court: (a) a declaration that the Contested Resolutions are unlawful because the CPUC may impose its surcharge solely on revenues derived from *intrastate* telecommunications services included in its prepaid plans; (b) an injunction barring enforcement of the Contested Resolutions; and (c) an injunction forbidding the CPUC from imposing through any other means a surcharge on revenue derived from *interstate* prepaid wireless service.

## PARTIES

13.     Plaintiff MetroPCS California, LLC d/b/a MetroPCS ("MetroPCS") is a Delaware limited liability company with its principal place of business in Bellevue, Washington.

14.     Defendant Michael Picker is a Commissioner and the President of the California Public Utilities Commission.  Defendants Carla J. Peterman, Liane M. Randolph, Martha Guzman Aceves, and Clifford Rechtschaffen are Commissioners of the California Public Utilities Commission.  All defendants are sued solely in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908); *see, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  All defendants are referred to collectively as the "CPUC" or "Commission."  The CPUC conducts business at its headquarters in San Francisco, California, and its other offices in Los Angeles, California, and Sacramento, California.

## JURISDICTION AND VENUE

15.     This civil action arises under the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, et seq.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the United States Constitution.  This Court therefore has jurisdiction over this case pursuant to 28 U.S.C. § 1331.  The Court also has jurisdiction over MetroPCS's dormant Commerce Clause claim, which arises under the Commerce Clause of the U.S. Constitution and 42 U.S.C. § 1983, and under 28 U.S.C. § 1343(a).  *See, e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 450-51 (1991).

16.     This Court has authority to issue injunctive relief under the All Writs Act,

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

28 U.S.C. § 1651.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants reside there and because a substantial part of the events giving rise to MetroPCS's claims occurred there.

18.     The Contested Resolutions harm MetroPCS in several ways, including, but not limited to, (a) making MetroPCS the direct object of an unlawful regulatory action, *see, e.g.*, *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011); (b) subjecting MetroPCS to a direct pecuniary harm by requiring it to assess, collect from its customers, and remit to the CPUC an unlawfully increased surcharge burden, thereby making it more difficult for MetroPCS to compete—including compete with carriers offering post-paid wireless service that are not subject to the increased surcharge burden under the Contested Resolutions—in a highly competitive market that includes prepaid and post-paid wireless services, *see, e.g.*, *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267 (1983) (standing to challenge discriminatory assessment that had "an adverse competitive impact on [plaintiffs'] business"; even if the assessment was "completely and successfully passed on [to plaintiffs' customers], it increas[ed] the price of [plaintiffs'] products as compared to the exempted [products]"); *ACF Indus., Inc. v. Calif. State Bd. of Equalization*, 42 F.3d 1286, 1291 (9th Cir. 1994) (similar); *National Meat Ass'n v. Deukmejian*, 743 F.2d 656, 661 n.3 (9th Cir. 1984) (standing exists even if the cost burden can be shifted to plaintiff service provider's customers), *aff'd*, 469 U.S. 1100 (1985); *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 85-86 (2d Cir. 2009) (standing to challenge fee imposed on plaintiff service provider's customers; "[t]he added cost to its passengers reduces both demand for [plaintiff's] services and [plaintiff's] revenue"); *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 335 F. Supp. 2d 275, 283-84 (D. Conn. 2004) (similar); (c) exposing MetroPCS to the threat of penalties for noncompliance with the Contested Resolutions, *see, e.g.*, *Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996); and (d) depriving MetroPCS of its statutory right under the federal Mobile Telecommunications Sourcing Act to rely on its auditable books and records to determine its properly surchargeable intrastate

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

revenues derived from the sale of its prepaid plans, *see, e.g.*, *Warth v. Seldin,* 422 U.S. 490, 514 (1975); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549, 1553 (2016), *as revised* (May 24, 2016); *De la Torre v. CashCall, Inc.*, No. 08-cv03174-MEJ, 2016 WL 6892693, at *6-10 (N.D. Cal. Nov. 23, 2016). With respect to the competitive harm inflicted upon MetroPCS by the Contested Resolutions, even if MetroPCS does not itself absorb the unlawfully inflated surcharge burden, it would be forced to either increase the cost of service or offer consumers less for the same price—both of which are direct harms to MetroPCS's business and its ability to compete in the marketplace. All of the harms described above are directly traceable to the Contested Resolutions, and they would be redressed if the Court were to grant the relief sought in this Second Amended Complaint.

## THE PREPAID WIRELESS INDUSTRY AND METROPCS

19. In its statement of findings supporting the Prepaid Collection Act—the California statute that the CPUC's Contested Resolutions purport to implement—the California Legislature recognized that "mobile telephony services are an important and growing segment of the communications industry" and that "[p]repaid mobile telephony services are often the only means by which persons with low incomes can obtain limited access to the telecommunications system." Cal. Rev. & Tax. Code § 42002(d). Similarly, the FCC recently recognized that many consumers are drawn to prepaid service because they "may lack the credit background or income necessary to qualify for postpaid service." *Implementation of Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, 2017 WL 4348640, at *19 ¶ 56 (FCC Sept. 26, 2017); *see also* Angelo Zino, *CFRA Industry Survey: Telecommunications* (June 2017) at 52 ("Prepaid wireless customers generally have much lower [average revenue per user] than postpaid customers do.").

20. MetroPCS, an industry leader in the prepaid wireless service market, has been offering prepaid wireless service in California since 2002. It offers consumers a range of prepaid wireless plans—all of which are sold for a flat rate (including all regulatory fees and taxes) at competitive prices. Each of MetroPCS's four "core" prepaid wireless plans enables consumers to make voice calls (interstate and intrastate), use broadband data services to access the internet, and

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

enjoy other features such as text messaging.  The four plans feature escalating allotments of data

for broadband usage.  As reflected in MetroPCS's June 2016 memorandum responding to the

CPUC's questions, those four core plans and corresponding broadband data allotments are as

follows:

- A $30 plan that includes 1GB of high-speed internet access;

- A $40 plan that includes 3GB of high-speed internet access;

- A $50 plan that includes 5GB of high-speed internet access; and

- A $60 plan that includes unlimited high-speed internet access[2]

21.    As MetroPCS explained in its memorandum, as of June 2016, the "Internet Access"

or mobile broadband portion of those plans constituted the following amounts, and percentages

(inclusive of surcharges and taxes), of the overall revenues derived from each plan:

**[BEGIN CONFIDENTIAL]**

- █████████████████████████

- ██████████████████████████

- ██████████████████████████

- ████████████████████████

**[END CONFIDENTIAL]**

These percentage allocations of interstate broadband revenues [**BEGIN CONFIDENTIAL**]

████████████████ [**END CONFIDENTIAL**] today.

22.    Moreover, MetroPCS's responses to the CPUC's data requests explicitly observed

that mobile broadband has been classified as an "interstate service" by the FCC.

23.    The following chart illustrates how, *without even taking account of* revenues

attributable to *interstate voice service* or other non-surchargeable services, the CPUC's intrastate

adjustment factor wildly underestimates the portion of interstate revenues derived from

MetroPCS's core prepaid wireless plans and thus imposes an impermissible surcharge on those

---

[2]  MetroPCS's four core prepaid plans are:  GSM130 ($30), GSMMU40 ($40), GSMMU50 ($50), and GSMMU60 ($60).  In addition, MetroPCS regularly offers promotional plans with varying features (e.g., different amounts of broadband data) at different prices.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

interstate revenues:

**[BEGIN CONFIDENTIAL]**

**[END CONFIDENTIAL]**

24.     Thus, for these plans, the evidence before the CPUC shows that under no circumstances could the percentage of MetroPCS's revenues attributed to non-surchargeable interstate service amount to as little as 27.25% of the total revenues derived from its prepaid wireless service—i.e., the portion of interstate or otherwise non-surchargeable revenue that the CPUC assumes in the 2017 Resolution (100% minus 72.75% for intrastate revenues = 27.25%). Rather, even as applied to MetroPCS's 1GB core plan, the proportion of revenues attributed to interstate broadband service alone is greater, at **[BEGIN CONFIDENTIAL]** ▆▆▆▆ **[END CONFIDENTIAL]**.  And that percentage skyrockets, up to **[BEGIN CONFIDENTIAL]** ▆▆ **[END CONFIDENTIAL]** for MetroPCS's core Unlimited data plan.  Similarly, under the 2018 Resolution, the CPUC's presumption that only 30.55% of any given prepaid plan's revenues are attributable to interstate or otherwise non-surchargeable service (100% minus 69.45% for intrastate revenues = 30.55%) underestimates the portion of revenues attributable to such service. For example, even as applied to the same MetroPCS's 1GB core plan, the CPUC assumes that, at

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

1   most, less than [**BEGIN CONFIDENTIAL**] ███ [**END CONFIDENTIAL**] of revenue is

2   attributable to interstate voice service (30.55% minus [**BEGIN CONFIDENTIAL**] ███ [**END**

3   **CONFIDENTIAL**] broadband allocation = [**BEGIN CONFIDENTIAL**] ███ [**END**

4   **CONFIDENTIAL**]), which is demonstrably incorrect.

