AROCLES AGUILAR (SBN 94753)
HELEN M. MICKIEWICZ (SBN 123184)
JONATHAN C. KOLTZ (SBN 268793)
ENRIQUE GALLARDO (SBN 191670)
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
Telephone:     (415) 703-2760
Facsimile:     (415) 703-2262
Email:         jk5@cpuc.ca.gov

*Attorneys for Defendants Michael Picker,*
*Martha Guzman Aceves, Carla J. Peterman,*
*Liane M. Randolph, and Clifford Rechtschaffen,*
*in their official capacities as*
*Commissioners of the Public Utilities*
*Commission of the State of California*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| METROPCS CALIFORNIA, LLC,<br><br>                          Plaintiff,<br><br>          vs.<br><br>MICHAEL PICKER., et al.,<br><br>                          Defendants. | Case No.:  3:17-cv-05959-SI<br><br>**DEFENDANTS' NOTICE OF MOTION, CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          July 13, 2018<br>Time:          10:00 a.m.<br>Courtroom:     1<br>Judge:         Hon. Susan Illston |

1

## Notice of Motion

2

**To all parties and their counsel of record**:

3

Please take notice that on July 13, 2018, at 10:00 a.m., or as soon thereafter as counsel

4 may be heard by the Court, located at Courtroom 1, 17th Floor, 450 Golden Gate Avenue, San

5 Francisco, California, 94102, before the Honorable Susan Illston, Defendants Michael Picker,

6 Martha Guzman Aceves, Carla Peterman, Liane Randolph, and Clifford Rechtschaffen, in their

7 official capacities as Commissioners of the California Public Utilities Commission ("CPUC"),

8 will and do move this Court for summary judgment under Rule 56 of the Federal Rules of Civil

9 Procedure.

10

The Prepaid Mobile Telephony Services Surcharge Collection Act[1] (the "Prepaid MTS

11 Act") directs all sellers of prepaid mobile telephony services to assess a surcharge on the entire

12 sales price of that service, and to collect it from the purchaser.  The California Public Utilities

13 Code requires the CPUC to calculate a portion of that surcharge.  The Plaintiff, MetroPCS

14 California, LLC ("MetroPCS"), a wireless telecommunications carrier subject to the Prepaid

15 MTS Act, asserts that the manner in which the CPUC calculates its portion of the surcharge

16 violates several federal laws and FCC regulations, and burdens interstate commerce.  In its

17 Motion for Summary Judgment and Permanent Injunction [Dkt. 63], filed on April 6, 2018

18 ("Plt.'s MSJ"), MetroPCS asks the Court to declare the CPUC's calculation method

19 unconstitutional and to permanently enjoin the CPUC from implementing it.  In the alternative,

20 MetroPCS asks the Court to declare some or all of the Prepaid MTS Act unconstitutional, and

21 to strike as much of the Act as is necessary to cure the alleged unconstitutionality.

22

The CPUC now files its Cross-Motion for Summary Judgment ("CPUC's MSJ").  As a

23 preliminary matter, because MetroPCS now asks the Court to invalidate a calculation

24 method—the so-called "intrastate allocation factor"—that it once asked the CPUC to adopt,

25 MetroPCS should be estopped from challenging the CPUC's adoption of that factor.  At any

26

27

28

---

[1]  Assembly Bill ("AB") 1717 (2013-2014 Reg. Sess.) (codified in scattered sections of
California's Public Utilities Code and Revenue & Taxation Code).

1    rate, because MetroPCS has not shown and cannot show either the CPUC's calculation method

2    or any part of the Prepaid MTS Act to be unconstitutional, the CPUC is entitled to judgment as

3    a matter of law.

4         This Motion is based on this Notice; the attached Memorandum of Points and

5    Authorities; the accompanying Declaration of Jonathan Koltz; the accompanying Objections to

6    Evidence; the accompanying Proposed Order; the papers already of record in this proceeding;

7    the oral argument of counsel; and any other documents or information that may come before the

8    Court when it hears this matter.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **Table of Contents**

**Pages**

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

Introduction......................................................................................................................1

Background ................................................................................................................... 5

Standard of Review.........................................................................................................10

Argument ......................................................................................................................11

I.    The CPUC's application of an intrastate allocation factor to the entire sales price of a prepaid wireless service transaction is consistent with the Prepaid MTS Act, and MetroPCS is estopped from challenging that application.................................................. 11

    A.    The plain language of the Prepaid MTS Act—not the CPUC's Resolutions— applies the prepaid MTS surcharge to the entire sales price of a prepaid wireless service transaction......................................................................................... 11

    B.    The Prepaid MTS Act requires the application of an intrastate allocation factor to substantially remove interstate revenues from prepaid wireless transactions. .......... 12

    C.    Because MetroPCS urged the CPUC to adopt its intrastate allocation factor, MetroPCS should be judicially estopped from challenging it now. ......................... 13

        1.    MetroPCS's October 2015 comments are clearly inconsistent with the argument it raises now. ....................................................................................15

        2.    MetroPCS asked the CPUC to adopt an intrastate allocation factor, which the CPUC did...................................................................................................15

II.    The Prepaid MTS Surcharge comports with federal law................................................ 18

    A.    Federal law, FCC regulations, and MetroPCS itself all recognize that, surcharging wireless services requires some overlap between interstate and intrastate revenues. 18

    B.    The Prepaid MTS Act does not violate Section 254(f)............................................. 21

        1.    The Prepaid MTS Surcharge is not "inequitable and discriminatory" because it treats all similarly-situated California prepaid MTS consumers the same. .........22

        2.    The Prepaid MTS Surcharge does not "rely on" or "burden Federal universal service support mechanisms" because California and the FCC surcharge different revenue streams.................................................................................................25

    C.    Because the Prepaid MTS Surcharge does not substantially surcharge mobile data, it does not violate the *Open Internet Order*............................................................. 26

    D.    Neither the *Contribution Methodology Order* nor the *Bundling Order* clearly indicates that the FCC sought to preempt California law. ......................................... 27

E.  The Mobile Telecommunications Sourcing Act does not preempt the Prepaid MTS Act, as implemented by the CPUC. ..................................................................... 30

F.  Because Congress has spoken, the dormant Commerce Clause does not apply. ........ 32

III.  Because the CPUC's intrastate allocation factors reasonably approximated the intrastate portion of the prepaid wireless carriers' service, the Court should defer to that calculation. ...................................................................................................................... 32

A.  This Court should defer to the CPUC's fact-heavy calculation of its portion of the Prepaid MTS Surcharge. ............................................................................................. 33

B.  The CPUC's calculation methodologies were reasonable, and were based on the carriers' own numbers. .................................................................................................. 34

IV.  Should the Court find that any portion of the Prepaid MTS Act is preempted, principles of federalism and judicial restraint require the Court to allow the California Legislature to rewrite it. ................................................................................... 35

Conclusion ................................................................................................................................... 39

# Table of Authorities

**Pages**

**Federal Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)....................................................................31

*Am. Trucking Ass'ns. v. Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ..............................36

*AT&T Communications, Inc. v. Eachus*, 174 F. Supp. 2d 1119 (D. Or. 2001)..................25

*AT&T Corp., v. Pub. Util. Comm'n of Tex.*, 373 F.3d 641 (5th Cir. 2004) .......................22

*Baker Botts L.L.P. v. ASARCO LLC*, ___ U.S. __,135 S. Ct. 2158 (2015) ......................38

*Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420 (7th Cir. 1993) .................................14

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) .............................................33

*Clallam County v. Wash. Dept. of Transp.*, 849 F.2d 424 (9th Cir. 1988) .................11, 33

*EEOC v. Recruit U.S.A., Inc.*, *U.S.A., Inc.*, 939 F.2d 746 (9th Cir. 1991).......................18

*FTC v. AT&T Mobility, LLC*, 883 F.3d 848 (9th Cir. 2018)................................................1

*Global NAPs, Inc. v. Verizon New England Inc.*, 444 F.3d 59 (1st Cir. 2006).................27

*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001)....................16-17

*Hillsborough County v. Automated Med. Labs. Inc.*, 471 U.S. 707 (1985).................27, 29

*Indus. Commc'ns Sys. v. Pac. Tel. & Tel. Co.*, 505 F.2d 152 (9th Cir. 1974) ..................33

*In re World War II Era Japanese Forced Labor Litigation*,
    164 F. Supp. 2d 1160 (N.D. Cal. 2001) ......................................................................29

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)..................................14

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)...................................................1, 18

*Marchetti v. United States*, 390 U.S. 39 (1967)................................................................38

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........................................................14, 16-17

*Northeast Bancorp., Inc. v. Bd. of Governors*, 472 U.S. 159 (1985)................................32

*Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166 (9th Cir. 2016).............................................34

*Pac. Legal Found v. State Energy Res. Conservation & Dev. Comm.*,
    659 F.2d 903 (9th Cir. 1981) ......................................................................................32

*Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89 (1984)....................................11

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1980)....................................33

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) .................37

*Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597 (9th Cir. 1996) ..13-14, 17-18

*Russello v. United States*, 464 U.S. 16 (1983) ............................................. 29-30

*San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005)......................31

*Silkwood v Kerr-McGee Corp.*, 464 U.S. 238 (1984)..................................................11, 21

*Telstar Res. Group, Inc. v. MCI, Inc.*, 476 F. Supp. 2d 261 (S.D.N.Y. 2007)..................21

*Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ...........................2

*T-Mobile South, LLC v. City of Roswell*, __U.S. __, 135 S. Ct. 808 (2015) ......................1

*Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903 (3d Cir. 1990).....................................29

*United States v. Manning*, 527 F.3d 828 (9th Cir. 2009)...................................................36

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) ........................................... 10-11

*Util Reform Network v. Cal. Pub. Util. Comm'n*,
   26 F. Supp. 2d 1208 (N.D. Cal. 1997) .........................................................................2, 32

*Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007) ............................23, 35

*Wardair Canada, Inc. v. FLA. Dept. of Revenue*, 477 U.S. 1 (1986) .........................29, 32

*WJG Tel. Co. v. FCC*, 675 F.2d 386 (D.C. Cir. 1982)......................................................33

*WorldCom, Inc. v. FCC*, 238 F.3d 449 (D.C. Cir. 2001).................................................33

*Wyeth v. Levine,* 555 U.S. 555 (2009) ..................................................................... 21-22

*Xi v. INC,* 298 F.3d 832 (9th Cir. 2002) ...........................................................................38

**FCC Orders**

*In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 21252  (1998).. 19-20

*In re Policy and Rules Concerning the Interstate, Interexchange Marketplace*,
   16 FCC Rcd 7418 (2001) ............................................................................... 19, 27-28

*In re Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015)  .... 21, 26-27

*In re Restoring Internet Freedom*, 2018 WL 305638 (Jan. 4, 2018)  .........................26-27

*In re Universal Service Contribution Methodology*,
   21 FCC Rcd. 7518 (2006).................................................................22-23, 27, 34-35

*In re Universal Service Contribution Methodology*, 25 FCC Rcd. 15651 (2010) ...........29

**U.S. Code**

4 U.S.C. § 116.................................................................................32

4 U.S.C. § 123.....................................................................18-19, 30-32

47 U.S.C. § 151..................................................................................1

47 U.S.C. § 254...................................................................... 1, 5, 21-25

**Uncodified Federal Law**

Pub. L. No. 104-104, 110 Stat. 56 .........................................................22

Pub. L. No. 16-252, 114 Stat. 626 .........................................................31

**Federal Rules of Civil Procedure**

Rule 56 ...........................................................................................10

**State  Cases**

*Bell Atl. Mobile, Inc. v. Dept. of Pub. Util. Control,* 754 A.2d 128 (Conn. 2000) ............25

*Calfarm Ins. Co. v. Deukmejian,* 771 P.2d 1247 (Cal. 1989) .............................................36

*People v. Spring Nextel Corp.,* 42 N.E.3d 655 (N.Y. 2015)......................................... 30-31

*Office of Regulatory Staff v. S.C. Pub. Serv. Comm'n.,* 647 S.E.2d 223 (S.C. 2007)........25

**California Public Utilities Commission Resolutions**

Res. T-17504.........................................................................7, 8, 17

Res. T-17542 ..................................................................... 8, 9-10, 17

Res. T-17568 ....................................................................10, 17, 34

Res. T-17569 ....................................................................10, 34

