UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

METROPCS CALIFORNIA, LLC,

Plaintiff,

v.

MICHAEL PICKER, *et al.*,

Defendants.

Case No. 17-cv-05959-SI

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 63, 73

On August 3, 2018, the Court held a hearing on the parties' cross-motions for summary judgment. After the hearing the Court ordered supplemental briefing, which has been completed. For the reasons set forth below, the Court GRANTS plaintiff's motion and DENIES defendants' motion. No later than **November 15, 2018**, the parties shall: (1) meet and confer and file a proposed order regarding appropriate injunctive relief; (2) file a joint letter stating the parties' views on what further proceedings, if any, are necessary in this case; and (3) file a proposed judgment if appropriate.

**INTRODUCTION**

Plaintiff MetroPCS brings this action for declaratory and injunctive relief seeking to declare unlawful, and enjoin enforcement of, three resolutions passed by the California Public Utilities Commission ("CPUC"), Resolution T-17542, Resolution T-17568 and Resolution T-17579 ("the Contested Resolutions"). The Contested Resolutions implement California's Prepaid Mobile Telephony Service Surcharge Collection Act (the "Prepaid Collection Act" or "the Act") and require that end consumers of prepaid wireless telephony service packages pay a surcharge (the "prepaid MTS surcharge") that is a percentage of the sales price of each retail transaction that

occurs in California.  The surcharge is used to fund, *inter alia*, California's universal service fund and certain CPUC fees.  MetroPCS contends that the CPUC's portion of the surcharge impermissibly assesses interstate revenues, including revenues attributable to interstate voice service and broadband data service, and that the imposition of a surcharge on these interstate services directly conflicts with federal law, including the Communications Act of 1934, various orders of the Federal Communications Commission ("FCC"), the Mobile Telecommunications Sourcing Act of 2000, and the United States Constitution's dormant Commerce Clause.

Defendants are the Commissioners of the CPUC.  Defendants contend that the CPUC's portion of the surcharge does not conflict with federal law because in calculating the amount of the surcharge, the CPUC adopted an "intrastate allocation factor" that has the effect of removing interstate and international charges from the surcharge base.  The CPUC also contends that the methodology it has imposed is required by the plain language of the Prepaid Collection Act, which requires that "if prepaid mobile telephony services are sold in combination with mobile data services or any other services or products for a single price, then the prepaid MTS surcharge and local charges shall apply to the entire price."  Cal. Rev. & Tax. Code § 42018(a).  The CPUC argues that the surcharge, which contains the interstate allocation factor, is the only way that that the prepaid MTS surcharge can be "appl[ied] to the entire price."  The CPUC also contends that MetroPCS is judicially estopped from challenging the MTS surcharge because MetroPCS previously advocated that the CPUC adopt the surcharge and interstate allocation factor methodology.  Both parties move for summary judgment.


## BACKGROUND

The Federal Communications Act requires every telecommunications carrier that provides interstate telecommunications services to contribute to the federal universal service fund ("USF").  47 U.S.C. § 254(f).  The USF "subsidizes the cost of telecommunication services for schools, libraries, health care providers and low income consumers."  *Panatronic USA v. AT&T Corp*., 287 F.3d 840, 843 (9th Cir. 2002) (citing 47 U.S.C. § 254(d), (h)).  The federal Universal Service Fund is paid for by contributions from providers of telecommunications services, not end users,

United States District Court
Northern District of California

although providers may seek to recoup those costs from their customers. *See id.*

The Federal Communications Act also affords states the discretion to establish their own universal service rules, subject to some guidelines. *See* 47 U.S.C. § 254(d). Prior to the passage of the Prepaid Collection Act, California required all telecommunications carriers in the state to collect universal service surcharges from their end users. Under that system, the universal service surcharges and other fees (such as a 9-1-1 surcharge to fund California's 9-1-1 emergency response system) were included on a customer's bill, and the carrier would collect those surcharges and fees and then remit those monies to the agency imposing the fee or the tax. Cal. Senate Gov. & Finance Comm., Legislative Analysis of AB 1717, at 1 (May 28, 2014), Karanjia Decl. Ex. 11 (Dkt. No. 63-12). However, because many prepaid wireless consumers do not have a contractual relationship with a carrier, "the surcharges [were] essentially built into the purchase price" and carriers were responsible for remitting the surcharges. Cal. Senate Appropriations Comm., Legislative Analysis of AB 1717, at 6 (Aug. 11, 2014), Koltz Decl. Ex. 5 (Dkt. No. 73-6). Many prepaid wireless carriers did not "have a convenient method (or at least a market-friendly method) to explicitly pass [the] surcharges on to the customer." *Id.*

The prepaid wireless industry lobbied in favor of California Assembly Bill 1717, which eventually became the Prepaid Collection Act. *See* Letter from Jamie Hastings, Vice President, External & State Affairs, CTIA-The Wireless Association, to the Hon. Henry T. Perea, California State Assembly (Apr. 14, 2014), Koltz Decl., Ex. 6 (Dkt. No. 73-7). In a letter dated April 14, 2014 to Assemblyman Henry Perea, a group representing the wireless industry wrote,

> The state's current system for collecting taxes and fees is based on carriers having a contractual relationship with customers and collecting those taxes and fees on a monthly bill. These consumers pay 911 fees that help fund the network costs associated with the delivery of wireless 911 services. They also pay state-imposed fees to fund telephone service for low-income households, broadband for underserved areas and more, and local government services such as police, fire, parks and libraries through local utility user taxes.
>
> However, today a growing number of customers choose to purchase wireless minutes on prepaid cards. While this provides benefits and flexibility to the consumer, it has created a problem with collection of existing taxes and fees on wireless services. Most prepaid wireless cards are purchased in third party retail outlets and are paid for in full before the consumer uses the service. Wireless carriers do not generally have an ongoing billing relationship with prepaid

3

customers and are, therefore, unable to collect the same taxes and fees from prepaid customers that they collect from other customers on monthly bills.

AB 1717 would modernize California's system of collecting existing taxes and fees to reflect new technologies, new business models and consumer choices. The bill establishes a statewide retail point-of-sale mechanism for collecting taxes and fees from prepaid wireless consumers. It would be administered by the Board of Equalization and be completely neutral, uniformly-administered, and transparent to consumers. . . .

