**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| METROPCS CALIFORNIA, LLC, *Plaintiff-Appellee*, v. MICHAEL PICKER; MARTHA GUZMAN ACEVES; CARLA PETERMAN; LIANE RANDOLPH; CLIFFORD RECHTSCHAFFEN, *Defendants-Appellants.* | No. 18-17382 D.C. No. 3:17-cv-05959-SI OPINION |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted February 5, 2020
San Francisco, California

Filed August 14, 2020

Before:  Richard A. Paez, Carlos T. Bea, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

# SUMMARY[*]

### Telecommunications

Reversing the district court's summary judgment and remanding, the panel held that federal law did not facially preempt California law governing universal service contributions from prepaid wireless providers.

The panel explained that federal law requires telecommunications providers to contribute to the federal Universal Service Fund from revenues the providers derive from their customers' interstate telecommunications. The Federal Communications Commission has authorized three methods that wireless providers can use to distinguish between interstate and intrastate revenues. Federal law also permits states to require telecommunications providers to contribute to state universal service programs based on the providers' intrastate revenues. California requires its own universal service contributions. In 2014, California adopted the Prepaid Mobile Telephony Services Surcharge Collection Act, which governed the collection of surcharges from prepaid wireless customers. The California Public Utilities Commission issued resolutions implementing the Prepaid Act that required providers of prepaid services to use a method other than the three FCC-recognized methods to determine the revenues generated by intrastate traffic that were subject to surcharge. The district court held that the CPUC resolutions were facially preempted by federal law, and the CPUC appealed.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As a threshold matter, the panel held that the expiration of the Prepaid Act while this appeal was pending did not cause this case to become moot. Plaintiff MetroPCS, a prepaid wireless provider, sought declaratory and injunctive relief on its claim that federal law preempts the CPUC's resolutions that required that prepaid providers use a uniform intrastate allocation factor, and not their chosen FCC-recognized method, to determine intrastate revenues subject to surcharge. The panel held that the case was not moot because MetroPCS had not complied with the CPUC's 2017 and 2018 Resolutions, and the CPUC still plans to enforce them.

On the merits of the preemption claim, the panel held that the CPUC resolutions were not facially preempted by the Telecommunications Act and related FCC decisions. The panel concluded that preemption was disfavored because there was a dual federal-state regulatory scheme and a history of state regulation in the area of intrastate telecommunications. The panel rejected MetroPCS's theories in support of its claim that the CPUC resolutions were facially preempted: (1) that the resolutions conflicted with the requirement of competitive neutrality by depriving prepaid providers (but not their competitors) of the "right" to calculate intrastate revenues in a way that avoided assessing the same revenues as federal contribution requirements; or (2) that because prepaid providers were deprived of that "right," the resolutions were preempted regardless of the treatment of competing providers. The panel reversed the district court's summary judgment and remanded to the district court to consider in the first instance MetroPCS's other challenges to the resolutions, including MetroPCS's as-applied preemption challenge.

## COUNSEL

Enrique Gallardo (argued), Arocles Aguilar, and Helen M. Mickiewicz, California Public Utilities Commission, San Francisco, California, for Defendants-Appellants.

Peter Karanjia (argued) and Joy G. Kim, DLA Piper LLP (US), Washington, D.C.; Martin L. Fineman and Geoffrey S. Brounell, Davis Wright Tremaine LLP, San Francisco, California; for Plaintiff-Appellee.

Niyati Shah, Asian Americans Advancing Justice | AAJC, Washington, D.C.; Jeffrey S. Raskin and Pejman Moshfegh, Morgan Lewis & Bockius LLP, San Francisco, California; for Amici Curiae Asian Americans Advancing Justice | AAJC, and Multicultural Media, Telecom and Internet Council.

## OPINION

FRIEDLAND, Circuit Judge:

MetroPCS California, LLC ("MetroPCS"), a wholly owned subsidiary of T-Mobile USA, Inc. ("T-Mobile"), sells prepaid cell phone plans in California and other states. Like other telecommunications providers, MetroPCS remits a portion of its revenue to federal and state governments to fund universal service programs. This appeal raises the question whether federal law preempts California law governing universal service contributions from MetroPCS and other prepaid wireless providers.

Federal law requires telecommunications providers, including wireless providers such as MetroPCS, to

contribute to the federal Universal Service Fund, which helps provide affordable telecommunications access.  These contribution requirements are imposed on revenues the providers derive from their customers' interstate telecommunications.  *See* 47 U.S.C. § 254(d).  The Federal Communications Commission ("FCC") has authorized three methods that wireless providers can use to distinguish between interstate and intrastate revenues.  Federal law also permits states to require telecommunications providers to contribute to state universal service programs based on the providers' intrastate revenues.  *See id.* § 254(f).

California requires its own universal service contributions.  It imposes surcharges on consumers' use of intrastate telecommunications services and relies on providers to collect those surcharges from their customers. In 2014, California adopted the Prepaid Mobile Telephony Services Surcharge Collection Act ("Prepaid Act"), which (prior to its recent expiration) governed the collection of surcharges from prepaid wireless customers.  The California Public Utilities Commission ("CPUC") issued resolutions implementing the Prepaid Act that required providers of prepaid services to use a method other than the three FCC-recognized methods to determine the revenues generated by intrastate traffic that were subject to surcharge.  Specifically, the CPUC resolutions required all prepaid providers to apply a uniform, flat-rate "intrastate allocation factor" to determine their intrastate revenues.  Providers of postpaid services, by contrast, were not governed by the resolutions and were free to use any of the three FCC-recognized methods to determine their intrastate revenues for purposes of calculating surcharges owed to the CPUC.

MetroPCS filed this lawsuit alleging that the CPUC resolutions were preempted by federal law.  Among other

things, MetroPCS contended that the resolutions' requirement of an intrastate allocation factor increased surcharges on prepaid services—but not on competing postpaid services—and thereby placed MetroPCS at a disadvantage in the wireless telecommunications market, in conflict with the federal Telecommunications Act of 1996 ("Telecommunications Act") and FCC decisions implementing it. The district court ruled for MetroPCS, and the CPUC appealed. While this appeal was pending, the Prepaid Act expired.

As a threshold matter, we hold that the expiration of the Prepaid Act did not cause this case to become moot and that we therefore have jurisdiction to reach the merits of MetroPCS's preemption claim. With respect to that claim, we hold that the CPUC resolutions are not facially preempted by the Telecommunications Act and related FCC decisions, and we therefore reverse the district court's ruling in favor of MetroPCS. We remand to the district court to consider in the first instance MetroPCS's other challenges to the resolutions.

## I.

### A.

The universal availability of critical telecommunications services is "a fundamental goal of federal telecommunications regulation." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1098 (D.C. Cir. 2009). From its inception, the FCC has been charged with "mak[ing] available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide . . . communication service with adequate facilities at reasonable charges." Communications Act of 1934, Pub. L. No. 73-416, § 1, 48 Stat. 1064, 1064. States have also historically

"exercised their jurisdictional authority to ensure the availability of universal service." *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 24744, 24747 (1998) ("*1998 Universal Service Decision*").

