1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

METROPCS CALIFORNIA, LLC,

Plaintiff,

v.

MARYBEL BATJER, *et al.*,

Defendants.

Case No. 17-cv-05959-SI

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND PROVIDING NOTICE OF INTENT TO APPOINT SPECIAL MASTER AND SCHEDULING FURTHER STATUS CONFERENCE**

Re: Dkt. Nos. 112, 123

On April 23, 2021, the Court held a hearing on the parties' cross-motions for summary judgment. After the hearing, the Court ordered supplemental briefing, and that briefing was submitted on May 11. For the reasons set forth below, the motions are GRANTED in part and DENIED in part. The Court sets a status conference for **11 a.m. on October 21, 2021**, to discuss further proceedings in this case, including the appointment of a Special Master and scheduling of a bench trial.

## DISCUSSION

### I.     The Ninth Circuit's Opinion

This case returns to the Court following the Ninth Circuit's reversal and remand in *MetroPCS California, LLC v. Picker et al.*, 970 F.3d 1106 (9th Cir. 2020). Because that opinion sets the framework for the Court's analysis on remand, and because the parties disagree about how to interpret the Ninth Circuit's decision, the Court finds it necessary to state the salient aspects of that opinion before addressing the specific issues raised by the current motions.

In this Court's November 16, 2018 summary judgment order, the Court held that the Prepaid

Act was facially preempted by federal law.  *See generally* Dkt. No. 88.  In reversing that holding, the Ninth Circuit instructed that in the context of this case, "there is a presumption against preemption" because "[t]he Telecommunications Act is premised on a 'system of cooperative federalism,' in which participating states are key partners to the federal government in regulating the telecommunications industry."  *MetroPCS*, 970 F.3d at 1118 (internal citation omitted).  "Because the CPUC resolutions regulate an aspect of this scheme in which the Telecommunications Act recognizes state authority—imposing surcharges on intrastate revenue to support state universal service programs—there is a higher threshold for showing that those resolutions are preempted."  *Id*. at 1119.

The Ninth Circuit then held that MetroPCS had failed to meet its burden to demonstrate that the CPUC's 2017 and 2018 Resolutions facially conflict with the FCC's competitive neutrality policy, which is related to the Telecommunication Act's "equitable and nondiscriminatory mandate."  *Id*. at 1120 (citing *In re Federal State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 8801 (1997), and 47 U.S.C. § 254(d), (f)).  The court noted that "[t]he FCC has defined competitive neutrality to 'mean[] that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another.'"  *Id.*   The court instructed, "[t]o the extent a state regulation violates that competitive neutrality requirement, the regulation is preempted—and one way in which a regulation can impermissibly create an 'unfair[ ] . . . disadvantage,' is by causing the double assessment of one provider's revenue but not a competing provider's revenue."  *Id.* at 1121-22 (internal citations omitted).  The court also noted that "under the CPUC resolutions, a provider of prepaid services that was subject to the same surcharge rate as a provider of postpaid services, but on a higher portion of its surchargeable revenues, would have found itself at an unfair competitive disadvantage."  *Id*. at 1123.

The Ninth Circuit reversed this Court's facial preemption holding because MetroPCS had failed to show that "no set of circumstances existed under which the [CPUC's] resolutions were valid."  *Id*. at 1122 (internal quotation marks and brackets removed).  The court stated that to meet that burden, "MetroPCS must demonstrate that every application of the CPUC resolutions caused

an unfair disadvantage for prepaid services, which MetroPCS could accomplish by showing that the resolutions always resulted in uneven double assessments." *Id*. The Ninth Circuit examined different hypothetical scenarios involving prepaid and postpaid carriers who offered $100 voice-only plans[1] and how they would be assessed for federal and state universal service contributions. *Id*. at 1122-24. Under certain circumstances, a prepaid carrier would be subject to a double assessment of its voice revenue while the postpaid carrier was not; the Ninth Circuit concluded that in those circumstances, "[t]he double assessment on prepaid services would, at least if the surcharge rates applicable to prepaid services were similar to the rates applicable to postpaid services, create a disadvantage for the provider of the prepaid services compared to the provider of postpaid services." *Id*. at 1123. The Ninth Circuit continued,

