Peter Karanjia (admitted *pro hac vice*)
DLA PIPER LLP (US)
500 8th Street, NW
Washington, D.C. 20004
Telephone:     (202) 799-4135
Email:         peter.karanjia@dlapiper.com

Melanie Walker (CA State Bar No. 336994)
DLA PIPER LLP (US)
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, California 90067
Telephone:     (312) 368-4000
Email:         melanie.walker@us.dlapiper.com

Martin L. Fineman (CA State Bar No. 104413)
Geoffrey S. Brounell (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111
Telephone:     (415) 276-6500
Email:         martinfineman@dwt.com
               geoffreybrounell@dwt.com

Attorneys for Plaintiff
MetroPCS California, LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| METROPCS CALIFORNIA, LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>ALICE B. REYNOLDS, President of the California Public Utilities Commission, in her official capacity; KAREN DOUGLAS, Commissioner of the California Public Utilities Commission, in her official capacity; DARCIE L. HOUCK, Commissioner of the California Public Utilities Commission, in her official capacity; JOHN REYNOLDS, Commissioner of the California Public Utilities Commission, in his official capacity; and GENEVIEVE SHIROMA, Commissioner of the California Public Utilities Commission, in her official capacity,<br><br>       Defendants. | Case No. 3:17-cv-05959-JD<br><br>**PLAINTIFF'S NOTICE OF MOTION, MOTION, AND BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**<br><br>Date:    April 27, 2023<br>Time:   10:00 a.m.<br>Place:  Courtroom 11, 19th Floor<br><br>Before the Honorable James Donato<br><br>Complaint Filed:  Oct. 17, 2017<br><br>Second Am. Complaint Filed: Jan. 19, 2018 |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 27, 2023, at 10:00 a.m. (or at such other time specially set by the Court), in Courtroom 11 of the U.S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiff MetroPCS California, LLC ("MetroPCS") will and hereby does move this Court for summary judgment pursuant to Fed. R. Civ. P. 56 and a permanent injunction on the grounds that MetroPCS is entitled to judgment as a matter of law against Defendant Commissioners of the California Public Utilities Commission (collectively, the "CPUC"). This relief is warranted because the CPUC Resolutions challenged in this case (Resolutions T-17542, T-17568, and T-17579 (collectively, the "Resolutions")) are preempted by federal law on the following grounds: (1) as applied to MetroPCS, they assess a surcharge on MetroPCS's revenues from broadband Internet access service (an interstate service) and other nonsurchargeable services, in violation of the federal Communications Act and orders of the Federal Communications Commission; and (2) they subject MetroPCS, as a prepaid wireless carrier, to a substantially higher surcharge than a postpaid carrier offering the same services and thereby violate 47 U.S.C. § 254(f) and the federal requirement of "competitive neutrality."

This Motion is based upon the accompanying Memorandum; the Declaration of Peter Karanjia and accompanying exhibits ("Karanjia Declaration"); the Declaration of John Barnes and accompanying exhibits (the "Barnes Declaration"); the Declaration of Paul Chill ("Chill Declaration"); the Declaration of Scott Taub and accompanying exhibits ("Taub Declaration"); the Declaration of Gregory Rosston and accompanying exhibits ("Rosston Declaration"); the [Proposed] Order; and the pleadings and records on file in this action.

DATED this 21st day of March, 2023.

DLA PIPER LLP (US)

By:___ */s/ Peter Karanjia* _____
        Peter Karanjia

Attorneys for Plaintiff MetroPCS California, LLC

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.  Regulatory Backgrouand ........................................................................................ 3

    A.  States Cannot Impose Surcharges on Data, Text, and Interstate Voice Service ...... 3

    B.  State Universal Service Assessments Must Be Competitively Neutral ................... 4

II.  The Prepaid Collection Act ..................................................................................... 5

III.  The CPUC's Implementation of the Prepaid Collection Act ................................. 6

    A.  The 2017 Resolution Required MetroPCS to Apply an Intrastate Factor ................ 6

    B.  The 2018 Resolution Also Required MetroPCS to Apply an Intrastate Factor ........ 6

IV.  MetroPCS's Prepaid Plans ..................................................................................... 6

V.  MetroPCS's Methodologies for Allocating Revenues Among Data, Text, and Voice ........ 7

    A.  Methodology for January 1, 2017 to August 31, 2018 .......................................... 7

    B.  Methodology for September 1, 2018 to December 31, 2018 .................................. 11

VI.  Procedural History ................................................................................................ 12

STANDARD OF REVIEW ................................................................................................. 13

ARGUMENT ....................................................................................................................... 13

I.  The Contested Resolutions Are Preempted Because They Impose the Surcharge on MetroPCS's Broadband and Other Nonsurchargeable Revenues ........................................ 14

    A.  MetroPCS's Allocation Methodologies Were Reasonable as a Matter of Law ...... 15

        1.  MetroPCS's Methodologies Were Consistent with GAAP and Economic Principles Followed by the FCC .................................................................... 16

        2.  Audits Confirm the Reasonableness of MetroPCS's Methodology ............ 17

        3.  In Contrast, the CPUC's Intrastate Factor Was Irreparably Flawed .......... 18

    B.  The Resolutions Imposed Surcharges on Nonsurchargeable Revenues ................. 19

II.  The Resolutions Are Preempted Because They Are Not Competitively Neutral ............... 23

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ................................................................. 25

*AT&T Corp. v. Pub. Util. Comm'n*,
252 F. Supp. 2d 347 (W.D. Tex. 2003) ................................................. 25

*AT&T Corp. v. Pub. Util. Comm'n*,
373 F.3d 641 (5th Cir. 2004) ........................................................... 23, 24

*In re Brazier Forest Prod., Inc.*,
138 B.R. 265 (Bankr. W.D. Wash. 1991) ............................................. 16

*Burbank-Glendale-Pasadena Airport Auth. v. City of L.A.*,
979 F.2d 1338 (9th Cir. 1992) ............................................................... 13

*California v. FCC*,
75 F.3d 1350 (9th Cir. 1996) ................................................................... 4

*MetroPCS Cal., LLC v. Batjer*,
2021 WL 4311468 (N.D. Cal. Sept. 22, 2021) ..................................... 14

*MetroPCS Cal., LLC v. Picker*,
970 F.3d 1106 (9th Cir. 2020) ....................................................... *passim*

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ............................................................................... 16

*In re Software Toolworks Inc.*,
50 F.3d 615 (9th Cir. 1994) ................................................................... 16

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015) ............................................................... 13

*Tex. Off. of Pub. Util. Couns. v. FCC*,
183 F.3d 393 (5th Cir. 1999) ................................................................. 24

*Verizon Commc'ns, Inc. v. FCC*,
535 U.S. 467 (2002) ............................................................................... 17

*Vonage Holdings Corp. v. FCC*,
489 F.3d 1232 (D.C. Cir. 2007) .............................................................. 5

*Wells Fargo Bank N.A. v. Boutris*,
419 F.3d 949 (9th Cir. 2005) ................................................................. 13

**Statutes and Rules**

4 U.S.C. § 116 et seq. .................................................................................. 13

47 U.S.C. §§ 151-152 ..................................................................................... 4

47 U.S.C. § 254(f) ............................................................................. 4, 14, 23

Fed. R. Civ. P. 56 .......................................................................................... 13

Cal. Rev. & Tax Code §§ 42004 (repealed 2020) ........................................ 5

Cal. Rev. & Tax Code § 42010 (repealed 2020) .......................................... 5

**Administrative Decisions**

*Amendment of the Commission's Rules with Regard to Commercial Operations in*
*the 3550-3650 Mhz Band,*
*30 FCC Rcd. 3959 (2015)* .......................................................... 14

*Implementation of the Local Competition Provisions in the Telecommunications*
*Act of 1996,*
*11 FCC Rcd. 15499 (1996)* ........................................................ 17

*Matter of CPUC Petition for Delegation of Additional Authority Pertaining to Area*
*Code Relief & Nxx Code Conservation Measures,*
*14 FCC Rcd. 17486 (1999)* ........................................................ 24

*Matter of Federal-State Joint Board on Universal Service,*
*15 FCC Rcd. 15168 (2000)* ........................................................ 25

*Matter of Level 3 Communications, LLC,*
*33 FCC Rcd. 2388 (2018)* .......................................................... 25

*Matter of New England Public Communications Council Petition for Preemption*
*Pursuant to Section 253,*
*11 FCC Rcd. 19713 (1996),* recon. denied, *12 FCC Rcd. 5215 (1997)* .............................. 25

*Matter of Telephone Number Portability,*
*17 FCC Rcd. 2578 (2002)* .......................................................... 24

*Policy & Rules Concerning the Interstate, Interexchange Marketplace,*
*16 FCC Rcd. 7418 (2001)* ................................................... 5, 15, 18