5       25.      Because the CPUC has exempted post-paid wireless service from its surcharge, *see*

6   2017 Resolution at 5, 20, the Contested Resolutions also disproportionately burdens pre-paid

7   service relative to post-paid service.

8                          **REGULATORY BACKGROUND**

9                      **Bifurcated Federal-State Regulatory Scheme**

10      26.      The Communications Act of 1934 explicitly recognizes a separation between

11  regulation of interstate and international telecommunications at the federal level and regulation of

12  intrastate telecommunications at the state level.  *See* 47 U.S.C. §§ 151-152.  "Under the

13  Communications Act …, *state utilities*, such as the CPUC, have authority over *intrastate* common

14  carrier communications by wire or radio," while "[t]he *FCC* has authority over *interstate* common

15  carrier communications by wire or radio."  *People of State of Cal. v. FCC*, 75 F.3d 1350, 1356 n.5

16  (9th Cir. 1996) (citing 47 U.S.C. § 152(a) & 152(b); emphases added); *see also Mims v. Arrow*

17  *Fin. Servs., LLC*, 565 U.S. 368, 373 n.1 (2012) ("In general, the Communications Act of 1934

18  grants to the Federal Communications Commission … authority to regulate interstate telephone

19  communications and reserves to the States authority to regulate intrastate telephone

20  communications.") (citing *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360, 369-370

21  (1986)).

22      27.      In the Telecommunications Act of 1996,[3] Congress retained and recognized the

23  ─────────────
    [3] In the 1996 Act, Congress "granted the FCC regulatory authority over those intrastate matters
24  governed by the Act, … and it granted the state commissions limited defined authority over
    interstate traffic under" the statutory provisions that authorize state commissions to arbitrate,
25  enforce, and approve "interconnection agreements" between carriers.  *Pacific Bell v. Pac-West*
    *Telecomm, Inc.*, 325 F.3d 1114, 1126-27 (9th Cir. 2003) (citing, *inter alia*, *AT&T Corp. v. Iowa*
26  *Utils. Bd.*, 525 U.S. 366, 377-78 (1999), and 47 U.S.C. §§ 251-252)).  In short, the 1996 Act
    "*limited* state commissions' authority to regulate local telecommunications competition" and
27  "*removed* a significant area from the States' exclusive control."  *Id.* at 1126-27 (quoting *Iowa*
    *Utils. Bd.*, 525 U.S. at 378 & n.6, 381 & n.8, 385 & n.10) (emphasis added).
28

DAVIS WRIGHT TREMAINE LLP

─────────────
                                      11

fundamental distinction between federal regulation of interstate communications services and state regulation of intrastate communications services. *See, e.g.*, 47 U.S.C. § 254(d) & (f) (added by the 1996 Act); *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 424 (5th Cir. 1999) ("[T]here is substantial support in the statute for a dual regulatory structure in the administration of the universal service program.  Section 254(d) specifically instructs interstate carriers to contribute to the FCC's universal service mechanisms, while § 254(f) instructs intrastate carriers to contribute to the states' individual universal service mechanisms."); H.R. Rep. No. 104-458, at 130 (1996) (Conf. Rep.) (under new Section 254 of the Communications Act, states are permitted to "adopt regulations imposing universal service obligations on *intrastate* services") (emphasis added).

### Universal Service Regulation

28.     One of the policy goals of the Communications Act is to advance "Universal Service," i.e., the availability of telecommunications services to all throughout the Nation.  *See, e.g.*, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1098 (D.C. Cir. 2009) (discussing 47 U.S.C. § 151).  The FCC furthers that goal by requiring every interstate provider of telecommunications (including prepaid wireless carriers such as MetroPCS) to contribute to the federal Universal Service Fund ("USF")—an approximately $10 billion dollar fund that subsidizes efforts to expand access to communications services across the country.  The FCC's regulations require telecommunications carriers such as MetroPCS to "pay a portion of their *international and interstate* telecommunications revenues into the federal universal service fund."  *AT&T Corp. v. Pub. Util. Comm'n of Tex.*, 252 F. Supp. 2d 347, 349-50 (W.D. Tex. 2003) (citing 47 C.F.R. 54.709(a); emphasis added), *aff'd*, 373 F.3d 641 (5th Cir. 2004).

29.     The FCC's rules specify how telecommunications carriers, including wireless carriers, must allocate (a) the portion of their revenues that are attributable to interstate and international voice telecommunications services (and thus subject to federal USF assessments), and (b) the portion of those revenues that are attributable to intrastate services (and thus exempt from federal USF assessments).  Under the FCC's rules, wireless carriers have the *option* of using: (1) their actual revenues allocations, (2) "traffic studies" (*i.e.*, studies that determine each carrier's individual allocation of interstate and international vs. intrastate voice calls based on sampling

DAVIS WRIGHT TREMAINE LLP

methods), *or* (3) a "safe harbor" (i.e., an optional flat-rate allocation specified by the FCC, that carriers may choose to use).  *Universal Service Contribution Methodology*, 21 FCC Rcd 7518, 7533-34, 7551 ¶¶ 27-29, 67 (2006) ("*FCC Contribution Methodology Order*") ("mobile wireless providers retain the option of reporting their actual interstate end-user telecommunications revenues"), *aff'd in relevant part and vacated in part on other grounds*, *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007).  Far from requiring all carriers to use a one-size-fits-all allocation, the FCC has stressed its "policy *preference* that providers contribute to the [federal Universal Service] Fund based on their *actual data* rather than on a safe harbor percentage where possible."  *Id.* at 7534 ¶ 28 (emphasis added).[4]

30.     To the extent wireless carriers choose to use the FCC's "safe harbor," that revenue allocation method attributes 37.1% of a carrier's voice service revenues to interstate and international calls that are subject to USF assessments, and the remaining 62.9% of voice revenue (not total revenue) to intrastate calls.  *FCC Contribution Methodology Order*, 21 FCC Rcd at 7520 ¶ 2.  MetroPCS does not currently use the FCC safe harbor for purposes of federal and state Universal Service reporting, but has a right under federal law to use that allocation methodology should it choose to do so.

31.     The CPUC has expressly recognized that the FCC's options for allocating revenues are "reasonable" methodologies that carriers should be free to use for purposes of their California Universal Service assessments.  *See, e.g.*, CPUC D.15-05-032 at 60 ("The Commission does not

---

[4] Similarly, the FCC's instructions for reporting revenues for federal USF purposes state:

> Where possible, filers should report their amount of total revenues that are intrastate, interstate, and international by using information from their books of account and other internal data reporting systems.

- Where a filer can determine the precise amount of revenues that it has billed for interstate and international services, it should enter those amounts ….

- If the allocation of revenues cannot be determined directly from corporate books of account or subsidiary records, filers may provide on the Worksheet good-faith estimates of these figures.

2017 Telecommunications Reporting Worksheet Instructions (FCC Form 499-A), at 38, available at https://www.usac.org/_res/documents/cont/pdf/forms/2017/2017-FCC-Form-499A-Form-Instructions.pdf ("General Requirements" - "ALLOCATING REVENUES BETWEEN THE JURISDICTIONS").

DAVIS WRIGHT TREMAINE LLP

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

dictate which methodologies a carrier may use for allocating revenue between interstate and intrastate and for collecting user fees and [Universal Service] surcharges from customers…. Reasonable methodologies for calculating intrastate revenue include, but are not limited to: inverse of FCC safe harbor percentage, traffic studies, [and carrier use of] books and records"); *see also* http://www.cpuc.ca.gov/General.aspx?id=9508 (recognizing same options as "reasonable" and non-exclusive "methods to determine intrastate revenues").