**California Public Utilities Code**

§ 319.......................................................................... *passim*

**California Revenue & Taxation Code**

§ 42004..............................................................................................................6

§ 42010........................................................................................... *passim*

§ 42018........................................................................................... *passim*


**Other Authorities**

Cal. Assembly Comm. on Rev. & Tax., Legislative Analysis of AB 1717,
 (May 12, 2014) (Koltz Decl., Exh. 4) ...............................................2-3, 25-26

Cal. Assembly Comm. on Util. & Commerce, Legislative Analysis of AB 1717,
 (Apr. 2, 2014) (Karanjia Decl., Exh. 9) ..........................................................38

Cal. Senate Appropriations Comm., Legislative Analysis of AB 1717,
 (Aug. 11, 2014) (Koltz Decl., Exh. 5) .........................................................2, 24

Cal. Senate Governance & Fin. Comm., Legislative Analysis of AB 1717,
 (May 28, 2014) (Karanjia Decl., Exh. 11) ...................................2, 13, 23-24

Cal. Senate Energy, Util., & Commc'ns Comm., Legislative Analysis of AB 1717,
 (June 17, 2014) (Karanjia Decl., Exh. 10) .....................................................24

Cal. State Bd. of Equalization, Draft Legislative Analysis of AB 1717,
 (Feb. 14, 2014) (Koltz Decl., Exh. 3) ..............................................................3

CDTFA Opinion Letter 18-233 (Apr. 19, 2018)
 (Koltz. Decl., Exh 1.) ................................................4, 8, 12, 16, 35, 37

H. Rpt. No. 103-111 (1993), *reprinted in* 1993 U.S.C.C.A.N. 587....................................1

Memorandum from Lynn Sadler, Director, CPUC Office of Gov't Affairs,
 to the CPUC (Apr. 8, 2014) (Karanjia Decl., Exh. 8)................................3, 24

Letter from Leon M. Bloomfield, Att'y for T-Mobile West LLC
 & MetroPCS Cal., LLC, to Michael Amato, Acting Director, Communications Div.,
 CPUC (Oct. 31, 2016) (Karanjia Decl., Exh. 32) ...................4, 8-9, 15, 20, 23

Letter from Jamie Hastings, Vice President, External & State Affairs,
 CTIA-The Wireless Ass'n, to the Hon. Henry T. Perea, Cal. State Assembly,
 (Apr. 14, 2014) (Koltz Decl., Exh. 6) .........................................................2, 5

Letter from Susan Lipper, Senior Manager, Gov't Affairs, T-Mobile USA, Inc.
 to the Members of the Cal. Senate, (Aug. 15, 2014) (Karanjia Decl., Exh. 30)............ 5-6

Wireless Indus. Comments on Draft Resolution T-17504
 (Oct. 26, 2015) (Karanjia Decl., Exh. 31).......................... 3, 4, 7-8, 12, 15, 17

18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4477 (1981) ......16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Memorandum of Points and Authorities**

"New technologies have spawned new regulatory challenges.  A phone company is no longer just a phone company."  *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 851 (9th Cir. 2018) (en banc).

## **Introduction**

Regulating a massively-interconnected telecommunications network was never easy, though, even when a phone was just a phone.  While the Communications Act of 1934 "would seem to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction—in practice, the realities of technology and economics belie such a clean parceling of responsibility."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986).  Mobile services, which, "by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure," H. Rpt. No. 103-111, at 260 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 587, blur the lines between interstate and intrastate even more.  Recognizing this, in drafting the Telecommunications Act of 1996, Congress rejected the '34 Act's tidy hemispheres in favor of a model of "cooperative federalism," giving state agencies broad discretion to implement federal policy in certain areas.  *See T-Mobile South, LLC v. City of Roswell*, __ U.S. __, __, 135 S. Ct. 808, 816 (2015).  It is with one of these areas—universal service funding—that this case deals.

Universal service is simply the idea that everyone in the country should have access to high-quality telecommunications service at a fair price.  47 U.S.C. § 151.  Congress requires every telecommunications carrier that provides interstate service to contribute to the federal universal service fund ("USF").  47 U.S.C. § 254(d).  The law also gives states the discretion to establish their own universal service rules, subject to some guidelines.  47 U.S.C. § 254(f).

Under that grant of authority, between 1996 and 2014, California required all telecommunications carriers in the state to collect universal service surcharges from their end

users.  *See Util. Reform Network v. Cal. Pub. Util. Comm'n*, 26 F. Supp. 2d 1208, 1211 (N.D. Cal. 1997).  In contrast, the federal "Universal Service Fund is paid for by contributions from providers of telecommunications", not end users.  FCC, Universal Service, *available at* https://www.fcc.gov/general/universal-service (last visited Apr. 26, 2018); *see also Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 433-35 (5th Cir. 1999).  California's end-user surcharges were sometimes criticized as anti-consumer, *see Util. Reform Network*, 26 F. Supp. 2d at 1211, but the system worked well for most service providers.

Most, but not all.  Some service providers, in the segment of the market called prepaid wireless service, objected.  "Unlike traditional 'postpaid' wireless service (whereby consumers are typically billed the month after using their service), prepaid customers pay in advance for the following month's usage."  Plt.'s MSJ at 1:5-7.  Also unlike postpaid, many prepaid service providers do not sell directly to the end user: "Estimates show major carriers sell 30 to 40% of prepaid plans, while non-carrier retailers from big box stores to convenience marts sell the rest, usually in the form of prepaid cards."  Cal. Senate Governance & Fin. Comm., Legislative Analysis of AB 1717, at 1 (May 28, 2014) (Karanjia Decl., Exh. 11).  (When a prepaid carrier sells service directly to its customers, it is known as a "direct seller"; non-carrier retailers are "indirect sellers.")  Lacking a contractual relationship with the customer, many prepaid carriers did not "have a convenient method (or at least a market-friendly method) to explicitly pass [the] surcharges on to the customer."  Cal. Senate Appropriations Comm., Legislative Analysis of AB 1717, at 6 (Aug. 11, 2014) (Koltz Decl., Exh. 5).  So they paid out of pocket.  *See id.*

The industry sought a legislative fix: AB 1717, the Prepaid MTS Act.  *See* Letter from Jamie Hastings, Vice President, External & State Affairs, CTIA-The Wireless Association, to the Hon. Henry T. Perea, California State Assembly (Apr. 14, 2014) (Koltz Decl., Exh. 6).  Starting in 2016, all sellers—both direct and indirect—of prepaid mobile telephony services "would be required to collect a unified 'prepaid MTS surcharge' from prepaid consumers at the time of sale.  This surcharge would be imposed as a percentage of the sales price . . . ."  Cal. Assembly Comm. on Rev. & Tax., Legislative Analysis of AB 1717, at 6 (May 12, 2014) (Koltz Decl., Exh. 4).  Under AB 1717, "prepaid MTS providers would no longer be required

to remit surcharges and fees out of their existing (largely wholesale) revenue streams.  Instead, carriers would be able to keep their existing revenue streams whole, by passing the surcharge and fee costs directly on to prepaid MTS consumers."  *Id.*

AB 1717 was not without problems: the State Board of Equalization ("BOE"),[2] one of the state agencies charged with implementing the Prepaid MTS Act, recognized that the surcharge did not "exclude ancillary [i.e., non-telephony] services. . . . [T]he bill requires the surcharge to apply to the *entire price* if prepaid MTS is sold in combination with mobile data services or any other service or products for a single price."  Cal. Bd. of Equalization, Draft Legislative Analysis of AB 1717, at 15 (Feb. 14, 2014) (Koltz Decl., Exh. 3) (emphasis in original).  This might cause the state to surcharge a substantial amount of interstate and non-surchargeable services.  Memorandum from Lynn Sadler, Director, CPUC Office of Government Affairs, to the CPUC, at 8 (Apr. 8, 2014) (Karanjia Decl., Exh. 8).  Still, the industry steadfastly supported AB 1717, and it became law, entire-price provisions intact.  Cal. Rev. & Tax. Code §§ 42010(a)(1), (b), (c)(1); 42018(a); Cal. Pub. Util. Code §§ 319(b), (c).

It fell to the CPUC to calculate the surcharge in a manner that did not capture a substantial amount of interstate and non-surchargeable services.  The first attempt—Resolution T-17504, issued November 19, 2015—was a false start.  A group of carriers, including MetroPCS, urged the CPUC to adopt an "intrastate allocation factor": calculate as a percentage amount "a reasonable estimate of the intrastate portion of prepaid revenues," multiply the surcharge by that percentage, apply that adjusted surcharge to the entire price of a prepaid sale, and that "would have the effect of removing interstate and international charges from the surcharge base."  Wireless Industry Comments on Draft Resolution T-17504, at 3 (Oct. 26, 2015) (Karanjia Decl., Exh. 31).  The CPUC did not adopt that approach in 2015, which

_____

[2] To make things more confusing, in 2017 the Legislature split the BOE into three successor agencies.  *See* Cal. Legislative Analyst's Office, California's New Tax Departments (Apr. 4, 2018), *available at* http://www.lao.ca.gov/Publications/Report/3796 (last visited Apr. 25, 2018). The California Department of Tax and Fee Administration ("CDTFA") now shares with the CPUC authority to implement the Prepaid MTS Act.  But the legislative history, and the statute itself, refer to the BOE.

proved problematic.  *See* CDTFA Opinion Letter 18-233, at 2 n.3 (Apr. 19, 2018)(Koltz Decl., Exh. 1).

The next year, in Resolution T-17542, the CPUC agreed to adopt the carriers' intrastate allocation factor.  But MetroPCS turned about face: now it said that the intrastate allocation factor should be mandatory for *indirect* sellers, but optional for *direct* sellers, who should also be allowed their own, carrier-specific intrastate factor.  Letter from Leon M. Bloomfield, Attorney for T-Mobile West LLC & MetroPCS Cal., LLC, to Michael Amato, Acting Director, Communications Division, CPUC, at 4-5 (Oct. 31, 2016) (Karanjia Decl., Exh. 32).  Because the Prepaid MTS Act requires all sellers, direct and indirect, to apply the same surcharge, the CPUC declined to go this route.  The CPUC has adjusted the intrastate allocation factor through subsequent Resolutions, but it is still mandatory for all sellers—as the law requires.

Despite the fact that the wireless industry once championed the Prepaid MTS Act, and despite the fact that MetroPCS once championed the intrastate allocation factor, MetroPCS now challenges both.  It asserts that the CPUC's Resolutions conflict with federal law, and burden interstate commerce.  Failing that, it says the same about the Prepaid MTS Act itself.  It asks the Court to declare the Resolutions unconstitutional and to enjoin them.  And it asks the Court essentially to write new language into the Prepaid MTS Act.

Because it supported the intrastate allocation factor before opposing it, MetroPCS should be estopped from challenging it now.  In any event, most of MetroPCS's arguments hang on two false premises: (1) that the states may never surcharge any part of a carrier's interstate service; and (2) that the CPUC calculated its intrastate allocation factor in an improper way.  But because the intrastate allocation factor reasonably approximates the carriers' intrastate service, California does not substantially surcharge any interstate service, and what overlap exists is permissible under federal law.  The CPUC asks the Court to grant its Motion for Summary Judgment, and to deny MetroPCS's Motion for Summary Judgment.

# Background

This case concerns the CPUC's administration of California's universal service funds, and it is important to understand what that means. Universal service is one of the oldest and most cherished goals of American telecommunications policy. Its principles include, but are not limited to: high quality service for all at reasonable rates; access to advanced telecommunications services; access in rural and high-cost areas; and support for schools, libraries, and rural health-care clinics. 47 U.S.C. § 254. Under the authority granted to it by 47 U.S.C. § 254(f), the CPUC administers over $2 billion in public purpose funds for the following programs:

- the California Advanced Services Fund, which promotes deployment of high-quality advanced communications services in unserved and underserved areas;

- California High-Cost Funds A and B, which support small independent telephone companies and carriers of last resort, respectively;

- California Lifeline, which provides discounted home phone and cell phone services to low-income households;

- California Teleconnect, which provides subsidized service to schools, libraries, hospitals, rural health clinics, community colleges, and other non-profit organizations; and

- the Deaf and Disabled Telecommunications Program, which provides telecommunications devices to deaf or hearing impaired consumers.