*Id.*

On September 30, 2014, the California Legislature enacted the Prepaid Collection Act, with an effective date of January 1, 2016. *See* Karanjia Decl., Ex. 7 (Dkt. No. 63-8).[1] When enacting the statute, the Legislature found and declared the following:

(a) Maintaining effective and efficient communications services, 911 emergency systems, communications-related public policy programs to promote universal service, and various local programs across the state benefits all persons with access to the telecommunications system.

(b) Providers of end-use communications services, including providers of mobile voice telecommunications services, which the Federal Communications Commission terms mobile telephony service, are required to collect and remit communications taxes, fees, and surcharges on various types of communication service revenues, as provided by existing state or local law.

(c) Consumers purchase prepaid mobile telephony services at a wide variety of retail locations and other distribution channels, as well as through service providers.

(d) Prepaid mobile telephony services are an important and growing segment of the communications industry. Prepaid mobile telephony services are often the only means by which persons with low incomes can obtain limited access to the telecommunications system.

(e) To ensure equitable contributions from end-use consumers of postpaid and prepaid mobile telephony services in this state, there should be standardization with respect to the method used to collect communications taxes, fees, and surcharges from end-use consumers of prepaid mobile telephony services.

(f) Prepaid mobile telephony services are frequently sold by a third-party retailer that is not the provider of mobile telephony services, and collecting taxes, fees, and surcharges from prepaid consumers of mobile telephony services at the time of the retail transaction is necessary and the most efficient and competitively neutral means of collection.

---

[1] The Act is codified in both the California Public Utilities Code and the California Revenue & Taxation Code, and it remains in effect until January 1, 2020.

(g) An equitable distribution mechanism is necessary to ensure that utility user taxes and other telecommunication charges are collected on behalf of cities and counties and are properly distributed to those jurisdictions.

Cal. Rev. & Tax. Code § 42002(a)-(g).

The Prepaid Collection Act created a new point-of-sale mechanism for the collection and remittance of the taxes, fees, and surcharges imposed on prepaid wireless consumers through a newly-defined surcharge: the Prepaid MTS Surcharge. Cal. Rev. & Tax. Code § 42004(m) (defining "prepaid MTS surcharge"). The Act provides, "[o]n and after January 1, 2016, a prepaid MTS surcharge shall be imposed on each prepaid consumer and shall be collected by a seller from each prepaid consumer at the time of each retail transaction in this state. The prepaid MTS surcharge shall be imposed as a percentage of the sales price of each retail transaction that occurs in this state." Cal. Rev. & Tax. Code § 42010(a)(1); *see also id*. at § 42018(a) ("[I]f prepaid mobile telephony services[2] are sold in combination with mobile data services or any other services or products for a single price, then the prepaid MTS surcharge and local charges shall apply to the entire price."). The MTS surcharge is "collected by" all sellers of prepaid wireless service, including "direct sellers," such as MetroPCS, as well as "indirect sellers," which are non-carrier retailers, such as Wal-Mart. *Id*. & § 42004(b)(1), (p).[3]

---

[2] The Act defines "prepaid mobile telephony service[s]" as "the right to utilize a mobile device for mobile telecommunications services or information services . . . that must be purchased in advance of usage in predetermined units or dollars." Cal. Rev. & Tax. Code § 42004(k) (emphasis added).

[3] The legislative history shows that the Legislature considered whether to have different assessment regimes for direct and indirect sellers. The California Assembly Committee on Utilities & Commerce recommended revising the bill to omit direct sellers: "As the bill moves forward, the author and sponsors may wish to consider requiring entities that currently remit state user fees and public purpose program fees to continue remitting to the CPUC on their own direct prepaid sales." Cal. Assembly Comm. on Util. & Commerce, Legislative Analysis of AB 1717, at 8 (Apr. 2, 2014), Karanjia Decl. Ex. 9 (Dkt. No. 63-10). The Assembly Committee on Revenue & Taxation questioned "whether this bill's proposed point-of-sale collection and remittance system should apply to cases where carriers sell prepaid MTS directly to customers (as opposed to third-party retail transactions)." Cal. Assembly Comm. on Rev. & Tax., Legislative Analysis of AB 1717, at 9 (May 12, 2014), Koltz Decl., Ex. 2 (Dkt. No. 73-3). Similarly, the Senate Governance & Finance Committee wrote,

AB 1717 is a great experiment in shifting the collection responsibility for end-user imposed fees to retailers [and the CDTFA]. . . . Instead of shifting the entire amount of risk, AB 1717 could instead only apply MTS fee collection to so-called

To come up with the prepaid MTS surcharge, the CPUC first calculates the California universal service surcharges and a CPUC reimbursement fee "as a percentage of the sales price for prepaid wireless service," and it reports those amounts to the California Department of Tax and Fee Administration ("CDTFA").[4] Cal. Pub. Util. Code §§ 319(b), (c). Next, the CDTFA combines those CPUC charges with a 9-1-1 surcharge to create the Prepaid MTS Surcharge. Cal. Rev. & Tax. Code § 42010(b). CDTFA then adds the Prepaid MTS Surcharge to the "utility user taxes," which are set city-by-city, and range from zero to 9%. *See* Cal. Rev. & Tax. Code § 42010(c)(1); *see also* CDTFA, Local Charges for the Prepaid Mobile Telephony Services Collection Act, available at https://www.cdtfa.ca.gov/formspubs/cdtfa105mts.pdf. This cumulative total is called the "posted combined rate." Cal. Rev. & Tax. Code § 42010(c)(1); *see also* CDTFA, Prepaid Mobile Telephony Services (MTS) Surcharge Rates, available at https://www.cdtfa.ca.gov/taxes-and-fees/mts-rates.aspx. This lawsuit only challenges the CPUC's methodology for calculating the CPUC universal service surcharges and the CPUC reimbursement fee.

The CPUC has calculated and implemented its portion of the Prepaid MTS Surcharge (i.e., the universal service surcharges and the reimbursement fee) through a series of Resolutions.

---

"indirect" retailers, who buy prepaid cards from prepaid wireless service providers, and keep "direct" sellers under the current construct. Because direct sellers complete the calls as wireless service providers, they have data that shows the intrastate versus interstate share. To the extent that the state is launching a risky venture to transfer the collections responsibilities from carriers to point-of-sale transactions, why should the bill exclude a large segment of the market that knows how to comply, and has the data to determine the intrastate share? *The Committee may wish to consider requiring current direct sellers to pay 911, CPUC, and local fees, and limit the measure's MTS provisions to indirect sellers*.