The Telecommunications Act solidified the commitment by the FCC and states to "ensuring the preservation and advancement of universal service." *Id.* at 24747–48; *see also* Pub. L. No. 104-104, § 101, 110 Stat. 56, 71–75 (1996). Under the Telecommunications Act, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service." 47 U.S.C. § 254(d). The Act further provides that states "may adopt regulations not inconsistent with the [FCC]'s rules [that] preserve and advance universal service." *Id.* § 254(f). In states adopting universal service regulations, "[e]very telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." *Id.*

The FCC has exercised its authority to establish guiding principles "for the preservation and advancement of universal service," *id.* § 254(b), by requiring that federal and state contributions be imposed on a competitively neutral basis. *In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 8801 (1997) ("*1997 Universal Service Order*"). The competitive neutrality policy is related to the statutory requirement that federal and state universal service contributions be "equitable and nondiscriminatory." *Id.*; *see also* 47 U.S.C. § 254(d), (f). It requires that universal service

"rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *1997 Universal Service Order*, 12 FCC Rcd. at 8801.

**B.**

To implement the Telecommunications Act's dual regulatory scheme, the FCC funds federal universal service programs by imposing a contribution requirement on the portion of telecommunications providers' revenues that is generated by interstate traffic, while states such as California support their own universal service programs through surcharges on the portion of revenues generated by intrastate traffic.[1]

The federal Universal Service Fund supports, among other things, the extension of high-speed internet to rural areas and the provision of discounted phone services to low-income consumers. *See Universal Service*, FCC, https://www.fcc.gov/general/universal-service (last visited Aug. 4, 2020). Telecommunications providers' contributions to the Universal Service Fund "are calculated by applying a quarterly 'contribution factor'" to the portion

---

[1] We adopt the following terminology for ease of reference throughout the remainder of this opinion. We use the term "interstate" as encompassing interstate and international telecommunications, both of which the FCC regulates. In addition, consistent with the terminology used by the FCC and the CPUC, we refer to federal contribution requirements as "contributions" or "contribution requirements," and we refer to California's contribution requirements as "surcharges."

of their surchargeable[2] telecommunications revenues that is interstate.  *See Rural Cellular Ass'n*, 588 F.3d at 1099.

"For companies connecting landline customers, determining the percentage of interstate . . . calls is relatively simple."  *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1236–37 (D.C. Cir. 2007).  But for providers of wireless and interconnected Voice over Internet Protocol ("VoIP") services[3]—"whose customers may use their services from many locations and often have area codes that do not correspond to their true location[s]"—it can be more difficult to determine the percentage of interstate traffic.  *Id.* at 1237.  The FCC has therefore authorized three options for wireless and interconnected VoIP providers to separate the revenues they generate from interstate traffic from the revenues they generate from intrastate traffic.

---

[2] Not all revenue is necessarily subject to federal contribution requirements or state surcharge requirements.  We use the term "surchargeable" to refer to the portion of revenue that is.  For example, both the FCC and the CPUC consider mobile wireless voice revenues to be surchargeable revenues, so the FCC's contribution requirements apply to interstate mobile wireless voice revenues, and the CPUC's surcharge requirements apply to intrastate mobile wireless voice revenues.  But neither the FCC nor the CPUC consider text messaging revenues to be surchargeable. *See In re Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 FCC Rcd. 12075, 12100 n.162 (2018); CPUC, Decision 19-01-029, Decision Determining that Public Purpose Program Surcharges and User Fees Will Not be Assessed on Text Messaging Services Revenue 21 (2019), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M265/K391/265391963.PDF.

[3] Interconnected VoIP service "allows a caller using a broadband Internet connection to place calls to and receive calls from other callers using either VoIP or traditional telephone service."  *Nuvio Corp. v. FCC*, 473 F.3d 302, 303 (D.C. Cir. 2006).

First, if wireless and interconnected VoIP providers have "actual revenue data" showing the portion derived from interstate telecommunications, they may rely on that data. *In re Universal Service Contribution Methodology*, 21 FCC Rcd. 7518, 7535, 7544 (2006) ("*2006 Universal Service Order*"). Second, providers may conduct a traffic study in which they take a sample of traffic on their network to estimate the percentage of all traffic that is interstate. *See id.* Finally, providers may rely on the FCC's "safe harbor," a percentage that is intended to "reasonably approximate the percentage of interstate . . . telecommunications revenues." *See In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 21252, 21253 (1998); *see also 2006 Universal Service Order*, 21 FCC Rcd. at 7532, 7544. Under the wireless safe harbor of 37.1% that has been in effect since 2006, for instance, a wireless provider can report that 37.1% of its surchargeable revenue is interstate without looking at an actual breakdown of its revenue or using a traffic study to approximate the breakdown. *See 2006 Universal Service Order*, 21 FCC Rcd. at 7532–33.

Although federal universal service contributions are imposed on telecommunications providers, it is common for providers to recover the amounts of their contributions from their customers, typically by putting a line item on monthly bills. *See Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 57 (D.C. Cir. 2011). As a result, "nearly every purchaser of telephone services in America helps support the [federal Universal Service Fund]." *Id.*

In California, the CPUC similarly imposes universal service surcharges on consumers' use of intrastate telecommunications services, which are collected by providers and then remitted to the state. The CPUC uses these funds to provide, among other things,

telecommunications devices to people with hearing loss and discounted telecommunications services to schools, libraries, hospitals, and other nonprofits.

For years, the CPUC did not mandate any particular methodology for wireless and VoIP providers to determine their intrastate revenues. Those providers could therefore use the three options recognized by the FCC—actual revenue, a traffic study, or the inverse of the FCC safe harbor.[4]

## C.

In 2014, California adopted the Prepaid Act, which addressed the collection of surcharges from consumers of prepaid wireless services. *See* 2014 Cal. Legis. Serv. ch. 885, § 8 (A.B. 1717) (West) (repealed 2020).[5] Prepaid wireless consumers pay in advance for services such as voice and data, while postpaid wireless consumers are billed monthly after the services have been provided. Prepaid service is increasingly popular, *see* Cal. Rev. & Tax. Code § 42002(d), including among "subscribers [who] lack the credit background or income [required] to qualify for postpaid service," *see In re Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act*

---

[4] The inverse of the FCC safe harbor is the portion of revenues not captured by the FCC safe harbor—that is, the portion of revenues attributed to intrastate traffic. For instance, the inverse of the FCC's current 37.1% safe harbor for wireless providers is 62.9%.