> That disadvantage for the provider of prepaid services would have been an "unfair[]" one. *See 1997 Universal Service Order*, 12 FCC Rcd. at 8801. We see no meaningful distinction between prepaid and postpaid services that could justify imposing the higher surcharge only on prepaid services. *Cf. AT&T, Inc*., 886 F.3d at 1250 (explaining that competitive neutrality does not prohibit a regulator "from according different treatment to competitors whose circumstances are materially distinct"). Prepaid and postpaid services offer the same telecommunications options of voice, text messaging, and data. *See, e.g., In re Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, 26 FCC Rcd. 9664, 9725 (2011). And counsel for the CPUC acknowledged at oral argument that prepaid and postpaid providers are equally capable, if permitted to do so, of using the three FCC-recognized methods to determine their intrastate revenues. *See* Oral Argument at 9:39–10:40. Thus, under the CPUC resolutions, a provider of prepaid services that was subject to the same surcharge rate as a provider of postpaid services, but on a higher portion of its surchargeable revenues, would have found itself at an unfair competitive disadvantage.

*Id*. (internal footnote omitted).

However, MetroPCS's facial preemption challenge failed because there were other hypothetical scenarios under which prepaid carriers would not be disadvantaged by the CPUC's resolutions. *See id*. at 1123-24 (positing hypothetical involving application of traffic studies to determine federal contribution).[2] "Thus, the adoption of an intrastate allocation factor in and of

---

[1] MetroPCS does not offer any voice-only plans. The evidence before the Court shows that MetroPCS offers a few plans with voice and text messaging, and many plans with a combination of voice, text messaging, and broadband data.

[2] The FCC has recognized three methods carriers may use to determine their interstate telecommunications revenues subject to surcharge: actual revenue data, traffic studies, and a "safe harbor." *See In re Universal Service Contribution Methodology*, 21 FCC Rcd. 7518, 7535, 7544

United States District Court
Northern District of California

United States District Court
Northern District of California

itself would not have invariably resulted in double assessments conflicting with the principle of competitive neutrality.  Nor has MetroPCS even attempted to argue that it is possible to discern from the specific intrastate allocation factors adopted by the CPUC (72.75% for 2017 and 69.45% for 2018) that double assessments unfairly disadvantaging every provider of prepaid services would have occurred."  *Id*. at 1124.

The Ninth Circuit concluded, "[o]ur analysis above makes clear that the resolutions would be preempted if applying them to MetroPCS resulted in double assessments on MetroPCS's revenue, which would unfairly disadvantage MetroPCS relative to its competitors—and thereby conflict with the competitive neutrality requirement.  Resolving that as-applied claim requires a largely factual inquiry that is best left to the district court."  *Id*. at 1126.  The Ninth Circuit did not reach MetroPCS's claim that the intrastate allocation factor is preempted by the Mobile Telephony Sourcing Act, nor did the court address MetroPCS's contention that "2017 and 2018 intrastate allocation factors were 'based on a fundamentally flawed methodology' and impermissibly 'require[d] a substantial assessment' of non-surchargeable revenue."  *Id*. at 1126.[3]

On remand, MetroPCS has filed a second motion for summary judgment.  MetroPCS contends that it has demonstrated that the CPUC's 2017 and 2018 Resolutions are preempted as applied to it.  The CPUC opposes summary judgment, arguing alternatively that there are factual issues that preclude summary judgment and that MetroPCS cannot meet its burden to demonstrate as-applied preemption and thus that the Court should enter summary judgment in favor of the CPUC.

**II.    As-applied preemption**

Before turning to the specifics of MetroPCS's as-applied challenge, the Court notes that the parties agree that revenue from broadband data is not surchargeable by the CPUC, and thus that if

---

(2006) ("*2006 Universal Service Order*").  If a carrier elects to use a traffic study, the carrier takes a sample of voice traffic on their network to estimate the percentage of all traffic that is interstate.