*Protecting & Promoting the Open Internet,*
*30 FCC Rcd. 5601 (2015)* ....................................................... 4, 14

*Rates for Interstate Inmate Calling Services,*
*36 FCC Rcd. 9519 (2021)* .......................................................... 17

ii

PLAINTIFF'S NOTICE OF MOTION, MOTION, AND BRIEF ISO MSJ AND PERMANENT INJUNCTION
*MetroPCS California, LLC v. Reynolds*, Case No. 3:17-cv-05959-JD

*Restoring Internet Freedom*,
33 FCC Rcd. 311 (2018) ..................................................................... 4, 14

*Universal Service Contribution Methodology*,
21 FCC Rcd. 7518 (2006) ....................................................................... 5

Decision 16-12-025, 2016 WL 7243749 (CPUC Dec. 1, 2016), *corrected on other grounds by* Decision 17-03-014, 2017 WL 1000600 (CPUC March 8, 2017) ....................... 14

**Other Authorities**

Black's Law Dictionary (10th ed. 2015) ..................................................... 15

Webster's Legal Dictionary (1st ed. 1996) ................................................. 15

**INTRODUCTION**

This case involves a federal preemption challenge to Resolutions adopted by the California Public Utilities Commission ("CPUC"), as applied to Plaintiff MetroPCS, a provider of prepaid wireless services.[1] The Resolutions, which covered the 2017-2018 period relevant to this lawsuit, are preempted because they (1) imposed surcharges on MetroPCS's mobile broadband data and other nonsurchargeable services in violation of federal law, and (2) subjected MetroPCS to a substantially higher surcharge than similarly situated postpaid carriers were required to pay.

During the relevant period (as now), MetroPCS offered its cell phone customers several wireless plan options. Each plan enabled customers to make and receive unlimited intrastate and interstate voice calls and send and receive unlimited text messages. In addition, almost all plans— used by more than 95% of MetroPCS's California customers—included mobile broadband internet access service. Like in-home broadband, this *mobile* broadband data service allowed customers to use their mobile phones to go online, stream or download videos, use apps and email, or otherwise access the internet. The plans offered differed mainly in the amount of "4G LTE" data (the highest speed available at the time) that customers could use each month—for example, unlimited data or a specific data allotment such as 10 Gigabytes.

The CPUC imposes surcharges on telecommunications carriers, including MetroPCS, to fund various California "Universal Service" programs (which subsidize communications services within the State) and the CPUC's general operating budget. Under federal law, however, the CPUC can only assess surcharges on ***intra***state telecommunications services. The Federal Communications Commission assesses a federal fee—used to finance the federal Universal Service Fund—on carriers' revenues from ***inter***state telecommunications services. And the FCC has held that federal and state Universal Service assessments ***must not*** be imposed on revenues from broadband data service (an exclusively interstate service) or text messaging service. Accordingly, the CPUC surcharges at issue here may not be imposed on MetroPCS's revenues from (i) data service, (ii) text messaging service, and/or (iii) interstate voice service. *See MetroPCS Cal., LLC v. Picker*, 970 F.3d

---

[1] Consumers of "prepaid" wireless service pay in advance of service. By contrast, consumers of "postpaid" service are billed the month after using service.

1106, 1111 n.2 (9th Cir. 2020); Dkt. No. 39 (CPUC Answer ¶ 8). And to the extent the CPUC surcharges are imposed on those revenues, they are plainly unlawful.

To remit surcharges, MetroPCS must determine the portion of its revenues attributable to surchargeable intrastate voice service as opposed to nonsurchargeable data, text messaging, and interstate voice services. The FCC prescribes options for how carriers may determine these allocations for their revenues from bundled services (such as the wireless plans here) when they calculate their Universal Service remittances. Among other options, carriers may use "reasonable" allocation methods. Further, within the category of voice service, carriers are permitted to apportion revenues from intrastate vs. interstate calling by using (among other options) "traffic studies"—that is, statistical analyses of calling traffic. MetroPCS uses (i) reasonable allocation methods based on Generally Accepted Accounting Principles ("GAAP") to allocate its data, text, and voice revenues, and (ii) traffic studies to determine the intrastate share of its voice service revenues.

In Resolutions covering 2017 and 2018, the CPUC no longer allowed MetroPCS and other *prepaid* carriers to rely on these FCC-authorized options to calculate their revenues subject to the CPUC surcharge—though the CPUC continued to allow *postpaid* carriers to do so. Instead, starting in January 2017, the CPUC required MetroPCS and other prepaid carriers to apply a one-size-fits-all proxy (which the CPUC dubbed the "intrastate factor") to determine their intrastate telecommunications service revenues subject to the surcharge. Contrary to both common sense and marketplace realities, this intrastate factor deemed ***more than two-thirds*** of revenues (72.75% in 2017 and 69.45% in 2018) from prepaid wireless plans to be attributable solely to intrastate telecommunications service. Thus, for every prepaid plan offered—regardless of how much broadband data or text messaging service it allowed customers to use—the CPUC required MetroPCS to calculate its surcharges as if more than two-thirds of revenues from the plan were derived from intrastate voice service alone. The CPUC adopted this intrastate factor despite the soaring consumer demand for mobile data services, as consumers increasingly use their mobile phones to access the internet, download and stream online videos, and use videoconferencing apps.

The Resolutions are preempted by federal law, as applied to MetroPCS, on two independent grounds: (1) they impermissibly impose surcharges on MetroPCS's broadband and other

nonsurchargeable revenues, and (2) they violate the FCC's "competitive neutrality" requirement by imposing a substantially higher surcharge burden on MetroPCS than on a similarly situated postpaid carrier. The Court can (and should) resolve both as-applied claims on summary judgment, because MetroPCS's revenue-allocation methodologies, which were based on GAAP and supported by rigorous traffic studies, were reasonable as a matter of law and result in allocations that clearly show—as a matter of basic mathematics—that the CPUC surcharge resulted in substantial unlawful assessments on nonsurchargeable services and unfairly exposed MetroPCS to much higher surcharges than a postpaid carrier offering the same service would have been required to remit.

At bottom, this case is simple: Comparing MetroPCS's revenue allocations for its prepaid wireless plans in 2017 and 2018 with the CPUC's intrastate factor for those years (72.75% and 69.45%, respectively) shows that the intrastate factor produced an unlawful assessment on MetroPCS's broadband and other nonsurchargeable revenues. And it resulted in an especially excessive unlawful assessment on broadband revenues for MetroPCS's "Unlimited Data" plans. In 2017, fully 75% of revenues (even more in 2018) were from nonsurchargeable broadband service and less than 18% of revenues were from intrastate voice service—essentially the *opposite* of what the CPUC's intrastate factor assumed. An analysis of MetroPCS's total revenues also shows a substantial unlawful assessment under the Resolutions. The CPUC sought to unlawfully impose surcharges on nearly *$1.5 billion* of nonsurchargeable revenue in 2017 and 2018.

Looking at assessments on individual MetroPCS wireless plans and total revenues, the conclusion is unavoidable: The Resolutions imposed assessments on nonsurchargeable service and are thus preempted. And they are doubly preempted because they also violate the FCC's requirement of "competitive neutrality." Because the CPUC cannot raise a *genuine* issue as to any material fact, the Court should grant summary judgment in MetroPCS's favor, declare that the Resolutions preempted and unlawful, and permanently enjoin their enforcement against MetroPCS.

## BACKGROUND

### I.    Regulatory Background

#### A.    States Cannot Impose Surcharges on Data, Text, and Interstate Voice Service

The Communications Act of 1934 recognizes a separation between regulation of interstate

and international telecommunications at the federal level and regulation of intrastate telecommunications at the state level. 47 U.S.C. §§ 151-152. Under that Act, "*state utilities [commissions]*," such as the CPUC, have authority over *intrastate* common carrier communications by wire or radio," while "[t]he *FCC* has authority over *interstate* common carrier communications by wire or radio." *California v. FCC*, 75 F.3d 1350, 1356 n.5 (9th Cir. 1996) (emphases added).

The Communications Act allows States to create their own Universal Service rules. But those rules must "not [be] inconsistent with" the FCC's rules. 47 U.S.C. § 254(f). Further, the FCC has made a consistent policy judgment *not* to subject revenues from the sale of broadband service—an interstate service—to federal Universal Service assessments, and it has expressly preempted States from subjecting broadband service (including the mobile data services at issue here) to state assessments. *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5803, 5837, ¶¶ 431-432, 490 & n.1477 (2015) ("*Open Internet Order*"), *pets. for rev. denied*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, 139 S. Ct. 475 (2018); *Restoring Internet Freedom*, 33 FCC Rcd. 311, 429, ¶¶ 196 & n.736, 199-200 (2018) ("*Restoring Internet Freedom Order*"), *vacated in part on other grounds*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019). Similarly, text messaging service is not subject to state and federal Universal Service assessments. *MetroPCS*, 970 F.3d at 1111 n.2 ("[N]either the FCC nor the CPUC consider text messaging revenues to be surchargeable.") (citations omitted).