32.     The FCC has determined that it would be contrary to the public interest to subject broadband revenues to any federal USF contribution obligations and has therefore (1) decided against imposing such obligations on carriers, and (2) expressly preempted states from imposing their own Universal Service assessments on broadband revenues. *See Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601, 5803 ¶¶ 431-432 (2015) ("*Open Internet Order*") ("[T]he imposition of state-level contributions on broadband providers that do not presently contribute would be inconsistent with our decision at the present time to forbear from mandatory federal USF contributions, and therefore we preempt any state from imposing any new state USF contributions on broadband."). In the *Open Internet Order*, which was upheld on judicial review, *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *reh'g en banc denied*, 855 F.3d 381 (D.C. Cir. 2017), *pet. for cert. docketed* (U.S. Oct. 3, 2017) (No. 17-504), the FCC also reaffirmed its determination that mobile broadband service is an interstate service. *See* 30 FCC Rcd at 5803 ¶ 431 ("[W]e reaffirm the [FCC's] longstanding conclusion that broadband Internet access service is jurisdictionally interstate for regulatory purposes.") (citing, *inter alia*, *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd 5901, 5911 ¶ 28 (2007) ("*Wireless Broadband Internet Access Order*")). In a subsequent order released on January 4, 2018, after this litigation commenced, the FCC expressly maintained the *Open Internet Order*'s preemption of state Universal Service assessments on broadband service and, once again, reaffirmed that broadband is an interstate service. *In re Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, WC Docket No. 17-108, FCC 17-166, at n.736 & ¶¶ 199-200 (rel. Jan. 4, 2018) ("*Restoring Internet Freedom Order*") (citing, *inter alia*, *Open Internet Order* and *Wireless Broadband Internet Access Order*), *available at*

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

http://transition.fcc.gov/Daily_Releases/Daily_Business/2018/db0105/FCC-17-166A1.pdf.[5]  Thus,

notwithstanding its other changes to existing law, the *Restoring Internet Freedom Order* preserved

the status quo concerning federal preemption of state Universal Service assessments on

broadband—an interstate service.  Consistent with this federal law, the CPUC—at least until the

2017 Resolution—has never attempted to apply any state surcharges (including the surcharge at

issue here) to broadband service.  *See* ¶ 43, *infra*.[6]

33.     In addition to directing the FCC to advance Universal Service, the federal

Communications Act authorizes the states to create their own supplemental support mechanisms

to further the same goal, *provided that* those mechanisms are consistent with federal mechanisms,

require carriers to contribute on "an equitable and nondiscriminatory basis," and do not "rely on or

burden Federal universal service support mechanisms."  47 U.S.C. § 254(f); *see also AT&T*

*Commc'ns, Inc. v. Eachus*, 174 F. Supp. 2d 1119, 1123 (D. Or. 2001) ("Section 254(f) constrains

state regulation by prohibiting regulations inconsistent with FCC rules to preserve and advance

universal service, prohibiting discrimination among carriers concerning contribution, and

providing that state regulations shall not rely on or burden federal universal service support

mechanisms.") (citing 47 U.S.C. § 254(f)).  Applying Section 254(f), courts have invalidated

Universal Service fees that state commissions have imposed on telecommunications carriers'

interstate revenues, reasoning that a "double assessment of interstate revenue" (i.e., the same

revenue that is already subject to FCC assessments for the federal USF) "puts multijurisdictional

carriers at a distinct competitive disadvantage compared with the pure interstate carriers" and

therefore "creates an inequitable, discriminatory, and anti-competitive regulatory scheme."  *AT&T*

*Corp. v. Pub. Util. Comm'n of Tex.*, 373 F.3d 641, 647 (5th Cir. 2004).  Moreover, these double

---

[5] The *Restoring Internet Freedom Order* provides that it will become effective "upon the effective date announced when the [FCC] publishes a notice in the Federal Register announcing" approval by the U.S. Office of Management and Budget of certain "information collection requirements" contained in the Order "and the effective date."  *Restoring Internet Freedom Order*, ¶ 354.

[6] Whether text messaging service is properly subject to federal USF contribution requirements is the subject of an open FCC proceeding, *see Universal Service Contribution Methodology*, FCC, WC Docket No. 06-122, GN Docket No. 09-51 (filed Apr. 30, 2012), and the CPUC is similarly addressing in a pending proceeding whether text messaging service is a surchargeable intrastate telecommunications service, *see* CPUC R.17-06-023 (filed June 29, 2017).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

assessments impermissibly "rely on" and "burden Federal universal support mechanisms" in violation of Section 254(f).  *Eachus*, 174 F. Supp. 2d at 1122-24 (quoting 47 U.S.C. § 254(f)).

34.     Because the FCC has carefully crafted rules and procedures that specify how carriers must distinguish between their interstate and intrastate revenues, state commissions' Universal Service mechanisms must, as a matter of federalism, respect those rules and procedures. In this respect, the state and federal allocation rules operate as "two sides of the same coin," *Hawaiian Tel. Co. v. Pub. Util. Comm'n of Haw.*, 827 F.2d 1264, 1275 (9th Cir. 1987), and a divergent approach adopted by a state commission would upend the federal scheme.  The FCC therefore has cautioned that "state universal service contribution requirements do not conflict with federal rules *to the extent* that states calculate the amount of their universal service assessments *in a manner that is consistent with the rules adopted in* the [FCC's] … *Contribution Methodology Order.*"  *Universal Service Contribution Methodology*, 25 FCC Rcd 15651, 15658 ¶ 17 (2010) (emphasis added).  Further, to "avoid a conflict with the [FCC's] rules" and to "ensure that state contributions requirements will not be imposed on the same revenue on which [the relevant service provider] is basing its calculation of federal [USF] contributions," a state "*must allow*" the service provider to "treat as intrastate for state universal service purposes the same revenues that they treat a[s] intrastate under the [Federal Communications] Commission's universal service contribution rules."  *Id.* (emphasis added).

**Federal Policy Favoring "Bundling" of Services**

The FCC's *Bundling Order*

35.     State commissions not only must act in a manner consistent with the FCC's allocation rules and procedures for federal USF contributions, under the Constitution's Supremacy Clause, they also must respect other federal policies.  Among other things, federal law generally bars state efforts to penalize carriers for offering consumers "bundled" service—i.e., packages that afford consumers the convenience of "one-stop-shopping," allowing them to enjoy several different services in a bundle without having to assemble the package of services themselves.  As the FCC has explained, "allowing all carriers to bundle products and services is generally procompetitive and beneficial to consumers.  Bundling encourages competition by giving carriers

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

flexibility both to differentiate themselves from their competitors and to target segments of the consumer market with product offerings designed to meet the needs of individual customers." *Policy and Rules Concerning Interstate, Interexchange Marketplace*, 16 FCC Rcd 7418, 7426 ¶¶ 14-15 (2001) ("*FCC Bundling Order*").  "Consumers benefit from the opportunity to obtain bundled services, and the universal service contribution mechanism should reflect and complement those marketplace and technological developments as much as possible."  *High-Cost Universal Serv. Support*, 24 FCC Rcd 6475, 6543 ¶ 106 (2008).

36.     The FCC's *Bundling Order* also affords telecommunications carriers such as MetroPCS "needed flexibility" in how they allocate their interstate vs. intrastate revenues for purposes of Universal Service reporting.  16 FCC Rcd at 7447 ¶ 49.  Specifically, the FCC adopted further "safe harbors"—in addition to the safe harbor discussed above—that allow carriers to "elect to report revenues" from telecommunications services that are "bundled" with, among other things, "enhanced service offerings" (i.e., services such as mobile broadband services[7]). When carriers bundle these services, they may report their revenues "based on the unbundled service offering prices" (excluding any discounts for the assessable "telecommunications service" portion of the bundle), or based on other reasonable and auditable allocation methods.  *Id.* at 7447-48 ¶¶ 50, 53-54; *see also FCC Contribution Methodology Order*, 21 FCC Rcd at 7522-23 ¶ 8 (noting that "the [FCC's] rules further provide a safe harbor for the reporting of telecommunications revenues when bundling telecommunications services with … information services").  Thus, federal law encourages carrier bundling and gives carriers flexibility to report the unbundled prices of each component in their packages.

The Mobile Telecommunications Sourcing Act

37.     Similarly, the Mobile Telecommunications Sourcing Act encourages bundling of mobile services on the ground that this leads to simplified customer bills and lower prices for

_____

[7] Although the regulatory status of broadband service has changed over time, the *FCC Bundling Order* makes clear that its references to "enhanced services" include broadband service.  *See* 16 FCC Rcd at 7420 ¶ 2 ("Enhanced services are now referred to as 'information services' in the 1996 Act and comprise services such as voice mail, e-mail and *other Internet services*.") (emphasis added).

DAVIS WRIGHT TREMAINE LLP

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

consumers.  This federal statute was enacted to create a nationwide rule for determining which

jurisdiction has the authority to impose assessments on mobile telecommunications services.