More information on these programs is available at http://www.cpuc.ca.gov/Communications/. Ensuring that these funds maintain an adequate and predictable balance is critical to the well-being of millions of Californians.

In 2014, an industry trade association called CTIA-The Wireless Association sought to change the way that California collects universal service surcharges for prepaid wireless service. CTIA sponsored AB 1717, which became the Prepaid MTS Act. Koltz Decl., Exh. 6. According to its backers, the Act would "be competitively neutral, uniformly-administered, and transparent to consumers." *Id.* at 1. MetroPCS personally threw its weight behind the bill, claiming that it would "foster fairness and balance among wireless consumers." Letter from

1    Susan Lipper, Senior Manager, Government Affairs, T-Mobile USA, Inc. to the Members of the

2    California State Senate (Aug. 15, 2014) (Karanjia Decl., Exh. 30); *see also* Van Wambeke

3    Depo. (Karanjia Decl., Exh. 12), at 197:15-17 (explaining that Susan Lipper held herself out as

4    representing both T-Mobile and MetroPCS).  The bill passed, becoming effective in 2015.

5         The Prepaid MTS Act created a new point-of-sale mechanism for the collection and

6    remittance of the taxes, fees, and surcharges imposed on prepaid wireless consumers through a

7    newly-defined surcharge: the Prepaid MTS Surcharge.  Cal. Rev. & Tax. Code § 42004(m)

8    (defining "prepaid MTS surcharge").  To come up with the surcharge, first the CPUC calculates

9    the California universal service surcharges and a CPUC reimbursement fee "as a percentage of

10   the sales price for prepaid wireless service", and it reports those amounts to the CDTFA.  Cal.

11   Pub. Util. Code §§ 319(b), (c).  Next, the CDTFA combines those CPUC charges with a 9-1-1

12   surcharge to create the Prepaid MTS Surcharge.  Cal. Rev. & Tax. Code § 42010(b).  CDTFA

13   then adds the Prepaid MTS Surcharge to the so-called "utility user taxes," which are set city-by-

14   city, and range from zero to 9%.  *See* Cal. Rev. & Tax. Code § 42010(c)(1); *see also* CDTFA,

15   Local Charges for the Prepaid Mobile Telephony Services Collection Act, *available at*

16   https://www.cdtfa.ca.gov/formspubs/cdtfa105mts.pdf (last visited May 2, 2018).  This

17   cumulative total is called the "posted combined rate."  Cal. Rev. & Tax. Code § 42010(c)(1);

18   *see also* CDTFA,  Prepaid Mobile Telephony Services (MTS) Surcharge Rates, *available at*

19   https://www.cdtfa.ca.gov/taxes-and-fees/mts-rates.aspx (last visited May 2, 2018).

20        The Prepaid MTS Surcharge "shall be imposed on each prepaid consumer and shall be

21   collected by a seller from each prepaid consumer at the time of each retail transaction in this

22   state."  Cal. Rev. & Tax. Code § 42010(a)(1); *see also* Cal. Rev. & Tax. Code § 42004(o)

23   (defining "Retail transaction"); § 42004(p) (defining "Seller").  It shall also "be imposed as a

24   percentage of the sales price of each retail transaction that occurs in this state."  Cal. Rev. &

25   Tax. Code § 42010(a)(1).  As a belt-and-suspenders measure, Revenue & Taxation Code

26   Section 42018(a) provides that "if prepaid mobile telephony services are sold in combination

27   with mobile data services or any other services or products for a single price, then the prepaid

28   MTS surcharge and local charges shall apply to the entire price."  Thus, for the first time, all

sellers of prepaid wireless service, both direct and indirect, would be required to assess, collect, and remit state surcharges on the entire sales price of that service.

The CPUC has calculated its portion of the Prepaid MTS Surcharge (i.e., the universal service surcharges and the reimbursement fee) through a series of Resolutions.  (A Resolution is a type of CPUC order voted out by the five Commissioners, and is an official CPUC action.)

On October 6, 2015, the Commission released for public comment a draft of its first such Resolution, Resolution T-17504.  On October 26, a wireless industry coalition made up of CTIA, MetroPCS, T-Mobile, AT&T, Verizon, Sprint, and TracFone submitted comments on that draft Resolution.  Karanjia Decl., Exh. 31.  The coalition raised several concerns, one of which interests us now.  They took issue with the manner in which the CPUC proposed to calculate and apply the CPUC's portion of the Prepaid MTS Surcharge:

> The Proposed Resolution currently appears to rely on the carriers to adjust their collections and remittances to account for intrastate revenue, which is how wireless revenues are currently adjusted with respect to mandatory surcharges and fees.  The Joint Wireless Carriers suggest an alternate approach for the prepaid MTS Surcharge.
>
> In particular, the Joint Wireless Carriers recommend that the [CPUC], adjust its portion of the MTS Surcharge to account for the fact that it applies only to intrastate revenue.  In other words, take the rate of the aggregated [CPUC] surcharges and fees (e.g., 8.07%), multiply it by a reasonable estimate of the intrastate portion of prepaid revenues (e.g., a weighted average of the major carriers' intrastate traffic factors), and then post that adjusted rate with the BOE.  This adjustment would have the effect of removing interstate and international charges from the surcharge base.

Karanjia Decl., Exh. 31, at 3.  This approach, according to the coalition, would offer a number of benefits:

- Consumer clarity – consumers will be able to more easily identify the amount of surcharges and fees they are required to pay for the [CPUC] programs.
- Equitable charges – consumers will be subject to the same MTS surcharge regardless of whether they purchase prepaid

---

wireless services directly from a wireless provider or from a third party retailer.

- Simpler audits – the [CPUC] will be able to more readily audit the collection and remittance of these charges since the MTS surcharge amounts collected from consumers will match the adjusted rates. Carriers would not adjust their reported intrastate revenue figures under this approach, as the rate adjustment already removes the portion of the revenue which is attributable to interstate and international traffic.

*Id.* at 3-4 (footnote omitted).

On November 23, 2015, the CPUC issued Resolution T-17504, which set the CPUC's portion of the prepaid MTS surcharge at 8.51% for calendar year 2016. Karanjia Decl., Exh. 1. The CPUC did not, at the time, adjust the surcharge rate as the carriers had suggested, stating that the carrier's approach was "unnecessarily complex and may inappropriately assess surcharges and fees on interstate, international and other revenues and services not subject to the Commission's or other State surcharges." *Id.* at 13-14. As the carriers wrote, however, and as the CDTFA later explained, this was likely an incorrect reading of the Prepaid MTS Act. *See* Koltz Decl., Exh. 1, at 2 n.3 ("Carriers pointed out, however, that this was an error.").

The CPUC issued the next year's Resolution, T-17542, on November 16, 2016. Karanjia Decl., Exh. 2. This time, the CPUC *did* propose to adopt an intrastate allocation factor—but now, there was some disagreement among the carriers. *See* Karanjia Decl., Exh. 32. Some carriers understood "Rev. & Tax. Code section 42018(a) to require the imposition of adopted MTS Rates on the entire price of a bundled service" and therefore interpreted "their statutory obligation to . . . assess the MTS Surcharge on the total service price." *Id.* at 5-6. This position was informed by the "literal language of the particular Code section, combined with the perceived Legislative intent to reduce any disparity between the costs of service for direct v. indirect prepaid consumers . . . ." *Id.* at 5-6. Other carriers—presumably including MetroPCS—believed that direct sellers should be allowed to use company-specific traffic factors to create individualized surcharge rates, with the intrastate allocation factor available as an optional "safe harbor." *Id.* at 6. All of the carriers agreed, however, that the intrastate

allocation factor should apply to indirect sellers.  *Id.* at 5.  But they all must have recognized that applying the intrastate factor to indirect sellers but not to direct sellers would be inequitable.  *Id.* at 4 (noting that an across-the-board intrastate allocation factor "promotes the equitable treatment of wireless consumers regardless of whether they purchase prepaid services from direct or indirect sellers and regardless of whether they are prepaid or postpaid consumers").  Still, the carriers all "welcome[d] the adoption of an intrastate factor in calculating the MTS Surcharge rate and believe[d] that the use of such a factor is consistent with the Act."  *Id.*

In Resolution T-17542, the CPUC explained that it was adopting an intrastate allocation factor

> to ensure that all customers purchasing prepaid wireless telephone services are assessed the MTS surcharge in an equitable manner. For 2017, the MTS surcharge is to be assessed on the total sales price rather than only the intrastate portion, as the rate has now been pre-adjusted by an intrastate allocation factor. Therefore, regardless of the purchase method, location, or seller type, the customer will pay one universal rate.

Karanjia Decl., Exh. 2, at 10.  The CPUC further explained that the intrastate allocation factor would comply with the Prepaid MTS Act's entire-price provisions.  *See id.* at 10 & n.19.

The CPUC declined to make the intrastate allocation factor an optional safe harbor:

> The intrastate factor has been applied to assure that all prepaid wireless customers are assessed the MTS surcharge equally regardless of where they purchase their prepaid wireless service(s).  As the Act requires, the MTS Surcharge is to be calculated and adjusted so that it can be applied to the total sales price.  Indeed, Joint Carriers agree that the adoption of an intrastate factor in calculating the MTS Surcharge rate is consistent with the Act, in that "adjusting the surcharge rate by an intrastate factor promotes the equitable treatment of wireless consumers regardless of whether they purchase prepaid services from direct or indirect sellers and regardless of whether they are prepaid or postpaid consumers." Allowing carriers the option to potentially assess an amount for the MTS surcharge that is greater than or less than the amount being assessed on all other customers of indirect sellers would be inconsistent with the Act.

Karanjia Decl., Exh. 2, at 15 (footnotes omitted).

On January 24, 2017, MetroPCS and T-Mobile asked the CPUC to modify Resolution T-17542, again asking that the intrastate allocation factor be optional rather than mandatory. Karanjia Decl., Exh. 3, at 6. Through Resolution T-17568, the CPUC denied this request, explaining that the Prepaid MTS Act forbade it. *Id.* at 5-9, 13-17. The CPUC also explained further why it had not adopted an intrastate allocation factor the first time, in Resolution T-17504: "it was the first year the Act was implemented and the [CPUC] did not have the requisite prepaid MTS jurisdictional allocation and revenue data from carriers to calculate an intrastate allocation factor for that year." *Id.* at 4 n.11. Finally, the CPUC detailed the method it had used to calculate the intrastate allocation factor. *Id.* at 7-13.

In Resolution T-17579, issued November 16, 2017, the CPUC adjusted the intrastate allocation factor downward for calendar year 2018. Karanjia Decl., Exh. 4. It used a more refined method to calculate the factor than it had the previous year, taking "the average of five categories of information provided by carriers." *Id.* at 17. T-Mobile and MetroPCS had again asked to make the intrastate allocation factor optional, and the CPUC again explained that there was "no basis, nor does the [CPUC] have discretion as T-Mobile claims, to revise this Resolution to create two different requirements for indirect and direct sellers concerning the assessment of the prepaid MTS surcharge." *Id.* at 21.

That is where things now stand.

## Standard of Review

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). Here, although the parties disagree about the conclusions to be drawn from the material facts, they agree that those facts are undisputed, and that this case should be decided as a matter of law.

MetroPCS argues that federal law preempts California's Prepaid MTS Act and the CPUC's regulations interpreting that law. Laws "adjusting the burdens and benefits of

economic life" are presumed to be constitutional, *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976), and the party claiming preemption bears the burden of showing that federal law preempts state law, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984).

# Argument

I.  **The CPUC's application of an intrastate allocation factor to the entire sales price of a prepaid wireless service transaction is consistent with the Prepaid MTS Act, and MetroPCS is estopped from challenging that application.**

This case involves the construction of a California law, the Prepaid MTS Act.  The CPUC is one of two state agencies charged with implementing the Act's provisions.  *See* Cal. Pub. Util. Code § 319.  The CDTFA is the other.  *See* Cal. Rev. & Tax. Code § 42010.  Federal courts are required to defer to state agencies in their interpretation of the law they are charged with administering.  *See Clallam County v. Wash. Dept. of Transp.*, 849 F.2d 424, 429 (9th Cir. 1988).  This is particularly important where, as here, the state agency itself is the federal-court defendant, because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

MetroPCS urges the Court to adopt a construction of the Prepaid MTS Act that conflicts with the plain language of the Act, and with how the CPUC and the CDTFA have construed that Act.  Plt.'s MSJ at 37-40.  The Court should reject MetroPCS's flawed interpretation.