Cal. Senate Governance & Fin. Comm., Legislative Analysis of AB 1717, at 8 (May 28, 2014) (emphasis in original), Karanjia Decl., Ex. 11 (Dkt. No. 63-12). .

[4] In 2017, the California Legislature split the State Board of Equalization ("BOE") into three successor agencies. *See* Cal. Legislative Analyst's Office, California's New Tax Departments (Apr. 4, 2018), *available at* http://www.lao.ca.gov/Publications/Report/3796. The CDTFA shares with the CPUC the authority to implement the Prepaid Collection Act. However, the legislative history and the statute only refer to the BOE.

## I.     CPUC's 2016 Resolution, Resolution T-17504

On November 23, 2015, the CPUC issued Resolution T-17504 (the "2016 Resolution"), in which the CPUC first implemented the Prepaid Collection Act.  *See* Karanjia Decl., Ex. 1 (Dkt. No. 63-2).  The 2016 Resolution was in effect from January 1, 2016 to December 31, 2016.  The 2016 Resolution required prepaid wireless carriers to assess the Prepaid MTS Surcharge "on prepaid wireless telephone service *intrastate* revenues subject to surcharge and collected from end-users in California."  *Id.* at 1 (emphasis added).  The 2016 Resolution set the CPUC's portion of the prepaid MTS surcharge at 8.51% for calendar year 2016.  *Id*.

In October 2015, prior to the issuance of the 2016 Resolution, MetroPCS and other carriers[5] (the "Joint Wireless Carriers") submitted comments in response to the CPUC's draft of what ultimately became the 2016 Resolution.  In those comments, the Joint Wireless Carriers raised concerns about the CPUC's draft resolution, which proposed assessing surcharges only on intrastate revenues.  The Joint Wireless Carriers recommended that the CPUC utilize an "alternate approach" for the assessment of the prepaid MTS surcharge:

> The new law requires the Commission to aggregate its Public Policy Program surcharges and its reimbursement/user fee into a single rate so that it can be incorporated by the BOE with the Emergency Telephone Users surcharge and local taxes into a single surcharge to be assessed on prepaid wireless consumers.  As noted above, the Commission-related charges are only to be assessed on the intrastate revenue associated with these consumers.  The Proposed Resolution currently appears to rely on the carriers to adjust their collections and remittances to account for intrastate revenue, which is how wireless revenues are currently adjusted with respect to mandatory surcharges and fees. The Joint Wireless Carriers suggest an alternate approach for the prepaid MTS Surcharge.

> In particular, the Joint Wireless Carriers recommend that the Commission, through the Resolution, adjust its portion of the MTS Surcharge to account for the fact that it applies only to intrastate revenue.  In order words, take the rate of the aggregated Commission surcharges and fees (e.g., 8.07%), multiply it by a reasonable estimate of the intrastate portion of prepaid revenues (e.g., a weighted average of the major carriers' intrastate traffic factors), and then post that adjusted rate with the [Board of Equalization].  This adjustment would have the effect of removing interstate and international charges from the surcharge base.  This alternative approach provides a number of advantages for all the stakeholders including, but not limited to, the following:

---

[5]   The other carriers included CTIA, T-Mobile, AT&T, Verizon, Sprint, and TracFone. Karanjia Decl. Ex. 31; Dkt. No. 63-32.

- Consumer clarity − consumers will be able to more easily identify the amount of surcharges and fees they are required to pay for the Commission programs.

- Equitable charges − consumers will be subject to the same MTS surcharge regardless of whether they purchase prepaid wireless services directly from a wireless provider or from a third party retailer.[]

- Simpler audits − the Commission will be able to more readily audit the collection and remittance of these charges since the MTS surcharge amounts collected from consumers will match the adjusted rates. Carriers would not adjust their reported intrastate revenue figures under this approach, as the rate adjustment already removes the portion of the revenue which is attributable to interstate and international traffic.

Wireless Industry Comments on Draft Resolution T-17504, Oct. 26, 2015, at 3-4 (internal footnotes omitted), Karanjia Decl., Ex. 31 (Dkt. No. 63-32).

The CPUC responded to those comments and provided the following explanation of why it was not adopting the Joint Wireless Carriers' proposal:

The Commission finds the methodology proposed in the Resolution to be more reasonable and more consistent with the operating statutes than the Joint Wireless Carriers' alternate approach. The Joint Wireless Carriers' alternate approach is unnecessarily complex and may inappropriately assess surcharges and fees on interstate, international and other revenues and services not subject to the Commission's or other State surcharges.

Currently, carriers assess surcharges only on those intrastate revenues subject to surcharge, regardless of whether the revenues derive from prepaid, postpaid, wireline, or wireless service. Consistent with this practice, the Act directs the Commission to do so for the "reimbursement fee or universal service surcharge . . . on both postpaid and prepaid intrastate service." We therefore calculated the MTS surcharge to be applied only to intrastate service revenues. The Act further supports the adoption of a rate that is only applied to intrastate services in it requiring that, "a prepaid MTS provider or direct seller shall report the intrastate revenue portion subject to the reimbursement fee and the telecommunications universal surcharges." We therefore do not find it consistent with the Act to calculate a prepaid MTS surcharge rate that would not be limited to intrastate prepaid wireless service revenue.

Karanjia Decl. Ex. 1 at 13-14 (internal footnote omitted) (Dkt. No. 63-2).

The CPUC now states that this initial resolution was a "false start" and "wrong" because the CPUC contends that the plain language of the Prepaid Collection Act requires that the surcharge be assessed on the entire price of a prepaid sale, and not just on the intrastate revenues.

MetroPCS does not challenge Resolution T-17504.

8

## II.     CPUC's 2017 Resolution, Resolution T-17542

The CPUC issued its Resolution for the 2017 calendar year on November 16, 2016. Karanjia Decl. Ex. 2 (Dkt. No. 63-3). In this Resolution, the CPUC adopted the intrastate allocation factor that is challenged in this lawsuit. The CPUC stated,

> In an effort to ensure that all customers purchasing prepaid wireless telephone services are assessed the MTS surcharge in an equitable manner, the Commission has modified the MTS rates for 2017. For 2017, the MTS surcharge is to be assessed on the total sales price rather than only the intrastate portion, as the rate has now been pre-adjusted by an intrastate allocation factor. Therefore, regardless of the purchase method, location, or seller type, the customer will pay one universal rate.