[5] The Prepaid Act expired as of January 1, 2020. *See* Cal. Rev. & Tax. Code § 42024 (providing that the Act "shall remain in effect only until January 1, 2020, and as of that date is repealed, unless a later enacted statute . . . deletes or extends that date"). For ease of reference, we do not note the Prepaid Act's expiration when citing provisions of the Act which are no longer in effect in the remainder of this opinion.

*of 1993*, 31 FCC Rcd. 10534, 10597 (2016). The CPUC estimates that prepaid services constitute about a third of the wireless services market in California.

Although postpaid providers can recover surcharges on intrastate traffic by placing charges on customers' monthly bills, prepaid service does not involve a monthly billing process. Prior to 2014, prepaid providers "essentially built" surcharges "into the purchase price" of prepaid services, and then remitted surcharges from their overall profits. Against this backdrop, the Prepaid Act was intended to "ensure equitable contributions from end-use consumers of postpaid and prepaid mobile telephony services in [California]" by "standardiz[ing] . . . the method used to collect communications taxes, fees, and surcharges from end-use consumers of prepaid mobile telephony services." Cal. Rev. & Tax. Code § 42002(e).

Under the Prepaid Act, a single surcharge rate, which included a component funding state universal service programs, had to be "imposed on each prepaid consumer." *See id.* § 42010(a)(1), (b)(2). Both direct sellers (prepaid wireless providers themselves) and indirect sellers (third-party retailers such as big box stores) were required to collect surcharges from consumers "at the time of each retail transaction." *See id.* §§ 42004(b)(1), (p), 42010(a)(1), (d)–(e). The surcharge was required to "be imposed as a percentage of the sales price" of each purchase of prepaid services, *id.* § 42010(a)(1); *see also id.* § 42018(a),[6] using a

---

[6] If prepaid services were sold in combination with other services or products for a single bundled price, the surcharge generally applied to that entire price. *See* Cal. Rev. & Tax Code § 42018(a); *see also id.* § 42018(b) (creating an exception by providing that, if prepaid services were sold with a mobile phone for a single bundled price, and the seller

rate the CPUC would establish each year, *id.* § 42010(b)(2); *see also* Cal. Pub. Util. Code § 319(b)–(c). The Prepaid Act took effect on January 1, 2016. *See* Cal. Rev. & Tax. Code § 42010(a)(1).

The CPUC issued a series of resolutions implementing the Prepaid Act. The first resolution (the "2016 Resolution") set a surcharge rate of 8.51%, which it stated applied only to "intrastate revenues subject to surcharge." But the 2016 Resolution did not specify how that amount of intrastate revenue was to be determined. In particular, nothing in the 2016 Resolution prevented prepaid providers from using any of the three FCC-recognized methods to do so. To take a hypothetical (and simplified) example of how the 2016 Resolution worked: suppose a provider selling a $40 voice-only prepaid plan had decided to use the traffic study method, and that its study showed that 60% of its traffic was intrastate. The provider would have applied the 8.51% surcharge to the portion of the sales price representing intrastate revenue ($24, or 60% of $40), producing a surcharge amount of $2.04 (8.51% of $24).

The CPUC changed course in its next resolution (the "2017 Resolution"). The CPUC explained that, on further study, it had determined that the 2016 Resolution did not comply with the Prepaid Act. The CPUC now believed that the Prepaid Act required that the surcharge rate "be applied to the total sales price" of prepaid services instead of only to "the intrastate portion" of the sales price.

---

disclosed on a receipt the portion of that price attributable to the *phone*, the seller could then apply the surcharge only to the remaining portion of the price attributable to *prepaid services*—rather than the full bundled price).

The 2017 Resolution began by setting an initial surcharge rate of 7.0854% using the methods the CPUC had relied on in 2016.  Then, because the CPUC had concluded that any surcharge rate had to apply to the "total" prepaid sales price, the CPUC took the further step of adjusting that initial rate by what it called an "intrastate allocation factor." The CPUC calculated an intrastate allocation factor of 72.75% based on the percentages of intrastate revenue reported by prepaid providers.  The result was a 5.15% adjusted surcharge rate (7.0854% multiplied by the intrastate allocation factor of 72.75%), which the 2017 Resolution specified applied to the entire sales price.

Although the 2017 Resolution required applying that *adjusted* surcharge rate to the *entire* sales price, it achieved the same mathematical result as applying the *unadjusted* surcharge rate to the intrastate *portion* of the sales price, as determined by applying the CPUC's intrastate allocation factor.  To illustrate using a hypothetical $40 plan, applying the adjusted surcharge rate of 5.15% to the entire price of that plan would have produced a surcharge of $2.06.  The same surcharge amount would result from using the 72.75% intrastate allocation factor to determine that $29.10 of that $40 plan was intrastate revenue, and then applying the unadjusted surcharge rate of 7.0854% only to that revenue.

This aspect of the 2017 Resolution—the requirement that providers use the 72.75% intrastate allocation factor to determine intrastate revenue subject to surcharge—was challenged by MetroPCS and T-Mobile.  Their application to modify the 2017 Resolution argued that they and other direct sellers should be allowed to rely on the FCC methods to determine intrastate revenue, rather than being required to use the intrastate allocation factor to do so.  The CPUC

denied the application and issued a resolution affirming the 2017 Resolution.

The next CPUC resolution (the "2018 Resolution") took the same approach as the 2017 Resolution, but with updated rates. As relevant here, it adopted a new intrastate allocation factor of 69.45% for determining prepaid intrastate revenue subject to surcharge.

In contrast to prepaid services, postpaid services were not governed by the Prepaid Act or the CPUC resolutions. Providers of postpaid services were therefore allowed to continue using the three FCC-recognized methods to determine their intrastate revenues subject to CPUC surcharge.

## D.

MetroPCS filed a lawsuit in 2017 against the members of the CPUC in their official capacities, challenging the CPUC's intrastate allocation factor methodology. MetroPCS explained in the operative Complaint that it has "been offering prepaid wireless service in California since 2002" and that it sells a variety of plans, "including voice, data, and text plans ranging from $30 to $60 per month." All MetroPCS plans are prepaid.

MetroPCS claimed that the CPUC's adoption of a "mandatory one-size-fits-all" intrastate allocation factor conflicted with federal law and was therefore preempted. As relevant here, the Complaint alleged that the CPUC's requirement that prepaid providers use the intrastate allocation factor to determine intrastate revenues subject to surcharge conflicted with an FCC order recognizing the three methods described above for separating interstate revenues from intrastate revenues for purposes of imposing

federal contribution requirements.  The Complaint further alleged that the CPUC resolutions resulted in "state Universal Service surcharges [being assessed] on the same revenues that [were] already subject to federal Universal Service" contributions and thus unfairly burdened prepaid providers by subjecting them to "double assessment" of their revenues.  The Complaint claimed that the 2017 Resolution, the resolution affirming the 2017 Resolution, and the 2018 Resolution were each "preempted both facially and as applied to MetroPCS."  MetroPCS sought a declaration that the resolutions were preempted and an injunction barring the CPUC from enforcing them.