[3]  The Court notes that the second amended complaint alleges two causes of action asserting preemption:  violation of the Supremacy Clause of the United States Constitution, and violation of the Dormant Commerce Clause.  All of MetroPCS's preemption theories are asserted in the context of these two causes of action.

MetroPCS can demonstrate that the CPUC's resolutions assessed a surcharge on broadband revenue, the resolutions would be preempted as applied to MetroPCS. The parties also agree that the CPUC may not assess its surcharges or fees on the same interstate-service revenue that is already subject to the FCC's assessments because "any double assessments on MetroPCS's revenue would necessarily conflict with the competitive neutrality principle, so the CPUC resolutions would be preempted on that ground." *Id.* at 1126 n.12.

The parties disagree about whether the Ninth Circuit's opinion discussed an additional way to demonstrate as-applied preemption. MetroPCS contends that it can prevail on its preemption claim if it shows that it "was subject to the same surcharge rate as a provider of postpaid services, but on a higher portion of its surchargeable revenues, [and thus] would have found itself at an unfair competitive disadvantage." *Id.* at 1123. The CPUC disagrees, asserting that MetroPCS has quoted the Ninth Circuit's decision out of context: "In the text of the Opinion that MetroPCS cites, the Ninth Circuit presented an exercise comparing the CPUC's methodology on a prepaid carrier to a revenue allocation on a [postpaid] carrier in its discussion of *facial* preemption." CPUC's Mtn. at 24 (emphasis in original). The CPUC contends that "[i]n order to prove its as-applied claims, MetroPCS must demonstrate actual revenues are double assessed." *Id.* at 25.

The Court agrees with MetroPCS's interpretation of the Ninth Circuit's opinion. While the Ninth Circuit discussed as-applied preemption largely within the context of "double assessments," the Ninth Circuit noted that a double assessment was "*one way* in which a regulation can impermissibly create an 'unfair[] . . . disadvantage'" that would violate the competitive neutrality requirement." *MetroPCS*, 970 F.3d at 1121-22 (emphasis added). In addition, the Ninth Circuit's focus on "double assessments" makes sense because the court was using examples of hypothetical carriers who offered voice-only plans: the FCC assesses interstate voice revenue, while the CPUC may assess intrastate voice revenue, and thus there is the possibility of a double assessment of revenue. However, MetroPCS could also show a conflict with the FCC's competitive neutrality policy by demonstrating that the CPUC's resolutions subject it "to the same surcharge rate as a provider of postpaid services, but on a higher portion of its surchargeable revenues," *id.* at 1123 – such as if prepaid carriers, but not postpaid carriers, were assessed on revenue from text messaging

or broadband data.

Indeed, the CPUC concedes that any state surcharges on broadband data revenue would be preempted by FCC orders, and such a showing is not dependent on a "double" assessment because neither the federal nor the state government may currently assess broadband data revenue for universal service contributions. *See Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5803 ¶¶ 431-32 ("[W]e reaffirm the Commission's longstanding conclusion that broadband Internet access service is jurisdictionally interstate for regulatory purposes," and "we preempt any state from imposing any new state USF contributions on broadband."). The Court also takes note of the Ninth Circuit's statement that it saw "no meaningful distinction between prepaid and postpaid services that could justify imposing the higher surcharge only on prepaid services," *MetroPCS*, 970 F.3d at 1123, and thus to the extent the CPUC asserts that it may treat prepaid and postpaid services differently, it must persuade the Court that any differential treatment does not violate the competitive neutrality requirement.

However, the Court concludes that there are factual disputes that preclude summary judgment on MetroPCS's as-applied challenge. MetroPCS contends that it has submitted undisputed evidence showing how it allocates revenue between the voice, data, and text components of its various plans, and that this evidence demonstrates both that (1) the CPUC's resolutions discriminate against MetroPCS as compared to a hypothetical postpaid carrier who offered the exact same plans as MetroPCS but who was not subject to the CPUC's resolutions and (2) the CPUC's resolutions impermissibly assess broadband data revenue.[4] Both preemption theories are premised on MetroPCS's revenue allocations as set forth in the report of its Bundle Valuation Committee. MetroPCS contends that its revenue allocation methodology is reasonable and that the CPUC has not put forth its own evidence challenging MetroPCS's allocations.