**B.      State Universal Service Assessments Must Be Competitively Neutral**

All state Universal Service assessments must be imposed on "an equitable and nondiscriminatory basis." 47 U.S.C. § 254(f). This requirement "encompasses '[t]he principle of competitive neutrality.'" *MetroPCS*, 970 F.3d at 1120 (citing FCC order). The competitive-neutrality principle "requires that universal service 'rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another.'" *Id.* at 1111 (citation omitted). And, "[t]o the extent a state regulation violates that competitive neutrality requirement, the regulation is preempted." *Id.* at 1121.

**C.      The FCC Authorizes Reasonable Allocation Methodologies and Traffic Studies**

The FCC has "conclude[d] that allowing all carriers to bundle products and services is

generally procompetitive and beneficial to consumers," and it has authorized carriers to use any of various optional methodologies to apportion their revenues for bundled offerings for Universal Service remittances. *Policy & Rules Concerning the Interstate, Interexchange Marketplace*, 16 FCC Rcd. 7418, 7420, 7426, 7447-48, ¶¶ 2, 14, 50-53 (2001) ("*Bundling Order*"). Specifically, for bundles that include both surchargeable telecommunications services and nonsurchargeable data and other services, carriers may (1) allocate and report their revenues "based on the unbundled service offering prices" (excluding discounts for the assessable portion of the bundle); (2) choose to "treat all bundled revenues as telecommunications service" subject to federal Universal Service assessments; or (3) **use other reasonable allocation methods**. *Id.* at 7447-48, ¶¶ 50-54.

Further, with respect to revenues from voice service (or other telecommunications services), carriers have three options for apportioning those revenues between interstate (or international) and intrastate service: use (1) "traffic studies" (statistical analyses of calling traffic), (2) actual allocations based on books and records, or (3) a "safe harbor" (an optional flat-rate allocation). *Universal Service Contribution Methodology*, 21 FCC Rcd. 7518, 7533-34 ¶¶ 26-29 (2006), *aff'd in part and vacated in part*, *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007).

## II. The Prepaid Collection Act

In 2014, the California Legislature enacted the Prepaid Collection Act, with an effective date of January 1, 2016. A.B. 1717, ch. 885, 2013-2014 Gen. Assemb., Reg. Sess. (2014).[2] The Act consolidated and created a new point-of-sale collection mechanism for various preexisting surcharges and fees, including (1) the CPUC's Universal Service program surcharges, and (2) a "User Fee" that funds the CPUC's general operating budget. *See* Cal. Rev. & Tax Code § 42004(n).

The Act imposed these aggregated surcharges—the "prepaid MTS [i.e., Mobile Telephony Services] surcharge" (the "surcharge") at issue in this case—on all purchases of prepaid wireless services in California. *Id.* § 42010(a)(1). The Act further directed that the surcharge be paid by "each prepaid consumer" and "collected by" all sellers of prepaid wireless service, including carriers such as MetroPCS. *Id.*; *see also id.* §§ 42004(b)(1), (p).

---

[2] Citations are to the version of these provisions in effect from January 2016 to December 2019.

III.    The CPUC's Implementation of the Prepaid Collection Act

    A.    The 2017 Resolution Required MetroPCS to Apply an Intrastate Factor

On November 16, 2016, the CPUC adopted the first Resolution challenged in this case—the "2017 Resolution"—to implement the Act for calendar year 2017. Karanjia Decl., Ex. 1; *see also MetroPCS*, 970 F.3d at 1113. In that Resolution, the CPUC conceded it lacks authority to impose its surcharge on interstate services (Karanjia Dec., Ex. 1 at 17), but believed that the Act required the CPUC to impose the surcharge on "the total sales price" of a prepaid bundle—even when that bundle includes broadband and other nonsurchargeable services. *Id.* at 15, 19-20.

The CPUC's solution was to require all *prepaid* carriers—but *not postpaid* carriers—to apply a mandatory one-size-fits-all "intrastate factor" that serves as a proxy for each prepaid carrier's revenues attributable to intrastate telecommunications service. *Id.* at 15, 19.

The CPUC set an intrastate factor of 72.75%—thus assuming that more than two-thirds of revenues from every prepaid service plan offered by every prepaid carrier is attributable to intrastate telecommunications service. *Id.* at 10. The CPUC multiplied the aggregated base surcharge rate (7.0854%) by the intrastate factor (72.75%), to arrive at an "adjusted" surcharge rate (5.15%) for 2017—and directed all prepaid carriers to assess the adjusted rate "on the total sales price of prepaid wireless telephone service." *Id.* at 1, 19. Over MetroPCS's objections, the CPUC reaffirmed its intrastate factor mandate in the second Resolution challenged in this lawsuit. Karanjia Decl., Ex. 2.

    B.    The 2018 Resolution Also Required MetroPCS to Apply an Intrastate Factor

In November 2017, the CPUC issued the third Resolution challenged here—the "2018 Resolution." Karanjia Decl., Ex. 3. This Resolution, in effect for calendar year 2018, again required *only prepaid* carriers to collect and remit a surcharge predicated on a mandatory one-size-fits-all intrastate factor. *Id.* at 24, 26. This time, however, the CPUC made a "slight" adjustment to its intrastate factor (69.45% rather than 72.75%), based on a new computation methodology. *Id.* at 18. This produced an adjusted surcharge rate of 5.55% for 2018. *Id.* at 2, 18-19.

IV.    MetroPCS's Prepaid Plans

MetroPCS has provided prepaid service in California since 2002. Barnes Decl. ¶ 6. In 2017 and 2018, MetroPCS offered consumers a range of prepaid wireless plans, all of which it sold for a

6

PLAINTIFF'S NOTICE OF MOTION, MOTION, AND BRIEF ISO MSJ AND PERMANENT INJUNCTION
*MetroPCS California, LLC v. Reynolds*, Case No. 3:17-cv-05959-JD

fixed monthly price (inclusive of all regulatory fees, surcharges, and taxes). *Id.* ¶¶ 7, 9 & Exs. A, B. Each plan enabled customers to make unlimited interstate and intrastate voice calls and use unlimited text messaging, and almost all plans included some mobile broadband 4G data. *Id.* ¶ 7. The plans differed primarily in the amount of 4G data for each plan. The plans MetroPCS offered during part or all of 2017 and 2018 included the following: (i) unlimited broadband ("Unlimited Data"), (ii) 10 Gigabytes ("GB"), (iii) 8 GB, (iv) 5 GB, (v) 3 GB, (vi) 2 GB, (vii) 1 GB, and (viii) no broadband ("Talk & Text-only" plans). *Id.* MetroPCS offered various iterations of each type of plan, such as special promotional plans and plans with additional features such as the ability to access Wi-Fi "hotspots." *Id.* ¶ 8.

## V.    MetroPCS's Methodologies for Allocating Revenues Among Data, Text, and Voice

MetroPCS has a Bundle Valuation Committee ("BVC"), which is responsible for, among other things, establishing the relative pricing of voice, text, and data services for MetroPCS's prepaid wireless plans. Barnes Decl. ¶ 11. Consistent with the FCC guidance that carriers may use "reasonable" allocation methodologies, *see supra* pp. 4-5, during the 2017-2018 period (and continuing today), the BVC applied rigorous methodologies, based on GAAP, to allocate revenue to each service component of its prepaid wireless plans: data, text, and voice services. *Id.* ¶ 14. GAAP is intended to provide financial information about an organization's transactions in a complete and neutral manner that faithfully reflects the economics underlying a transaction, and accordingly is well-suited to building a methodology to allocate revenue among the components of MetroPCS's prepaid wireless plans. Taub Decl., Ex. A ¶¶ 5, 6.

### A.    Methodology for January 1, 2017 to August 31, 2018

GAAP specifically addresses how sellers of bundled products (such as MetroPCS's prepaid wireless plans), which are sold for one price, should allocate that price among the individual elements of the bundle: The bundle price should be allocated to each element pro rata based on the relative values of the elements (the "Relative Selling Price"). Taub Decl., Ex. A ¶ 44. GAAP provides that the value of each element should be assessed based on the price that element would be sold for if it were sold on its own (its "standalone selling price" or "SSP"). *Id.* ¶ 45. If the seller offers the item in question on a standalone basis, that price provides the appropriate pricing

benchmark. If the item is not sold on a standalone basis, the seller then looks to other evidence to determine what the item would be sold for if it were sold on its own. In some cases, the price charged by a competitor that sells a functionally identical item could be the best proxy for the price the seller would charge. In the absence of such objective evidence from its own or competitors' standalone sales of an item, the seller determines its best estimate of standalone selling price, considering all available evidence. *Id.* ¶ 60; Barnes Decl. ¶¶ 17-18.