Under the statute's "sourcing" rule, all mobile telecommunications services are "sourced," or

assigned, to a customer's "place of primary use" (i.e., the address where the customer's use of the

services "primarily occurs.").  4 U.S.C. §§ 117, 124(8).  The Mobile Telecommunications

Sourcing Act also contains provisions that protect wireless carriers from state taxes and fees that

effectively penalize them for bundling their services.  Specifically, subject to exceptions not

relevant here, the statute prohibits states from imposing any fees on "mobile telecommunications

services," i.e., mobile voice service,[8] where (1) the jurisdiction imposing the fees would not

otherwise impose assessments on those services, (2) the carrier has bundled the otherwise non-

assessable service with other services subject to fees, but can use its "books and records that are

kept in the regular course of business" to "reasonably identify" the revenues "not subject to such

… fees," and (3) the non-assessable carrier revenues or "charges" are currently "aggregated with

and not separately stated from charges that are subject to" fees.[9]  In other words, so long as the

carrier can segregate the revenues attributable to a service that would not otherwise be subject to

assessment, such as interstate mobile voice service, federal law forbids "taxing jurisdiction[s]"[10]

---

[8] The Mobile Telecommunications Sourcing Act equates "mobile telecommunications services" with "the provision of commercial mobile radio service," as defined in FCC regulations.  *See* 4 U.S.C. § 124(1) (citing 47 C.F.R. § 20.3 (version in effect as of June 1, 1999)).  The cross-referenced FCC regulation governs mobile voice service.  *See, e.g.*, *Amendment of Commission's Rules to Establish Part 27, The Wireless Communications Service*, 12 FCC Rcd 10785, 10833 ¶ 90 (1997) (referring to "conventional mobile voice CMRS," i.e., commercial mobile radio service), *recon. granted in part*, 12 FCC Rcd. 3977 (1997).

[9] 4 U.S.C. § 123(b) provides: "If a taxing jurisdiction does not otherwise subject charges for mobile telecommunications services to taxation and if these charges are aggregated with and not separately stated from charges that are subject to taxation, then the charges for nontaxable mobile telecommunications services may be subject to taxation *unless* the home service provider can reasonably identify charges not subject to such tax, charge, or fee from its books and records that are kept in the regular course of business."  (Emphasis added.)

[10] Although the CPUC's surcharge is not a tax, *see* 2017 Resolution at 16, the Mobile Telecommunications Sourcing Act defines a "taxing jurisdiction" as "any of the several States, … or assessment jurisdiction, or any other political subdivision within the territorial limits of the United States with the authority to impose a tax, *charge, or fee*."  *Id.* § 124(12) (emphasis added).  *See also id.* § 116 (Mobile Telecommunications Sourcing Act applies to "*any tax, charge, or fee levied by a taxing jurisdiction* …, regardless of whether such tax, charge, or fee is imposed on the

---

18

such as the CPUC from imposing taxes or fees on revenues associated with the non-assessable

service, which would penalize the carrier for bundling the non-assessable voice service (e.g.,

interstate voice service) with assessable services.

**California's Prepaid Collection Act**

38.     On September 30, 2014, the California Legislature enacted "The Prepaid Mobile

Telephony Services Surcharge Collection Act" (the "Prepaid Collection Act" or the "Act"), with

an effective date of January 1, 2016.  The Act—which is codified in both the California Public

Utilities Code and the California Revenue & Taxation Code—remains in effect until January 1,

2020.

39.     The Prepaid Collection Act imposes a surcharge—statutorily labeled the "prepaid

MTS surcharge"—on all purchases of prepaid wireless services made in the State of California.

40.     Significantly, the Act did not purport to impose any *new* surcharges on purchases

of prepaid wireless services in California.  Rather, it merely aggregated and created *one* collection

mechanism for the following *pre-existing* surcharges:

- The CPUC's six Public Purpose Program Surcharges (the "Universal
  Service Surcharges"):
    - (1)     the Universal Lifeline Telephone Service ("California Lifeline");
    - (2)     the Deaf and Disabled Telecommunications Program ("DDTP")
    - (3)     the California High Cost Fund-A ("CHCF-A");
    - (4)     the California High Cost Fund-B ("CHCF-B");
    - (5)     the California Teleconnect Fund ("CTF"); and
    - (6)     the California Advanced Services Fund ("CASF")
- The CPUC's User Fee (the "CPUC Fee");
- The Emergency Telephone Users surcharge; and
- The local taxes/911 service fees.

41.     In this lawsuit, MetroPCS challenges the application of only the first two categories

vendor or customer of the service and regardless of the terminology used to describe the tax,
charge, or fee.") (emphasis added).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

of these four pre-existing surcharges:  the six "Universal Service Surcharges" and the "CPUC

Fee," each of which the CPUC sets.  *See* Cal. Pub. Util. Code §§ 319(b)-(d) & 431.  These are the

portions of the "prepaid MTS surcharge" that the CPUC administers.  (This Complaint refers to

both the "Universal Service Surcharges" and the "CPUC Fee" collectively as the "Surcharge."

Where the Complaint intends to refer to only one of the Surcharges, it will refer to it by name.)

42.     As acknowledged by the CPUC, the Surcharge is a regulatory fee, not a sales tax.

*See* 2017 Resolution at 16.  The CPUC imposes obligations to assess and collect the Surcharge

from consumers on a narrow, defined target class—prepaid wireless companies operating in

California—and the funds collected for the six Universal Service Surcharges are specifically

earmarked for the CPUC's "universal service funds," Cal. Rev. & Tax. Code § 42023(b)(2), while

the CPUC Fee is used to defray the CPUC's operating costs, *see id.* (CPUC Fee to be allocated to

Public Utilities Commission Reimbursement Account); 2017 Resolution at 2 ("The CPUC collects

the annually-established user fee from all telephone corporations providing services to end users

within California.  Revenue collected in the form of this fee fund the Public Utilities Commission

Utilities Reimbursement Account, which provides the Commission's operating budget.").  The

Universal Service Surcharges are also imposed in connection with regulatory activities (as

opposed to unrelated funding purposes), and the CPUC calibrates the amount of the Universal

Service Surcharges based on its estimate of the cost of providing the supported services.  The

2016-2017 annual budget for the combined six funds financed by the CPUC's Universal Service

Surcharges exceeds $1 billion.[11]

43.     Consistent with the applicable federal law, the implementing CPUC orders and

resolutions, as well as California statutory provisions governing the Surcharge, make clear that the

CPUC is limited to imposing the Surcharge *only* on revenues attributable to *intrastate*

telecommunication services.  *See, e.g.*, General Order 153 § 2.11 ("California Lifeline is funded

by a surcharge on all end users of *intrastate* telecommunications services for discounted services

---

[11] For Financial Year 2016-2017, the funding for the six Universal Service funds is as follows: (1) California Lifeline ($483.2 million); (2) DDTP ($68 million); (3) CHCF-A ($43.1 million); (4) CHCF-B ($22.3 million); (5) CTF ($147.5 million); and (6) CASF ($315 million).  *See* http://www.cpuc.ca.gov/surchargesfeestaxes/ ("Fact Sheet" for each listed fund).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

to eligible customers."); Cal. Pub. Util. Code § 2881(g) (for the DDTP, "[t]he commission shall establish a rate recovery mechanism through a surcharge not to exceed one-half of 1 percent uniformly applied to a subscriber's *intrastate* telephone service."); Resolution T-17491 at 3 ("CHCF-A is funded by a surcharge assessed on revenues collected from end-users for *intrastate* telecommunications services subject to surcharge."); Resolution T-17446 at 1 ("The CHCF-B program is funded by a surcharge assessed on *intrastate* telecommunications service revenues collected from end-users."); Resolution T-17496 at 2 ("The CTF Program is funded by a surcharge assessed on revenues collected from end users for *intrastate* telecommunications services subject to surcharge."); Resolution T-17536 at 1 ("All regulated telecommunication carriers shall revise the CASF surcharge rate from 0.464% to 0.00% on their end-user charges billed for *intrastate* telecommunications services beginning December 1, 2016."); Cal. Pub. Util. Code § 432(c)(3) (in calculating the Commission Fee, the CPUC must allocate "the ratio that each corporation's gross *intrastate* revenues bears to the total gross *intrastate* revenues for the class.") (emphases added).

44.    Consistent with these provisions of California law, the Prepaid Collection Act added the following language to the California Public Utilities Code:

> (g)(2) When reporting prepaid mobile telephony service revenues to the commission, a prepaid MTS provider or direct seller shall report the *intrastate revenue portion subject to the reimbursement fee and the telecommunications universal service surcharges*, as well as total state mobile telephony service revenue.