A.  **The plain language of the Prepaid MTS Act—not the CPUC's Resolutions—applies the prepaid MTS surcharge to the entire sales price of a prepaid wireless service transaction.**

MetroPCS asserts that *the CPUC* "require[d] prepaid carriers to impose the surcharge 'on the total sales price' of prepaid wireless service bundles . . . ."  Plt.'s MSJ at 2:11-12.  Not so.  The plain language of the Prepaid MTS Act itself requires that result.

Section 42010(a)(1) of the California Revenue & Taxation Code provides:

> On and after January 1, 2016, a prepaid MTS surcharge shall be imposed on each prepaid consumer and shall be collected by a seller from each prepaid consumer at the time of each retail transaction in this state.  The prepaid MTS surcharge shall be

1        imposed as a percentage of the sales price of each retail transaction

2        that occurs in this state.

3  Section 42018(a) likewise mandates that "if prepaid mobile telephony services are sold in

4  combination with mobile data services or any other services or products for a single price, then

5  the prepaid MTS surcharge and local charges shall apply to the entire price."  And, in

6  calculating its portion of the Prepaid MTS Surcharge, the CPUC is also required to compute that

7  part "as a percentage of the sales price for prepaid mobile telephony services . . . ."  Cal. Pub.

8  Util. Code § 319(b), (c).  These provisions are unambiguous: "prepayment for usage of all

9  telecommunications services—both interstate and intrastate—as well as information services is

10  subject to the prepaid MTS surcharge."  Koltz Decl., Exh. 1, at 3.

11      **B.**    **The Prepaid MTS Act requires the application of an intrastate**
              **allocation factor to substantially remove interstate revenues from**

12                **prepaid wireless transactions.**

13        It is broadly true, as MetroPCS says, that the states may not surcharge any substantial

14  part of an interstate telecommunications service.  Plt.'s MSJ at 1:27-28.  It is also true, as

15  explained above, that the Prepaid MTS Act surcharges the entire purchase price of prepaid

16  wireless service transactions.  That would seem to create a problem: how to surcharge the entire

17  price of a mixed-jurisdiction transaction without surcharging the interstate part?

18        MetroPCS offered an answer:

19        [The CPUC could] adjust its portion of the MTS Surcharge to
20        account for the fact that it applies only to intrastate revenue. In
           other words, take the rate of the aggregated [CPUC] surcharges
21        and fees (e.g., 8.07%), multiply it by a reasonable estimate of the
           intrastate portion of prepaid revenues (e.g., a weighted average of
22        the major carriers' intrastate traffic factors), and then post that
           adjusted rate with the BOE.  This adjustment would have the effect
23        of removing interstate and international charges from the surcharge
           base.
24

25  Karanjia Decl., Exh. 31, at 3.  The CDTFA goes one step further than MetroPCS, writing that,

26  to comply with both the rate-setting provisions of the Public Utilities Code and with federal law,

27  "the CPUC *must* multiply its aggregate CPUC-surcharge rate by a reasonable estimate of the

28  intrastate portion of prepaid revenues . . . ."  Koltz Decl., Exh. 1, at 2 n.3 (emphasis added).

This approach is consistent with the legislative intent.  The California Senate Governance & Finance Committee promulgated its legislative analysis of AB 1717 in May 2014.  It wrote:

How does this work?  Assuming an intrastate percentage of 78.5%, if I buy $100 worth of prepaid services from a third party retailer, the state taxes, fees and surcharges imposed on my transaction would be:

- 911 surcharge (0.50%): First, multiply 0.50% by 78.5% making the 911 portion of the MTS surcharge rate .3925%.  Multiply the surcharge rate by the sales price equal to $0.39 (.3925% x $100).
- CPUC surcharges: the 6 cumulative CPUC surcharges and user fee total 2.96%, or $2.96 on a $100 purchase.  Multiple that $2.96 by 78.5% to total $2.32.

- In the City of Sacramento, the UUT rate as adjusted by the bill is 2.5%.  My total UUT would be $2.50 (100 x 2.5%), not subject to the intrastate percentage.

On a $100 price of prepaid voice, talk and text, I would pay $5.21 ($0.39 + $2.32 + $2.50 in state taxes and surcharges.

Karanjia Decl., Exh. 11, at 9.  The Committee's analysis tracks exactly what the carriers urged the CPUC to do, and what it eventually did: calculate the intrastate portion of the service as a percentage amount, multiply the surcharge by that amount, and apply that adjusted surcharge to the entire purchase price of the transaction.

This is the best—and only feasible—reading of the Prepaid MTS Act.  The intrastate allocation factor is an integral part of the Prepaid MTS Surcharge; the two cannot be considered separately.

**C.      Because MetroPCS urged the CPUC to adopt its intrastate allocation factor, MetroPCS should be judicially estopped from challenging it now.**

The doctrine of judicial estoppel "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996).  Unlike other theories of estoppel, which generally hang either on reasonable reliance by the party arguing for estoppel, or on bad faith by the party to be estopped, in judicial estoppel the key party is "the

court in which a litigant takes a position incompatible with one the litigant has previously taken." *Id.* at 603. "'Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding.'" *Id.* at 604 (quoting *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993)).

Although "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle . . . several factors typically inform the decision whether to apply the doctrine in a particular case . . . ." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal punctuation altered; citations omitted). These factors are:

> 1) Is the party's later position clearly inconsistent with its earlier position?
>
> 2) Did the party succeed in persuading an adjudicator—a court, or a regulatory agency—to accept its earlier position, creating a perception that either the first or second adjudicator was misled? And,
>
> 3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party?

*New Hampshire*, 532 U.S. at 750-51. Again, however, the Supreme Court has cautioned, that these factors are not "inflexible prerequisites or an exhaustive formula", and "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.* at 751; *see also Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933) (courts of equity "are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion"). In this case, these factors tip strongly in favor of barring MetroPCS's challenge to the intrastate allocation factor. MetroPCS does not dispute the third factor, unfair detriment. Nor could it plausibly do so, since it has haled the CPUC into federal court to challenge a position that it once urged the CPUC to take. The CPUC therefore discusses only the first two factors here.

///

///

### 1.    MetroPCS's October 2015 comments are clearly inconsistent with the argument it raises now.

In October 2015, MetroPCS recommended that the CPUC

> adjust its portion of the MTS Surcharge to account for the fact that it applies only to intrastate revenue. In other words, take the rate of the aggregated [CPUC] surcharges and fees (e.g., 8.07%), multiply it by a reasonable estimate of the intrastate portion of prepaid revenues (e.g., a weighted average of the major carriers' intrastate traffic factors), and then post that adjusted rate with the BOE. *This adjustment would have the effect of removing interstate and international charges from the surcharge base.*

Karanjia Decl., Exh. 31, at 3 (emphasis added).  MetroPCS now argues not only that the intrastate allocation factor fails to account for non-surchargeable services, but that it violates a host of other federal laws and regulations—none of which it mentioned in 2015.  Those two positions are clearly incompatible.  MetroPCS tries to square the circle by relying on documents that it filed *more than a year later*, in which it recommended that the intrastate allocation factor be optional for direct sellers.  Plt.'s MSJ at 44:1-7.  Somehow, apparently, when MetroPCS filed its 2015 comments, the CPUC should have anticipated its future comments, and read them all together.  And even in 2016—that is, when the CPUC adopted the intrastate allocation factor—MetroPCS "welcome[d] the adoption of an intrastate factor in calculating the MTS Surcharge rate and believe[d] that the use of such a factor is consistent with the Act."  Karanjia Decl., Exh. 32, at 4.  The point remains that MetroPCS first told the CPUC one thing, and then told it—and now the Court—something very different, a fact MetroPCS cannot escape.

### 2.    MetroPCS asked the CPUC to adopt an intrastate allocation factor, which the CPUC did.

The second factor seems equally clear: In 2015 MetroPCS asked for an intrastate allocation factor and, in 2016, the CPUC adopted an intrastate allocation factor, accepting MetroPCS's earlier position.  MetroPCS raises three arguments to the contrary.  First, it notes that that CPUC failed to adopt the intrastate allocation factor in 2015, only adopt it a year later.  Plt.'s MSJ at 44:7-10.  Second, MetroPCS asserts that, when the CPUC did adopt the intrastate allocation factor, it "clearly understood MetroPCS to be requesting an optional safe harbor".  *Id.*

at 44:12 (internal punctuation omitted).  And third, MetroPCS says that it asked for a "reasonable factor based on a weighted average" and the CPUC's intrastate allocation factor is "neither reasonable nor based on a weighted average."  *Id.* at 44:16-18.

MetroPCS's first argument appears to be a quasi-estoppel argument of its own.  Because the CPUC rejected the intrastate allocation factor in 2015, MetroPCS seems to be saying, the CPUC was precluded from relying on MetroPCS's 2015 comments in 2016, and is precluded from relying on them now.  But it is well-understood that "'broad interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests.'"  *New Hampshire*, 532 U.S. at 755 (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4477, p. 784 (1981)).  Public policy dictated the result here: by failing to adopt an intrastate allocation factor in 2015, the CPUC arguably may have violated state law, and needed to correct that problem.  *See* Koltz Decl., Exh. 1, at 2 n.3.

Moreover, it is not true that, to satisfy the "judicial acceptance" prong, the earlier adjudicatory body must have immediately and unswervingly adopted every argument that the party made.  In *Hamilton v. State Farm Fire & Casualty Co.*, a debtor was estopped from suing an insurer for property losses because he had failed to list his claims against the insurer as an asset in an earlier bankruptcy proceeding.  270 F.3d 778 (9th Cir. 2001).  Relying on the debtor's misrepresentation, the bankruptcy court discharged his debts.  *Id.* at 781.  The bankruptcy trustee later discovered the misrepresentation and moved to dismiss the debtor's bankruptcy.  *Id.*  The bankruptcy court dismissed the bankruptcy and vacated the discharge.  *Id.*  The Ninth Circuit held that the misrepresentation sufficed to estop the debtor from then bringing suit against the insurer for property losses.  *Id.* at 784.  It did not matter that the discharge had been vacated: it was enough that the debtor's misrepresentation "deceived the bankruptcy court and [the] creditors, who relied on the [bankruptcy] schedules to determine what action, if any, they would take in the matter."  *Id.* at 785.  Nor did the Ninth Circuit "imply that the bankruptcy court must actually discharge debts before the judicial acceptance prong may be satisfied.  The bankruptcy court may 'accept' the debtor's assertions by relying on the debtor's nondisclosure of potential claims in many other ways."  *Id.* at 784.

1    MetroPCS cannot plausibly argue that the CPUC did not rely on the 2015 comments to

2   determine what action to take: the CPUC expressly discussed those comments in Resolution T-

3   17504.  Karanjia Decl., Exh. 1, at 13-14.  In Resolution T-17542, although the CPUC did not

4   expressly mention the 2015 comments, it adopted the reasoning in those comments.  Karanjia

5   Decl., Exh. 2, at 15.  And, in Resolution T-17568, the CPUC again expressly cited MetroPCS's

6   2015 comments as justification for adopting the intrastate allocation factor.  Karanjia Decl.,

7   Exh. 3, at 16-17.  It would be impossible to explain why the CPUC took those actions if it had

8   not "accepted" the 2015 comments.  And if judicial estoppel can apply where a party's position

9   initially succeeded but ultimately failed, *see Hamilton*, 270 F.3d at 784-85, it must also apply

10  here, where MetroPCS's position initially failed but ultimately succeeded.

11    Second, as to MetroPCS's argument that, by the time the CPUC adopted the intrastate

12  allocation factor, the CPUC could not rely on the 2015 comments because MetroPCS's position

13  had already changed: this argument implies that a party can make itself estoppel-proof if it

14  simply changes its mind often enough.  That cannot be the rule.

15    Third, MetroPCS's 2015 comments suggested that a reasonable interstate allocation

16  factor might be, "*e.g.*, a weighted average", not that a weighted average was the only way to

17  calculate a reasonable intrastate allocation factor.  Karanjia Decl., Exh. 31, at 3 (emphasis

18  added).  And, to the extent MetroPCS now argues that the CPUC calculated the intrastate

19  allocation factor in an unreasonable way—that is at issue in this litigation.  It puts the cart

20  before the horse to claim that, because MetroPCS now argues that the CPUC got the factor

21  wrong, it should not be estopped from making that argument in the first place.