*Id*. at 10. The CPUC also explained why it declined to adopt the proposal, advanced by the Joint Carriers, to make the intrastate allocation factor an optional "safe harbor" that the carrier could elect to use:

> Because our goal is to ensure all prepaid wireless customers are treated equally and assessed the MTS surcharge in the same manner, we do not authorize the use of the intrastate factor as an optional "safe harbor" only for direct sellers. The intrastate factor has been applied to assure that all prepaid wireless customers are assessed the MTS surcharge equally regardless of where they purchase their prepaid wireless service(s). As the Act requires, the MTS Surcharge is to be calculated and adjusted so that it can be applied to the total sales price. Indeed, Joint Carriers agree that the adoption of an intrastate factor in calculating the MTS Surcharge rate is consistent with the Act, in that "adjusting the surcharge rate by an intrastate factor promotes the equitable treatment of wireless consumers regardless of whether they purchase prepaid services from direct or indirect sellers and regardless of whether they are prepaid or postpaid consumers." Allowing carriers the option to potentially assess an amount for the MTS surcharge that is greater than or less than the amount being assessed on all other customers of indirect sellers would be inconsistent with the Act.

*Id*. at 15 (internal footnotes omitted).

On January 24, 2017, MetroPCS and T-Mobile asked the CPUC to modify Resolution T-17542, again requesting that the intrastate allocation factor be optional for direct sellers rather than mandatory. Karanjia Decl., Ex. 3 at 5-6 (Dkt. No. 63-4). The CPUC denied the request through Resolution T-17568, stating that "nothing in the [Prepaid Collection] Act permits sellers the discretion to assess the prepaid MTS surcharge in the manner of their choosing, as MetroPCS/T-Mobile request," and that "[t]o the contrary, the Act mandates the same application of the prepaid MTS surcharge by direct and indirect sellers." *Id*. at 6. The CPUC also explained why it had not adopted an intrastate allocation factor in the first resolution, Resolution T-17504: "it was the first

9

year the Act was implemented and the [CPUC] did not have the requisite prepaid MTS jurisdictional allocation and revenue data from carriers to calculate an intrastate allocation factor for that year." *Id*. at 4 n.11. Finally, the CPUC described the method it had used to calculate the intrastate allocation factor. *Id*. at 7-13.

### III.  CPUC's 2018 Resolution, Resolution T-17579

On November 16, 2017, the CPUC issued Resolution T-17579, which adjusted the intrastate allocation factor downward for calendar year 2018. Karanjia Decl., Ex. 4 (Dkt. No. 63-5). The CPUC stated that it calculated the factor by taking "the average of five categories of information provided by carriers." *Id*. at 17. T-Mobile and MetroPCS had again asked to make the intrastate allocation factor optional, and the CPUC again responded that there was "no basis, nor does the [CPUC] have discretion as T-Mobile claims, to revise this Resolution to create two different requirements for indirect and direct sellers concerning the assessment of the prepaid MTS surcharge." *Id*. at 21.

On September 7, 2018, the CPUC issued draft Resolution T-17632 (the "Draft 2019 Resolution"). Dkt. No. 85-1. The Draft 2019 Resolution proposes to continue using the mandatory intrastate allocation factor, and to use the same methodology from the 2018 Resolution. *Id*. at 15.

### LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to produce evidence showing the absence of a genuine issue of material fact. *Id.* at 325. Rather, the burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.*

10

1   Once the moving party has met its burden, the burden shifts to the non-moving party to

2   "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting then

3   Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply

4   show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.,*

5   *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of

6   evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find

7   for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

8   In deciding a summary judgment motion, the evidence of the non-movant is to be believed,

9   and all justifiable inferences are to be drawn in his favor.  *Id.* at 255.  "Credibility determinations,

10  the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

11  functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  *Id.*  However,

12  conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine

13  issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec.*

14  *Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.

15  Fed. R. Civ. P. 56(c)(4).[6]

16

17                                  **DISCUSSION**

18  **I.      Judicial Estoppel**

19  The CPUC contends that MetroPCS is judicially estopped from challenging the intrastate

20  allocation factor because MetroPCS proposed that the CPUC adopt that very same methodology.

21  The CPUC cites MetroPCS's October 2015 comments on the draft resolution T-17504, in which

22  MetroPCS, along with other prepaid carriers, urged the CPUC to implement the Prepaid

23  Collection Act through the use of an intrastate allocation factor.  *See* Karanjia Decl. Ex. 31 (Dkt.

24  No. 63-32).  The CPUC also notes that in 2016, the year that the CPUC adopted the Surcharge,

25  MetroPCS stated in its comments to draft resolution T-17542 that it "welcome[d] the adoption of

26

27      ――――――――――――――――
        [6]  The CPUC has objected to some of the deposition testimony of Eric Van Wambeke, a
28  CPUC employee, on the ground that the questions asked called for a legal conclusion.  The Court
    does not rely on any of the testimony that is at issue.

                                        11

an intrastate factor in calculating the MTS Surcharge rate and believe[d] that the use of such a factor is consistent with the Act." Karanjia Decl., Ex. 32 at 4 (Dkt. No. 63-33). The CPUC contends that MetroPCS's October 2015 and 2016 comments are directly contrary to its current arguments that the use of an intrastate allocation factor violates numerous federal laws and regulations.

Judicial estoppel is an equitable doctrine invoked by a court at its discretion to prevent improper use of judicial machinery. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). It is a doctrine "that is intended to protect the integrity of the judicial process by preventing a litigant from 'playing fast and loose with the courts.'" *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004) (internal citation omitted). In *New Hampshire v. Maine*, the Supreme Court set forth the three-part test for judicial estoppel:

> First, a party's later position must be "clearly inconsistent" with its earlier position.

> Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception "that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity.

> A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

532 U.S. at 750-51 (internal citations omitted). The Supreme Court added that these three factors "do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." *Id*.