As to the Prepaid Act that the resolutions were issued to implement, MetroPCS contended that the Act itself could be construed to avoid a conflict with federal law.  To the extent a saving construction was not possible, the Complaint sought a declaration that any provision of the Prepaid Act conflicting with federal law was preempted and an injunction barring enforcement of any such provision.

MetroPCS and the CPUC filed cross-motions for summary judgment, and the district court granted summary judgment for MetroPCS.  *MetroPCS Cal., LLC v. Picker*, 348 F. Supp. 3d 948, 950 (N.D. Cal. 2018).  The district court first observed that orders issued by the FCC "stand for the proposition that wireless carriers have several options when allocating their interstate and intrastate revenues" to determine federal universal service contributions.  *Id.* at 962–63.  Explaining that the CPUC resolutions required that "the intrastate allocation factor [be] the sole method" for determining intrastate revenue subject to surcharge, the court reasoned that the resolutions "deprived [prepaid] carriers of the ability to rely on [the] alternative allocation methodologies" recognized by the FCC.  *Id.* at 963.  The

court held that the CPUC resolutions were facially preempted because the "mandatory intrastate allocation factor" conflicted with federal law by preventing providers from choosing among the FCC-recognized methods. *Id.* The court explained that this conclusion made it "unnecessary to address MetroPCS's other [preemption] challenges to the Contested Resolutions." *Id.* With respect to the Prepaid Act, the court held that "the language and structure of the Act require[d] the usage of an intrastate allocation factor" and that the Act was therefore also preempted. *Id.* at 965. The court granted declaratory and injunctive relief with respect to both the resolutions and the Act.

Before the district court issued its ruling, the CPUC had adopted another resolution (the "2019 Resolution") patterned on the 2017 and 2018 Resolutions. Following the district court's decision, the CPUC rescinded the 2019 Resolution. Instead, the CPUC reverted to using "the surcharge . . . collection and remittance framework that existed prior to" the Prepaid Act.

MetroPCS did not comply with the 2017 and 2018 Resolutions' requirement that it use the intrastate allocation factor to determine the intrastate portion of the sales price subject to CPUC surcharge. Instead, MetroPCS remitted surcharges using the FCC-recognized traffic study method—an option permitted under the 2016 Resolution. There is no indication in the record that the CPUC has ever attempted to enforce its resolutions against MetroPCS, other than through its defense in this litigation.

The CPUC appealed the district court's ruling that the required intrastate allocation factor method for determining intrastate revenue is facially preempted. The Prepaid Act

subsequently expired by its own terms on January 1, 2020. *See* Cal. Rev. & Tax. Code § 42024.

## II.

The Prepaid Act's expiration prompts us to consider, as a preliminary matter, whether this case has become moot. "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999)). When "there is no longer a possibility that [a party] can obtain relief for [its] claim, that claim is moot." *Id.* (quoting *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 521 (9th Cir. 1999)).

MetroPCS seeks only forward-looking declaratory and injunctive relief on its claim that federal law preempts the CPUC's requirement that prepaid providers use a uniform intrastate allocation factor, and not their chosen FCC-recognized method, to determine intrastate revenues subject to surcharge. But the Prepaid Act, which the CPUC interpreted as requiring use of an intrastate allocation factor, and which motivated the challenged resolutions, has expired. *See* Cal. Rev. & Tax. Code § 42024. Because the Prepaid Act's expiration may have already "accomplished all that a judgment could accomplish," and may thereby have deprived us of the ability to give any meaningful prospective relief to MetroPCS, we requested supplemental briefing from the parties on whether this case had become moot. *See Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000), *overruled on other grounds by Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc).

Generally, the "expiration of challenged legislation . . . render[s] a case moot." *Glazing Health*, 941 F.3d at 1198. But a case challenging expired legislation remains justiciable when the litigant still "need[s] . . . the judicial protection that it sought." *See Jacobus v. Alaska*, 338 F.3d 1095, 1102–03 (9th Cir. 2003) (quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000) (per curiam)), *overruled on other grounds by Glazing Health*, 941 F.3d 1195. In *Jacobus*, we held that we had jurisdiction because the plaintiffs who had challenged a since-repealed law would "likely experience prosecution and civil penalties for their past violations" of the law. *Id.* at 1104. We explained that their claims were not moot "[i]n light of the ongoing civil and criminal ramifications of [their] past violations." *Id.* To avoid mootness, liability need not be certain; it is enough that the "possibility" of liability "for a proven past violation is real and not remote." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 610 (2013).

Applying these principles here, we hold that this case is not moot. MetroPCS has not complied with the 2017 and 2018 Resolutions. Even though there is no indication that the CPUC has yet attempted to enforce those resolutions against MetroPCS, the CPUC asserts in its briefing that the California Constitution requires it to enforce the resolutions implementing the Prepaid Act. *See* Cal. Const. art. III, § 3.5 (providing that "[a]n administrative agency . . . has no power . . . to refuse to enforce a statute [based on federal law] unless an appellate court [makes] a determination that the enforcement of such statute is prohibited by federal law or federal regulations"). If we were to reverse the district court and uphold those resolutions, the CPUC represents that it would seek to hold MetroPCS liable for remitting surcharges based on the relevant intrastate allocation factor for at least

the years 2017 and 2018.[7]  Both parties' supplemental briefs take the position that the CPUC's intent to pursue enforcement prevents this case from being moot.

Even though the parties both contend that we have jurisdiction, we have an obligation to make that determination for ourselves.  *See Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 871–72 (9th Cir. 2007).  We conclude we do have jurisdiction.  The CPUC has announced its intent to enforce the resolutions, and we are not aware of any basis for concluding that the CPUC can no longer bring an enforcement action.  For example, the Prepaid Act itself contains no statute of limitations.  *See* Cal. Rev. & Tax. Code § 42001 *et seq.*  If the California catchall statute of limitations were to apply, it appears it would not have lapsed before an enforcement action could be brought.  *See* Cal. Civ. Proc. Code § 343 (four-year statute of limitations).  And even assuming the CPUC is subject to principles of equitable estoppel, the CPUC could only be estopped from enforcement if MetroPCS showed "detrimental reliance on [the CPUC's] misrepresentations."  *See Lyng v. Payne*, 476 U.S. 926, 935 (1986).  It does not appear that the CPUC has ever misrepresented to MetroPCS that it would refrain from enforcing the 2017 and 2018 Resolutions.

---

[7] The parties dispute whether MetroPCS could be liable for underpaying surcharges in 2019—the year for which the CPUC initially issued a resolution requiring use of an intrastate allocation factor but later rescinded that resolution in response to the district court's ruling. Regardless of MetroPCS's liability for 2019, the CPUC's representation that it will seek to hold MetroPCS liable for 2017 and 2018 prevents this case from being moot for the reasons we explain below.  Because our jurisdiction does not depend on MetroPCS's 2019 liability, we decline to address in the first instance the parties' disagreements about that year.