The FCC has designated as "presumptively reasonable" the following two allocation

---

[4] MetroPCS also contends that the CPUC's resolutions impose a "double assessment" through the MTS Increment. That contention is discussed *infra* in Section II. In addition, while MetroPCS asserts that the CPUC's resolutions impermissibly assess revenue from text messaging and interstate voice, the primary focus on the present motions is MetroPCS's allocation of broadband data revenue.

United States District Court
Northern District of California

methodologies that carriers may use to allocate revenue when telecommunication services and non-telecommunication services (such as broadband data) are offered as a bundled package:

> 50.     First, contributors may elect to report revenues from bundled telecommunications and CPE/enhanced service offerings based on the unbundled service offering prices, with no discount from the bundled offering being allocated to telecommunications services.  For example, assume that a carrier offers voice-mail service, an enhanced service, as a stand-alone offering for $6.00, and also offers basic phone service, a telecommunications service, for $20.00.  The carrier offers the two services for the bundled price of $22.00, resulting in a discount of $4.00.  Under this approach, the carrier would report telecommunications service revenue of $20.00 per month (the stand-alone price for the phone service) and non-telecommunications revenue of $2.00 per month (the stand-alone price for voice-mail minus the discount from the bundled offering). . . .

> 51. Alternatively, contributors may elect to treat all bundled revenues as telecommunications service revenue for purposes of determining their universal service obligations. For example, assume that a carrier offers a bundled package of voice-mail and basic phone service to end-users at $25.00 per month.  The carrier decides that it cannot distinguish revenue for the basic service (the telecommunications service) from voice-mail (the non-telecommunications service). This carrier would report telecommunications revenue of $25.00 per month.  This option would permit those contributors that are unable or unwilling to separate end-user telecommunications revenues from non-telecommunications revenue to comply with their universal service obligations when they generate revenues from bundled telecommunications services and CPE/enhanced service offerings.

*In re Policy & Rules Concerning Interstate, Interexchange Marketplace*, 16 FCC Rcd. 7418, 7447-48 ¶¶ 50-51 (2001) ("*Bundling Order*").  The FCC states that "[t]hese allocation methods are 'safe harbors' and will be afforded a presumption of reasonableness in an audit or enforcement context." *Id*. at 7448 ¶ 52.  "Both of the above-described methods enable carriers to allocate revenues for purposes of universal service contributions in an easily ascertainable and reasonable manner[,]" and "[t]hese methods also decrease the investigative burden in an audit or other enforcement proceeding because the necessary information is easily obtained and verified." *Id*.

It is undisputed that MetroPCS does not use either of the presumptively reasonable FCC methodologies for allocating bundled revenue.  Instead, MetroPCS has used its own methodology, and MetroPCS asserts that its revenue allocation is reasonable, supported by objective data, and consistent with Generally Accepted Accounting Practices ("GAAP").  MetroPCS also contends that its methodology has been reviewed by the CPUC in a recent audit as well as by an independent auditor.  MetroPCS emphasizes that the FCC permits carriers to "use allocation methods other than the two described above." *Id.* at 7448 ¶ 53.

1    However, the Court notes that the FCC advises, "[c]arriers should realize, however, that any

2    other allocation methods *may not be considered reasonable, and will be evaluated on a case-by-*

3    *case basis in an audit or enforcement context*." *Id.* (emphasis added).  The FCC instructed:

4        In evaluating the reasonableness of any alternative methods, we will apply the
         standards underlying the safe harbors described above.  For example, carriers should

5        not apply discounts to telecommunications services in a manner that attempts to
         circumvent a carrier's obligation to contribute to the universal service support

6        mechanisms.  Should an audit or enforcement proceeding be initiated, carriers will
         need to provide evidence that the amount of reported telecommunication revenues

7        that they report reflects compliance with the carrier's obligation to contribute to the
         universal   service   support   mechanism   based   on   interstate   end-user

8        telecommunications revenue.