**Components in MetroPCS's Prepaid Wireless Plans.** The first step in applying the Relative Selling Price allocation method is to identify the elements in the bundle. MetroPCS's BVC identified the following individual services that make up its most common plans: (1) unlimited voice; (2) unlimited text messaging; (3) unlimited 3G/2G data; and (4) one GB of 4G data service. Barnes Decl. ¶ 31; Taub Decl., Ex. A ¶ 64. As explained above, all MetroPCS plans contained unlimited voice and text and (for plans with some data) unlimited 3G/2G data. In contrast, MetroPCS sold plans with limited amounts of 4G data—for example, plans with 1, 2, 3, 5, and 8 GBs of 4G data—as well as plans with unlimited 4G data. Barnes Decl. ¶ 32; Taub Decl., Ex. A ¶¶ 66-68. The BVC determined that various quantities of 4G data did not constitute different bundle components, but instead constituted different quantities of the same item. That is, two GBs of 4G data is not a different service from one GB of 4G data—it is merely delivering one GB of such data twice; therefore, with respect to 4G data, the BVC needed to determine the SSP of one GB of 4G data and include the appropriate quantity in its allocation for each plan. Barnes Decl. ¶¶ 32-33; Taub Decl., Ex. A ¶ 69.

After identifying the bundle elements, the BVC had to determine the SSP of each element. The BVC observed that MetroPCS and its competitors did not sell a standalone unlimited voice plan or a standalone unlimited text messaging plan in the relevant markets. Nor did MetroPCS sell prepaid wireless plans for cell phone users that included unlimited 4G data on a standalone basis (*i.e.*, without also including voice and text messaging services). The BVC also determined that third-party evidence of selling price (*i.e.*, evidence of standalone selling prices for largely interchangeable services) was not available given significant differences in features and branding between MetroPCS plans and its competitors' offerings. Barnes Decl. ¶ 26; Taub Decl., Ex. A ¶ 73.

8

Accordingly, consistent with GAAP, the BVC used a "best estimate of selling price" approach to determine standalone selling prices for MetroPCS's voice, text messaging, and data services. *Id.*

**SSP of Voice ($20) and Text ($5).** The BVC determined that the best estimate of the SSPs for voice and text were $20 and $5, respectively. While MetroPCS did not sell voice or text separately, it did, during the relevant period, sell combined Talk & Text-only plans for $25. Barnes Decl. ¶ 37. Based on this evidence, the BVC assigned a combined SSP of $25 to voice and text. *Id.* From the combined $25, the BVC assigned $20 to voice and $5 to text based on information from Current Analysis, a publisher of market research reports and industry analyses, which included an estimated price of $5 for text messaging services. Barnes Decl. ¶¶ 38-39 & Exs. E, F.

**SSP of Data ($5 per GB of 4G Data).** In arriving at a best estimate of selling price for 3G/2G data and one GB of 4G data, the BVC considered prices paid by MetroPCS customers who purchased add-on optional services for Talk & Text-only plans. Barnes Decl. ¶ 44; Taub Decl., Ex. A ¶ 79. Specifically, the BVC considered that MetroPCS sold a 1 GB data "top-up" for customers who exceed their monthly 4G data allotment, but do not want to upgrade to a larger amount of 4G service going forward. Barnes Decl. ¶ 45 & Ex. D at 17; Taub Decl., Ex. A ¶ 79. The BVC also considered that, before MetroPCS launched its 4G data service, it charged $5 for a standalone add-on of unlimited internet access at lower, pre-4G LTE speeds. *Id.* The BVC also considered prices charged by competitors for additional high-speed data beyond the customer's existing allowance, which ranged from $5 to $10 per additional GB. Barnes Decl. ¶ 46 & Ex. D at 17; Taub Decl., Ex. A ¶ 81. This was also consistent with the price charged by MetroPCS for data-only plans for tablet (*e.g.*, iPad) users of $15 for 2 GB of high-speed data, or the equivalent of $7.50 for 1 GB of such data. Barnes Decl. ¶ 47 & Ex. D at 17; Taub Decl., Ex. A ¶ 81. Based on this information, the BVC estimated a standalone selling price of $5 for 1 GB of 4G data. Barnes Decl. ¶ 47.

**Number of Building Blocks of 4G Data in Unlimited Data Plans.** Once the BVC had determined the best estimate of the standalone selling price for 1 GB of 4G data (one "building block" of 4G data), it determined how many building blocks to use for plans with unlimited 4G Data. Barnes Decl. ¶ 49. In doing so, the BVC relied on the actual usage data of its subscribers to Unlimited Data plans, which MetroPCS tracked in the ordinary course of business. *Id.* ¶¶ 50-53.

MetroPCS's contemporaneous records showed that, on average, these subscribers consumed approximately 14 GB of 4G data per month. *Id.* & Exs. I, J, K, L. Accordingly, the BVC determined that it should assign 14 building blocks of 1 GB of 4G data for each Unlimited data plan. *Id.* ¶ 30.

**Application of the Relative Selling Price Method.** Having determined the standalone selling prices for its building blocks (each bundle element), it was a straightforward mathematical exercise for the BVC to allocate revenue for the various wireless plans MetroPCS sold (*i.e.*, plans with Unlimited Data, 8 GB, 6 GB, 5 GB, 3 GB, 2 GB, and 1 GB of 4G data). MetroPCS simply aggregated the standalone selling prices of each building block and then allocated the price charged to each component based on that component's relative portion (or percentage) of the sum of the standalone selling prices. Barnes Decl. ¶ 55; Taub Decl., Ex. A ¶ 82. For example, a prepaid wireless bundle including unlimited voice, text, 3G/2G data, and 3 GB of 4G data would contain the following components, or building blocks, with a sum of the SSPs of $45:



The $20 voice component represents 44.45% ($20/$45), the $5 text component is 11.1% ($5/$45), and the $20 data component is 44.45% ($20/$45) of the total. Bundles are appealing to consumers because they are typically sold for less than the sum of their parts. So, these percentages are then applied to the actual selling price, resulting in an allocation of the selling price based upon the relative standalone selling prices. For example, if the above plan were sold to a customer for $40, the allocation would be $17.78 to voice (44.45% of $40), $4.44 to text (11.1% of $40), and $17.78 to data (44.45% of $40). Barnes Decl. ¶¶ 56-60; Taub Decl., Ex. A ¶¶ 82-86.

The allocations produced by this methodology for each cell phone plan that MetroPCS sold to California customers from January 2017 to August 2018 are shown in Exhibits A and B to the Barnes Declaration. For example, for various versions of MetroPCS's popular "Unlimited Data" plans, the revenue allocations were: data (75%); text (4.983%); and voice (20.017%). Thus, just the

amount of data revenues for these plans significantly exceeded the 27.25% of total revenues that the CPUC allowed for all nonsurchargeable services under its 2017 intrastate factor (100% minus 72.75% = 27.25%).

In addition to using the methodology described above to apportion revenues between the data, text, and voice elements of each wireless plan, MetroPCS relied on traffic studies (contemporaneous statistical analysis of voice calls) to allocate between interstate and intrastate voice revenues. Barnes Decl. ¶ 21. These studies, which were created on a quarterly basis in the ordinary course of business, enabled MetroPCS to apply a "traffic factor"—the percentage split of voice service for the intrastate category as opposed to interstate. *Id.*

## B.    Methodology for September 1, 2018 to December 31, 2018

Effective September 1, 2018, the BVC changed its process for determining standalone selling prices. Barnes Decl. ¶ 78. The revised approach focused on estimating SSP based on MetroPCS's *costs* of providing each service, plus a profit margin. *Id.* This "expected cost plus a margin" approach is one of several methods recognized by GAAP for estimating SSP. Taub Decl., Ex. A ¶ 90. A significant reason for the changed approach was the recognition that T-Mobile was making multi-billion dollar investments in its network to increase broadband speed and capacity to meet surging customer demand for mobile data. Barnes Decl. ¶¶ 79-81; *see also* Rosston Decl., Ex. A ¶¶ 22, 27-29. As a contemporaneous memo explained, "[d]ata consumption [was] increasing at a rapid rate in contrast to voice and text" and "the network [was] primarily [being used] for the provision of data services." Barnes Decl. ¶ 79 & Ex. X. Thus, an allocation approach that focused more on cost made sense.