Cal. Pub. Util. Code § 319(g)(2) (emphasis added).[12] The "Reimbursement fee" refers to the CPUC Fee, and "universal service surcharges" refer to the six Universal Service Surcharges. *Id.* § 319(a)(2) & (a)(3).

45.    Subject to exceptions where a carrier bundles prepaid service with the sale of a mobile phone, the Prepaid Collection Act further provides that, "if prepaid mobile telephony services are sold in combination with mobile data services or any other services or products for a single price, then the prepaid MTS surcharge and local charges shall apply to the entire price."

---

[12] Different reporting and remittance procedures apply to "indirect sellers"—i.e., retailers such as Walmart. *See* Cal. Rev. & Tax. Code § 42010(d)(1). The provisions governing indirect sellers are not at issue in this case.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

Cal. Rev. & Tax. Code § 42018(a).  Nothing in the statute, however, suggests that the California Legislature intended to impose the Surcharge on interstate revenues, as doing so would directly conflict with federal law, Cal. Pub. Util. Code § 319(g)(2), quoted above, and the other provisions of California law discussed above (*see* ¶ 43, *supra*).

## THE CPUC'S IMPLEMENTATION OF THE PREPAID COLLECTION ACT

### In the 2016 Resolution, the CPUC Properly Limited the Surcharge to Intrastate Revenues

46.     On November 23, 2015, the CPUC issued Resolution T-17504 (the "2016 Resolution"), in which the CPUC first implemented the Prepaid Collection Act.  The 2016 Resolution was in effect from January 1, 2016 to December 31, 2016.

47.     The 2016 Resolution required wireless carriers to assess the Surcharge "on prepaid wireless telephone service *intrastate revenues subject to surcharge* and collected from end-users in California."  2016 Resolution at 1 (emphasis added); *see also id.*, Ordering Paragraph 2, at 20 ("All telephone corporations shall, beginning January 1, 2016, assess the adopted Mobile Telephony Service surcharge on *intrastate* prepaid wireless telephone service revenues subject to surcharge and collected from end-users in California.") (emphasis added).  The 2016 Resolution also required prepaid carriers to "report prepaid wireless *intrastate* revenue subject to surcharge and remit the accompanying surcharges and fees" to the CPUC.  *Id.*, Ordering Paragraph 3 (emphasis added).

48.     The 2016 Resolution was therefore consistent with both state and federal law, which limit the imposition of the Surcharge to intrastate revenue.  In adopting the 2016 Resolution, the CPUC did not suggest that anything in the Prepaid Collection Act (including Revenue & Taxation Code § 42018(a)) required a different approach.  To the contrary, it explained that "[t]he [Prepaid Collection] Act … *supports* the adoption of a rate that is *only applied to intrastate* services.…  We … do not find it consistent with the [Prepaid Collection] Act to calculate a prepaid MTS surcharge rate that would not be limited to intrastate prepaid wireless service revenue."  2016 Resolution at 14 (emphasis added).

### In the 2017 Resolution, the CPUC Assesses the Surcharge on the Entire Prepaid Bundle, Subject to a One-Size-Fits-All 72.75% "Intrastate Allocation Factor"

49.     On November 10, 2016, the CPUC adopted the first contested Resolution in this

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

case, Resolution T-17542 (the "2017 Resolution").  (A copy of the 2017 Resolution is attached to this Complaint as Exhibit A.)

50.     The CPUC concedes in the 2017 Resolution that it may not assess any surcharges or fees on interstate services.  *See* 2017 Resolution at 17 ("The Commission agrees … that, service, which has been classified as interstate and/or international are [sic] not subject to California's intrastate service surcharges.").

51.     Unlike the 2016 Resolution, however, the 2017 Resolution does *not* limit the imposition of the Surcharge to "intrastate revenues subject to surcharge."  Rather, the 2017 Resolution directs that the Surcharge is "to be assessed on the *total sales price of prepaid wireless telephone service and collected from end-users in California.*"  2017 Resolution at 1 (emphasis added); *see also id.*, Ordering Paragraph 2, at 20 ("All telephone corporations shall, beginning January 1, 2017, assess the adopted Mobile Telephony Service surcharge on the total sales price of prepaid wireless telephone service subject to surcharge and collected from end-users in California.").  Thus, on its face, the 2017 Resolution requires prepaid carriers to assess, collect and remit the Surcharge on interstate services and other non-surchargeable services.

52.     The 2017 Resolution rejected arguments made by, among others, MetroPCS that prepaid wireless carriers in its position should have the option of (1) adjusting the "aggregate base rate [of revenues subject to the Surcharge] by an auditable, carrier-specific intrastate factor" (i.e., a methodology consistent with the FCC's approach of allowing carriers to report their actual revenue allocations or to rely on traffic studies) or (2) using the CPUC's 72.75% intrastate factor only as a "safe harbor."  2017 Resolution at 15; *see also* Joint Wireless Carriers' Comments on Draft Resolution T-17542 at 5 & n.9 (carriers should "have the option" of "continu[ing] to utilize carriers-specific intrastate factors" or applying the CPUC's intrastate factor as a "safety factor") (citing, *inter alia*, *FCC Contribution Methodology Order*, 21 FCC Rcd at 7532 ¶ 25).  The CPUC rejected this individualized approach to revenues allocation, instead asserting that its one-size-fits-all rule would treat all carriers "equally."  *See* 2017 Resolution at 15 ("our goal is to ensure all prepaid wireless customers are treated equally and assessed the MTS surcharge in the same manner").

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

53.     Without any explanation for how it arrived at its 72.75% number, the 2017 Resolution asserts that this "adjusted factor … is reasonable to calculate the 2017 MTS surcharge rate." *Id.* at 19.  And while acknowledging that "interstate and/or international" service is "not" properly "subject to California's intrastate service surcharges," *id.* at 17, the CPUC maintains that its 72.75% intrastate adjustment factor cures any concerns.  *Id.* at 10 n.20 ("The California intrastate factor for prepaid wireless services was calculated to represent that portion of prepaid wireless service revenue subject to the MTS surcharge.  This therefore excludes interstate, international, and non-jurisdictional revenues.").  Applying its mandatory, one-size-fits-all intrastate adjustment factor, the CPUC multiplied the 2017 base Surcharge rate (7.0854% of assessable revenues) by 72.75%, to arrive at an adjusted Surcharge rate of 5.15%, which the Resolution directs prepaid carriers to assess, collect and remit on their entire bundles.  *Id.* at 11, 20.

**The CPUC Refuses to Stay the Effective Date of the 2017 Resolution**

54.     In mid-December 2016, MetroPCS again asked the CPUC to allow carriers to either "assess and collect the unadjusted MTS Surcharge Rate [on their] ... intrastate revenue" as determined by their "auditable books and records" or use the CPUC's intrastate adjustment factor as a "safe harbor."  Joint Prepaid Carriers' Application for Modification of Resolution T-17542 (filed Dec. 13, 2016) at 14.  At the same time, MetroPCS sought a stay of the effective date of the 2017 Resolution, arguing, among other things, that "the Resolution would – contrary to Federal and state law – require the imposition of the surcharge" on all services included in a prepaid wireless service bundle, "including interstate telephone service and mobile broadband, neither of which is properly subject to surcharge by the Commission."  Letter dated December 14, 2016 from Leon Bloomfield, Counsel to MetroPCS, to Timothy J. Sullivan, Executive Director, CPUC, at 2; *see also id.* at 6 & n.20 (imposing the Surcharge "on otherwise non-surchargeable revenue … would be inconsistent with federal law.").  In a two-page letter, the CPUC denied MetroPCS's request for a stay, stating that "MetroPCS does not identify any technical or procedural limitations that would otherwise prevent [it] from complying with" the Resolution.  Letter dated December 21, 2016 from Ryan Dulin, Deputy Executive Director, CPUC, to Mr. Bloomfield.

DAVIS WRIGHT TREMAINE LLP

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

55.     The following month, MetroPCS filed an Amended Application urging the CPUC to modify its 2017 Resolution, in which it again detailed the Resolution's incompatibility with federal law, including its conflict with the federal Communications Act, FCC orders, and the dormant Commerce Clause.  Joint Prepaid Carriers' Amended Application for Modification of Resolution T-17542 (Jan. 24, 2017) at 13-18.  And, again, MetroPCS asked the CPUC to allow prepaid wireless service providers to apply the base Surcharge rate to the providers' "intrastate revenue only based on their well-established methodologies (including auditable books and records)." *Id.* at 21.