22    Finally, the "judicial acceptance" factor is not an "inflexible prerequisite" to application

23  of the doctrine.  *New Hampshire*,  532 U.S. at 751. The Ninth Circuit has recognized as much:

24  in *Rissetto*, it surveyed the case law and explained that

25         only a few cases hold categorically that prior judicial adoption is
       required for application of judicial estoppel . . . . [M]ost of the
26         cases can be read as saying that judicial estoppel is *particularly*
       appropriate when the party succeeded in the prior proceeding, but
27

28

---

1

they do not really say that the doctrine *cannot* be applied absent
such prior success.

2

3

*Rissetto*, 94 F.3d at 601 n.3 (emphasis in original).  Thus, even if the CPUC had *never* relied on

4

MetroPCS's 2015 comments, the Court could still find that MetroPCS is estopped from making

5

this argument now.

6

The lodestar of equity is, always, that justice be done.  *EEOC v. Recruit U.S.A., Inc.*, 939

7

F.2d 746, 753 (9th Cir. 1991).  MetroPCS clearly asked the CPUC to adopt an intrastate

8

allocation factor, and clearly said that to do so would comply with federal law.  It would be

9

unjust to allow it to argue the contrary now.

10

## II.    The Prepaid MTS Surcharge comports with federal law.

11

Even if MetroPCS's previous representations do not estop it from bringing this claim

12

now, they cast at least some doubt on its claim that the Prepaid MTS Surcharge violates a slew

13

of federal authority.  As the following pages demonstrate, that doubt is justified: MetroPCS has

14

not shown the surcharge to be preempted.

15

### A.    Federal law, FCC regulations, and MetroPCS itself all recognize that, surcharging wireless services requires some overlap between interstate and intrastate revenues.

16

17

An error runs throughout MetroPCS's brief, coloring every argument it makes: "the

18

allocation between surchargeable *intra*state revenues and non-surchargeable *inter*state and other

19

revenues must add up to 100%."  Plt.'s MSJ at 27:9-10 (emphasis in original); *see also*, *e.g.*, *id.*

20

at 1:27-28 ("The CPUC may impose surcharges or fees *only* on intrastate telecommunications

21

services.") (emphasis in original).  The CPUC does not deny that it cannot surcharge interstate

22

services in any great measure, any more than the FCC could do for intrastate services.  But in

23

the telecommunications industry, the dividing line between what is properly *inter*state and what

24

is properly *intra*state is rarely clear; some overlap is inevitable.  *See La. Pub. Serv. Comm'n*,

25

476 U.S. at 360.  Everyone—from Congress, to the FCC, to MetroPCS itself—recognizes this.

26

The federal Mobile Telecommunications Sourcing Act ("MTSA") provides that, in some

27

circumstances, where a carrier's charges for mobile telecommunications services "are

28

aggregated with and not separately stated from charges that are subject to taxation, *then the*

1   *charges for nontaxable mobile telecommunications services may be subject to taxation*" by a

2   taxing jurisdiction, like a state.  4 U.S.C. § 123(b) (emphasis added).  In essence, in some cases,

3   a state may surcharge 100% of an otherwise interstate or non-surchargeable service.  And this is

4   legal.

5          Similarly, in its *Bundling Order*, the FCC allowed many telecommunications carriers to

6   bundle together telecommunications and non-telecommunications services for a single price.  *In*

7   *re Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 16 FCC Rcd 7418,

8   7419, ¶ 1 (2001) ("*Bundling Order*").  It noted, however, that if "carriers generate revenues

9   from bundled packages of telecommunications services and [non-telecommunications] services

10  . . . the calculation of their universal service contribution becomes more complicated."  *Id.* at

11  7446, ¶ 48.  To make the process as simple as possible, the FCC offered two options.  First,

12  carriers could contribute to the federal fund "based on the unbundled service offering prices."

13  *Id.* at 7447, ¶ 50.  That is, they could break out the cost of each element of their bundle and

14  contribute only on the surchargeable portion of the bundle.

15             Alternatively, contributors may elect to treat *all* bundled revenues
               as telecommunications service revenue for purposes of
16             determining their universal service options.  For example, assume
               that a carrier offers a bundled package of voice-mail and basic
17             phone service to end-users at $25.00 per month.  The carrier
               decides that it cannot distinguish revenue for the basic service (the
18             telecommunications service) from voice-mail (the non-
               telecommunications service).  The carrier would report
19             telecommunications revenue of $25.00 per month.
20

21  *Id.* at 7447-48, ¶ 51 (emphasis added).  Thus, in some cases, the FCC may surcharge 100% of a

22  service bundle comprising both surchargeable and non-surchargeable elements.  And this too is

23  legal.

24          Or consider the FCC's safe harbor: for purposes of contributing to the federal USF,

25  carriers may report their interstate revenue to the FCC by using "'safe harbor' percentages" that

26  the FCC believes "*reasonably approximate* the percentage of interstate wireless

27  telecommunications revenues generated by each category of wireless telecommunications

28

---

providers." *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 21252, 21253, ¶ 1 (1998) ("*First Wireless Safe Harbor Order*") (emphasis added).  The first year the FCC set the safe harbor, in making that "reasonable approximation," it based its determination "on the level of interstate traffic experienced by wire*line* [i.e., landline] providers."  *Id.* at 21259, ¶ 13 (emphasis added).  That was formulated less on extensive record evidence than on its absence: "we do not have evidence before us to indicate that the level of interstate wireless traffic experienced by [wireless providers] is less than the level experienced by wireline providers." *Id.*  In other words, the FCC made an educated guess.  However good that guess, surely the possibility exists that, for any given carrier using the FCC's safe harbor, the FCC may surcharge at least some intrastate revenue.  And yet this is legal.

Finally, assuming that MetroPCS wins this case: MetroPCS seeks to have the Prepaid MTS Surcharge apply not to the entire sales price, but to a portion of it, and to allow direct sellers to adopt carrier-specific surcharges.  But MetroPCS accepts that, for indirect sellers, the CPUC's intrastate allocation factor cannot be optional; it must be mandatory.  *See* Karanjia Decl., Exh. 32, at 4-5.  Many carriers do business both in direct sales and indirect sales.  Assume the CPUC adopts an intrastate allocation factor that is the precise inverse of the FCC safe harbor: 62.9%.  *See* Plt.'s MSJ at 36:19-37:1.  Then assume a wireless carrier that makes both direct and indirect sales, and sells only two services: 50% intrastate voice and 50% data, bundled together for a single price.  A customer buying $100 worth of that carrier's service directly from the carrier would pay the Prepaid MTS Surcharge on 50% of the sales price.  That same customer, buying that same $100 bundle from a Walmart, would pay the Prepaid MTS Surcharge on 62.9% of the sales prices.  That customer would therefore be paying the surcharge on about 26% of the interstate portion of their service.  According to MetroPCS's argument here, that could not be legal.  And yet, contends MetroPCS, it is.  *See* Karanjia Decl., Exh. 32, at 4-5.

Thus, it cannot be true that "the allocation between surchargeable *intra*state revenues and non-surchargeable *inter*state and other revenues must add up to 100%."  Plt.'s MSJ at 27:9-10 (emphasis in original).  Some overlap must always exist, but as long as the surcharging

1    jurisdiction—the FCC or the states—reasonably approximates which portion they are entitled to

2    surcharge, that method is legal.  The CPUC has made such a reasonable approximation here.

3         **B.      The Prepaid MTS Act does not violate Section 254(f).**

4         47 U.S.C. § 254(f) gives the states broad discretion to implement universal service rules,

5    subject to several restrictions applicable here.  First, the state's rules must be "not inconsistent

6    with the Commission's rules to preserve and advance universal service."  Second, the state's

7    rules must be "equitable and nondiscriminatory."  Third, the state's rules must not "rely on or

8    burden Federal universal service support mechanisms."  Section 254(f) does not, however,

9    "specifically delineate[] the revenue base against which federal or state USF surcharges may be

10   assessed . . . ."  *Telstar Res. Group, Inc. v. MCI, Inc.*, 476 F. Supp. 2d 261, 268 (S.D.N.Y.

11   2007).  Despite that lack of a clear delineation, MetroPCS argues that the Prepaid MTS

12   Surcharge impermissibly reaches the carriers' interstate revenue, and therefore argues that the

13   Prepaid MTS Surcharge falls afoul of all three restrictions.[3]  Plt.'s MSJ, at 18-20.

14        Federal law can preempt a state law in one of three situations:

15             [1] If Congress evidences an intent to occupy a given field, any
               state law falling within that field is preempted.  If Congress has not
16             entirely displaced state regulation over the matter in question, state
               law is still preempted [2] to the extent it actually conflicts with
17             federal law, that is, when it is impossible to comply with both state
               and federal law, or [3] where the state law stands as an obstacle to
18             the accomplishment of the full purposes and objectives of
               Congress.
19

20   *Silkwood*, 464 U.S. at 248 (citations omitted).  It is not entirely clear whether MetroPCS is

21   asserting conflict preemption or obstacle preemption here, or perhaps both.  In any event, as in

22   all preemption cases, the Court must "start with the assumption that the historic police powers

23   of the States were not to be superseded by the Federal Act unless that was the clear and manifest

24

25   _____

26   [3] MetroPCS's argument that the Prepaid MTS Surcharge is "inconsistent with" Section 254
     essentially reiterates its argument that the Prepaid MTS Surcharge violates the *Open Internet*
27   *Order*.  *See* Plt.'s MSJ 18:10-16.  The CPUC will address the *Open Internet Order* all in one
     place.
28

1    purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal punctuation

2    omitted).  The Telecommunications Act of 1996 also contains a statutory presumption against

3    preemption: "This Act and the amendments made by this Act shall not be construed to modify,

4    impair or supersede Federal, State, or local law unless expressly provided in such Act or

5    Amendments."  Pub. L. No. 104-104, 110 Stat. 56, § 601(c)(1),  *reprinted in* 47 U.S.C. § 152

6    (Addendum A-1).  Section 254 was one of the "amendments made by" the '96 Act.  *See* Pub. L.

7    No. 104-104, 110 Stat. 56, § 101 (establishing Part II of Title II of 47 U.S.C.).  Thus, the Court

8    should not find that Section 254 preempts California law or the CPUC's regulations unless the

9    conflict is "clear and manifest."  Here, there is no clear conflict.

> **1.     The Prepaid MTS Surcharge is not "inequitable and discriminatory" because it treats all similarly-situated California prepaid MTS consumers the same.**

12       MetroPCS argues that the Prepaid MTS Surcharge results in a greater assessment of

13   USF surcharges against those carriers doing more *inter*state business than those carriers doing

14   more *intra*state business, rendering the Prepaid MTS Surcharge "inequitable and

15   discriminatory"  in violation of Section 254(f).  Plt.'s MSJ at 18-19.  For that proposition,

16   MetroPCS cites *AT&T Corp. v. Public Utilities Commission of Texas*, 373 F.3d 641 (5th Cir.

17   2004).  The Court there held that, when Texas imposed a fee "on all telecommunications

18   carriers who provide any intrastate service", and when "the fee applied to all revenue [the

19   carriers] derived from intrastate, interstate, and international calls originating in Texas", that

20   burdened "multijurisdictional carriers more severely than pure interstate or intrastate carriers",

21   and was therefore discriminatory.  373 F.3d at 644, 647.  That case might apply here, if

22   California surcharged carriers.  It does not.

23       The federal USF provision, Section 254(d), is analogous to Section 254(f) in that the

24   FCC may only require that contributions to the federal USF be made "on an equitable and

25   nondiscriminatory basis . . . ."  47 U.S.C. § 254(d).  The two are "companion sections" and their

26   nondiscrimination language should be read the same.  *AT&T v. Pub. Util. Comm'n of Tex.*, 373

27   F.3d at 646.  Under Section 254(d), "in determining what is equitable and nondiscriminatory,

1    the [FCC] looks to ensure that the contribution methodology does not treat *similarly situated*

2    *contributors* differently."   *In re Universal Service Contribution Methodology*, 21 FCC Rcd.