MetroPCS contends that the CPUC cannot establish the elements of judicial estoppel. MetroPCS argues, *inter alia*, that its positions are not clearly inconsistent because it previously advocated the use of a "reasonable" estimate of the intrastate portion of prepaid revenues, including for example a "weighted average of the major carriers' intrastate traffic factors." Karanjia Decl. Ex. 31 at 3 (Dkt. No. 63-4). MetroPCS argues that the CPUC did not use a reasonable estimate, nor did it use a weighted average. MetroPCS also argues that the CPUC

1  neither relied on nor accepted the October 2015 advocacy because the CPUC did not adopt the

2  Prepaid MTS Surcharge in response to that advocacy; instead, the CPUC rejected the carriers'

3  arguments and did not adopt the Prepaid MTS Surcharge until the following year.  MetroPCS also

4  emphasizes that it argued in 2016 and 2017 that the intrastate allocation factor should be an

5  optional safe harbor for direct sellers, and not a "one-size-fits-all" charge applied to both direct

6  and indirect sales.

7         The Court concludes that it is not appropriate to apply the doctrine of judicial estoppel as a

8  bar to MetroPCS's claims.  The Court agrees with MetroPCS that its current and prior positions

9  are not clearly inconsistent because MetroPCS previously advocated that the CPUC adopt a

10 "reasonable" intrastate allocation factor and MetroPCS now contends that the CPUC's

11 methodology is not reasonable, and MetroPCS did previously (although not consistently) argue for

12 an optional safe harbor in addition to the usage of an intrastate allocation factor.  The Court also

13 notes that both the CPUC and MetroPCS have asserted positions that have evolved over time, and

14 that these changing views are not surprising given the complexities of regulating a rapidly

15 changing telecommunications industry and the fact that the usage of an intrastate allocation factor

16 is an apparently novel approach to making jurisdictional assignments of prepaid revenues.[7]  Under

17 these circumstances, the Court finds that it would not be appropriate to apply the doctrine of

18 judicial estoppel.

19

20 II.    FCC's *Interim Contribution Methodology Order*, *Bundling Order*, and *Universal
            Service Declaratory Ruling*

21

22        MetroPCS contends that the CPUC's adoption of a mandatory intrastate allocation factor

23 _____

24        [7]  The *amicus curiae* brief filed by Sprint Corporation states that "Sprint has been subject
      to regulation by state utility commissions across the country for decades and there has never been
25    a single instance in any state – as confirmed by the CPUC itself – in which a state utility
      commission has sought to require the application of such an arbitrary mechanism."  Dkt. No. 72-1
26    at 4.  Both Sprint and MetroPCS cite the deposition testimony of Eric Van Wambeke, the CPUC
      Supervisor who drafted the 2016 Resolution and devised the CPUC's intrastate allocation factors.
27    Mr. Van Wambeke testified that the usage of an intrastate allocation factor was "new" and
      something that the CPUC had never tried before.  Van Wambeke Depo. at 68:1-15, Karanjia Decl.,
28    Ex. 12 (Dkt. No. 63-13).  The CPUC does not dispute that the intrastate allocation factor is a novel
      methodology for making jurisdictional assignments of prepaid revenues.

conflicts with federal law because the FCC has expressly permitted wireless carriers to rely on traffic studies and individualized revenue allocations for purposes of determining their contributions to the federal USF. MetroPCS argues that because the FCC has established allocation methodologies governing federal USF contributions for interstate telecommunications services, state commissions may not adopt conflicting allocation methodologies, and that the Contested Resolutions are preempted under the Supremacy Clause of the United States Constitution.

MetroPCS argues that two FCC orders – the *Universal Service Contribution Methodology Order*, 21 FCC Rcd. 7518 (2006) ("*Interim Contribution Methodology Order*"), and the *Policy and Rules Concerning Interstate, Interexchange Marketplace*, 16 FCC Rcd. 7418 (2001) ("*Bundling Order*") – establish that when wireless carriers allocate the portions of their revenues that are attributable to interstate and international services vs. intrastate services to determine federal USF contributions, carriers may choose whether to use (1) their actual revenue allocations, (2) traffic studies, or (3) a "safe harbor" that is a set percentage set by the FCC.

In the *Interim Contribution Methodology Order*, the FCC addressed how wireless carriers could allocate their revenues between intrastate and interstate jurisdictions for purposes of reporting interstate telecommunications service revenues subject to federal USF assessments. The FCC made these changes pursuant to Section 254(b) and (d) of the Communications Act. 21 FCC Rcd. at 7521 ¶ 5. The FCC noted,

> Universal service is a key component in communications policy for ensuring that charges are reasonable. Section 254(b) of the 1996 Act instructs the Commission to establish universal support mechanisms with the goal of ensuring the delivery of affordable telecommunications services to all Americans. Section 254(b) also provides that Commission policy on universal service shall be based, in part, on principles that contributions should be equitable and nondiscriminatory, and support mechanisms should be specific, predictable, and sufficient. Section 254(d) of the 1996 Act mandates that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service."

*Id*. (internal footnotes omitted). For mobile voice service or other telecommunications services, the FCC raised the interim wireless safe harbor from 28.5% to 37.1% to reflect the fact that the percentage of interstate mobile wireless traffic had grown and that wireless subscribership and

14

usage levels had significantly increased. *Id*. at 7532 ¶¶ 24-25. The FCC also stated that "although we adopted the interim wireless safe harbor in part because wireless providers historically have claimed it difficult to identify interstate versus intrastate revenues, it is the Commission's policy preference that providers contribute to the Fund based on their actual data rather than on a safe harbor percentage where possible." *Id*. at 7534 ¶ 28. The FCC also stated that providers had the option of relying on "traffic studies" to determine its interstate revenues if the provider submitted the traffic study for review. *Id*. at 7534 ¶ 29.

In the *Bundling Order*, the FCC adopted additional "safe harbors" that allow carriers to "elect to report revenues" from telecommunications services that are "bundled" with, *inter alia*, "enhanced service offerings," such as mobile broadband services.[8] The order provides that when carriers bundle these services, they may report their revenues "based on the unbundled service offering prices, with no discount from the bundled offering being allocated to telecommunications services," or "contributors may elect to treat all bundled revenues as telecommunications service revenue for purposes of determining their universal service obligations." 16 FCC Rcd. at 7447-48 ¶¶ 50-51. The FCC stated that "[t]hese allocation methods are 'safe harbors' and will be afforded a presumption of reasonableness in an audit or enforcement context." *Id*. at 7448 ¶ 52. Carriers can also use other "reasonable" allocation methods that are subject to audit. *Id*. at 7448 ¶¶ 53-54.