The possibility that the CPUC will bring an enforcement action against MetroPCS if the resolutions are upheld means there is still a live controversy, so we proceed to the merits of MetroPCS's preemption claim.

## III.

Preemption is "a question of law reviewed de novo." *Toumajian v. Frailey*, 135 F.3d 648, 652 (9th Cir. 1998). We first conclude that preemption is disfavored in the circumstances of this case, and we then turn to MetroPCS's specific preemption arguments.

## A.

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "When a state law, 'in [its] application to [a particular] case, come[s] into collision with an act of Congress,' the state law 'must yield to the law of Congress.'" *Close v. Sotheby's, Inc.*, 909 F.3d 1204, 1209 (9th Cir. 2018) (alterations in original) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210 (1824)), *cert. denied*, 139 S. Ct. 1469 (2019) (mem.). State law can be preempted by constitutional text, by federal statute, or by a federal regulation. *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Where, as here, we consider whether a federal agency has preempted state regulation, we do not focus on Congress's "intent to supersede state law" but instead ask "whether [the federal agency] meant to pre-empt [the state law]." *Barrientos v. 1801–1825 Morton LLC*, 583 F.3d 1197, 1208 (9th Cir. 2009) (alterations in original) (quoting *de la Cuesta*, 458 U.S. at 154).

Conflict preemption occurs when "it is impossible to comply with both state and federal requirements," or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000) (quoting *Indus. Truck Ass'n v. Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997)).**[8]** MetroPCS does not contend that it is impossible to comply both with federal law and with the CPUC resolutions but instead argues that the resolutions are an obstacle to the FCC's accomplishing its purposes. To evaluate whether a state law poses an obstacle to the implementation of a federal program, "the Supreme Court has stated that the 'pertinent question []' is whether the state law 'sufficiently injure[s] the objectives of the federal program to require nonrecognition.'" *See Topa Equities, Ltd. v. City of Los Angeles*, 342 F.3d 1065, 1071 (9th Cir. 2003) (alterations in original) (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583 (1979)). The mere "fact that there is '[t]ension between federal and state law is not enough to establish conflict preemption.'" *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 988 (9th Cir. 2007) (alteration in original) (quoting *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007)).

"[T]he case for federal pre-emption" is "less persuasive" when "coordinate state and federal efforts exist within a complementary administrative framework[] and in the pursuit of common purposes." *N.Y. State Dep't of Soc.*

---

**[8]** The other two categories of preemption—express preemption ("where Congress explicitly defines the extent to which its enactments preempt state law"), and field preemption ("where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy")—are not at issue in this case. *See Williamson*, 208 F.3d at 1149 (quoting *Indus. Truck Ass'n*, 125 F.3d at 1309).

*Servs. v. Dublino*, 413 U.S. 405, 421 (1973); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 959 F.3d 1201, 1225 (9th Cir. 2020) (citing the existence of a "cooperative federalism scheme," among other factors, as "rais[ing] the strong inference that Congress did not intend to" preempt state and local enforcement). Moreover, when Congress has legislated in a field in which there is a "historic presence of state law," a presumption against preemption applies. *See Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009). What matters for application of this presumption is whether "Congress has set foot in a 'field which the States have traditionally occupied,'" *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 675 (9th Cir. 2013) (quoting *Wyeth*, 555 U.S. at 565); if it has, there is a presumption against preemption regardless of whether "Congress has regulated [in that field] comprehensively for fifty years or only interstitially for five," *see id.*

Here, there is a "dual regulatory scheme" requiring that our "conflict-pre-emption analysis . . . be applied sensitively . . . so as to prevent the diminution of the role Congress reserved to the States." *See Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 514–15 (1989). The Telecommunications Act is premised on a "system of 'cooperative federalism,'" in which participating states are key partners to the federal government in regulating the telecommunications industry. *See T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 303 (2015) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 128 (2005) (Breyer, J., concurring)). Under this scheme, states are, "subject to the boundaries set by Congress and federal regulators, . . . called upon to apply their expertise and judgment and have the freedom to do so." *BellSouth Telecomms., Inc. v. Sanford*, 494 F.3d 439, 449 (4th Cir.

2007). Because the CPUC resolutions regulate an aspect of this scheme in which the Telecommunications Act recognizes state authority—imposing surcharges on intrastate revenue to support state universal service programs—there is a higher threshold for showing that those resolutions are preempted. *See id.* at 448–49 (citing universal service as an example of the Telecommunication Act's cooperative federalism scheme).

Further, the history of state regulation in this area requires us to apply the presumption against preemption. *See McDaniel*, 717 F.3d at 675. States traditionally "exercised broad power to regulate telecommunications markets within their borders in ways that were designed to promote . . . universal service." *In re Public Utility Commission of Texas*, 13 FCC Rcd. 3460, 3463 (1997); *see also, e.g.*, *In re Federal-State Joint Board on Universal Service*, 14 FCC Rcd. 8078, 8100–01 (1999) (referring to states' historical efforts to "ensure[] universal service principally through implicit support mechanisms, such as geographic rate averaging"); *1998 Universal Service Decision*, 13 FCC Rcd. at 24747 (acknowledging that, "[h]istorically, . . . state . . . regulators have exercised their jurisdictional authority to ensure the availability of universal service").

MetroPCS contends that our decisions in *Qwest Corp. v. Arizona Corp. Commission*, 567 F.3d 1109 (9th Cir. 2009), and *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), nevertheless prevent the presumption against preemption from applying here. But *Qwest Corp.*, relying on *Ting*, stated that "the long history of federal presence in regulating *long-distance telecommunications*" made the presumption inapplicable. *See Qwest Corp.*, 567 F.3d at 1118 (emphasis added) (quoting *Ting*, 319 F.3d at 1136). As those cases

explained, the historic telecommunications regulatory scheme granted authority to the FCC—not states—to regulate interstate long-distance telecommunications. *See id.* at 1112, 1117–18 (observing that "telephone service regulatory issues [used to] mainly revolve[] around rates, with the FCC setting interstate rates," and that long-distance telecommunications are "typically *interstate*" (quotation marks omitted)); *see also Ting*, 319 F.3d at 1130–32 (describing the FCC's historical regulation of rates for interstate long-distance service). *Qwest Corp.* and *Ting* are therefore distinguishable from this case because they involved state laws covering a part of the regulatory scheme that was traditionally dominated by the FCC.  By contrast, the CPUC resolutions here were focused on regulating *intrastate* telecommunications to further state universal service efforts.  Because this is an area that has clearly been "traditionally occupied" by the states, *see Wyeth*, 555 U.S. at 565 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)), the presumption against preemption applies.