9    *Id.* (citing 47 C.F.R. §§ 54.706, 54.709).   The cited FCC regulations elaborate on the type of

10   information needed to demonstrate reasonableness in the event of an audit:

11       (e) Any entity required to contribute to the federal universal service support
         mechanisms shall retain, for at least five years from the date of the contribution, all

12       records that may be required to demonstrate to auditors that the contributions made
         were in compliance with the Commission's universal service rules.  These records

13       shall include without limitation the following: Financial statements and supporting
         documentation; accounting records; historical customer records; general ledgers; and

14       any other relevant documentation.  This document retention requirement also applies
         to any contractor or consultant working on behalf of the contributor.

15

16   47 C.F.R. § 54.706

17       The Court has reviewed the voluminous evidence in the record and cannot determine on

18   summary judgment that the manner in which MetroPCS has allocated its bundled revenue is

19   reasonable as a matter of law.  MetroPCS has not provided the Court with the information set forth

20   in the quoted FCC regulation, such as historical customer records.  In addition, the CPUC has raised

21   various criticisms of MetroPCS's methodology and argues that MetroPCS's revenue allocation is

22   not reasonable, not consistent with GAAP, and that it overestimates the revenue attributable to

23   broadband data at the expense of surchargeable voice revenue.  *See generally* Van Wambeke Decl.

24   The CPUC also disputes MetroPCS's assertion that the recent CPUC audit validated MetroPCS's

25   revenue allocation methodology with respect to how MetroPCS accounts for broadband data

26   revenue, and the CPUC objects that MetroPCS has only provided the Court with selected quotes

27   from the recent third-party audit.  On this record, the Court cannot conclude as a matter of law that

28   MetroPCS's revenue allocation methodology is reasonable, and thus MetroPCS has not met its

1    burden on summary judgment to show that the CPUC's resolutions are preempted as applied to

2    MetroPCS. "[R]easonableness [is] appropriate for determination on [a] motion for summary

3    judgment when only one conclusion about the conduct's reasonableness is possible." *In re Software*

4    *Toolworks Inc.*, 50 F.3d 615, 621-22 (9th Cir. 1994). Accordingly, the Court DENIES the parties'

5    motions on this question.

6         At the hearing on the parties' cross-motions, counsel stated that if the Court denied the

7    current motions, it was their view that the parties would likely present essentially the same evidence

8    about revenue allocation to the Court at a bench trial. The Court has determined that that it is

9    appropriate to appoint a Special Master pursuant to Federal Rule of Civil Procedure 54 to assist the

10   Court in determining whether MetroPCS's revenue allocation methodology is reasonable (including

11   what evidence is needed to make that determination), and relatedly whether the CPUC's Resolutions

12   impermissibly assess broadband data or other non-intrastate revenue.[5] The Court will discuss the

13   appointment of a Special Master at the October 21, 2021 case management conference.

14

15   **III.    Challenge to MTS Increment**

16        For the first time in this litigation, MetroPCS challenges the "MTS Increment," an

17   administrative fee that the CPUC imposed on prepaid carriers in connection with the Prepaid Act.

18   MetroPCS contends that the MTS Increment is preempted because it (1) results in a double

19   assessment on intrastate voice services and (2) puts prepaid carriers at a competitive disadvantage

20   because only prepaid carriers were required to pay the fee. MetroPCS argues that because the 2017

21   and 2018 Resolutions required MetroPCS to assess the surcharge rate, including the MTS Increment

22   and adjusted by the CPUC's intrastate factor, on the total sales price of service, the MTS Increment

23   "thus applied to all revenues from a MetroPCS prepaid wireless plan—critically, including revenues

24   for interstate Voice service that are already subject to federal USF assessments." MetroPCS's Mtn.

25   at 27.