To implement this new approach, in early 2018, MetroPCS's parent company (T-Mobile) engaged Deloitte Advisory to conduct an independent, third-party analysis of (1) customer usage of components on T-Mobile's network and (2) the cost to maintain and improve the network to support voice, text, and data service traffic. Barnes Decl. ¶ 83. T-Mobile provided Deloitte with extensive financial and customer usage information to conduct the analysis. Chill Decl. ¶¶ 5-6; Barnes Decl. ¶ 86. In turn, Deloitte provided T-Mobile with formulas so that it could convert voice minutes of use, text messages, and data to a common metric (megabytes of bandwidth used) and calculate costs

per megabyte of each of these services. This analysis, including the resulting "conversion factors," could then be used to allocate costs per megabyte to voice, text, and data at a plan-by-plan level depending on the average usage of each service for that specific plan. Chill Decl. ¶ 8; Barnes Decl. ¶¶ 87, 89. The BVC added a gross profit margin (45%) and operating margin (40%) to the cost per megabyte for each service. Barnes Decl. ¶ 91.

The following table illustrates the application of the expected-cost-plus-a-margin approach:

| Magenta | TM One | $ 75.00 | MRC | | | |
|---|---|---|---|---|---|---|
| | | | **Data** | | **Talk** | **Text** |
| | Avg MBs per sub per month | | 13,346 | | 231 | 5.6 |
| | Cost per MB | $ | 0.00170 | $ 0.00486 | $ | 0.00415 |
| | Cost subtotal | $ | 22.73 | $ 1.12 | $ | 0.02 |
| | Gross Margin | | 45% | | 45% | 45% |
| | Subtotal - Cost + Gross Margin | $ | 32.96 | $ 1.63 | $ | 0.03 |
| | SG&A (% revenue) | | 40% | | 40% | 40% |
| | Total | $ | 46.15 | $ 2.28 | $ | 0.05 |
| | | | 95.20% | | 4.71% | 0.10% |

For the illustrated plan, the "Av[erage] MBs per sub[criber] per month" is based on average usage for subscribers to that particular plan, which T-Mobile/MetroPCS tracks in the ordinary course. Voice service was allocated 4.71% of the revenue; text was allocated 0.10%; and data was allocated 95.20%. If this plan were sold to a customer for $75, the allocation would be $3.53 to voice (4.71% of $75); $0.07 to text (0.10% of $75); and $71.40 to data (95.20% of $75). Barnes Decl. ¶ 92.

As with the earlier period, MetroPCS relied on its traffic studies to apportion voice revenues between interstate and intrastate service. *Id*. ¶¶ 22, 98.

## VI. Procedural History

In 2017, MetroPCS commenced this action, asserting both facial and as-applied preemption claims. Dkt. No. 1. In November 2018, Judge Illston granted summary judgment in favor of MetroPCS, holding that the CPUC Resolutions were *facially* preempted. Dkt. 88 at 17-18. Because the Court ruled on this ground, it found it unnecessary to reach MetroPCS's as-applied claims. The

1 CPUC appealed. Dkt. 96.[3]

2     In August 2020, the Ninth Circuit reversed the District Court's facial invalidation of the
3 Resolutions and Prepaid Act, but remanded the case for consideration of MetroPCS's as-applied
4 challenges. *MetroPCS*, 970 F.3d at 1110, 1126. On remand, Judge Illston granted in part and denied
5 in part cross-motions for summary judgment on MetroPCS's as-applied challenges. Dkt. 152.[4] After
6 that ruling, the parties exchanged expert reports and completed expert discovery. Dkt. No. 178 at 6.

7 **STANDARD OF REVIEW**

8     Summary judgment is appropriate where there is "no genuine issue as to any material fact"
9 and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the
10 CPUC "must establish a *'genuine'* factual dispute, which involves 'more than . . . some
11 metaphysical doubt as to the material facts.'" *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803
12 F.3d 1084, 1088 (9th Cir. 2015) (emphasis added and citations omitted).

13     Federal preemption "is 'a question of law,'" *MetroPCS*, 970 F.3d at 1117 (citation omitted).
14 Courts within this Circuit routinely grant summary judgment to plaintiffs asserting as-applied
15 challenges to government action. *See, e.g.*, *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949 (9th Cir.
16 2005) (affirming grant of plaintiff's motion for summary judgment on as-applied preemption claim);
17 *Burbank-Glendale-Pasadena Airport Auth. v. City of L.A.*, 979 F.2d 1338 (9th Cir. 1992) (affirming
18 grant of plaintiff's motion for summary judgment on preemption claims).

19 **ARGUMENT**

20     The Resolutions are preempted for two independent reasons. *First*, they assess the CPUC
21 surcharge on MetroPCS's revenues from broadband service (and other nonsurchargeable services),

22

---

23 [3] On January 1, 2020, while the CPUC's appeal was pending, the Prepaid Collection Act expired by
24 its own terms. *See MetroPCS*, 970 F.3d at 1115. Notwithstanding this expiration, the CPUC indicated that it intends to enforce its Resolutions, thereby preserving a live controversy. *See id.* at
25 1117. Further, on April 22, 2022, the CPUC issued an Order Instituting Investigation and Order to Show Cause seeking, among other things, to enforce the Prepaid Act against MetroPCS, collect the
26 disputed surcharges, and impose penalties for alleged non-compliance with the Resolutions challenged here. Dkt. No. 178 at 5.

27 [4] Judge Illston dismissed MetroPCS's claims alleging preemption under the Mobile Telecommunications Sourcing Act, 4 U.S.C. § 116 et seq., and based on the MTS Increment. Dkt.
28 152 at 8-13. MetroPCS is not asking this Court to reconsider those rulings. Judge Illston denied the remainder of both sides' motions. She did so without the benefit of the expert testimony now before this Court and based on a more limited evidentiary record.

in violation of the FCC's express preemption of such assessments. *Second*, they unfairly discriminate against MetroPCS, as compared with postpaid carriers offering identical services, in violation of 47 U.S.C. § 254(f) and the FCC's requirement of competitive neutrality.

## I. The Contested Resolutions Are Preempted Because They Impose the Surcharge on MetroPCS's Broadband and Other Nonsurchargeable Revenues

Federal law preempts the CPUC from imposing surcharges on *mobile broadband* revenues. *See Open Internet Order*, 30 FCC Rcd. 5601, 5803, 5837, ¶¶ 431-432, 490 & n.1477 (state Universal Service assessments on broadband are expressly preempted by Section 254(f) of the Communications Act); *Restoring Internet Freedom Order*, 33 FCC Rcd. at 429, ¶ 196 n.736 (same); *see also MetroPCS Cal., LLC v. Batjer*, 2021 WL 4311468, at *3 (N.D. Cal. Sept. 22, 2021) ("[T]he parties agree that revenue from broadband data is not surchargeable by the CPUC, and thus that if MetroPCS can demonstrate that the CPUC's resolutions assessed a surcharge on broadband revenue, the resolutions would be preempted as applied to MetroPCS."). Similarly, federal law bars assessments on *text messaging* service, which the FCC has classified as a nonsurchargeable "information service." *See MetroPCS*, 970 F.3d at 1111 n.2 ("[N]either the FCC nor the CPUC consider text messaging revenues to be surchargeable") (citations omitted). Finally, the CPUC concedes it may not impose its surcharge on *interstate voice* service. *See* Dkt. No. 39 ¶ 8.

Despite these undisputed legal principles establishing the nonsurchargeable nature of broadband, text messaging, and interstate voice services, the CPUC directed that ***more than two-thirds*** of every prepaid carrier's total revenues in 2017 and 2018 must be attributed to surchargeable intrastate telecommunications service. This defies both common sense and reality. As the CPUC recognized in December 2016 (the month before the 2017 Resolution went into effect), "[t]he data to voice ratio on smartphones has soared to roughly 10:1." Decision 16-12-025, 2016 WL 7243749, at *20 (CPUC Dec. 1, 2016), *corrected on other grounds by* Decision 17-03-014, 2017 WL 1000600 (CPUC March 8, 2017); *see also* Dkt. No. 39 (CPUC Answer ¶ 11) ("The CPUC admits that customers are using more mobile data than in the past."). The FCC similarly has observed that consumer demand for mobile broadband is "surging." *Amendment of the Commission's Rules with Regard to Commercial Operations in the 3550-3650 Mhz Band*, 30 FCC Rcd. 3959, ¶ 9 (2015).

Indeed, data usage in the United States increased exponentially from 388 billion MB in 2010 to ***37.1 trillion*** MB in 2019. *See* Rosston Decl., Ex. A ¶ 32. In light of these trends, it is unsurprising that the contested Resolutions imposed a grossly excessive assessment on MetroPCS's broadband revenues—exactly what federal law forbids.