### The CPUC Refuses to Modify the 2017 Resolution

56.     In August 2017, the CPUC issued in draft form a Resolution denying MetroPCS's request for modification of the 2017 Resolution.  MetroPCS filed detailed comments on the draft Resolution, explaining that the CPUC's "'one-size-fits-all' intrastate factor … is irreconcilable with well-established industry practice and existing law," resulting in the imposition of "unlawful surcharges on mobile broadband and interstate voice traffic" in violation of the federal Communications Act and the Mobile Telecommunications Sourcing Act, as well as FCC orders.  Letter dated September 4, 2017 from Mr. Bloomfield, et al., Counsel to MetroPCS, to Cynthia Walker, Director of the Communications Division, CPUC, at 1-2, 5 & nn.3, 15-17.  MetroPCS further explained that, even "[a]part from the fundamental error of the Draft Resolution's one-size-fits-all approach to assessing surcharges, the Commission's methodology for calculating its 'intrastate revenue allocation factor' is fatally flawed."  *Id.* at 2.  Citing its responses to the CPUC's data requests, MetroPCS pointed out that, among other things, the 72.75% intrastate adjustment factor significantly underestimates the revenues attributable to broadband service—an interstate service—thereby impermissibly "impos[ing] surcharges on data/internet revenue which is jurisdictionally *interstate* as a matter of law."  *Id.* at 4 & n.12.

57.     In a subsequent submission, MetroPCS explained that nothing in the Prepaid Collection Act—including California Revenue & Taxation Code § 42018(a), *see* ¶ 45, *supra*—prevented the CPUC from granting the relief sought.  Letter dated September 25, 2017 from Mr. Bloomfield, et al., Counsel for MetroPCS, to Hien Vo Winter, Legal Division, CPUC, et al.

DAVIS WRIGHT TREMAINE LLP

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

In particular, MetroPCS explained that, under well-established principles of statutory interpretation applied by California courts, the CPUC should not read Section 42018(a) in isolation, but instead should construe it in conjunction with the entire statutory scheme, including Public Utilities Code § 319(g)(2) (which the Prepaid Collection Act added) and the multiple provisions of California law that limit the assessment of the Surcharge to intrastate revenues. *Id.* at 1-3; *see also* 2016 Resolution at 14 (quoting Pub. Util. Code § 319(g)(2) for the proposition that "[t]he Act … supports the adoption of a rate that is only applied to intrastate services").  In addition to underscoring the CPUC's obligation to follow controlling federal law, MetroPCS explained that the CPUC could (and must) construe Section 42018(a)'s reference to "apply[ing]" the Surcharge "to the entire price" of a prepaid service bundle in a way that avoids both constitutional concerns and conflicts with federal law. *Id.* at 4 & n.12 (citing *People v. Brown*, 6 Cal. 4th 322, 335 (1993)).  Specifically, the Surcharge could be "*applied* to the 'entire price' but *assessed* only on the intrastate revenue associated with the given plan," by allowing carriers to use their own "*individualized* 'intrastate adjustment factors' (which would vary from one carrier to another and from one prepaid plan to another) to the unadjusted rate.  In other words, each carrier would rely on its auditable methodologies for segregating surchargeable intrastate revenues from non-surchargeable interstate and other revenues and then apply that methodology to adjust the unadjusted rate.  This would have the net effect of applying a surcharge to the entire bundle, but that surcharge rate would then be subject to individualized adjustments to account for the varying allocations of surchargeable vs. non-surchargeable revenues among carriers and among particular prepaid plans." *Id.* at 5 & n.13.  MetroPCS stressed that this approach would avoid reading Section 42018(a) in a way that not only inexplicably departs from the entire statutory scheme's focus on intrastate revenues, but would also render the Prepaid Collection Act "at war with itself" by, among other things, contradicting the requirement that a prepaid service provider report only "*the intrastate revenue portion* [of service] subject to the reimbursement fee and the telecommunications universal service surcharges." *Id.* at 3 (quoting Cal. Pub. Util. Code § 319(g)(2)).

        58.      Finally, on September 26, 2017, MetroPCS wrote directly to the Defendant

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

Commissioners, urging them to reject the draft Resolution or at least hold the item.  Among other things, MetroPCS reiterated that the draft Resolution "unlawfully compels prepaid wireless carriers to impose surcharges on interstate (e.g., data/internet) and other non-surchargeable revenue in direct conflict with federal and state law," and "[a]dopts a *mandatory* adjustment factor" that "incorrectly assumes that 72.75% (almost three-quarters) of every bundle of prepaid wireless service" is "attributable to intrastate voice [service] in contravention of record evidence, common consumer experience, and the Commission's own findings regarding the significant (and growing) amount of wireless data usage."  Letter dated September 26, 2017 from Mr. Bloomfield, et al., Counsel for MetroPCS, to the Commissioners at 1-2.

59.     On October 12, 2017, the CPUC adopted Resolution T-17568—a modified version of the Draft Resolution—which denied MetroPCS's request to modify the 2017 Resolution (the "2017 Reaffirming Resolution").  (A copy of the 2017 Reaffirming Resolution is attached to this Complaint as Exhibit B.)

60.     In the 2017 Reaffirming Resolution, the CPUC opined that the Prepaid Collection Act compels its one-size-fits-all intrastate factor.  According to the CPUC, "[t]he Act requires … all prepaid wireless sellers to assess the prepaid MTS surcharge in the same manner, i.e., *on the entire sales price* of a prepaid MTS retail transaction."  2017 Reaffirming Resolution at 8 (emphasis added).  Rejecting MetroPCS's arguments that prepaid carriers should be permitted to rely on their well-established methodologies (including auditable books and records) for determining their intrastate revenues on an individualized basis, or alternatively, use the CPUC's intrastate factor as a safe harbor, the CPUC asserted that "[t]he plain language" of the Prepaid Collection Act "demonstrates that the Act does not allow for the seller to determine the treatment of revenues subject to the surcharge.  To the contrary, the Act mandates the same application of the prepaid MTS surcharge" by all sellers of prepaid wireless service, including prepaid carriers such as MetroPCS and indirect sellers such as third-party retailers.  2017 Reaffirming Resolution at 6 (emphasis in original).  The CPUC did not address MetroPCS's statutory interpretation arguments.

61.     In an effort to reconcile its new reading of the state statute with the contrary

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

approach it took in the 2016 Resolution, the CPUC stated that it "could not adjust the CPUC portion of the 2016 prepaid MTS surcharge rate, which was 8.51% [*i.e.*, the 2016 base rate], because it was the first year the Act was implemented and the Commission did not have the requisite prepaid MTS jurisdictional allocation and revenue data from carriers to calculate an intrastate allocation factor for that year." *Id.* at 4 n.11.  The CPUC did not, however, identify any provision in the Prepaid Collection Act that would authorize the agency to depart from what it otherwise—incorrectly—understands to be a mandate to impose a single, invariable surcharge rate on *all* revenues, including interstate revenues, derived from all prepaid wireless carriers' plans. Nor did the CPUC's 2016 Resolution make any mention of adopting a contrary statutory interpretation due to the absence of any relevant data.

62.     Ignoring MetroPCS's arguments under federal law, the CPUC asserted without factual support that its 72.75% intrastate adjustment factor adequately limits assessment of the Surcharge to intrastate revenues.  *See id.* at 3 & 11-12 n.43 ("We need not … address the legal arguments raised in MetroPCS/T-Mobile's Amended Application concerning federal preemption of interstate surcharges because as explained, the CPUC MTS rate is an intrastate surcharge.").

63.     Finally, the CPUC stated that it calculated its 72.75% intrastate factor by analyzing data provided to it by 14 companies that represent 27 prepaid wireless carriers operating in California.  *See id.* at 10-11.[13]  The CPUC explained that its staff "arrive[d] at the 72.75%" intrastate factor by relying on "the average of" certain revenue allocations reported by the respondent carriers.  *Id.* at 11.  At the same time, the CPUC still agreed that it "may not impose a state surcharge on interstate or non-surchargeable services."  *Id.* at 12 n.43.

**In the 2018 Resolution, the CPUC Makes a Minor Revision to its Intrastate Factor**

64.     On November 16, 2017, the CPUC released Resolution T-17579 (the "2018 Resolution"), which makes only a "slight" revision to its intrastate factor for calendar year 2018. 2018 Resolution at 18.  (A copy of the 2018 Resolution is attached to this Complaint as Exhibit C.)  Specifically, the CPUC adjusted its intrastate factor from 72.75% to 69.45%.  *Id.* (describing

---

[13] According to the CPUC, five other companies either provided no response to the agency's data requests or provided "unusable data."  2017 Reaffirming Resolution at 10 n.40.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

the change as a "slight reduction to the intrastate portion"). Based on this new intrastate factor, as well as an increase in the unadjusted Surcharge rate, the 2018 Resolution establishes a new, adjusted Surcharge rate of 5.55%, effective January 1, 2018. *Id.* at 2, 18-19 & App. A.