3    7518, 7532, ¶ 24 (2006) ("*Contribution Methodology Order*") (emphasis added), *overturned in*

4    *part by Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007).

5         To determine whether the Prepaid MTS Act is equitable and nondiscriminatory,

6    therefore, we should look to ensure that those who pay the Prepaid MTS Surcharge—the

7    prepaid consumers—are treated the same.  They are.  A California consumer who buys $100

8    worth of prepaid service today will pay the exact same surcharge whether she buys that service

9    from MetroPCS, or Verizon, or AT&T, and whether she buys that service directly from the

10   carrier or from an indirect seller.

11        MetroPCS is wrong when it argues that the relevant comparison class is the carriers.

12   Plt.'s MSJ 18:17-27.  It is also wrong to argue that the Prepaid MTS Surcharge is discriminatory

13   because the surcharge burdens prepaid consumers more than postpaid consumers.  Plt.'s MSJ

14   19:1-9.  Even if that were true as a matter of fact, it is legally irrelevant here, because the two

15   classes of consumers are not similarly situated.  In postpaid service, the carrier always has a

16   contractual relationship with the customer, and can always calculate an individualized surcharge

17   amount.  On the other hand, the majority of prepaid customers do not have such a relationship

18   with their carrier: about 60-70% of the prepaid market is in indirect sales.  Karanjia Decl., Exh.

19   11, at 1.  As MetroPCS has recognized, "indirect sellers do not generally have information

20   available to them that would allow them . . . to determine what portion of revenue collected is

21   jurisdictionally intrastate . . . ."  Karanjia Decl., Exh. 32, at 4.  Thus the majority of prepaid

22   consumers buy service from sellers who *cannot* calculate an individualized surcharge amount.

23   And, as MetroPCS must know, allowing direct sellers to assess one surcharge rate but requiring

24   indirect sellers to assess a different surcharge rate *would* treat some prepaid consumers

25   differently from others: MetroPCS asked the CPUC to make the intrastate allocation factor

26   mandatory for indirect sellers because that might close "at least part of the disparity between

27   what a direct and indirect seller would otherwise be able to assess on consumers."  *Id.*  Rather

28   than curing any discrimination, MetroPCS's proposed solution would create it.

One final note remains.  MetroPCS quotes out of context portions of the CPUC's legislative analysis of AB 1717, and of the deposition transcript of the CPUC's deponent, Eric Van Wambeke.  Plt.'s MSJ 19:14-22.  It uses these quotes to misrepresent the CPUC; to suggest that the CPUC knew that *its interpretation* of the Prepaid MTS Act would burden prepaid consumers more heavily than postpaid consumers.  Given the above discussion, this is not really relevant, but the CPUC feels compelled to correct the misrepresentation.

Before 2014, prepaid carriers were paying most of the California USF surcharges out of pocket, and not passing the surcharge onto customers.  *See* Koltz Decl., Exh. 5, at 6.  The purpose of AB 1717 was to shift that surcharge burden to the consumer.  *Id.*  That benefitted service providers because they were "no longer . . . required to pay surcharges out of profits, and prepaid consumers [would] instead pay the surcharges on top of the price for service." Karanjia Decl., Exh. 10, at 6.  But the "group that definitely [would] not benefit from this bill are customers of prepaid service because they [would] be required to pay an additional amount on top of the price of service . . . ." *Id.* at 7.[4]  The CPUC recognized a further impact on prepaid customers: the Prepaid MTS Act would increase the CPUC's administrative costs, which "point[ed] to higher surcharges on users of communications services."  Karanjia Decl., Exh. 8, at 6; *see also* Van Wambeke Depo., at 40:20-23 ("[B]ecause of the additional costs of the MTS program, it would necessitate a much higher surcharge rate than is -- was currently required at the time.").  That is the discrimination that concerned the CPUC, and one reason the CPUC opposed the bill—yet it passed with the support of the industry.  For MetroPCS to suggest otherwise misstates the record.

In sum, because the Prepaid MTS Surcharge applies evenly to all prepaid consumers in California, it is neither inequitable nor discriminatory.

---

[4] *See also*, *e.g.*, Karanjia Decl., Exh. 11, at 8 ("[W]hile carriers don't like paying the fees, they're clearly capable, so why reassign this burden to prepaid customers, who are often low-income?  *The Committee may wish to consider the merits of explicitly reassigning the burden of paying fees and charges from sophisticated service providers to consumers*.") (emphasis in original).

2.      **The Prepaid MTS Surcharge does not "rely on" or "burden Federal universal service support mechanisms" because California and the FCC surcharge different revenue streams.**

MetroPCS asserts that the Prepaid MTS Surcharge "relies on or burdens Federal universal service support mechanisms" because the Prepaid MTS Surcharge assesses "interstate revenues already subject to federal USF assessments."  Plt.'s MSJ at 19-20.  Only one federal case has interpreted Section 254(f)'s "rely on or burden" language: *AT&T Communications, Inc. v. Eachus*, 174 F. Supp. 2d 1119 (D. Or. 2001).

In that case, the Oregon Public Utilities Commission required "AT&T and other carriers to pay a surcharge on the revenue that they collect from intrastate and international telecommunications service that they provide to service addresses in Oregon."  *Id*. at 1121.  The *Eachus* court found that requirement to violate Section 254(f), because "[w]here a state's USF regulations 'depend on' the same interstate revenues utilized by the federal universal service fund program, it improperly 'relies' on federal universal service support mechanisms."  *Id*. at 1124 (quoting 47 U.S.C. § 254(f)).

*Eachus* does not apply here.  First, several state courts have pointed out that its conclusion is suspect: a state law that double-taxes a carrier's interstate revenues might burden the *carrier*, but "the burden on carriers and the burden on the federal support mechanism are not necessarily synonymous."  *Office of Regulatory Staff v. S.C. Pub. Serv. Comm'n*, 647 S.E.2d 223, 231 (S.C. 2007); *see also Bell Atl. Mobile, Inc. v. Dept. of Pub. Util. Control*, 754 A.2d 128, 148 (Conn. 2000) ("[M]erely because there may be an overlapping in terms of the revenues being assessed for both funds does not suggest that the federal funding mechanisms have been relied on or burdened in any way, which is what the statute prohibits.").  Second, even assuming *Eachus* was correctly decided, California's USF regulations do not depend on "the same interstate revenues utilized by the federal universal service fund program . . . ."  *Eachus*, 174 F. Supp. 2d at 1124.  Again, California surcharges the end user, not the carrier.  Indeed, the point of the Prepaid MTS Act was to ensure that "prepaid MTS providers would no longer be required to remit surcharges and fees out of their existing (largely wholesale) revenue streams.

Instead, carriers would be able to keep their existing revenue streams whole, by passing the surcharge and fee costs directly on to prepaid MTS consumers."  Koltz Decl., Exh. 4, at 6. Thus, even assuming that a burden on carriers equates to a burden on the federal USF mechanism, *Eachus* is inapposite because California does not burden the carriers.

### C.     Because the Prepaid MTS Surcharge does not substantially surcharge mobile data, it does not violate the *Open Internet Order*.

MetroPCS claims that the FCC's *Open Internet Order*,[5] issued in 2015, preempts any state universal service assessments on broadband, and that a later FCC order, the *Restoring Internet Freedom Order*,[6] released on January 4, 2018, continued the *Open Internet Order*'s preemption of state Universal Service assessments on broadband service.  Plt.'s MSJ at 16-17. As explained elsewhere in this brief, California does not impermissibly surcharge broadband Internet access service.  Accordingly, the Prepaid MTS surcharge does not conflict with either the *Open Internet Order* or the *Restoring Internet Freedom Order*.

The CPUC further notes that MetroPCS's reliance on the *Restoring Internet Freedom Order* is improper, since that Order is not yet in effect.  The Order provides that it will become effective "upon the effective date announced when the Commission publishes a notice in the Federal Register . . . ."  *Restoring Internet Freedom Order*, 2018 WL 305638, at *122, ¶ 354. On February 22, 2018, the FCC announced that minor parts of the *Restoring Internet Freedom Order* would become effective on April 23, 2018.  The FCC is awaiting approval from the Office of Management and Budget before the bulk of the *Restoring Internet Freedom Order*, including any preemptive provisions, becomes effective.

In addition, uncertainty abounds about which, if any, of the two orders will be good law, as both are currently the subject of litigation.  A petition for writ of certiorari to review the

---

[5] *In re Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("*Open Internet Order*"), *rev. denied*, *U.S. Telecom. Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *petition for cert. filed* (U.S. Sept. 28, 2017) (No. 17-504).

[6] *In re Restoring Internet Freedom*, 2018 WL 305638 (Jan. 4, 2018), *petitions for rev. filed* (D.C. Cir. Nos. 17-1051 *et al.*).

*Open Internet Order* is pending before the U.S. Supreme Court, and many parties, including the CPUC, have petitioned the D.C. Circuit to review the *Restoring Internet Freedom Order*. Because of this uncertainty, should the Court find these Orders material to its decision, the Court may wish to consider deferring judgment until the D.C. Circuit and the Supreme Court complete their review of these Orders.

> **D.    Neither the *Contribution Methodology Order* nor the *Bundling Order* clearly indicates that the FCC sought to preempt California law.**

MetroPCS next asserts that the Prepaid MTS Surcharge violates the FCC's *Contribution Methodology Order*, 21 FCC Rcd 7518, and its *Bundling Order*, 166 FCC Rcd 7418.  Plt.'s MSJ at 23-28.  Although a federal agency may preempt state law, there must be "a clear indication" that it intends to do so.  *Global NAPs*, *Inc. v. Verizon New England*, *Inc.*, 444 F.3d 59, 71 (1st Cir. 2006) (citing *Hillsborough County v. Automated Med. Labs. Inc.*, 471 U.S. 707, 718 (1985)).  "The requirement of a clear indication of the agency's intent to preempt is especially important in the context of the [Telecommunications Act of 1996], which divide[d] authority among the FCC and the state commissions in an unusual regime of 'cooperative federalism,' with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states."  *Global NAPs*, 444 F.3d at 72 (second alteration in original; internal quotation marks omitted).

Here, MetroPCS notes that the *Contribution Methodology Order* sets forth the FCC's "'policy preference that providers contribute to the [federal Universal Service] Fund based on their actual data rather than on a safe harbor percentage where possible.'"  Plt.'s MSJ, at 24:6-7 (quoting 21 FCC Rcd, at 7534, ¶ 28 (emphasis removed; alteration in original)).  It also notes that carriers may bundle together telephony and non-telephony services and asserts that, when they do so, the *Bundling Order* has "'encourage[d]'" carriers to report their revenues based on "'reasonable' and auditable allocation methods."  Plt.'s MSJ at 25:19-23 (quoting 16 FCC Rcd, at 7447-48, ¶¶ 50, 53-54 (alteration in original)).  It argues, therefore, that the FCC has preempted California from adopting any rules conflicting with these orders.  MetroPCS's argument has multiple problems.

---

1    First, on their faces, both the *Contribution Methodology Order* and the *Bundling Order*

2    discuss only how carriers should contribute to the *federal* USF; neither addresses how states

3    should calculate state USF contributions.  Nothing California does would prevent a carrier from

4    reporting its revenues to the FCC based on actual data; it would be entirely free to do so.

5    Second, MetroPCS misrepresents what the *Bundling Order* says.  The FCC *did not*

6    "encourage" carriers to use "other 'reasonable' and auditable allocation methods." Plt.'s MSJ at

7    25:21-23.  As discussed above in Section II.A, when carriers determine how to contribute to the

8    federal USF on a bundled service, the FCC sets forth two default options: first, carriers may

9    contribute to the federal fund "based on the unbundled service offering prices. . . .