Citing another FCC order, *In the Matter of Universal Service Contribution Methodology* ("*Universal Service Declaratory Ruling*"), 25 FCC Rcd. 15651 (2010), MetroPCS contends that the CPUC's intrastate allocation factor violates federal law because the CPUC has imposed a "one-size-fits-all" methodology that does not allow carriers to rely on their actual revenue allocations or traffic studies for purposes of contributing to California's Universal Service Fund. In that order, the FCC stated,

---

[8] In a series of orders the FCC has declared that broadband Internet access service is jurisdictionally interstate for regulatory purposes, decided to forbear from imposing federal USF contributions on broadband revenues, and preempted states from imposing their own universal service assessments on broadband revenues. *See Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601, 5803 ¶¶ 431-32 (2015), *pets. For rev. denied*, *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *pet. for cert. docketed* (U.S. Sept. 28, 2017) (No. 17-504); *In the Matter of Restoring Internet Freedom*, 33 FCC Rcd. 311, 427-30 ¶¶ 195-200 (2018), *petitions for rev. filed* (D.C. Cir. Nos. 18-1051 *et al*.).

We further conclude that state universal service contribution requirements do not conflict with federal rules to the extent that states calculate the amount of their universal service assessments in a manner that is consistent with the rules adopted in the *Interim Contribution Methodology Order*. Under the Commission's rules, an interconnected VoIP provider contributes to the federal fund on the basis of its revenues from interstate and international traffic; revenues from intrastate traffic are excluded. As described above, the Commission's rules give providers three options by which they can establish their federal universal service revenue base: (1) use a safe harbor under which 64.9 percent of their revenues are deemed to be jurisdictionally interstate (and therefore not intrastate); (2) conduct a traffic study to allocate revenues by jurisdiction; or (3) develop a means of accurately classifying interconnected VoIP[9] communications between federal and state jurisdictions. Therefore, to avoid a conflict with the Commission's rules, a state imposing universal service contribution obligations on interconnected VoIP providers must allow those providers to treat as intrastate for state universal service purposes the same revenues that they treat at intrastate under the Commission's universal service contribution rules. This will ensure that state contribution requirements will not be imposed on the same revenue on which an interconnected VoIP provider is basing its calculation of federal contributions. To the extent a state fails to comply with this limitation in the future, it may be subject to preemption consistent with the prospective Declaratory Ruling we issue today.

25 FCC Rcd. at 15658 ¶ 17 (internal footnotes omitted). The FCC emphasized that "duplicative state assessments conflict with the federal rules and policies governing interconnected VoIP services because their practical effect is to increase the portion of interconnected revenue assigned to the intrastate jurisdiction beyond that contemplated under the rules adopted in the *Interim Contribution Methodology Order*." *Id*. at 15659 ¶ 19. The FCC further found that "duplicative state assessments on interconnected VoIP providers would violate the principle of competitive neutrality by placing interconnected VoIP provides at an artificial competitive disadvantage with respect to their traditional telephony competitors, which are generally not subject to double assessments." *Id*. at 15659-60 ¶ 20.

MetroPCS notes that prior to the Contested Resolutions, the CPUC allowed carriers to choose which of the FCC-approved methodologies they would use for purposes of allocating revenues for the assessment of CPUC surcharges. MetroPCS asserts that when it reports its

---

[9] "VoIP" stands for Voice over Internet Protocol. The FCC has defined "interconnected VoIP service" as "a service that (1) enables real-time, two-way voice communications; (2) requires a broadband connection from the user's location; (3) requires Internet protocol-compatible customer premises equipment; and (4) permits users generally to receive calls that originate on the public switched telephone network (PSTN) and to terminate calls to the PSTN.6 Interconnected VoIP services may be fixed or nomadic. A fixed interconnected VoIP service can be used at only one location, whereas a nomadic interconnected service may be used at multiple locations." *Id*. at 15652 ¶ 3.

surchargeable wireless revenues to the CPUC, it has long relied on its federal right under the *Contribution Methodology Order* and the *Bundling Order* to use the same allocation methodologies that it uses for federal Universal Service assessment purposes.  MetroPCS asserts that it uses a rigorous methodology, based on objective and auditable data and applying GAAP and FASB guidance, to determine the revenue allocations for the "voice," "data" (mobile broadband), and "text" elements of its prepaid wireless service bundles.  MetroPCS argues that the mandatory intrastate allocation factor conflicts with the FCC's rules which expressly grant carriers the flexibility to choose among methodologies for allocations of interstate and intrastate revenues, inevitably resulting in a double assessment of interstate revenues.

The Supreme Court has held that the FCC has the rulemaking authority to implement the federal Communications Act of 1934 and the Telecommunications Act of 1996.  *AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 378 & n.6 (1999).  State regulations or laws that conflict with or are inconsistent with federal regulations are nullified under the Supremacy Clause.  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873-74 (2000); *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (discussing field preemption versus conflict preemption, and stating that "If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.") (internal citations omitted); *Qwest Corp. v. Arizona Corp. Comm'n*, 567 F.3d 1109, 1119-20 (9th Cir. 2009) ("[A] federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law") (internal citation omitted) (holding state utility commission's orders were preempted based on conflict with FCC orders).

The Court agrees with MetroPCS that the usage of a mandatory intrastate allocation factor conflicts with federal law because it deprives carriers of the ability to treat as intrastate for universal service purposes the same revenues that they treat as intrastate for federal USF contributions.  Taken together, the three FCC orders discussed above stand for the proposition that wireless carriers have several options when allocating their interstate and intrastate revenues for

federal USF assessments, and that the states may not adopt methodologies that are inconsistent with the federal rules. By using the intrastate allocation factor as the sole method for assessing the CPUC fees, the CPUC has deprived carriers of the ability to rely on alternative allocation methodologies, such as their actual revenue data. As the FCC stated in the *Universal Service Declaratory Ruling*, "state universal service contribution requirements do not conflict with federal rules to the extent that states calculate the amount of their universal service assessments in a manner that is consistent with the rules adopted in the *Interim Contribution Methodology Order*." 25 FCC Rcd. at 15658 ¶ 17. The CPUC distinguishes the *Universal Service Declaratory Ruling* on the ground that the FCC was addressing VoIP technology, not wireless. *See* CPUC's Motion at 29 (Dkt. No. 73). However, the CPUC does not explain why this difference is meaningful in light of the fact that both VoIP and wireless carriers provide interstate/international and intrastate service, and the FCC was addressing the question of how a state could impose universal service contributions without violating federal law.