**B.**

MetroPCS focuses on two theories in support of its claim that the CPUC resolutions are facially preempted by the Telecommunications Act and related FCC decisions: (1) that the resolutions conflict with the requirement of competitive neutrality by depriving prepaid providers (but not postpaid providers) of the "right" to calculate intrastate revenues in a way that avoids assessing the same revenues as federal contribution requirements, and (2) that because prepaid providers are deprived of that "right," the resolutions are preempted regardless of the treatment of competing providers.  Evaluating these theories in light of the foregoing reasons to disfavor preemption, we reject each of them.

**1.**

MetroPCS argues that the CPUC resolutions facially conflict with the FCC's competitive neutrality policy, *see 1997 Universal Service Order*, 12 FCC Rcd. at 8801, which is related to the Telecommunications Act's "equitable and nondiscriminatory" mandate, *see* 47 U.S.C. § 254(d), (f). Specifically, MetroPCS points out that the CPUC's requirement that an intrastate allocation factor be used to determine intrastate revenue applied "*only* to *prepaid*" services and not to "similarly situated postpaid" services. MetroPCS asserts that this differential treatment made it harder for prepaid providers to compete with postpaid providers.

**a.**

As relevant to MetroPCS's argument, the Telecommunications Act provides:

> A State may adopt regulations not inconsistent with the [FCC's] rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.

47 U.S.C. § 254(f). The FCC has determined that the requirement that contributions be imposed "on an equitable and nondiscriminatory basis" encompasses "[t]he principle of competitive neutrality." *1997 Universal Service Order*, 12 FCC Rcd. at 8801 (explaining that the competitive

neutrality principle is "embodied in . . . section 254(f)'s requirement that state universal service contributions be equitable and nondiscriminatory").

The FCC has defined competitive neutrality to "mean[] that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *Id.*; *see also AT&T Corp. v. Pub. Util. Comm'n*, 373 F.3d 641, 647 (5th Cir. 2004) (explaining that competitive neutrality at least prohibits putting some providers "at a distinct competitive disadvantage compared with" other providers). Competitive neutrality prohibits regulators "from treating competitors differently in *unfair* ways," *see AT&T, Inc. v. FCC*, 886 F.3d 1236, 1250 (D.C. Cir. 2018) (formatting altered) (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1104 (D.C. Cir. 2009)), but does not prohibit regulators "from according different treatment to competitors whose circumstances are materially distinct," *id.*

One of our sister circuits has addressed the requirement that states impose universal service contributions on a competitively neutral basis. In *AT&T Corp.*, the Fifth Circuit considered Texas's universal service fee, which the state imposed "on all telecommunications carriers who provide[d] any intrastate service." 373 F.3d at 644. A 3.6% state fee applied to such carriers' intrastate revenue as well as to any revenue they "derived from . . . interstate[] and international calls originating in Texas." *Id.* The result was that "multijurisdictional carriers" providing both intrastate and interstate service in Texas had two different fees imposed on their interstate revenues: they paid the 3.6% state fee on such revenues *plus* the 7.28% federal universal service fee on the same revenues. *See id.* at 644, 646–47.

By contrast, "pure-interstate-provider[s]" were not subject to the Texas fee and paid only the 7.28% federal fee on their interstate revenues. *Id.* at 647. The Fifth Circuit determined that this "double assessment" of multijurisdictional carriers' interstate revenues put them "at a distinct competitive disadvantage compared with the pure interstate carriers," who did not have their interstate revenues doubly assessed. *Id.* It therefore held that the Texas fee was preempted by federal law. *Id.*

The FCC adopted a similar position in a ruling addressing whether states could require universal service contributions from certain interconnected VoIP providers. *See In re Universal Service Contribution Methodology*, 25 FCC Rcd. 15651, 15656 (2010) ("*2010 VoIP Contribution Ruling*"). Prior to that ruling, the FCC had concluded (just as it had with wireless providers) that these providers could use any of the three methods of actual revenue, a traffic study, or the VoIP safe harbor (of 64.9%) to determine interstate revenues subject to federal universal service contribution requirements. *See 2006 Universal Service Order*, 21 FCC Rcd. at 7544–45. In response to two states' request for a declaratory ruling on the permissibility of imposing state universal service contribution requirements on interconnected VoIP providers, the FCC ruled that a state could impose such contribution requirements on the intrastate revenues of those providers— but specified that the state's methodology must not result in "double assessments" of providers' revenues. *See 2010 VoIP Contribution Ruling*, 25 FCC Rcd. at 15655, 15659– 60.

The FCC explained that such double assessments might occur if states had different ways of determining which revenues fell within their respective jurisdictions and as a

result imposed their universal service contribution requirements on the same revenue. *See id.* at 15659. The FCC described a hypothetical example in which "all of an interconnected VoIP provider's customers have a billing address in State A and service address in State B," and "State A and State B use billing addresses and service addresses, respectively, to determine the state universal service revenue base." *Id.* If the provider used the FCC safe harbor and its inverse to determine its interstate and intrastate revenue, 64.9% of its revenue would be assessed for federal contributions, 35.1% of its revenue would be assessed by State A, and 35.1% of its revenue would be assessed by State B—resulting in double assessments on 35.1% of its revenue. *See id.*

The FCC concluded that the double assessments it described "would violate the principle of competitive neutrality." *Id.* at 15659–60. Interconnected VoIP providers compete with "traditional telephone service" providers. *See 2006 Universal Service Order*, 21 FCC Rcd. at 7541. Because "traditional telephony" providers "are generally not subject to double assessments," any double assessments on interconnected VoIP providers' revenues would place those providers "at an artificial competitive disadvantage." *2010 VoIP Contribution Ruling*, 25 FCC Rcd. at 15659–60. The FCC thus determined that any state contribution requirements resulting in assessments by two states on the same interconnected VoIP revenue would conflict with the "important federal policy of competitive neutrality" and be preempted on that ground. *See id.*

### b.

We agree with the reasoning of our sister circuit and the FCC. *Cf. Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 649–50 (9th Cir. 2014) ("find[ing] . . . persuasive" an agency's

position that a federal statute does not preempt state laws). Again, competitive neutrality attempts to create an even playing field between competitors by prohibiting rules that "unfairly advantage [or] disadvantage one provider over another." *See 1997 Universal Service Order*, 12 FCC Rcd. at 8801. To the extent a state regulation violates that competitive neutrality requirement, the regulation is preempted—and one way in which a regulation can impermissibly create an "unfair[] . . . disadvantage," *see id.*, is by causing the double assessment of one provider's revenue but not a competing provider's revenue. *See AT&T Corp.*, 373 F.3d at 647; *2010 VoIP Contribution Ruling*, 25 FCC Rcd. at 15659–60.