26   _____

27        [5] Although MetroPCS also contends that the CPUC's Resolutions are preempted because
     they unfairly discriminate against prepaid carriers, that theory appears to be based primarily on its
28   allocation of revenue to broadband data. At trial, MetroPCS is free to pursue any as-applied
     preemption theory provided it is consistent with this order and the Ninth Circuit's opinion.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The CPUC contends that the challenge to the MTS Increment is a new claim that MetroPCS

2    cannot raise for the first time on summary judgment.  The Court agrees.  "[W]here, as here, the

3    complaint does not include the necessary factual allegations to state a claim, raising such claim in a

4    summary judgment motion is insufficient to present the claim to the district court."  *Navajo Nation*

5    *v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008); *see also Pickern v. Pier 1 Imports (U.S.),*

6    *Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (holding that the complaint did not satisfy the notice

7    pleading requirements of Federal Rule of Civil Procedure 8(a) because the complaint "gave the

8    [defendants] no notice of the specific factual allegations presented for the first time in [the

9    plaintiff's] opposition to summary judgment").

10    MetroPCS made no mention of the MTS Increment in its complaints or in its first motion

11    for summary judgment.  Instead, as the CPUC notes, the second amended complaint alleges that the

12    CPUC's initial implementation of the Prepaid Act – the 2016 Resolution – was "correct," "consistent

13    with both state and federal law," and that "[u]nlike the 2016 Resolution, however, the 2017

14    Resolution does *not* limit the imposition of the Surcharge to 'intrastate revenues subject to

15    surcharge.'"  Second Amend. Compl. ¶¶ 48, 51, 74.  It is undisputed that the 2016 Resolution

16    contained the MTS Increment.  MetroPCS's first summary judgment motion similarly characterized

17    the 2016 Resolution as "consistent with federal law and state law" and "Properly Limit[ing] the

18    Surcharge to Intrastate Revenues."  MetroPCS's First MSJ at 7, 20-21.  The Court is unpersuaded

19    by MetroPCS's assertion that its current challenge to the MTS Increment is embraced by its general

20    allegations that the 2017 and 2018 Resolutions discriminated against prepaid carriers as compared

21    to postpaid carriers.  To the contrary, prior to the filing of the second summary judgment motion

22    MetroPCS had never challenged the MTS Increment as unlawful; rather, MetroPCS had consistently

23    described the 2016 Resolution – which contained that increment – as lawful.  Thus, MetroPCS had

24    provided no notice of the specific factual allegations that MetroPCS is now asserting in its

25    preemption challenge to the MTS Increment.  The Court finds that this is inappropriate and will not

26    consider this new claim at this late stage of the proceedings, and accordingly GRANTS summary

27    judgment in favor of the CPUC on this issue.

28

IV.     **Challenge to CPUC's Methodology for Calculating the Intrastate Allocation Factor**

MetroPCS contends that the specific methodology that the CPUC used to come up with the intrastate allocation factors contained in the 2017 and 2018 Resolutions was "fundamentally flawed." MetroPCS frames this challenge as an independent basis to find preemption. *See* MetroPCS's Mtn. at 32. The parties debate what standard of review the Court should use to evaluate the CPUC's methodology and whether what the CPUC did was reasonable or not.

The Court concludes that it cannot evaluate the CPUC's methodology – under any standard of review – as a standalone question divorced from the as-applied challenge. MetroPCS raises numerous challenges to the CPUC's methodology that do not depend on a showing that MetroPCS was actually harmed by the use of that methodology. For example, MetroPCS complains that the CPUC's 2017 intrastate allocation factor is "based on a simple average (i.e., the arithmetic mean)— that was not weighted by market share—of questionnaire responses from a subset of prepaid carriers." *Id*. Even if the Court agreed with MetroPCS's criticism – a question the Court need not reach at this time – that finding would not necessarily show that the 2017 intrastate allocation factor, as applied to MetroPCS, resulted in an impermissible assessment of revenue. In the Court's view, MetroPCS's independent challenges to the CPUC's methodology appear to be a different form of a facial preemption challenge. *Cf. MetroPCS*, 970 F.3d at 1124 ("Nor has MetroPCS even attempted to argue that it is possible to discern from the specific intrastate allocation factors adopted by the CPUC (72.75% for 2017 and 69.45% for 2018) that double assessments unfairly disadvantaging every provider of prepaid services would have occurred.").