This intuitive fact is confirmed by the undisputed evidence. As discussed below, (1) MetroPCS applied reasonable revenue allocation methodologies that comport with the FCC's instructions regarding permissible approaches for allocating revenues for Universal Service purposes; and (2) the resulting revenue allocations clearly show that the Resolutions impermissibly assessed the surcharge on MetroPCS's broadband, text messaging, and interstate voice service revenues. Even a conclusion that the Resolutions imposed surcharges on broadband service alone is sufficient to require invalidation of the Resolutions. *See supra* p. 4.

### A.    MetroPCS's Allocation Methodologies Were Reasonable as a Matter of Law

The FCC has authorized both prepaid and postpaid carriers to apportion their revenues subject to federal Universal Service Fund assessments by using any of several optional methodologies, including "reasonable" allocation methods. After identifying two "safe harbor" options (*see supra* p. 5), the FCC's *Bundling Order* addressed the option MetroPCS uses: "Carriers may choose to use allocation methods other than the two described above," but those methods may be evaluated for their "reasonableness." 16 FCC Rcd. at 7448, ¶ 53; *see also* Black's Law Dictionary (10th ed. 2015) (defining "reasonable" as "fair, proper, or moderate under the circumstances; sensible."); Webster's Legal Dictionary (1st ed. 1996) (defining "reasonable" as "having a basis in fact or evidence; sensible; not arbitrary and capricious or purely speculative."). The FCC explained:

> [T]he methods outlined in this Order are examples of how carriers may report revenues for universal service purposes, and *carriers may choose to use a different method altogether*. We adopt this approach in recognition of the fact that, at this time, we cannot anticipate the various ways in which carriers may choose to bundle their goods and services.

16 FCC Rcd. at 7448, ¶ 54 (emphasis added). Because "carriers may bundle goods and services in a multitude of ways that cannot be anticipated," the FCC "afford[ed] carriers the needed flexibility to determine the appropriate allocation of revenues for universal service support purposes." *Id*. at 7447, ¶ 49. Carriers should "exercise good faith in reporting revenues." *Id.*

MetroPCS uses the authorized option of applying reasonable allocation methodologies to apportion its revenues between broadband data, text, and voice services. Barnes Decl. ¶ 13. And it uses traffic studies to determine the proportion of voice service that is intrastate rather than interstate. *Id.* ¶ 21. As shown below, MetroPCS's revenue allocation methodologies during the 2017-2018 period were "reasonable" and thus comported with the *Bundling Order* as a matter of law. *See, e.g.*, *In re Software Toolworks Inc.*, 50 F.3d 615, 625 (9th Cir. 1994) ("The Underwriters' reliance on Deloitte's accounting decisions was reasonable as a matter of law. Summary judgment was appropriate on this issue."); *In re Brazier Forest Prod., Inc.*, 138 B.R. 265, 269 (Bankr. W.D. Wash. 1991) ("[T]he debtor has articulated a realistic and factual basis for its [allocation] methods, and its computations should thus be accepted."); *supra* p. 15 (dictionary definitions); *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (consulting Black's Law Dictionary to determine the "ordinary meaning" of words in preemption case).

### 1. MetroPCS's Methodologies Were Consistent with GAAP and Economic Principles Followed by the FCC

MetroPCS adhered to GAAP in developing its revenue allocation methodology. Scott Taub (a former Acting Chief Accountant at the SEC and author of a leading treatise on revenue recognition under GAAP) attests that the allocation methodologies MetroPCS used during the relevant period comport with GAAP. Mr. Taub explains that "[t]he same principles that make GAAP useful in the capital markets are well-suited to building a methodology to allocate revenue amongst the components of MetroPCS's prepaid wireless plans." Taub Decl., Ex. A ¶ 5. And he concludes that "MetroPCS reasonably applied the principles of GAAP in determining the allocations used for calendar years 2017 and 2018. MetroPCS used reasonable judgment in determining the standalone selling prices of the voice, text, and data components of its prepaid wireless bundles." *Id.* ¶ 6. Regarding the "building block" approach (used from January 2017 to August 2018), Mr. Taub concludes that "the application of the relative selling price method to the determined standalone selling prices is mechanical, rigorous, objective, and neutral. This is consistent with GAAP and reflects the principles employed in ASC 605-25 and ASC 606." *Id.* ¶ 87. He reaches the same conclusion regarding the cost-plus-a-margin approach (September to December 2018). *Id.* ¶ 111.

MetroPCS's methodologies not only complied with GAAP, but also are consistent with economic principles the FCC has followed in analogous contexts. Dr. Greg Rosston (a professor of economics at Stanford University and former senior economist at the FCC) attests that, based on his experience and knowledge, MetroPCS's allocation methodologies during the relevant period "were [economically] reasonable and align with well-established economic principles, including economic principles the FCC has followed in similar contexts." Rosston Decl., Ex. A ¶ 4. For example, the FCC has recognized the economic principle that no more cost (or revenue) should be allocated to a service than its standalone cost (or revenue), and no less cost (or revenue) should be allocated than the service's incremental cost (or revenue). *See id.* ¶¶ 44-53 (citing FCC orders).[5] Both of MetroPCS's methodologies were consistent with those economic principles. *See id.* ¶¶ 54-58, 64-68. Accordingly, Dr. Rosston concludes that "MetroPCS's revenue allocation methodologies during 2017 and 2018 and the specific revenue allocations MetroPCS adopted for its various prepaid wireless plans during that period were consistent with both economic principles and the applicable FCC rules and guidance." *Id.* ¶ 68.

In its *Bundling Order*, the FCC has instructed that allocation methodologies to determine broadband revenues must be "reasonable." There can be no serious question that a methodology based on GAAP principles on revenue allocation and consistent with accepted economic doctrine is reasonable. The CPUC provides no basis to conclude otherwise.

## 2. Audits Confirm the Reasonableness of MetroPCS's Methodology

Audits by the FCC's Universal Service administrator (the Universal Service Administrative Company or "USAC") and the CPUC itself confirm this point. In 2015, USAC conducted audits of MetroPCS affiliates that used the same building block allocation methodology that MetroPCS used during the January 2017 to August 2018 period. *See* Barnes Decl. ¶ 64 & Exs., P, Q; *see also* Rosston

---

[5] *See, e.g.*, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, 15852-54, ¶¶ 696, 698 (1996) (discussing how "common costs shall be allocated among elements and services in a reasonable manner" and "[i]n no instance should prices exceed the stand-alone cost for a specific element, and in most cases they should be below stand-alone costs"), *aff'd in relevant part*, *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002) (discussed in Rosston Decl., Ex. A ¶¶ 49, 56, 66); *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd. 9519, ¶ 189 (2021) ("[C]ompensation is fair if the price for each service or group of services 'recovers at least its incremental costs, and no one service . . . recovers more than its stand-alone cost.'") (citations omitted).

Decl., Ex. A ¶¶ 59-63. Except for *de minimis* changes affecting less than 0.0044% of reported revenues, USAC (relying on reports by an independent auditor) found that the MetroPCS affiliates had each "use[d] a good-faith estimate to allocate revenue from the bundle to the applicable lines on the FCC Form 499-A" and "the total revenues from these plans were reported at the correct amounts." Barnes Decl. ¶ 67 & Ex. P at 6, Ex. Q at 6; *see also Bundling Order*, 16 FCC Rcd. at 7418, ¶ 49 ("[C]arriers . . . are expected to exercise good faith in reporting revenues"). Far from raising any questions or concerns about the MetroPCS affiliates' building block methodology, USAC "evaluated the accuracy and completeness of the revenues and other information reported by [each] Filer" and signed off on its auditor's conclusion that the affiliates had reported total revenues at the correct amounts. Barnes Decl. ¶ 65, Ex. P at 6, 8, Ex. Q at 6, 8.

The CPUC's own auditors likewise found no fault with MetroPCS's building block methodology when conducting an audit of MetroPCS for 2017. The CPUC auditors specifically inquired into how MetroPCS "allocate[s] its service revenue within [its] bundle[s]." Barnes Decl. ¶ 72 & Ex. U. In response, MetroPCS described the building block methodology in detail. *Id.* The CPUC's final audit report, issued in October 2019, states that the CPUC audit team examined, among other things "[w]ritten policies and procedures related to [MetroPCS's] methodology used to derive the intrastate revenues" and "[s]ervice allocation percentages for MetroPCS's various bundle plans." Barnes Decl. ¶ 73 & Ex. V at 9. In stark contrast with the CPUC's *post hoc* criticisms of MetroPCS's methodology in the context of this litigation, the CPUC's auditors concluded that (except for a finding concerning a late payment "due to oversight"), "MetroPCS is compliant with the prepaid MTS surcharge requirements." *Id.* ¶ 74 & Ex. V at 12-13. The CPUC's audit report does not raise any concerns about the BVC's methodology or MetroPCS's underlying data.