65. In so doing, the CPUC "incorporate[d] by reference" its reasoning in the 2017 and 2017 Reaffirming Resolutions rejecting MetroPCS's arguments and reaffirmed that the Surcharge must be "assess[ed] . . . in the same manner . . . on the entire price of prepaid mobile telephony service sold in a retail transaction involving a bundle." *Id.* at 21. The CPUC also explained that it calculated its revised intrastate factor "by taking the average of five categories of information," including the flawed intrastate factor for 2017. *Id.* at 17.

66. The 2018 Resolution therefore suffers from the same flaws as the 2017 and 2017 Reaffirming Resolutions, which it explicitly reaffirms. The CPUC's negligible adjustment to the intrastate factor certainly does not cure the conflicts with federal law and constitutional concerns addressed in MetroPCS's original Complaint, the First Amended Complaint, or this Second Amended Complaint.

67. MetroPCS continued to assess and collect the Surcharge on its intrastate revenues, in accordance with the 2016 Resolution, while its request for modification of the 2017 Resolution was pending before the CPUC. Upon the CPUC's denial of that request on October 12, 2017, MetroPCS promptly commenced this challenge to the unlawful imposition of the Surcharge on its interstate revenues.

## CLAIMS FOR RELIEF

### First Claim for Relief Against All Defendants:

### Violation of Article VI of the United States Constitution

68. MetroPCS realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69. The Supremacy Clause of Article VI of the Constitution of the United States bars the CPUC from adopting any rule that conflicts with federal law.

70. The Contested Resolutions conflict with and stand as an obstacle to the fulfilment of federal law. Accordingly, they are preempted both facially and as applied to MetroPCS.

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

71.     These conflicts with federal law, which arise under the doctrines of "express preemption," "obstacle preemption," and "field preemption," include (but are not limited to) the following:

(a)     The Contested Resolutions violate Section 254(f) of the Communications Act.  They impose the Universal Service Surcharges on revenues derived from the sale of interstate voice service contained in a prepaid wireless service bundle, thereby assessing state Universal Service surcharges on the same revenues that are already subject to federal Universal Service assessments.  This "double assessment" conflicts with all three provisions of Section 254(f):  (1) it is "inconsistent with" the FCC's Universal Service rules, (2) it is not imposed on an "equitable and nondiscriminatory basis," and (3) it "rel[ies] on" and "burden[s] Federal universal support mechanisms."  47 U.S.C. § 254(f).  The Resolutions also run afoul of Section 254(f) on the additional ground that they impose inequitable and discriminatory Universal Service Surcharges that disproportionately burden prepaid carriers and their customers relative to post-paid carriers and customers.

(b)     The Contested Resolutions conflict with federal law, including Section 254(f) of the Communications Act and FCC orders implementing that statute, by imposing the Universal Service Surcharges on revenues attributable to mobile broadband service—an interstate service.  Given the nature of mobile broadband as an inherently interstate service, it is not possible to carve out an exclusively "intrastate" portion of that service, and any state Universal Service assessments on mobile broadband conflict with federal policy and objectives.  Moreover, the Contested Resolutions are expressly preempted by the FCC's *Open Internet Order* and *Restoring Internet Freedom Order*.  The *Open Internet Order*, which the *Restoring Internet Freedom Order* reaffirmed on this issue, unequivocally states: "the imposition of state-level contributions on broadband providers that do not presently contribute would be inconsistent with our decision at the present time to forbear from mandatory federal USF contributions, and therefore we preempt any state from imposing any new state USF contributions on broadband."  30 FCC Rcd at 5803 ¶¶ 431-432; *see also id.* at 5836-37 ¶ 490 & n.1477; *Restoring Internet Freedom Order* at n.736 ("[W]e continue to preempt any state from imposing any new state universal service fund

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

contributions on broadband Internet access service.") (citing *Open Internet Order*, 30 FCC Rcd at 5836-37 ¶ 490 n.1477).  By, for the first time, requiring prepaid carriers such as MetroPCS to assess and collect Universal Surcharges on their broadband revenues, the Contested Resolutions impose an impermissible new contribution requirement on an inherently interstate service in flagrant violation of federal law (including the FCC's express directives and longstanding federal policy).

          (c)     The Contested Resolutions conflict with the Mobile Telecommunications Sourcing Act, which prohibits states from imposing fees on a mobile voice service where (1) the governmental entity would not otherwise impose fees on that service, (2) the carrier has bundled the non-assessable service with other services subject to fees, but can use its "books and records that are kept in the regular course of business" to "reasonably identify" the revenues "not subject to such … fee[s]," and (3) the non-assessable carrier revenues or "charges" are currently "aggregated with and not separately stated from charges that are subject to" fees.  4 U.S.C. § 123(b).  All of these conditions are met here.  First, the CPUC "does not otherwise" impose "fees" on "charges for" interstate voice service (a "mobile telecommunications service[]").  *Id.*  Second, MetroPCS is able to segregate its prepaid revenues attributable to interstate voice service (based on its books and records) and repeatedly urged the CPUC to allow it to do so.  Third, MetroPCS does not separately identify the revenues (or "charges") for its interstate voice service on customer bills for prepaid wireless service (e.g., MetroPCS does not separately itemize charges for long-distance service and local calling service).  As a result, the Mobile Telecommunications Sourcing Act expressly prohibits the CPUC from assessing the Surcharge on revenues attributable to interstate voice service.  Moreover, contrary to the CPUC's assertions in the 2018 Resolution (at 22), the statutory exception at 4 U.S.C. § 116(c)(1) for prepaid calling services is irrelevant to this case.  That exception is, by its terms, limited to the "taxing situs" provisions of the Mobile Telecommunications Sourcing Act—i.e., 4 U.S.C. § 117 (captioned "Sourcing rules"), § 122 (captioned "Determination of place of primary use"), and § 124(8) (defining "place of primary use")—and does not extend to the bundling provision (codified at § 123b) that applies here.

          72.     The Contested Resolutions are also preempted both on their face and as applied to

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

MetroPCS because they adopt a mandatory one-size-fits-all intrastate adjustment factor (72.75% for 2017 and 69.45% for 2018). That factor not only fails to cure the Contested Resolutions' impermissible assessment on interstate revenues, but also creates additional conflicts with federal law, including (but not limited to) the following:

(a)     The 72.75% and 69.45% adjustment factors conflict with provisions of the Mobile Telecommunications Sourcing Act that grant wireless carriers the right to use individualized revenues allocations for the wireless voice component of their bundled plans when they have "books and records that are kept in the regular course of business" to "reasonably identify" the revenues "not subject to" the Surcharge, 4 U.S.C. § 123(b)—as is the case for MetroPCS.

(b)     The 72.75% and 69.45% adjustment factors conflicts with the *FCC Contribution Methodology Order*, which gives wireless carriers three options to comply with the FCC's rules for reporting interstate and international voice service revenues subject to federal USF assessments:  carriers may elect to use (a) their actual revenues allocations, (b) traffic studies, or (c) a safe harbor.  *See* 21 FCC Rcd at 7533-34, 7551 ¶¶ 27-29, 67.  The CPUC's Contested Resolutions stand as an obstacle to the fulfillment of that federal policy—which, though it governs federal USF reporting, necessarily affects computations on the other "side[] of the same coin," *Hawaiian Tel. Co.*, 827 F.2d at 1275—because they force MetroPCS and other prepaid wireless carriers to apply a one-size-fits-all proxy rather than using individualized traffic studies or following the FCC's "policy preference that providers" base their USF contributions on "their actual data."  21 FCC Rcd at 7534 ¶ 28.  Moreover, even if the imposition of a mandatory one-size-fits-all intrastate factor were not preempted, the CPUC's *specific intrastate factors* conflict with federal law because they assume a greater portion of total bundled revenues (72.75% and 69.45%) are intrastate than the safe harbor set forth in the *FCC Contribution Methodology Order* for voice service revenues.  The FCC's optional safe harbor attributes—at most—62.9% of voice service revenues to intrastate service.  *Id.* at 7520 ¶ 2.  Thus, even excluding other interstate services included in a prepaid bundle (e.g., broadband service), the 72.75% and 69.45% intrastate factors impermissibly require carriers to assume that a greater percentage of their revenues are

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

intrastate.  This, on its face, conflicts with the FCC's rules and policies.

(c)     The 72.75% and 69.45% adjustment factors conflict with the *FCC Bundling Order*, which provides telecommunications carriers a federal right to rely on their individualized revenue allocations when they attribute revenues to interstate broadband service included in a bundle of commingled services.  *See* 16 FCC Rcd at 7447-48 ¶¶ 49-50, 53-54.