10   Alternatively, contributors may elect to treat all bundled revenues as telecommunications

11   service revenue for purposes of determining their universal service options."  16 FCC Rcd, at

12   7447-7448, ¶¶ 50-51.  As the FCC explained:

13           These allocation methods are "safe harbors" and will be afforded a
             presumption of reasonableness in an audit or enforcement context.
14           Both of the above-described methods enable carriers to allocate
             revenues for purposes of universal service contributions in an
15           easily ascertainable and reasonable manner. These methods also
             decrease the investigative burden in an audit or other enforcement
16           proceeding because the necessary information is easily obtained
             and verified. Thus, *these allocation methods provide certainty to*
17           *both carriers and the Commission, and we encourage their use.*

18

19   *Id.* at 7448, ¶ 52 (emphasis added).  The FCC continued: "Carriers *may choose* to use allocation

20   methods other than the two described above.  Carriers should realize, however, that any other

21   allocation methods may not be considered reasonable, and will be evaluated on a case-by-case

22   basis in an audit or enforcement context."  *Id.* at 7448, ¶ 53 (emphasis added).  So MetroPCS

23   has it exactly backwards: the FCC encouraged carriers to use a safe harbor method, *not* an

24   individualized method, and if carriers chose the latter, they would face additional scrutiny.

25   Third, even if either the *Contribution Methodology Order* or the *Bundling Order*

26   concerned a state's USF, and even if they held the meaning MetroPCS ascribes to them, both

27   are hortatory rather than mandatory: the *Contribution Methodology Order* expresses a

28

"preference"; the *Bundling Order* "encourages."  MetroPCS offers no authority for the proposition that California can be preempted by a preference.  Rather, the relevant authority runs the other way.  *See Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 906-07 (3d Cir. 1990) (refusing to find that an international free-trade agreement preempted Pennsylvania's buy-American law where the free-trade agreement's language was "hortatory rather than mandatory"); *accord In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160, 1167-68 (N.D. Cal. 2001) (same analysis as to treaty encouraging but not requiring non-judicial resolution of war claims); *and cf. Wardair Canada, Inc. v. Fla. Dept. of Revenue*, 477 U.S. 1, 9 (1986) (finding in a Commerce Clause case that a state tax on aviation fuel did not conflict with an "*aspiration . . .* to eliminate all impediments to foreign air travel—including taxation of fuel") (emphasis in original).

Finally, MetroPCS cites a third FCC Order, *In re Universal Service Contribution Methodology*, 25 FCC Rcd 15651, 15658, ¶ 17 (2010), for the notion that the states must use exactly the same methodology to calculate contributions to the state USF as the FCC uses to calculate contributions to the federal USF.  Plt.'s MSJ at 27-28.  MetroPCS fails to note, however, that this Order applies to "nomadic interconnected Voice over Internet Protocol (VoIP) service providers," not to wireless service providers.  25 FCC Rcd, at 15651, ¶ 1. Unless MetroPCS anticipates changing its business model significantly, this Order just does not apply.  Indeed, if anything, it cuts against MetroPCS's argument.  The Order does specifically provide that, when a state proposes to surcharge VoIP providers, it "must allow those providers to treat as intrastate for state universal service purposes the same revenues that they treat as intrastate under the [FCC]'s universal service contribution rules."  *Id.* at 15658, ¶ 17.  This shows that the FCC will command the states to adopt a particular contribution method when it wants to.  That it did so with respect to VoIP service, but not with respect to wireless service, strongly indicates that the FCC chose to preserve the states' freedom to adopt different methods for wireless service.  *See Automated Med. Labs*, 471 U.S. at 718 ("[B]ecause agencies normally address problems in a detailed manner . . . we can expect that they will make their intentions clear if they intend for their regulations to be exclusive.); *cf. Russello v. United States*, 464 U.S.

16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts internationally and purposely in the disparate inclusion or exclusion.").

Outside of the limited context of nomadic interconnected VoIP, nothing in these FCC orders evinces a "clear indication" that the FCC intended to preempt state regulation.

### E.   The Mobile Telecommunications Sourcing Act does not preempt the Prepaid MTS Act, as implemented by the CPUC.

MetroPCS relies on one provision in the Mobile Telecommunications Sourcing Act, 4 U.S.C. § 123(b), to claim that the MTSA "preempts surcharges on interstate voice services" and thus prohibits the application of an intrastate allocation factor to the Prepaid MTS Surcharge. *See* Plt.'s MSJ at 20:14-15.  Not so.

Section 123(b) provides in its entirety:

> Additional taxable charges. -- If a taxing jurisdiction does not otherwise subject charges for mobile telecommunications services to taxation and if these charges are aggregated with and not separately stated from charges that are subject to taxation, then the charges for nontaxable mobile telecommunications services may be subject to taxation unless the home service provider can reasonably identify charges not subject to such tax, charge, or fee from its books and records that are kept in the regular course of business.

MetroPCS asserts that Section 123(b) confers a "right" that "expressly allow[s] carriers to rely on their books and records to allocate their interstate and other non-surchargeable revenues on an individualized basis" when services are bundled for a single price.  Plt.'s MSJ at 22:20-27. That reads far too much into Section 123(b)'s plain language, which does not apply where state law dictates how to surcharge bundles of wireless service that include both *intra-* and *inter*state telephony services.  That is precisely what the Prepaid MTS Act does.  *See* Cal. Rev. & Tax. Code §§ 42010(a)(1); 42018(a); Cal. Pub. Util. Code §§ 319(b), (c).

In 2015, against a challenge from Sprint, New York's high court upheld a state law that taxed the entire price of flat-rate bundled mobile services, including interstate and international services.  *People ex rel. Schneiderman v. Sprint Nextel Corp.*, 42 N.E.3d 655 (N.Y. 2015), *cert. denied sub nom. Sprint Nextel Corp. v. New York*, 136 S. Ct. 2387 (2016).  Like MetroPCS,

1    "Sprint cite[d] 4 USC § 123 (b) for the presumption that taxes may not be applied to interstate

2    and international calls which are bundled with intrastate calls where the service provider can

3    reasonably identify charges not subject to the tax."  *Id*. at 661.  The court rejected Sprint's

4    argument, stating:

5              This bundling provision expressly opens by respecting and
               incorporating state authority, rather than restricting it. Section 123
6              (b) anticipates disaggregation only of charges "not otherwise
               subject . . . to [state] taxation." Because the Tax Law imposes a tax
7              on the entire amount of the fixed monthly charge for voice
               services, there is no exemption for any interstate and international
8              component that would even trigger section 123 (b)'s exception
               here.
9

10   *Id*.  As does New York's law, the Prepaid MTS Act imposes a surcharge on the entire amount of

11   the charge for wireless service.  *See* Cal. Rev. & Tax. Code § 42010(a)(1).  Thus, Section

12   123(b) does not apply.

13         Even if section 123(b) were to apply, its plain language does not give wireless carriers

14   an enforceable "right to use individualized revenues allocations for the wireless voice

15   component of their bundled plans." Second Amended Compl. ("Complaint") [Dkt. 49]; *see also*

16   Plt.'s MSJ at 22:20-27, 28:9-12.  "[S]tatutes that focus on the person regulated rather than the

17   individuals protected create 'no implication of an intent to confer rights on a particular class of

18   persons.'" *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1095 (9th Cir. 2005)

19   (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)).  The MTSA identifies additional

20   charges that a taxing jurisdiction may reach, but confers no explicit protections on the carriers.

21   Thus, the statute does not create a general right to individualized revenue allocations.

22         Finally, MetroPCS plucks a few words from the MTSA's legislative history to

23   mischaracterize its purpose, stating that "the MTSA encourages the 'bundling' of mobile

24   services."  Plt.'s MSJ at 20:19-20.  This argument then treats the "encouragement" of bundling

25   as if it were an enforceable federal policy.  *See id*. at 22:20-22, 28:14-17.  MetroPCS's premise

26   is wrong: The MTSA's stated purpose is "to establish sourcing requirements for State and local

27   taxation of mobile telecommunications services."  Pub. L. No. 106–252, 114 Stat. 626,

28   Synopsis.  The only two provisions of the MTSA that discuss bundled service, Sections

116(c)(2) and 123(b), do not encourage it.  Rather, they provide rules for taxing mobile services that are part of a bundle.  And even if the MTSA did "encourage" bundling, the encouragement of a particular policy within a statute (and much less within legislative history) does not create enforceable federal policy; only the unambiguous text of the statute can do so.  *See Pac. Legal Found. v. State Energy Res. Conservation & Dev. Comm.*, 659 F.2d 903, 926 (9th Cir. 1981).  The MTSA's text is certainly not unambiguous.  Thus, it does not protect bundling or create an enforceable policy of which the CPUC runs afoul.

> **F.    Because Congress has spoken, the dormant Commerce Clause does not apply.**

MetroPCS finally argues that, because it double-collects on carriers' interstate revenues, the Prepaid MTS Surcharge burdens interstate commerce, thereby violating the dormant Commerce Clause.  Plt.'s MSJ at 20:4-13.  A dormant Commerce Clause analysis is inappropriate, however, where "the Federal Government has affirmatively acted, rather than remained silent . . . ."  *Wardair Canada*, 477 U.S. at 9.  "When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."  *Northeast Bancorp., Inc. v. Bd. of Governors*, 472 U.S. 159, 174 (1985).  Section 254(f) "explicitly authorizes States to determine the manner in which carriers should contribute to the provision of universal services."  *Util. Reform Network*, 26 F. Supp. 2d at 1213.  MetroPCS alleges that the CPUC has violated Section 254(f)'s substantive provisions; that is for the Court to decide.  Without a doubt, however, "the commerce power of Congress is not dormant, but has been exercised by that body" and MetroPCS's dormant Commerce Clause challenge is therefore misplaced.  *Northeast Bancorp*, 472 U.S. at 174.

> **III.    Because the CPUC's intrastate allocation factors reasonably approximated the intrastate portion of the prepaid wireless carriers' service, the Court should defer to that calculation.**

In addition to arguing that the CPUC's adoption of an intrastate allocation factor was generally impermissible, MetroPCS argues that the CPUC's specific, year-to-year calculation method was also impermissible.  Plt.'s MSJ at 29-37.  This Court should not, however, lightly disturb an expert agency's interpretation of the laws it is charged with implementing.  As the

following sections show, the CPUC's calculation of the year-to-year intrastate allocation factors were, if not perfect, then at least substantially reasonable.  MetroPCS's arguments fail.

### A. This Court should defer to the CPUC's fact-heavy calculation of its portion of the Prepaid MTS Surcharge.

California law authorized the CPUC to calculate that part of the Prepaid MTS Surcharge that MetroPCS now challenges.  Cal. Pub. Util. Code §§ 319(b), (c).  And, as noted above, Courts must defer to a state agency's construction of a state law it administers.  *Clallam County*, 849 F.2d at 429.  Moreover, when a court reviews an agency action involving primarily issues of fact, and when the factual determinations involve matters within the agency's expertise, courts defer to the agency's discretion.  *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651 (1990) ("[J]udgments about the way the real world works . . . are precisely the kind that agencies are better equipped to make than are courts."); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004).  When an agency's task is quantitative, the "relevant question is whether the agency's numbers are within a zone of reasonableness, not whether its numbers are precisely right."  *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (internal quotation marks omitted); *see also WJG Tel. Co. v. FCC*, 675 F.2d 386, 389 (D.C. Cir. 1982) ("If the figure selected by the agency reflects its informed discretion, and is neither patently unreasonable nor a dictate of unbridled whim, then the agency's decision adequately satisfies the standard of review.") (internal quotation marks omitted).

The CPUC's determination of the Prepaid MTS Surcharge rate, including the determination of the year-to-year intrastate allocation factors, was largely factual.  Such determinations are well within the CPUC's historical ambit.  *See Indus. Commc'ns Sys. v. Pac. Tel. & Tel. Co.*, 505 F.2d 152, 157 (9th Cir. 1974) (noting, in 1974, that the CPUC had "[f]or over a decade . . . pervasively regulated all elements which affect the relationship between a radio-telephone utility and the public.") (internal quotation marks omitted).  Because the CPUC's calculations here were within a zone of reasonableness, the Court should defer to the CPUC's expertise.

### B.    The CPUC's calculation methodologies were reasonable, and were based on the carriers' own numbers.

MetroPCS asserts that the CPUC's calculation of the 2017 and 2018 intrastate allocation factors was arbitrary.  *See* Plt.'s MSJ at 29:3-9.  In the related context of deciding whether a federal agency's actions were arbitrary and capricious under the Administrative Procedures Act, an agency's decision is not arbitrary where it "has considered the relevant factors and articulated a rational connection between the facts found and the choice made . . . . This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173-74 (9th Cir. 2016) (internal quotation marks and citations omitted).