The CPUC also contends that neither the *Contribution Methodology Order* nor the *Bundling Order* clearly indicates that the FCC sought to preempt California law. The CPUC argues that both orders only discuss how carriers should contribute to the federal USF, and that neither order addresses how states should calculate state USF contributions. However, "the [Supreme] Court has never before required a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists." *Geier*, 529 U.S. at 884-85; *see also Vonage Holdings Corp. v. Nebraska Pub. Serv. Comm'n*, 564 F.3d 900, 905 (8th Cir. 2009) (affirming district court's holding that state law requiring VoIP providers to collect USF surcharge from customers was preempted by federal law and noting the "conflict which would arise if states adopted conflicting methods or proxies for determining which VoIP customers are subject to their respective universal service fund surcharges.").[10]

---

[10] The parties dispute what standard the Court should use when analyzing plaintiff's claims. Quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), the CPUC contends that the Court "must start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." CPUC's Motion at 21-22 (Dkt. No. 73). MetroPCS asserts that the presumption against preemption does not apply where the federal government has long occupied the field, as with

Because the Court concludes that the usage of a mandatory intrastate allocation factor conflicts with federal law and is therefore preempted, the Court finds it unnecessary to address MetroPCS's other challenges to the Contested Resolutions.[11]

### III.    Remedy

The Court ordered the parties to file supplemental briefs regarding whether the Court could enjoin the Contested Resolutions because they impermissibly require a one-size-fits-all methodology that conflicts with FCC orders, without striking down the Prepaid Collection Act. MetroPCS contends that the Court need not find the Prepaid Collection Act unconstitutional, and that the Court should only enjoin the CPUC's Resolutions implementing the intrastate allocation factor.  MetroPCS argues that the Court should not read Cal. Rev. & Tax. Code section 42018(a)[12] in isolation, or literally.  MetroPCS's Motion at 37-38.  (Dkt. No. 63).  Instead, MetroPCS argues that the Court should read this provision "in harmony" with the rest of the statute, including the portion of the statute that requires a prepaid service provider to report only "the intrastate revenue portion [of service] subject to the reimbursement fee and the telecommunications universal service surcharges."  Cal. Pub. Util. Code § 319(g).

---

interstate telecommunications.  *See* MetroPCS's Reply at 25-26, citing *Qwest*, 567 F.3d at 1118 ("the ordinary presumption against finding preemption does not apply" given the "long history of federal presence in regulating long-distance telecommunications") (Dkt. No. 77).

To the extent the CPUC argues that a "clear indication" of preemptive intent is needed to find preemption, the Court disagrees.  *See Geier*, 529 U.S. at 884.  The Court need not resolve the question of whether the traditional presumption against preemption applies in telecommunications cases because even if that presumption applied in this case, the Court would reach the same result.

[11]   MetroPCS argues, *inter alia*, that the intrastate allocation factor impermissibly assesses broadband data and other interstate revenues, and that the methodology that the CPUC used to come up with the intrastate allocation factor percentage is arbitrary and flawed.  The CPUC counters that its approach was and is reasonable, and that the percentage it arrived at in fact does not generally assess broadband or other interstate revenues.  While the Court finds that the usage of a single "one-size-fits-all" methodology does, by its very nature, mean that there will be a double assessment on interstate revenue for at least some carriers because the FCC methodologies differ from the CPUC's jurisdictional allocation, the Court does not find it necessary to resolve the distinct questions of whether the intrastate allocation factor impermissibly assesses particular interstate revenues or whether the CPUC's methodology was flawed.

[12]   That subsection reads, "if prepaid mobile telephony services are sold in combination with mobile data services or any other mobile data services or any other services or products for a single price, then the prepaid MTS surcharge and local charges shall apply to the entire price."

1      MetroPCS asserts that the CPUC could still impose a uniform Surcharge rate that is

2 expressed as a percentage of the sales price (the base Surcharge rate) and carriers would then rely

3 on their FCC-approved methodologies (effectively, an individualized intrastate allocation factor)

4 to assess that uniform rate on only their intrastate telecommunications service revenues. *See*

5 MetroPCS's Reply at 28 (Dkt. No. 77). MetroPCS argues, "the Court should read the Act to

6 require prepaid wireless carriers (or 'direct sellers') to 'apply' the Surcharge to the 'entire price' of

7 a prepaid bundle, thereby satisfying Cal. Rev. & Tax. Code § 42018(a), but 'assess' the Surcharge

8 only on the properly surchargeable intrastate revenues associated with the given plan. This would

9 allow these carriers to use their own FCC-approved allocation methodologies for segregating

10 intrastate telecommunications service revenues from non-surchargeable interstate and other

11 revenues—in effect, using their own carrier-specific intrastate factors—and then apply those to

12 adjust the base Surcharge rate." MetroPCS's Supplemental Brief at 2 (Dkt. No. 85). MetroPCS

13 asserts that this approach would simply require the CPUC to follow the practice it previously

14 followed with regard to prepaid carriers, and that it still follows for post-paid carriers.

15      Alternatively, MetroPCS argues that the Court can apply the statute's severability clause

16 sever and strike section 42018(a) of the California Revenue and Taxation Code as well as the

17 second sentence of section 42010(a)(1) (stating that the MTS surcharge "shall be imposed as a

18 percentage of the sales price of each retail transaction"). MetroPCS argues that these provisions

19 are "grammatically, functionally, and volitionally separable," because they can be removed

20 without affecting the wording any of any provision, they are not necessary to the statute's purpose,

21 and they are not of critical importance to the statute's enactment. MetroPCS's Motion at 41 (Dkt.

22 No. 63), quoting *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821 (1989).

23      The CPUC contends that if the Court concludes that the intrastate allocation factor is

24 preempted, the Court must declare the Prepaid Collection Act unconstitutional because the plain

25 language of the Act requires a uniform surcharge, to be applied by all sellers on every sale of

26 prepaid mobile telephony service in the state, as a percentage of the total sales price. The CPUC

27 also argues that the legislative history of the Act supports its interpretation, and that as a matter of

28 traditional notions of federalism and comity, this Court should defer to the CPUC's and the

CDTFA's interpretation of the Act as requiring the usage of an intrastate allocation factor. *See generally* CPUC's Supp. Brief (Dkt. No. 84).