In evaluating whether the CPUC resolutions at issue here are facially preempted, we use "the rules that apply to facial challenges" to statutes. *See Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016). To succeed on its facial preemption claim under those rules, MetroPCS "must show that 'no set of circumstances exist[ed] under which the [resolutions] [were] valid.'" *See id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Salerno*, 481 U.S. at 745 (explaining that a facial challenge is "the most difficult challenge to mount successfully"). Specifically, MetroPCS must demonstrate that every application of the CPUC resolutions caused an unfair disadvantage for prepaid services, which MetroPCS could accomplish by showing that the resolutions always resulted in uneven double assessments.

Under the CPUC resolutions, providers of prepaid services were still able to use any of the FCC-recognized methods to determine the portion of *interstate* revenue subject to *federal* contribution requirements (and a corresponding portion of intrastate revenue not subject to

federal contribution requirements). But those providers could not rely on the FCC methods to determine the portion of *intrastate* revenue subject to *state* surcharge. Instead, the resolutions required use of an intrastate allocation factor to capture the portion of revenues that were intrastate. As the CPUC has explained, that intrastate allocation factor served the function of "determining" providers' "intrastate revenue subject to the state's universal service surcharges."**[9]**

For example, take a provider that operated exclusively in California and sold a $100 voice-only prepaid plan, all of the revenue from which was surchargeable. To determine its interstate revenue for federal universal service purposes, suppose that the provider used the federal safe harbor of 37.1% interstate revenue, which would have resulted in the FCC's assessing $37.10 of the plan—but not the $62.90 treated as intrastate revenue under the safe harbor. By contrast, under the CPUC's 2017 Resolution, the provider would have been required to use the intrastate allocation factor of 72.75% to determine that $72.75 of the plan was intrastate revenue for state universal service purposes. The unadjusted CPUC surcharge rate would have been applied to that $72.75. The end result would have been the FCC's assessing $37.10 and the CPUC's assessing $72.75 (a total of $109.85). Thus, as a consequence of the provider's using the FCC safe harbor to derive interstate revenue subject to federal contributions, but using the CPUC-mandated intrastate allocation factor to derive intrastate revenue

---

**[9]** As explained above, even though the CPUC resolutions nominally required applying the relevant *adjusted* surcharge rate to the *entire* purchase price, that was mathematically equivalent to requiring use of the intrastate allocation factor to determine the intrastate *portion* of the purchase price to which the *unadjusted* surcharge rate applied. *See supra* Part I.C.

subject to state surcharge, there would have been a double assessment on $9.85 of the $100 plan.

By contrast, consider a competing provider that sold a similar $100 voice-only postpaid plan in California. The provider of postpaid services, unlike the provider of prepaid services, would have been permitted to use any of the three FCC methods to determine both its interstate and intrastate revenues. Suppose the provider used the federal safe harbor and its inverse. Using the federal safe harbor of 37.1% for federal universal service contributions, the provider would have had $37.10 in interstate revenue subject to such contributions. And using the inverse of that safe harbor, 62.9%, the provider would have had $62.90 in intrastate revenue subject to CPUC surcharge—for a total assessment on $100, and no double assessment at all.

The double assessment on prepaid services would, at least if the surcharge rates applicable to prepaid services were similar to the rates applicable to postpaid services, create a disadvantage for the provider of prepaid services compared to the provider of postpaid services. *See AT&T Corp.*, 373 F.3d at 647 (explaining that there was a "competitive disadvantage" because one subset of carriers was "burden[ed] . . . more severely" than other carriers). On their $100 plans, both providers would have paid the same federal contribution amount. But the CPUC surcharge amount would have been higher for the provider of prepaid services if, as was true here, the surcharge rates for prepaid services essentially the same rates applicable to postpaid services. If the state surcharge rate for both were 10%, for example, the provider of prepaid services would have had an additional $9.85 in revenue subject to that rate—and therefore paid an additional surcharge amount of $0.985.

That disadvantage for the provider of prepaid services would have been an "unfair[]" one. *See 1997 Universal Service Order*, 12 FCC Rcd. at 8801. We see no meaningful distinction between prepaid and postpaid services that could justify imposing the higher surcharge only on prepaid services. *Cf. AT&T, Inc.*, 886 F.3d at 1250 (explaining that competitive neutrality does not prohibit a regulator "from according different treatment to competitors whose circumstances are materially distinct"). Prepaid and postpaid services offer the same telecommunications options of voice, text messaging, and data. *See, e.g.*, *In re Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, 26 FCC Rcd. 9664, 9725 (2011). And counsel for the CPUC acknowledged at oral argument that prepaid and postpaid providers are equally capable, if permitted to do so, of using the three FCC-recognized methods to determine their intrastate revenues. *See* Oral Argument at 9:39–10:40.[10]   Thus, under the CPUC resolutions, a provider of prepaid services that was subject to the same surcharge rate as a provider of postpaid services,

---

[10] The CPUC contends that its resolutions do not conflict with the principle of competitive neutrality because they treated direct sellers (providers such as MetroPCS) the same as indirect sellers (such as big box stores). *See* Oral Argument at 7:45–9:28. Both direct sellers and indirect sellers were required to use the intrastate allocation factor. Thus, as the CPUC explains in its briefing, "[a] California consumer who [bought] $100 worth of prepaid service would [have paid] the exact same surcharge whether she [bought] that service . . . directly from the carrier or from an indirect seller." But the fact that direct sellers and indirect sellers were treated equally by the CPUC does not change the fact that providers of prepaid services were potentially treated inequitably compared to providers of postpaid services. *Cf. In re Silver Star Telephone Company, Inc.*, 13 FCC Rcd. 16356, 16360–61 (1998) (explaining that competitive neutrality requires such neutrality "among the entire universe of participants . . . in a market").

but on a higher portion of its surchargeable revenues, would have found itself at an unfair competitive disadvantage.

Importantly, however, the CPUC's adoption of an intrastate allocation factor would not necessarily have resulted in an unfair disadvantage for every prepaid provider. Take, for instance, a provider that sold a $100 voice-only prepaid plan in California and relied on a traffic study showing 25% interstate traffic and 75% intrastate traffic for its federal universal service contributions. The FCC would have applied its contribution factor to $25, while the CPUC, using its 2017 intrastate allocation factor of 72.75%, would have applied its surcharge rate to another $72.75. No disadvantageous double assessment would have occurred.[11]

Thus, the adoption of an intrastate allocation factor in and of itself would not have invariably resulted in double assessments conflicting with the principle of competitive neutrality. Nor has MetroPCS even attempted to argue that it is possible to discern from the specific intrastate allocation factors adopted by the CPUC (72.75% for 2017 and 69.45% for 2018) that double assessments unfairly disadvantaging every provider of prepaid services would have occurred. *See generally Faria v. M/V Louise*, 945 F.2d 1142, 1143 (9th Cir. 1991) (explaining that "one of the most basic propositions of law" is "that the plaintiff bears the burden of proving [its] case"). MetroPCS's facial preemption

---

[11] To the extent the CPUC resolutions resulted in providers of prepaid services having *less* than 100% of their revenues assessed, other competing providers could potentially claim their own competitive disadvantage if they had *all* 100% of revenues assessed. But this case does not involve any such claim, so we have no occasion to address any implications of prepaid providers' potentially being competitively advantaged.

challenge based on a conflict with competitive neutrality therefore fails. *See Puente Ariz.*, 821 F.3d at 1104.