The Ninth Circuit remanded this case for a determination of whether MetroPCS can demonstrate that the CPUC's resolutions are preempted as applied to MetroPCS. To prevail, MetroPCS must demonstrate that the use of the 2017 and 2018 intrastate allocation factors resulted in an impermissible or discriminatory assessment of its revenue. The Court can only evaluate the soundness of the CPUC's methodology in calculating the 2017 and 2018 intrastate allocation factors within the context of determining whether the CPUC's Resolutions imposed an impermissible surcharge on MetroPCS's revenue. The Court DENIES the parties' motions on this question.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.      Mobile Telephony Sourcing Act**

MetroPCS invokes the doctrine of conflict preemption, *see* MetroPCS's Mtn. at 37, to contend that the CPUC's resolutions are preempted by the Mobile Telephony Sourcing Act ("MTSA"), 4 U.S.C. §§ 116 *et seq.*  MetroPCS relies on the following provision in the MTSA:

> Additional taxable charges -- If a taxing jurisdiction does not otherwise subject charges for mobile telecommunications services to taxation and if these charges are aggregated with and not separately stated from charges that are subject to taxation, then the charges for nontaxable mobile telecommunications services may be subject to taxation unless the home service provider can reasonably identify charges not subject to such tax, charge, or fee from its books and records that are kept in the regular course of business.

4 U.S.C. § 123(b).

MetroPCS argues that under this section, "as long as the carrier can segregate the revenues applicable to the particular voice service included in a bundle and that service would not otherwise be subject to assessment, any 'taxing jurisdiction' such as the CPUC may not penalize the carrier for bundling that non-assessable voice service when it is sold with other assessable services."

The CPUC argues that the MTSA does not apply to universal service assessments.  The Court agrees.[6]  The General Exceptions section of the MTSA expressly states that sections 116 through 126 of the MTSA "do not apply to . . . any fee related to obligations under section 254 of the Communications Act of 1934."  *Id.* at § 116(b)(5).  Section 254 of the Communications Act, titled "Universal Service," provides, *inter alia*, that "[a] State may adopt regulations . . . to preserve and advance universal service" and "[e]very telecommunications carrier that provides intrastate telecommunications service shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State."  47 U.S.C. § 254(f); *see also MetroPCS*, 970 F.3d at 1110-11 (discussing 47 U.S.C. § 254 and dual regulatory regime permitting federal and state contribution requirements to fund federal and state universal service programs).

Here, the state universal service surcharges assessed by the CPUC are "fee[s] related to

---

[6]  The Court also notes that there are no cases interpreting the General Exceptions section of the MTSA, and only one case from New York that addresses any aspect of the MTSA.  *See People ex rel. Schneiderman v. Sprint Nextel Corp.*, 42 N.E.3d 655 (N.Y. 2015), *cert. denied sub nom. Sprint Nextel Corp. v. New York*, 136 S. Ct. 2387 (2016).

obligations under section 254 of the Communications Act of 1934," and thus they are not subject to the MTSA.  MetroPCS argues that "Section 254 of the Communications Act does not create any 'obligations' to pay the MTS surcharge—those obligations were created under the California Prepaid Collection Act."  Reply at 34.  The Court is not persuaded by MetroPCS's semantic argument.  Section 254 of the Communications Act expressly authorizes states to impose surcharges to fund universal service, and the Prepaid Act, along with the CPUC's 2017 and 2018 Resolutions implementing that Act, imposed a new structure for assessment and collection of prepaid carriers' state universal service fees.  Accordingly, the Court GRANTS summary judgment in favor of the CPUC on this issue.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the cross-motions for summary judgment.  The Court will hold a further case management conference on October 21, 2021 at 11:00 a.m. to discuss the appointment of a Special Master, the scheduling of a bench trial, and any other proceedings necessary to bring this case to a final resolution.

**IT IS SO ORDERED**.

Dated: September 22, 2021

SUSAN ILLSTON
United States District Judge

13