### 3. In Contrast, the CPUC's Intrastate Factor Was Irreparably Flawed

In sharp contrast to MetroPCS's reasonable allocations, the CPUC's intrastate factor was fundamentally flawed and cannot be squared with economic principles that the FCC applies.

As Dr. Rosston explains "[t]he CPUC methodology violates economic principles by allocating more revenues to a service that does not change when another service is added to the bundle. In particular, when a MetroPCS prepaid wireless plan has more broadband data included

but no additional voice service, the CPUC allocates more revenue to voice service. Instead, economic principles would imply in that case that voice service should share the bundle's discounted price." Rosston Decl., Ex. A ¶ 71. For example, for a prepaid wireless plan that sold for $30 and included unlimited voice and text but a limited amount of 4G data, the CPUC's 72.75% intrastate factor for 2017 would produce an allocation of $21.83 for intrastate voice ($30 × 72.75%). However, for a plan that sold for $50 and included unlimited voice and text and unlimited 4G data, the CPUC's intrastate factor would result in $36.38 being allocated to intrastate voice ($50 × 72.75%). This is nonsensical, as the $50 plan includes more 4G data service, but the voice service remains the same. Dr. Rosston explains: "This allocation to voice service is not only above the amount that it would garner as a standalone product, but it is also unreasonable because the attribution to voice service increases when the unlimited voice product did not change." *Id*. ¶ 72.

The intrastate factor was also fundamentally flawed in its design and execution. For example, in calculating the intrastate factor for 2017, the CPUC misconstrued carriers' revenue reporting on FCC forms and thus "erroneously included non-surchargeable broadband revenue in the surchargeable revenue base, which, in turn, resulted in an improper assessment of the surcharge on MetroPCS's broadband revenues." Rosston Decl., Ex. A ¶ 74.

**B.      The Resolutions Imposed Surcharges on Nonsurchargeable Revenues**

Because MetroPCS's revenue allocation methodologies are reasonable, it follows that they reasonably determined the portions of MetroPCS's revenues attributable to voice, text, and broadband data service. As discussed below, a comparison between MetroPCS's revenue allocations for its prepaid wireless plans and the CPUC's intrastate factors shows that the intrastate factors resulted in an unlawful assessment on broadband revenues for almost all MetroPCS plans (*i.e.*, more than 97% of all active plans, used by more than 97% of MetroPCS California customers) in both 2017 and 2018. This establishes that the Resolutions are preempted.

***2017 Assessments on Broadband Revenues***. Under the CPUC's 2017 intrastate factor, the CPUC deemed at least 72.75% of revenues from each prepaid plan to be surchargeable—*i.e.*, that (i) 72.75% of revenues are attributable to *intrastate* voice service (or other intrastate telecommunications service), and (ii) the remainder (27.25%) to all nonsurchargeable services,

including broadband service, interstate voice service, and text messaging service. *See* 2017 Resolution at 10-11. But *broadband alone* accounted for more than 27.25% of plan revenues for virtually all of MetroPCS's active plans in 2017—more than 90 plans used by more than 97% of customers. *See* Barnes Decl. ¶ 94 & Ex. A (showing that broadband data ranged from 75% to 28.567% for all but four Talk & Text-only plans). This alone shows that the 2017 Resolution imposed an unlawful assessment on MetroPCS's broadband revenues.

In many cases, the proportion of plan revenues attributable to intrastate voice service was dramatically lower than the CPUC assumed—and, conversely, the proportion of revenues for nonsurchargeable broadband service was dramatically higher. For example, for numerous Unlimited Data plans, used by more than one-third of MetroPCS's California customers in 2017, fully 75% of revenues were for nonsurchargeable broadband service and only 17.68% of revenues were for intrastate voice service (20.017% total voice revenues × 88.32% annualized traffic factor for 2017). *See* Barnes Decl. ¶ 97 & Ex. A at 1-2. The following chart starkly illustrates the overassessment:



While the CPUC's intrastate factor significantly *understated* the proportion of revenues from MetroPCS's broadband services, it wildly *overstated* the proportion of revenues from intrastate voice service. With the narrow exceptions of the Talk & Text-only plans used by less than 2.5% of

20

MetroPCS's California customers, the portion of each prepaid plan's revenues attributable to *all* voice service ranged from as little as 20.017% to no more than 57.133% in 2017. Barnes Decl. ¶ 98 & Ex. A at 1-4. Moreover, this included *interstate* calling. Applying MetroPCS's annualized traffic factor during 2017 of 88.32% means that no more than 17.68%[6] to 50.46%[7] of total revenues for these plans were attributable to intrastate voice service—far less than the intrastate factor. *Id.*

*2018 Assessments on Broadband Revenues*. Similarly, a comparison between MetroPCS's revenue allocations for its prepaid wireless plans with customers in 2018 and the CPUC's 69.45% intrastate factor for that year shows that the factor resulted in an unlawful assessment on broadband revenues for almost all plans, used by more than 94% of customers. *See* Barnes Decl. ¶ 99. The CPUC deemed at least 69.45% of revenues from each MetroPCS prepaid plan to be surchargeable— *i.e.*, that (i) 69.45% of revenues were attributable to *intrastate* voice service (or other intrastate telecommunications service), and (ii) the remainder (30.55%) to all nonsurchargeable services, including broadband service, interstate voice service, and text messaging service. *Id.* ¶ 101. But *broadband alone* accounted for substantially more than 30.55% of plan revenue for virtually all active plans (more than 98%) in 2018. *Id.* & Ex. B (showing that broadband revenue accounted for 95.58% to 37.5% for all but eight plans). Again, this demonstrates a substantial unlawful surcharge assessment on MetroPCS's broadband revenues.

As with 2017, the assessment on broadband revenues was particularly excessive for the popular Unlimited Data plans, used by more than two-thirds (67%) of MetroPCS's California customers that year. *Id.* ¶ 102 (similar charts to those for 2017) & Ex. B at 1-3, 6-8. For the vast majority of MetroPCS's 65 Unlimited Data plans in 2018, at least 75% of revenues were from nonsurchargeable broadband service. *Id.*, Ex. B at 1-2, 6-8.[8] Yet the CPUC imposed its surcharge on 69.45% of revenues for all these (and other) MetroPCS prepaid plans. In all these cases, then,

---

[6] 20.017% (all voice service) × 88.32% (2017 annualized traffic factor for intrastate portion of voice service) = 17.68% (representing intrastate voice service).

[7] 57.133% (all voice service) × 88.32% (2017 annualized traffic factor for intrastate portion of voice service) = 50.46% (representing intrastate voice service).

[8] For eight Unlimited Data plans used during the January to August 2018 period by only 1.6% of MetroPCS's California customers, less than 75% of revenues were attributed to broadband. But even for those plans, 65.9% of revenues were from broadband alone—almost the same proportion of revenues that the CPUC erroneously attributed to intrastate voice service. Barnes Decl., Ex. B at 2-3.

the CPUC imposed unlawful surcharges on broadband revenues.

Also consistent with 2017, the CPUC's intrastate factor for 2018 significantly overstated the proportion of revenues attributable to intrastate voice service. The portion of each prepaid plan's revenues attributable to intrastate voice service as determined by the BVC ranged from 3.74%[9] to no more than 50.55%,[10] with the rare exceptions of Talk & Text-only plans used by less than 2.0% of MetroPCS's California customers in 2018. Barnes Decl. ¶ 102, Ex. B at 4-5, 6, 10. Yet the CPUC's intrastate factor under the 2018 Resolution assumed that at least 69.45% of prepaid carrier revenues account for surchargeable intrastate voice service. *Id.*

**_Assessments on Text Messaging and Interstate Voice Revenues_**. Because broadband alone accounted for a greater share of nonsurchargeable revenues than the CPUC assumed (*i.e.*, more than 27.25% in 2017 and 30.55% in 2018), it follows that the CPUC impermissibly assessed its surcharge on text messaging and/or interstate voice service revenues—both services that are included in every MetroPCS prepaid plan. *See* Taub Decl., Ex. A ¶ 115. Because the Resolutions compel these additional assessments on nonsurchargeable services, they are also preempted for this independent reason. *See supra* p. 14.