(d)     The 72.75% and 69.45% adjustment factors dramatically and demonstrably overestimate the portion of intrastate revenues derived from MetroPCS's sale of its prepaid plans and, by the same token, underestimate the portion of MetroPCS's interstate revenues.  As a result, as applied to MetroPCS, the adjustment factors do not cure the impermissible imposition of the Surcharge on interstate revenues in violation of the provisions of federal law discussed above.

73.     The 2017 Resolution provides that "interstate and international services that are *sold independently of* any intrastate or bundled services are not subject to the MTS surcharge." 2017 Resolution at 18 (emphasis added).  But this too fails to cure the Contested Resolutions' conflicts with federal law.  That provision, which goes on to clarify that "if services are bundled then, the adjusted intrastate factor is applied [to the whole bundle]," *id.*, effectively penalizes the bundling of wireless service—undermining, and standing as an obstacle to, the pro-bundling policies of the *FCC Bundling Order* and the Mobile Telecommunications Sourcing Act.  As a result, this provision of the 2017 Resolution is also preempted on its face and as applied to MetroPCS.

74.     Contrary to the CPUC's interpretation of the Prepaid Collection Act in its Contested Resolutions, the Act (including the provision codified at California Revenue & Taxation Code § 42018(a)) can and should be construed to avoid the conflicts with federal law identified above, as well as the constitutional concerns presented by the Contested Resolutions' violation of the dormant Commerce Clause.  *See* Second Claim for Relief, *infra*.  The CPUC's initial (and correct) implementation of the Prepaid Collection Act in its 2016 Resolution demonstrates that the Act can be construed in such a manner, *see* ¶¶ 47-48, *supra*, and MetroPCS has explained at length why the Act should be so construed, *id.* ¶ 57.  If, however, the Court disagrees that Section 42018(a) (or any other provision of the Act) can be construed to avoid the

conflicts with federal law and constitutional concerns identified below, in accordance with the statute's severability clause, *see* 2014 Cal. Legis. Serv. Ch. 885, § 14 (A.B. 1717) (filed Sept. 30, 2014), then the Court should sever the relevant provision(s) from the remainder of the statutory provisions codifying the Prepaid Collection Act and find the severed provision(s) preempted for the same reasons that the Contested Resolutions are preempted.

75.    If, contrary to MetroPCS's arguments, the Court is unable to construe the Prepaid Collection Act in a manner that renders it consistent with federal law and if the Court further concludes that the provision(s) of the Act that render it incompatible with federal law cannot be severed from the remainder of the Act, then the Court should find the Prepaid Collection Act preempted in its entirety.

WHEREFORE, MetroPCS prays for judgment as set forth below.

**Second Claim for Relief Against All Defendants:**

**Violation of the Commerce Clause of the United States Constitution**

76.    MetroPCS realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

77.    The Commerce Clause provides that "[t]he Congress shall have Power … [t]o regulate Commerce … among the several States…."  U.S. Const. art. I, § 8, cl. 3.

78.    This clause encapsulates a "negative" or "dormant" Commerce Clause, which precludes states from discriminating against interstate commerce even in the absence of congressional action.

79.    The Contested Resolutions discriminate against interstate commerce by penalizing carriers such as MetroPCS by imposing a double assessment that discriminates against interstate commerce.

80.    Contrary to the CPUC's interpretation of the Prepaid Collection Act in its Contested Resolutions, the Act (including the provision codified at California Revenue & Taxation Code § 42018(a)) can and should be construed to avoid these constitutional concerns, as well as the conflicts with federal law identified above.  The CPUC's initial (and correct) implementation of the Prepaid Collection Act in its 2016 Resolution demonstrates that the Act can

DAVIS WRIGHT TREMAINE LLP

34

be construed in such a manner, *see* ¶¶ 47-48, *supra*, and MetroPCS has explained at length why the Act should be so construed, *id.* ¶ 57. If, however, the Court disagrees that Section 42018(a) (or any other provision of the Act) can be construed in a manner to avoid the conflicts with federal law and constitutional concerns identified, in accordance with the statute's severability clause, *see* 2014 Cal. Legis. Serv. Ch. 885, § 14 (A.B. 1717) (filed Sept. 30, 2014), then the Court should sever the relevant provision(s) from the remainder of the statutory provisions codifying the Prepaid Collection Act and find the severed provision(s) unconstitutional for the same reasons that the Contested Resolutions are unconstitutional.

81.     If, contrary to MetroPCS's arguments, the Court is unable to construe the Prepaid Collection Act in a manner that renders it consistent with federal law and if the Court further concludes that the provision(s) of the Act that render it incompatible with federal law cannot be severed from the remainder of the Act, then the Court should find the Prepaid Collection Act unconstitutional in its entirety.

82.     42 U.S.C § 1983 provides MetroPCS with a remedy in federal court to vindicate its constitutional interests.

## PRAYER FOR RELIEF

WHEREFORE, MetroPCS prays for judgment as follows:

1.     A declaration that (a) the Contested Resolutions conflict with federal law and therefore are unlawful and preempted; (b) the CPUC may impose the Surcharge in the 2017 and 2018 Resolutions (and any future Resolutions or other CPUC actions) solely on revenue derived from the intrastate telecommunications services included in MetroPCS's prepaid wireless plans; (c) MetroPCS has a right under federal law to allocate its intrastate prepaid wireless service revenues on an individualized basis (including the options of reporting its actual intrastate revenues or using traffic studies or analyses), or, alternatively, using the safe harbors adopted by the FCC; and (d) to the extent that, notwithstanding MetroPCS's arguments, California Revenue & Taxation Code § 42018(a) (or any other provision of the Prepaid Collection Act) cannot be construed to avoid the conflicts with federal law addressed above, the provision(s) in question is/are severed from the remainder of the Prepaid Collection Act and is/are preempted for the same

DAVIS WRIGHT TREMAINE LLP

reasons as the Contested Resolutions (or, if the Act cannot be construed as MetroPCS maintains and if any preempted provision(s) cannot be severed, granting the alternative relief sought in paragraphs 75 and 81, *supra*).

2.     An injunction enjoining the CPUC from (a) enforcing the Contested Resolutions; (b) imposing the Surcharge(s) on any revenues that MetroPCS derives from providing interstate prepaid wireless services, including mobile broadband service and interstate voice service; (c) otherwise requiring MetroPCS to assess, collect, and/or remit the Surcharge(s) based on a methodology that applies the Surcharge(s) to the entire price of a prepaid service plan and/or relies on a mandatory one-size-fits-all intrastate adjustment factor (rather than allowing MetroPCS to rely on any of the revenues allocation options specified in the *FCC Contribution Methodology Order* and *FCC Bundling Order*); and (d) enjoining the CPUC's enforcement of California Revenue & Taxation Code § 42018(a) (or any other provision of the Prepaid Collection Act) insofar as the statutory provision(s) in question, notwithstanding MetroPCS's arguments, cannot be construed to avoid the conflicts with federal law addressed above.

3.     An award of MetroPCS's costs and expenses, including reasonable attorneys' fees and costs of suit, *see* 42 U.S.C. § 1988;

4.     Any other and additional relief the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), MetroPCS demands a trial by jury of all issues triable by right of jury.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP

1   Dated:  January 19, 2018

2                                          Respectfully submitted,

3                                          DAVIS WRIGHT TREMAINE LLP

4                                          By:____/s/ Peter Karanjia_____

5                                              Peter Karanjia (admitted *pro hac vice*)
6                                              Geoffrey S. Brounell (admitted *pro hac vice*)
                                             DAVIS WRIGHT TREMAINE LLP
                                             1919 Pennsylvania Avenue, NW, Suite 800
7                                            Washington, D.C. 20006
                                             Telephone:     (202) 973-4200
8                                            Email:         peterkaranjia@dwt.com
                                                            geoffreybrounell@dwt.com
9
                                             Suzanne K. Toller (CA State Bar No. 129903)
10                                           Martin L. Fineman (CA State Bar No. 104413)
                                             DAVIS WRIGHT TREMAINE LLP
11                                           505 Montgomery Street, Suite 800
                                             San Francisco, California  94111
12                                           Telephone:     (415) 276-6500
                                             Facsimile:     (415) 276-6599
13                                           Email:         martinfineman@dwt.com
                                                            suzannetoller@dwt.com
14

15                                           Attorneys for Plaintiff
                                             MetroPCS California, LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

37
SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:17-cv-05959-SI

DAVIS WRIGHT TREMAINE LLP