Here, the CPUC articulated in detail the underpinnings of its year-to-year intrastate allocation factors.  *See* Karanjia Decl., Exh. 3, at 8-13, 17-18; Karanjia Decl., Exh. 4, at 15-18, 24.  Crucial to both the calculations and this case, the CPUC based those factors in large part on the carriers' own numbers.  To calculate the 2017 factor, the CPUC sent data requests asking service providers to report the allocation of its revenue attributable to intrastate services for the first six months of 2016, *see* Karanjia Decl., Exh. 20, and averaged the responses from 27 providers, which together constituted 99.89% of the prepaid wireless industry in California, Karanjia Decl., Exh. 3, at 10-11.  For the 2018 intrastate allocation factor, the CPUC added several additional data points, in order to arrive at a "reasonable estimate of the intrastate portion of prepaid revenues."  Karanjia Decl., Exh. 4, at 16-18.

This method compares favorably to the manner in which the FCC calculates its safe harbors.  When it updated its safe harbor for wireless providers in 2006, for example, the FCC examined a traffic study of only seven wireless service providers, whose interstate minutes of use ranged from 11.9 percent to 37.1 percent, and selected "the highest percentage of interstate and international usage by a wireless company supported in the record" to set the wireless safe harbor at 37.1 percent. *Contribution Methodology Order*, 21 FCC Rcd at 7532-33, ¶ 25.  The FCC did so not because that was the only possible outcome, or even the most reasonable outcome, but because the FCC needed to augment the federal universal service fund, which had

become depleted. *Id.* at 7527-28, ¶ 17; 7531-32, ¶ 23. Likewise, in determining the safe harbor for VoIP providers, the FCC chose not to use any revenue data from VoIP providers in its calculation. Instead, the FCC determined that VoIP service was similar to wireline toll service, and simply used the percentage of interstate revenues reported to the Commission by wireline toll providers to establish the VoIP safe harbor at 64.9 percent. *See id.* at 7545, ¶ 53. When Vonage, a VoIP carrier, challenged this safe harbor, the D.C. Circuit recognized how imprecise the FCC's analysis was, but upheld it nonetheless. *Vonage Holdings Corp.*, 489 F.3d at 1242-43.

The CPUC examined the best data available to it—data provided by service providers representing a vast majority of the prepaid wireless market in California—to reach a reasonable approximation of the carriers' intrastate revenues. Its resolutions describe how it reached its results. The CPUC's process was not arbitrary.

**IV.    Should the Court find that any portion of the Prepaid MTS Act is preempted, principles of federalism and judicial restraint require the Court to allow the California Legislature to rewrite it.**

As the CPUC explained in the beginning of its brief, MetroPCS starts from a misunderstanding of the Prepaid MTS Act. *See* Section I.A-B, *supra*. MetroPCS asserts that *the CPUC* "require[d] prepaid carriers to impose the surcharge 'on the total sales price' of prepaid wireless service bundles . . . ." Plt.'s MSJ at 2:11-12. This is just not true: the Prepaid MTS Act requires it. *See* Koltz Decl., Ex. 1, at 3 (analyzing the statutory scheme and concluding that "prepayment for usage of all telecommunications services—both interstate and intrastate—as well as information services is subject to the prepaid MTS surcharge."). Implicitly recognizing this, if the Court finds that the Prepaid MTS Surcharge is unconstitutional, MetroPCS asks the Court to strike down as much as is necessary of the Prepaid MTS Act to cure the problem. Plt.'s MSJ at 40-41.

The Prepaid MTS Act contains a severability clause. Karanjia Decl., Ex. 7, at 36. Even when a statute contains such a clause, however, federal courts will decline to excise provisions of a statute when that would require the court "to examine and rewrite most of the

1   statute in a vacuum as to how the various provisions were intended to intersect and in a way that

2   would be at odds with the purpose of the statute." *United States v. Manning*, 527 F.3d 828, 840

3   (9th Cir. 2008).  And even when individual provisions of a statute may be severed, if major

4   portions of a statute are preempted, "it may not be practicable to leave the remaining portions

5   standing." *Am. Trucking Ass'ns v. Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009).

6           MetroPCS asks the Court to sever and strike Section 42018(a) of the California Revenue

7   & Taxation Code. Plt.'s MSJ at 40:18-24.  That section provides that "if prepaid mobile

8   telephony services are sold in combination with mobile data services or any other services or

9   products for a single price, then the prepaid MTS surcharge and local charges shall apply to the

10  entire price." Cal. Rev. & Tax. Code § 42018(a).  According to MetroPCS, Section 42018(a)

11  meets California's test for severability.  Plt.'s MSJ at 41:8-9 (quoting *Calfarm Ins. Co. v.*

12  *Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989)).  Were Section 42018(a) the only entire-price

13  provision in the Prepaid MTS Act, the CPUC might be inclined to agree.  But it is not.

14          MetroPCS understands this, and goes on to ask the Court to strike the second sentence of

15  Section 42010(a)(1) of the California Revenue & Taxation Code.  Plt.'s MSJ at 41:6-8.  This

16  sentence reads: "The Prepaid MTS surcharge shall be imposed as a percentage of the sales price

17  of each retail transaction that occurs in this state." Cal. Rev. & Tax. Code § 42010(a)(1).  Nor

18  is this the only entire-price provision at issue, however.

19          Public Utilities Code Section 319(b) provides:

20                  The [CPUC] shall annually, on or before October 1 of each year,
                    commencing October 1, 2015, *compute a reimbursement fee as a*
21                  *percentage of the sales price for mobile telephony services*, to be
                    effective on January 1 of the following year and to be collected
22                  and remitted pursuant to the Prepaid Mobile Telephony Services
                    Surcharge Collection Act . . . .  (emphasis added)
23

24  Likewise, Section 319(c) provides:

25                  The [CPUC] shall annually, on or before October 1 of each year,
26                  commencing October 1, 2015, *compute the individual and*
                    *cumulative amounts of the telecommunications universal service*
27                  *surcharges as a percentage of the sales price for mobile telephony*
                    *services*, to be effective on January 1 of the following year and to
28

be collected and remitted pursuant to the Prepaid Mobile
Telephony Services Surcharge Collection Act . . . . (emphasis
added)

Unlike the provisions of the Revenue and Taxation Code, these entire-price provisions are not standalone sections or even sentences that could be neatly severed. They are individual clauses within a larger sentence, and "federal courts ought not be redrafting state statutes at the level of individual words." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 937 (9th Cir. 2004). Nor could the Court strike Sections 319(b) and (c) in their entirety without fatally harming the statutory scheme. These sections tell the CPUC how to calculate its part of the Prepaid MTS Surcharge. Eliminating those provisions would eliminate the CPUC's role.

Even if the Court could strike down those four entire-price provisions and leave a meaningful Prepaid MTS Surcharge, MetroPCS still could not calculate an individualized, carrier-specific surcharge amount, because "[n]o provision in The Act authorizes direct sellers to collect the prepaid MTS surcharge from a prepaid consumer in a manner different from indirect sellers." Koltz Decl., Exh. 1, at 1 (footnote omitted).

The first sentence of Section 42010(a)(1) reads: "On and after January 1, 2016, a prepaid MTS surcharge shall be imposed on each prepaid consumer and shall be collected *by a seller* from each prepaid consumer at the time of each retail transaction in this state." Cal. Rev. & Tax. Code § 42010(a)(1) (emphasis added). The statute does not distinguish between direct sellers and indirect sellers. Similarly, Section 42010(c)(1) requires the CDTFA to add together the CPUC's reimbursement fee and the universal service surcharges with the 9-1-1 surcharge, and to post "the combined total of the rates of the prepaid MTS surcharge and the rate or rates [of the local charges] on its Internet web site. The posted combined rate *shall be the rate that applies to all retail transactions* during the calendar year beginning April 1 following the posting." Cal. Rev. & Tax. Code §42010(c)(1) (emphasis added); *see also* BOE Formal Issue Paper 15-009, at 4 (Koltz Decl., Exh. 2) ("A direct seller *must utilize the rates posted on the BOE's website* when determining what amounts to collect and remit to the PUC, BOE, and each jurisdiction or local agency.) (emphasis added). Thus, "[a]s stated plainly in statute, the

combined prepaid MTS surcharge rate posted by the CDTFA applies to all retail transactions; no seller is authorized to apply an individualized prepaid MTS surcharge rate."  Koltz Decl., Exh. 1, at 2.  If the Court strikes down those provisions, then it will have stricken the entirety of Section 42010(a)(1), which is the surcharge provision itself.  And at that point, the law becomes meaningless.  Alternatively, the Court would have to insert new language into the Prepaid MTS Act, allowing direct sellers and indirect sellers to assess and collect the surcharge in a different way, something the Court lacks the authority to do.  *See, e.g.*, *Baker Botts L.L.P. v. ASARCO LLC*, __ U.S. __, __, 135 S.Ct. 2158, 2169 (2015) (courts "lack the authority to rewrite" statutes); *Marchetti v. United State*s, 390 U.S. 39, 60 n.18 (1967) (refusing "to insert words that are not now in the statute" because that would "substitute the judicial for the legislative department of the government . . . .") (internal quotation marks omitted).

To get the result MetroPCS seeks, the Court would not only have to sever discrete portions of the statute, but to rewrite it wholesale.  "[A] decision to rearrange or rewrite the statute falls within the legislative, not the judicial, prerogative."  *Xi v. INS*, 298 F.3d 832, 839 (9th Cir. 2002).  If there is a problem with the Prepaid MTS Act, then the California Legislature should be allowed to fix it.

One final irony remains: the Legislature has already tried to fix the law once.  The problem that AB 1717 sought to address was the difficulty some carriers had in surcharging customers with whom they lacked a direct contractual relationship.  Applying the law to direct sellers like MetroPCS was unnecessary to solve that problem.  Thus, the  California Assembly Committee on Utilities & Commerce recommended revising the bill to omit direct sellers: "*As the bill moves forward, the author and sponsors may wish to consider requiring entities that currently remit state user fees and public purpose program fees to continue remitting to the CPUC on their own direct prepaid sales*."  Karanjia Decl., Exh. 9, at 8 (emphasis in original).  That revision would have permitted direct sellers to continue assessing and remitting an individualized, carrier-specific surcharge, as they had been doing for years.  *See* Plt.'s MSJ at 1:12-19.  In other words, legislative staff tried to give the wireless industry the result that

---

1   MetroPCS now seeks from this Court.  But the Prepaid MTS Act was the law the industry

2   sought, and it is the law the industry got.

3                                        **Conclusion**

4           As required by California law and consistent with federal law, the CPUC administers

5   over $2 billion in California's universal service programs, for the benefit of all Californians.

6   The Prepaid MTS Act alters the way that the CPUC collects money for those programs from the

7   prepaid wireless service industry.  CPUC adopted an intrastate allocation factor, which modifies

8   the CPUC portion of the Prepaid MTS Surcharge, which in turn applies to the entire sales price

9   of every prepaid wireless transaction in the state.  As MetroPCS once recognized, that complies

10  with federal law.  Even were that not true, because MetroPCS championed the intrastate

11  allocation factor before the CPUC, MetroPCS should be estopped from challenging it now.  Nor

12  is MetroPCS correct to argue that the CPUC calculated the year-to-year intrastate allocation

13  factor in an unreasonable or arbitrary way.

14          The CPUC therefore asks the Court to grant the CPUC's Motion for Summary

15  Judgment, and to deny MetroPCS's Motion for Summary Judgment and for a Permanent

16  Injunction.

17

18  Dated:  May 4, 2018                         Respectfully submitted,

19

20                                              /s/     Jonathan C. Koltz
                                         By:    _____
21                                                      Jonathan C. Koltz

22                                              Attorney for the California Public
                                                Utilities Commission Defendants
23

24

25

26

27

28

## <u>Certificate of Service</u>

I certify that I electronically filed the following documents:

1. **Defendants' Notice of Motion, Cross-Motion for Summary Judgment, and Opposition to the Plaintiff's Motion for Summary Judgment;**

2. **Declaration of Jonathan C. Koltz in Support of Defendants' Motion for Summary Judgment;**

3. **Defendants' Objections to Evidence;** and

4. **Defendants' Proposed Order**

with the Clerk of Court for the United States District Court for the Northern District of California by using the CM/ECF system on May 4, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


<u>/s/ Jonathan C. Koltz</u>
Jonathan C. Koltz