The Court agrees with the CPUC that the language and structure of the Act require the usage of an intrastate allocation factor, and thus that the Court must declare both the Act and the Contested Resolutions as preempted by federal law. The Act provides that the "prepaid MTS surcharge shall be imposed as a percentage of the sales price of each retail transaction that occurs in this state." Cal. Rev. & Tax. Code § 42010(a)(1); *see also* Cal. Rev. & Tax. Code § 42018(a) ("[I]f prepaid mobile telephony services are sold in combination with mobile data services or any other services or products for a single price, then the prepaid MTS surcharge . . . shall apply to the entire price."). Further, in calculating its portion of the MTS surcharge, the CPUC is required to compute that part "as a percentage of the sales price for prepaid mobile telephony services." Cal. Pub. Util. Code § 319(b), (c). As the CPUC argues, the only way to apply a surcharge to the entire sales price of prepaid service without potentially assessing interstate and international revenues is through the use of an intrastate allocation factor that theoretically removes those revenues from the surcharge base. The Court is not persuaded by MetroPCS's argument that these sections do not have to be interpreted literally. Further, although section 319(g)(2) requires carriers to "report the intrastate revenue portion subject to the reimbursement fee," that section relates to carriers' reporting duties, and not specifically to the CPUC's calculation of the prepaid MTS surcharge, which must be "a percentage of the sales price . . ." Cal. Pub. Util. Code § 319(g)(2).

The Act also states that "a prepaid MTS surcharge shall be imposed on each prepaid consumer and shall be collected by a seller from each prepaid consumer at the time of each retail transaction in this state." Cal. Rev. & Tax. Code § 42010(a)(1). A "seller" is defined as "a person that sells prepaid mobile telephony service to a person in a retail transaction," and does not distinguish between direct sellers or indirect sellers. Cal. Rev. & Tax. Code § 42004(p). A "direct seller" is specifically defined "a prepaid MTS provider or service supplier . . . that makes a sale of prepaid mobile telephony services directly to a prepaid consumer for any purpose other than resale in the regular course of business." Cal. Rev. & Tax. Code § 42004(b)(1). Thus, the Act's directive that "a prepaid MTS surcharge shall be imposed on each prepaid consumer and shall be collected

21

by a seller from each prepaid consumer at the time of each retail transaction in this state," applies equally to direct and indirect sellers   Cal. Rev. & Tax. Code § 42010(a)(1); *see also* Cal. Rev. & Tax. Code § 42010(g) ("A direct seller shall utilize the amounts posted by the [CDTFA] . . . when determining what amounts to remit . . . .); Cal. Bd. of Equalization, Formal Issue Paper 15-009, at 4 (Sept. 4, 2015), Koltz Decl., Ex. 2 (Dkt. No. 73-3) ("A direct seller must utilize the rates posted on the [CDTFA's] website when determining what amounts to collect and remit . . . .").[13]  The Court agrees with the CPUC that because the Prepaid Collection Act imposes the surcharge on both direct and indirect sales, the Court cannot interpret the statute to require that the surcharge only apply to indirect sellers and sales.

Although the Court is mindful that if possible, courts should construe statutes to avoid constitutional issues, *see INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001), "federal courts ought not to be redrafting state statutes at the level of individual words." *Planned Parenthood of Idaho, Inc. v. Waden*, 376 F.3d 908, 937 (9th Cir. 2004).  Federal courts decline to excise provisions of a statute when that would require the Court "to examine and rewrite most of the statute in a vacuum as to how the various provisions were intended to intersect and in a way that would be at odds with the purpose of the statute." *United States v. Manning*, 527 F.3d 828, 840 (9th Cir. 2008).  In order to reach the result that MetroPCS advocates, the Court would be required to sever multiple provisions of the statute relating to the CPUC's calculation of the surcharge based upon the "entire price" of the retail transaction, and either sever or rewrite provisions that require the surcharge to be "collected by a seller," that direct that the "posted combined rate shall be the rate that applies to all retail transactions," and that "[a] direct seller must utilize the rate . . . ."

---

[13]  MetroPCS asserts that the CPUC requested the CDTFA letter "with the candid purpose of using it in the summary judgment briefing," and that the request "consisted of leading questions . . . accompanied . . . with selective citations apparently designed to guide the CDTFA toward the CPUC's preferred answers."  MetroPCS's Reply at 27 n.13 (Dkt. No. 77).  Even if MetroPCS's characterization is correct, however, the letter represents the agency's interpretation of the statute it is charged with administering.  The CPUC and the CDTFA are the agencies responsible for administering the Prepaid Collection Act, and the Court "afford[s] considerable deference to an agency's interpretation of the statute it administers." *Clallam Cty. v. Wash. Dep't of Transp.*, 849 F.2d 424, 429 (9th Cir. 1988) (addressing federal court review of coordinating action of a federal agency and state agency, and stating that "[t]he standard of review of agency action for either is essentially the same.").

1    Further, the Court finds it significant that the California Legislature considered allowing

2    direct sellers to continue assessing and remitting an individualized, carrier-specific surcharge, and

3    the Legislature declined to do so.  Finally, the Court notes that both the CPUC and the CDTFA,

4    the state agencies charged with implementing and administering the Prepaid Collection Act, have

5    taken the position that the  Prepaid Collection Act requires the use of an intrastate allocation factor

6    to be applied to all sales of prepaid telephony services in California.

7    Accordingly, the Court declares that the Prepaid Collection Act and the Contested

8    Resolutions conflict with federal law and are therefore preempted and unconstitutional.

9

10

11                                              **CONCLUSION**

12    For the foregoing reasons and for good cause shown, the Court hereby GRANTS

13    plaintiff's motion for summary judgment and DENIES defendants' motion for summary

14    judgment.

15    No later than **November 15, 2018,** the parties are directed to meet and confer and submit a

16    proposed order (or competing orders, if the parties cannot agree) regarding the appropriate

17    injunctive relief.  The parties shall also submit a joint letter informing the Court regarding whether

18    any further proceedings are necessary in this case prior to the entry of judgment, and if no further

19    proceedings are necessary, the parties shall file a proposed judgment.

20

21    **IT IS SO ORDERED**.

22

23    Dated: November 5, 2018                          _____

24                                                        SUSAN ILLSTON
                                                       United States District Judge

25

26

27

28