**2.**

MetroPCS additionally contends that providers of prepaid services have a freestanding "right to use the same FCC-authorized methodologies . . . for purposes of calculating their *intrastate* telecommunications service revenues subject to CPUC surcharges" to avoid having the same revenue subject to both federal and state contribution requirements. MetroPCS argues that the CPUC resolutions deprived providers of this "right" and are therefore facially preempted regardless of how other providers were treated.

In making this argument, MetroPCS relies on a different part of the FCC's declaratory ruling permitting states to impose universal service contribution requirements on intrastate interconnected VoIP revenue. *See 2010 VoIP Contribution Ruling*, 25 FCC Rcd. at 15658. The FCC observed in that ruling that interconnected VoIP providers have "three options by which they can establish their federal universal service revenue base." *Id.* The FCC stated that, "to avoid a conflict" with its rules, "a state imposing universal service contribution obligations on interconnected VoIP providers must allow those providers to treat as intrastate for state universal service purposes the same revenues that they treat as intrastate under the [FCC's] universal service contribution rules." *Id.* By allowing for consistent treatment of revenues, a state would "ensure that [its] contribution requirements [were] not . . . imposed on the same revenue on which an interconnected VoIP provider [was] basing its calculation of federal contributions." *Id.*

Suppose, for example, that an interconnected VoIP provider operating exclusively in one state used the federal

safe harbor of 64.9% to determine interstate revenue subject
to federal contribution requirements.  If the provider were
also required by that state to treat 50% of revenue as
intrastate, the provider would be subject to assessments on
114.9% of its revenue (that is, double assessments on 14.9%
of its revenue).  The FCC suggested that a state regulation
resulting in such double assessment "may be subject to
preemption." *Id.*

For two reasons, we conclude that this part of the FCC's
ruling does not provide a basis for resolving this appeal in
MetroPCS's favor.  First, the FCC's position is unclear.  It
does not seem that the FCC has even reached a definitive
conclusion about preemption; instead, the FCC used the
tentative language "may."  *See id.*  Nor does the FCC's
sparsely reasoned ruling provide a clue as to how we could
discern whether any double assessment sufficiently injured
a federal objective so as to trigger preemption.  *See Topa
Equities, Ltd.*, 342 F.3d at 1071; *see also Wyeth*, 555 U.S.
at 576–77 (explaining that we can consider "an agency's
explanation of how state law affects the regulatory scheme"
in deciding whether a state law conflicts with a federal
regulation, although we do "not defer[] to an agency's
*conclusion* that state law is pre-empted" and must undertake
our "own conflict determination").

Second, in the circumstances present in this case, the
question whether federal law enshrines a freestanding right
to avoid double assessment of revenue is ultimately beside
the point.  To prevail on a facial challenge premised on the
existence of such a right, MetroPCS would need to show that
every application of the CPUC resolutions would have
resulted in double assessment of prepaid revenue—but, as
explained above, MetroPCS has failed to make such a
showing. *See supra* Part III.B.1.b.  Also, at least as far as we

can tell, any double assessment on prepaid revenue would necessarily have created an "unfair[] . . . disadvantage" for the prepaid provider compared to competing postpaid providers. *See 1997 Universal Service Order*, 12 FCC Rcd. at 8801. As explained above, only the prepaid provider, and not postpaid providers, would have been subject to double assessment, and yet the surcharge rates were similar for prepaid and postpaid services. *See supra* Part III.B.1.b. The result would have been higher surcharges for prepaid services but not postpaid services, despite there being no meaningful difference between the two. *See supra* Part III.B.1.b. Any double assessment on prepaid revenue would therefore conflict with the competitive neutrality requirement that the FCC has prescribed. And because the double assessment would be invalid for that reason, it would make no difference whether it was invalid for the additional reason of violating a freestanding right against double assessments.

As a final matter, we reject one further argument by MetroPCS that an even more expansive right is guaranteed by federal law: the right to use the FCC-recognized methods to determine intrastate revenue, regardless of whether any inconsistency between those methods and state-permitted methods results in double assessments. Specifically, MetroPCS argues that the FCC "deliberately sought" to make available three options for determining revenue, and that the CPUC resolutions are preempted solely because they deprived prepaid providers of that flexibility. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 878, 881 (2000); *de la Cuesta*, 458 U.S. at 155–56. But the CPUC resolutions did not prevent prepaid providers from using the FCC-recognized options to determine *interstate* revenue subject to federal contributions; they only prevented prepaid providers from using those options to determine *intrastate*

revenue subject to state surcharge.  *Cf. In re Volkswagen*, 959 F.3d at 1221 (holding that the EPA's enforcement of federal law would not be impeded by local "parallel rules, and so there is no basis to infer a congressional intent to preempt them").   And MetroPCS has pointed to little evidence that flexibility—in federal contribution calculations, let alone in state ones—was an overriding purpose of the relevant FCC orders. *Cf. Barrientos*, 583 F.3d at 1210 (rejecting preemption claim when the asserted federal goal was "an important means to the ultimate end of providing housing, but not [actually] a goal in itself").

## IV.

MetroPCS advances several other challenges to the CPUC resolutions.  These challenges were not reached by the district court, and we therefore decline to address them in the first instance. *See Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014) ("Typically, 'a federal appellate court does not consider an issue not passed upon below.'" (quoting *Quinn v. Robinson*, 783 F.2d 776, 814 (9th Cir. 1986))).

First, MetroPCS argues that the CPUC resolutions are preempted as applied to MetroPCS.  Our analysis above makes clear that the resolutions would be preempted if applying them to MetroPCS resulted in double assessments on MetroPCS's revenue, which would unfairly disadvantage MetroPCS relative to its competitors—and thereby conflict with the competitive neutrality requirement.  Resolving that

as-applied claim requires a largely factual inquiry that is best left to the district court.[12]

Second, MetroPCS advances two alternative grounds for wholly invalidating the CPUC resolutions. MetroPCS argues that the intrastate allocation factor conflicts with the federal Mobile Telecommunications Sourcing Act. And MetroPCS contends that the 2017 and 2018 intrastate allocation factors were "based on a fundamentally flawed methodology" and impermissibly "require[d] a substantial assessment" of non-surchargeable revenue. The district court did not reach these arguments, and we decline to do so in the first instance.

**REVERSED and REMANDED**.

---

[12] At this juncture, we see no reason for the district court to consider an as-applied challenge premised on a standalone federal right to be free from double assessments. As explained above, on the facts of this case, it seems that any double assessments on MetroPCS's revenue would necessarily conflict with the competitive neutrality principle, so the CPUC resolutions would be preempted on that ground.