**_Total Impact of Improper Assessments_**. MetroPCS had total service revenue subject to CPUC surcharge of $1,483,797,980 in 2017 and $1,536,092,114 in 2018. Barnes Decl. ¶ 116. According to the CPUC, 72.75% of MetroPCS's total 2017 revenues—or $1,079,463,030—was attributable solely to intrastate voice service, and 69.45% of MetroPCS's total 2018 revenues—or $1,066,815,973—was attributable solely to intrastate voice service. *Id.* ¶ 117. In fact, however, only 26.1% of MetroPCS's 2017 revenues, or $387,677,643, was attributable to intrastate voice, and only 18.3% of MetroPCS's 2018 revenues, or $280,912,733, was attributable to intrastate voice. *Id.* ¶ 118. A simple comparison of MetroPCS's actual surcharge remittances during the relevant period with the surcharges that the contested Resolutions directed the company to collect and remit shows

---

[9] 4.23% (all voice service) × 88.47% (2018 annualized traffic factor for intrastate portion of voice service) = 3.74% (representing intrastate voice service). *See* Exhibit B at 6 (plans P3UNL78, 3UNL90, P3UNL90, 1UNLM50, 2UNLM80, 1UNL60, 2UNL90 in September to December 2018).

[10] 57.133% (all voice service) × 88.47% (2018 annualized traffic factor for intrastate portion of voice service) = 50.55% (representing intrastate voice service). *See* Exhibit B at 4-5 (plans 1GB30, 1GB360P, 1GB260PF, GSM130, GSM130F in January to August 2018).

that (i) the CPUC's 2017 Resolution subjected MetroPCS to *$49,154,265* in excess, unlawful surcharges (*i.e.*, in addition to the surcharges that would have been due if MetroPCS had been treated in the same way as a postpaid carrier) during that calendar year, and (ii) the 2018 Resolution subjected MetroPCS to *$63,184,109* in excess, unlawful surcharges. *Id.* ¶ 120; *see also id.* ¶¶ 117-119 (explaining calculations). Thus, whether viewed at the level of individual wireless plans or total revenues, the conclusion is inescapable: The Resolutions impermissibly imposed very substantial surcharges on MetroPCS's nonsurchargeable revenues from data, text, and interstate voice services.

## II.     The Resolutions Are Preempted Because They Are Not Competitively Neutral

The Resolutions also are preempted for the independent reason that they subject MetroPCS to substantially higher surcharges than would have applied to a postpaid carrier offering identical services. This violates 47 U.S.C. § 254(f) and the related principle of competitive neutrality, which "requires that universal service 'rules neither unfairly advantage nor disadvantage one provider over another.'" *MetroPCS*, 970 F.3d at 1120 (citing FCC order). The Ninth Circuit explained that, "[t]o the extent a state regulation violates that competitive neutrality requirement, the regulation is preempted." *Id.* at 1121. The Court also cited a Fifth Circuit decision for the proposition that "competitive neutrality at least prohibits putting some providers 'at a distinct competitive disadvantage compared with' other providers." *Id.* at 1120 ("agree[ing] with" *AT&T Corp. v. Pub. Util. Comm'n*, 373 F.3d 641, 647 (5th Cir. 2004)); *id.* at 1125 (discussing "unfair disadvantage" to prepaid carriers such as MetroPCS, and noting that "[t]he result would have been higher surcharges for prepaid services but not postpaid services, despite there being no meaningful difference between the two").[11]

Here, the analysis above shows that the 2017 and 2018 Resolutions do exactly that. Each subjects MetroPCS to much higher surcharges than a postpaid carrier offering the same services. *See supra* pp. 22-23 (2017 Resolution subjected MetroPCS to $49,154,265 in additional surcharges

---

[11] The Ninth Circuit rejected the CPUC's argument that prepaid service is sufficiently dissimilar to postpaid service to justify higher surcharge burdens imposed on prepaid carriers. The Court explained that "[w]e see *no meaningful distinction between prepaid and postpaid services that could justify imposing the higher surcharge only on prepaid services.* . . . Prepaid and postpaid services offer the same telecommunications options of voice, text messaging, and data." *MetroPCS*, 970 F.3d at 1123 (emphasis added).

23

PLAINTIFF'S NOTICE OF MOTION, MOTION, AND BRIEF ISO MSJ AND PERMANENT INJUNCTION
*MetroPCS California, LLC v. Reynolds*, Case No. 3:17-cv-05959-JD

(*i.e.*, in addition to the surcharges that would have been due if MetroPCS had been treated in the same way as a postpaid carrier) during that calendar year, and 2018 Resolution subjected MetroPCS to $63,184,109 in additional surcharges). This violates the competitive-neutrality requirement. *See, e.g.*, *AT&T*, 373 F.3d at 647 (explaining that there was a "competitive disadvantage" because one subset of carriers was "burden[ed] . . . more severely" than other carriers); *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 433-45 (5th Cir. 1999) (FCC rule requiring petitioner COMSTAT to contribute more to the federal USF than other carriers was "discriminatory" and violated competitive neutrality where, among other things, it "damage[d] some international carriers like COMSAT more than it harm[ed] others"); *Matter of CPUC Petition for Delegation of Additional Authority Pertaining to Area Code Relief & Nxx Code Conservation Measures*, 14 FCC Rcd. 17486, 17495 ¶ 18 (1999) ("[A] competitively neutral cost recovery mechanism should not give one service provider an appreciable, incremental cost advantage over another service provider") (citation and internal quotation marks omitted).[12]

The same conclusion follows from a comparison of how the surcharge is calculated for each of MetroPCS's plans using (a) the CPUC's mandated intrastate factor as compared with (b) using the methodologies MetroPCS would have been free to use if it had been a postpaid carrier offering the same services. In each instance, the surcharge amount for virtually every prepaid plan with California customers (except the very small number of Talk & Text-only plans) was dramatically higher under the Resolutions. And in many instances (for example, for the Unlimited Data plans), the surcharge was dramatically higher—sometimes more than four times higher than it would have been for a postpaid carrier offering the same plan. *See* Barnes Decl. ¶¶ 104-113 & Exs. BB, CC (tables showing comparisons in surcharge burden for each plan).

Given the Ninth Circuit's holding that there is no lawful basis for treating MetroPCS worse than postpaid carriers offering equivalent service, *see supra* p. 23 & n.11, the contested Resolutions violate the requirement of competitive neutrality and are preempted. *MetroPCS*, 970 F.3d at 1121.

---

[12] In contrast, rules *are* competitively neutral where they subject all categories of carriers to the *same* surcharge burdens. *See, e.g.*, *Matter of Telephone Number Portability*, 17 FCC Rcd. 2578, 2594-95 ¶ 30 (2002) ("The [FCC] determined that the end-user revenues allocator is competitively neutral in part because it spreads the costs . . . among all telecommunications carriers rather than imposing the costs disproportionately on any particular class or classes of carriers").

24

PLAINTIFF'S NOTICE OF MOTION, MOTION, AND BRIEF ISO MSJ AND PERMANENT INJUNCTION
*MetroPCS California, LLC v. Reynolds*, Case No. 3:17-cv-05959-JD

Indeed, this is a paradigmatic competitive-neutrality violation because the increased surcharge burden makes it much more difficult for MetroPCS to compete with postpaid carriers for new customers. Barnes Decl. ¶¶ 109, 113; *see also Matter of New England Public Communications Council Petition for Preemption Pursuant to Section 253*, 11 FCC Rcd. 19713, 19721-22 ¶ 20 (1996) (state requirement applicable to only one class of payphone providers, but not others, violated competitive-neutrality principle where it "substantially raise[d] the costs and other burdens of providing payphone services, thus deterring the entry of potential competitors"), *recon. denied*, 12 FCC Rcd. 5215 (1997); *Matter of Federal-State Joint Board on Universal Service*, 15 FCC Rcd. 15168, 15181, ¶ 31 (2000) (state PUC rule "violate[d] the competitive neutrality principle by unfairly skewing the provision of universal service support in favor of" other carriers); *Matter of Level 3 Communications, LLC*, 33 FCC Rcd. 2388, 2394, ¶ 17 (2018) (rejecting a proposed rule that "would create an unlevel playing field, violating the principle of competitive neutrality").

## CONCLUSION

MetroPCS respectfully requests that the Court grant summary judgment in its favor, declare that the contested Resolutions are preempted and unlawful, and permanently enjoin enforcement of those Resolutions against MetroPCS. Absent a permanent injunction, the CPUC would be able to enforce its unlawful Resolutions against MetroPCS, making it substantially more difficult for MetroPCS to compete in a fiercely competitive marketplace. *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (where a state regulation or policy is "preempted by federal law," it "is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available"); *see also AT&T Corp. v. Pub. Util. Comm'n*, 252 F. Supp. 2d 347, 354 (W.D. Tex. 2003) (permanently enjoining state PUC officials from "assessing and collecting any Texas Universal Service Fund assessments" under the challenged regulation), *aff'd*, *AT&T Corp.*, 373 F.3d at 647.

DATED this 21st day of March, 2023.

Respectfully submitted,

DLA PIPER LLP (US)

By: _/s/ Peter Karanjia_
　　　　Peter Karanjia

Attorneys for Plaintiff MetroPCS California, LLC