Peter Karanjia (admitted *pro hac vice*)
DLA PIPER LLP (US)
500 8th Street, NW
Washington, D.C. 20004
Tel.:       (202) 799-4135
E-mail:     peter.karanjia@dlapiper.com

Melanie Walker (CA State Bar No. 336994)
DLA PIPER LLP (US)
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, California 90067
Tel.:       (312) 368-4000
E-mail:     melanie.walker@us.dlapiper.com

Martin L. Fineman (CA State Bar No. 104413)
Geoffrey S. Brounell (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111
Tel.:       (415) 276-6500
E-mail:     martinfineman@dwt.com
            geoffreybrounell@dwt.com

Attorneys for Plaintiff MetroPCS California, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| METROPCS CALIFORNIA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ALICE REYNOLDS, President of the California Public Utilities Commission, in her official capacity; et al.,<br><br>Defendants. | Case No. 3:17-cv-05959-JD<br><br>**DECLARATION OF SCOTT A. TAUB, CPA IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**<br><br>Date:       April 27, 2023<br>Time:       10:00 a.m.<br>Place:      Courtroom 11, 19th Floor<br><br>Before the Honorable James Donato<br><br>Complaint Filed: Oct. 17, 2017<br>Second Am. Complaint Filed: Jan. 19, 2018 |

I, Scott A. Taub, CPA, declare as follows:

1.      I am over the age of 18 and am competent to testify as to all of the facts contained in this Declaration, of which I have first-hand, personal knowledge.

2.      I am currently a Managing Director of Financial Reporting Advisors, LLC ("FRA"). FRA provides consulting services related to accounting and financial reporting and litigation support services, primarily with regard to the application of Generally Accepted Accounting Principles ("GAAP"), International Financial Reporting Standards ("IFRS"), and the rules and regulations of the U.S. Securities and Exchange Commission ("SEC"). I have over 31 years of accounting and auditing experience, including seven years as a financial statement auditor and 24 years in various roles as an accounting, auditing, and financial reporting expert.

3.      From September 2002 to January 2007, I served as Deputy Chief Accountant at the SEC, and I served twice as Acting Chief Accountant for a total of 14 months. I was also a Professional Accounting Fellow in the Office of the Chief Accountant between 1999 and 2001. These roles regularly required me to determine whether accounting treatment used by an entity did or did not comply with GAAP. Further, while a Professional Accounting Fellow, I worked on implementation issues related to a new revenue recognition standard (Accounting Standards Codification ("ASC") 606), which was issued in 2014 and was required to be applied by publicly traded companies in 2018.

4.      I have been retained as an expert witness by counsel for Plaintiff MetroPCS California, LLC in this action to: (i) provide opinions based on GAAP as to whether MetroPCS used a reasonable method to apportion its revenues among various services included in its prepaid wireless bundles; and (ii) respond to certain arguments made by the California Public Utilities Commission ("CPUC") regarding MetroPCS's apportionment method.

5.      On January 21, 2022, I prepared and signed an expert report for use in this action that contains my opinions and analyses on the aforementioned issues. A true and correct copy of my written expert report is attached hereto as **Exhibit A** to this Declaration (the "January 21, 2022 Taub Report").

6.      On March 24, 2022, I prepared a reply report for use in this action, which:

(i) responded to the rebuttal expert report of the CPUC's designated expert, Mr. Bert Nuehring, dated February 24, 2022; and (ii) contained additional opinions. The opinions I reached in the January 21, 2022 Report remain unchanged. A true and correct copy of my reply report is attached hereto as **Exhibit B** to this Declaration (the "March 24, 2022 Taub Report").

7.      If called upon to testify at trial, I would testify in a manner consistent with the conclusions and opinions contained in my January 21, 2022 Taub Report and March 24, 2022 Taub Report.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March __20__, 2023, at Chicago, Illinois.


_____

SCOTT A. TAUB

Exhibit A

**CONTAINS INFORMATION DESIGNATED HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE PROTECTIVE ORDER**

METROPCS CALIFORNIA, LLC,

     Plaintiff,

 v.

ALICE REYNOLDS, President of the California Public Utilities Commission, in her official capacity; JOHN REYNOLDS, Commissioner of the California Public Utilities Commission, in his official capacity; GENEVIEVE SHIROMA, Commissioner of the California Public Utilities Commission, in her official capacity; DARCIE HOUCK, Commissioner of the California Public Utilities Commission, in her official capacity; and CLIFFORD RECHTSCHAFFEN, Commissioner of the California Public Utilities Commission, in his official capacity,

     Defendants.

Case No. 3:17-cv-05959-SI

**EXPERT REPORT OF SCOTT A. TAUB, CPA**

**Date:  January 21, 2022**

## I.  INTRODUCTION

1.     This report provides certain analysis and discussion concerning a dispute between MetroPCS California, LLC ("MetroPCS") and the California Public Utilities Commission ("CPUC") regarding the CPUC's implementation of the California Prepaid Mobile Telephony Services Surcharge Collection Act of 2014 ("Prepaid Act") relating to calendar years 2017 and 2018.

2.     I have been retained by counsel on behalf of MetroPCS to: 1) provide opinions based on United States Generally Accepted Accounting Principles ("GAAP") as to whether MetroPCS used a reasonable method to apportion its revenues amongst various services included in its prepaid wireless bundles, and 2) to respond to certain arguments made by the CPUC regarding MetroPCS's apportionment method.

3.     I understand that MetroPCS contends that the method it used to apportion its prepaid wireless bundle revenues amongst the components included in a bundle is consistent with guidance included in GAAP, and that use of GAAP for such allocation is reasonable.  This report provides analysis in regards to those contentions, including:

   a.   An explanation of the objectives and concepts that underlie GAAP.

   b.   A discussion of the particular requirements of GAAP that apply to the allocation of revenue amongst components of a contract, along with explanation of how those requirements are intended to reflect the objectives and concepts that underlie GAAP.

   c.   Evaluation of whether the processes and procedures employed by MetroPCS are consistent with the requirements of GAAP.

4.     In addition, this report provides responses, based on GAAP, to various assertions by the CPUC in court documents filed in this matter.

## II.  SUMMARY OF OPINIONS

5.     GAAP is intended to provide financial information about an entity's transactions in a complete and neutral manner that faithfully reflects the economics underlying the entity's transactions.  The same principles that make GAAP useful in the capital markets are well-suited to building a methodology to allocate revenue amongst the components of MetroPCS's prepaid wireless plans in a neutral, representationally faithful manner.

6.     MetroPCS reasonably applied the principles of GAAP in determining the allocations used for calendar years 2017 and 2018.  MetroPCS used reasonable judgment in determining the standalone selling prices of the voice, text, and data components of its prepaid wireless bundles.

7.     The mandatory allocation factors in the CPUC Resolutions[1] at issue—which assume that 27.25% of prepaid wireless service revenues in 2017[2] and 30.55% of such revenues in 2018[3] were non-surchargeable—result in the application of CPUC surcharges to a substantial amount of MetroPCS's broadband data service revenue, as well as to text messaging and interstate voice service revenues, as those revenues were determined using the principles in GAAP. In the case of every prepaid wireless plan that provided voice, text, and broadband data services, the application of the CPUC's intrastate factors resulted in an assessment of surcharges on a substantial amount of MetroPCS's revenue from broadband data and text service in both 2017 and 2018.

8.     In its Motion for Summary Judgment submitted on February 19, 2021 (the "CPUC MSJ"),[4] the CPUC put forward several criticisms of MetroPCS's application of the "relative selling price" method required under GAAP. Those criticisms, however, reflect misunderstandings of the application of the method and do not demonstrate a failure on MetroPCS's part in the application of the guidance in GAAP.

## III.   QUALIFICATIONS

9.     I have 31 years of accounting and auditing experience, including seven years as a financial statement auditor and 24 years in various roles as an accounting, auditing, and financial reporting expert.

10.    I am currently a Managing Director of Financial Reporting Advisors, LLC ("FRA"). FRA provides consulting services related to accounting and financial reporting and litigation support services, primarily with regard to the application of GAAP, International Financial Reporting Standards ("IFRS"), and the rules and regulations of the U.S. Securities & Exchange Commission ("SEC").

11.    From September 2002 through January 2007, I was a Deputy Chief Accountant at the SEC, and I served twice as Acting Chief Accountant for a total of 14 months. In those roles, I played a key part in the SEC's implementation of the reforms under the Sarbanes-Oxley Act. I was also responsible for the day-to-day operations of the Office of the Chief Accountant, including resolution of accounting and auditing practice issues, rulemaking, and oversight of private sector standard-setting efforts and regulation of auditors. I was also a member of the

---

[1] The "CPUC Resolutions" refer collectively to CPUC Resolution T-17542, CPUC Resolution T-17579, and CPUC Resolution T-17595.

[2] The CPUC's "intrastate factor" under the 2017 Resolution was 72.75% and thus assumed that 72.75% of every bundled prepaid wireless plan represented surchargeable revenue from intrastate telecommunications service and that 27.25% (100% - 72.75% = 27.25%) consisted of revenues from broadband or other non-surchargeable services. See CPUC Resolution T-17542 ("2017 Resolution"), pp. 10–11.

[3] The CPUC's intrastate factor under the 2018 Resolution was 69.45% and thus assumed that 69.45% of every bundled prepaid wireless plan represented surchargeable revenue from intrastate telecommunications service and that 30.55% (100% - 69.45% = 30.55%) consisted of revenues from broadband or other non-surchargeable services. See CPUC Resolution T-17579 ("2018 Resolution"), p. 18.

[4] Defendants' Notice of Motion, Cross-Motion for Summary Judgment, and Opposition to the Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC. vs. Marybel Batjer, et al.*, February 19, 2021 (Dkt. 123).

SEC staff between 1999 and 2001 as a Professional Accounting Fellow in the Office of the Chief Accountant.  These roles regularly required me to determine whether accounting treatment used by an entity did or did not comply with GAAP.

12.     From 1997 to 1999, I was a manager in Arthur Andersen's Professional Standards Group ("PSG"), and from 2001 to 2002, I was a partner in that group.  The role of the PSG within Arthur Andersen was to: 1) consult on complex financial reporting matters; 2) establish and disseminate Arthur Andersen's policies regarding financial reporting matters; and 3) represent the firm before various standards setters including the Financial Accounting Standards Board ("FASB"), the SEC, the American Institute of Certified Public Accountants ("AICPA"), and the International Accounting Standards Board ("IASB").  From 1990 to 1997, I was an auditor in Arthur Andersen's Detroit office, working on audits of a variety of companies in the manufacturing, retail, and banking industries.

13.     I have authored many articles and reports covering a variety of accounting and financial reporting issues and was the primary author of several SEC reports and publications.  I am also the author of CCH's Revenue Recognition Guide, a 600-page comprehensive reference manual covering key concepts and issues that arise when determining when and how to recognize revenue, and an author of CCH's Financial Instruments: A Comprehensive Guide to Accounting and Reporting, which provides over 500 pages of guidance on accounting for financial instruments.

14.     Over my career, I have served on multiple working groups and task forces of the FASB, the IASB, the International Organization of Securities Commissions (the Monitoring Group of regulators formed to assess the restructuring of the International Auditing and Assurance Standards Board), and other groups relevant to financial reporting.

15.     While a Professional Accounting Fellow at the SEC, I was one of the primary authors of Staff Accounting Bulletin No. 101, which was issued in 1999 and provided the views of the SEC staff on a number of issues related to the recognition of revenue.  I was a member of the FASB/IASB Joint Transition Resource Group for Revenue Recognition that was formed to consider implementation issues related to a new revenue recognition standard (Accounting Standards Codification ("ASC") 606, which is discussed below), which was issued in 2014 and was required to be applied by publicly-traded companies in 2018.  My full resume is included in Appendix A.

16.     I am being compensated for my work at my standard hourly rate of $750 per hour. I have been assisted in this matter by staff of Cornerstone Research.  My compensation is not contingent upon my conclusions or the outcome of the matter.

## IV.     SCOPE OF ASSIGNMENT AND INFORMATION ABOUT THIS REPORT

17.     Section V of this report includes a brief summary of certain background facts and information that is relevant to the case and to understanding MetroPCS's process for allocating its revenues amongst the components included in its prepaid wireless bundles.

18.     Section VI explains the way that GAAP is promulgated and discusses the objectives of financial reporting under GAAP.  Section VI also identifies the particular guidance in GAAP that pertains to the allocation of revenue to components of a contract with a customer that includes multiple products or services.

19.     Sections VII and VIII of this report include discussion and analysis of the processes and procedures used by MetroPCS in allocating revenue amongst the components of its prepaid wireless bundles for the years ended December 31, 2017 and 2018, which are the periods relevant to this case (the "Relevant Period").  Sections VII and VIII summarize those procedures and discuss whether and how they are consistent with GAAP.

20.     Section IX compares the results of MetroPCS's allocation process to the results of applying the surcharges as required by the CPUC's Resolutions during the Relevant Period.

21.     Section X analyzes certain assertions by the CPUC in this matter through the lens of relevant GAAP.

22.     Section XI reiterates my opinions and conclusions regarding the issues addressed.

23.     This report is intended solely for use in the matter identified in paragraph 1 and should not be used for any other purposes.  This report represents my current analysis and conclusions, based on the materials I have reviewed and analyzed to date.  I have ascertained the background facts (outlined in Section V) and gained an understanding of the processes and procedures used by MetroPCS in allocating revenue amongst the components of its prepaid wireless bundles (as discussed in Sections VII and VIII) from a review of documents and information identified in Appendix B.  I have assumed the facts set forth in those documents are true and accurate for purposes of this report and have not sought to independently verify that information.  If different or additional relevant material or information comes to my attention, I reserve the right to withdraw, revise, or supplement this report.  I also reserve the right to respond to the reports or conclusions of other expert witnesses in this matter and to modify or supplement my conclusions accordingly.

## V.     FACTUAL BACKGROUND

### A.     MetroPCS Business and Service Offerings

24.     MetroPCS provides prepaid wireless service.[5]  MetroPCS's prepaid plans allow customers to pay for wireless service up-front, without any contractual commitments, early-termination fees, or credit checks.  During the Relevant Period, MetroPCS offered a number of prepaid wireless plans, all of which were sold for a fixed monthly price, which included taxes and fees.[6]  Each such plan enabled customers to make and receive unlimited intrastate and

---

[5] Second Declaration of John Barnes in Support of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction and Exhibits, *MetroPCS California LLC v. Marybel Batjer, et al.*, November 23, 2020 (Dkt. 112-24) ("Second Barnes Declaration"), par. 6.

[6] Second Barnes Declaration, par. 7.

interstate voice calls and send and receive unlimited text messages.  In addition, almost all plans provided customers with access to mobile broadband data service.[7]  The plans offered in 2017 and 2018 differed mainly in the amount of broadband data available to customers.[8]

### B.    Universal Service Fund and the Prepaid Act

25.    The Communications Act of 1934 ("Communications Act") provides that state utilities commissions, such as the CPUC, have authority over intrastate telecommunications services while the Federal Communications Commission ("FCC") has authority over interstate telecommunications services.[9]  The FCC requires every provider of interstate telecommunication services to contribute to the federal Universal Service Fund ("USF"), which subsidizes efforts to provide nationwide access to communications services.[10]

26.    States are also permitted to establish rules regarding their own Universal Service programs, subject to limitations specified in the Communications Act and relevant FCC Orders.[11] Amongst these limitations, the FCC has expressly preempted states from subjecting broadband data service to Universal Service assessments.[12]  Further, neither the FCC nor the CPUC consider text messaging revenues to be subject to Universal Service assessments.[13]

27.    Prior to 2017, the CPUC allowed MetroPCS and other prepaid wireless carriers to allocate their revenues from bundled plans amongst intrastate voice, interstate voice, text, and broadband data services using the same methodologies that the FCC has authorized wireless carriers to apply when allocating their revenues for purposes of calculating USF contributions.[14] However, in 2017 and 2018, the CPUC changed its method of assessing fees to one that required use of an "intrastate factor" that MetroPCS and other prepaid wireless carriers were required to apply to the total sales price of a prepaid wireless plan.[15]  The stated intent of the factor was to serve as a proxy for each prepaid carrier's actual proportion of revenues attributable to intrastate

---

[7] Second Barnes Declaration, pars. 7, 19.  While MetroPCS also offers plans that offer broadband data service without voice service for owners of tablet devices, those plans are not at issue in this matter, as the Prepaid Act applies only when voice service is sold in combination with other services (see 2017 Resolution, p. 10; 2018 Resolution, p. 15).

[8] Second Barnes Declaration, par. 19.

[9] 47 U.S.C. §§ 152(a), 152(b).

[10] 47 U.S.C. § 254(d).

[11] 47 U.S.C. § 254(f).

[12] Order Granting in Part and Denying in Part Motions for Summary Judgment and Providing Notice of Intent to Appoint Special Master and Scheduling Further Status Conference, *MetroPCS California, LLC v. Marybel Batjer*, September 22, 2021 (Dkt. 152) ("September 2021 Order"), p. 6.

[13] Plaintiff's Notice of Motion and Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Marybel Batjer, et al.*, November 24, 2020 (Dkt. 112) ("MetroPCS November 2020 MSJ"), pp. 6-7.

[14] MetroPCS November 2020 MSJ, pp. 1–2.

[15] 2017 Resolution, p. 10; 2018 Resolution, pp. 15–18.

telecommunications services in comparison to all other services.[16]  The factor for 2017 was 72.75% and for 2018 was 69.45%.[17]

### C.    Summary of the Dispute

28.    MetroPCS contested the CPUC's imposition of the intrastate factor, and, in October 2017, filed suit to challenge the CPUC's use of the intrastate factor to implement the Prepaid Act as preempted by federal law, asserting both facial and as-applied claims.[18]  In 2018, the United States District Court for the Northern District of California (the "Court") granted summary judgment in favor of MetroPCS on one of its facial challenges to the CPUC Resolutions.[19]  However, in August 2020, the Ninth Circuit reversed that ruling and remanded the case to the District Court for consideration of MetroPCS's remaining claims challenging the CPUC's intrastate factor as applied to MetroPCS.[20]

29.    Both MetroPCS and the CPUC subsequently submitted motions for summary judgment.  On April 23, 2021, the Court held a hearing on the parties' motions for summary judgment.[21]  The Court issued an order following consideration of the motions on September 22, 2021.  The September 2021 Order states that:

> …the parties agree that revenue from broadband data is not surchargeable by the CPUC, and thus that if MetroPCS can demonstrate that the CPUC's resolutions assessed a surcharge on broadband revenue, the resolutions would be preempted as applied to MetroPCS. The parties also agree that the CPUC may not assess its surcharges or fees on the same interstate-service revenue that is already subject to the FCC's assessments because 'any double assessments on MetroPCS's revenue would necessarily conflict with the competitive neutrality principle, so the CPUC resolutions would be preempted on that ground.'[22]

30.    The September 2021 Order also notes that:

> …the CPUC concedes that any state surcharges on broadband data revenue would be preempted by FCC orders, and such a showing is not dependent on a 'double' assessment because neither the federal nor the state government may currently assess broadband data revenue for universal service contributions.[23]

---

[16] 2017 Resolution, p. 10; 2018 Resolution, p. 24.

[17] 2017 Resolution, p. 11; 2018 Resolution, p. 18.

[18] MetroPCS November 2020 MSJ, pp. 11–12, 14.

[19] MetroPCS November 2020 MSJ, p. 14.

[20] MetroPCS November 2020 MSJ, p. 15.

[21] September 2021 Order, p. 1.

[22] September 2021 Order, pp. 4–5.

[23] September 2021 Order, p. 6.

31.     MetroPCS contends that its revenue allocation methodology is reasonable and that the CPUC's Resolutions impermissibly impose surcharges on broadband data revenue, improperly discriminate against MetroPCS as a prepaid carrier, and are flawed in additional respects.[24]

32.     The FCC has designated two allocation methodologies as "safe harbors" for determining the split between telecommunications services and other services (such as broadband) included in a bundle.[25] These safe harbor allocation methods are afforded "a presumption of reasonableness in an audit or enforcement context."[26]  The FCC also allows carriers to "use allocation methods other than the two described" (*i.e.,* other than the two safe harbors), so long as those other methods are "[]reasonable," which is decided "on a case-by-case basis in an audit or enforcement context."[27]  MetroPCS does not use either of the safe harbor methodologies.  Instead, during the Relevant Period, MetroPCS used its own methodology, which it asserts is reasonable, supported by objective data, and consistent with GAAP.[28]

33.     In the September 2021 Order, the Court concluded that it could not "…determine on summary judgment that the manner in which MetroPCS has allocated its bundled revenue is reasonable as a matter of law."[29]

### D.     MetroPCS's Allocation Methodology During the Relevant Period

34.     During the Relevant Period, MetroPCS used an allocation methodology based on GAAP for the allocation of revenues amongst the voice (and other telecommunications services), text messaging, and broadband data components of its prepaid wireless plans.[30]  MetroPCS's Bundle Valuation Committee ("BVC") is responsible for applying this methodology.[31]  The March 2018 Memo, which I understand was previously provided in the matter, describes the methodology used by the BVC, and the application of that methodology in 2017 and part of 2018.  That methodology relied on indicators of the value in the market of each of the prepaid plan components.[32]

35.     While MetroPCS continued to use a methodology based on GAAP for the allocation of revenue amongst voice, text, and broadband data throughout 2017 and 2018, it revised the basis for its allocations in late 2018 to focus on the costs incurred by T-Mobile,

---

[24] September 2021 Order, pp. 6, 11.

[25] September 2021 Order, p. 7.

[26] September 2021 Order, p. 7.

[27] September 2021 Order, pp. 7–8.

[28] September 2021 Order, p. 7.

[29] September 2021 Order, p. 8.

[30] "MetroPCS's Bundle Allocation Methodology," Bundle Valuation Committee, March 9, 2018, MPCS000502–664 ("March 2018 Memo"), p. 2.

[31] March 2018 Memo, Appendix 1.

[32] March 2018 Memo, pp. 15–17.

MetroPCS's parent company, to support its voice, text, and broadband data services, as determined by the bandwidth (i.e., megabytes) on its network used to provide each of the components.[33]  The methodology used in late 2018 is explained in several documents, including an August 2, 2018 Memo regarding the BVC's determination of standalone selling price ("August 2, 2018 Memo").[34]

## VI.    GAAP

### A.    Objectives of GAAP

36.    Financial information produced under GAAP is intended to faithfully represent economic phenomena and be complete, neutral, and free from error. Logically, these qualities are also desirable in financial information used for other purposes, which explains the widespread use of GAAP in contracts (e.g., debt covenants, royalty agreements, and compensation agreements) and compliance-related undertakings.

37.    GAAP are promulgated by the Financial Accounting Standards Board and codified in the Accounting Standards Codification.  GAAP represent the authoritative accounting standards applicable to nongovernmental entities in the United States.[35] The FASB has also published Statements of Financial Accounting Concepts ("SFAC"), which, while not authoritative on their own, are used by the FASB as guidance in developing GAAP.[36] Concepts Statements describe the concepts and objectives that underlie accounting standards and general purpose financial reporting and are together referred to as the Conceptual Framework for Financial Reporting ("Framework").[37]  The Securities and Exchange Commission provides oversight of the FASB's activities to ensure that GAAP is suitable for use in financial reporting for the capital markets.[38]

38.    The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders,

---

[33] See, e.g., Memo from Revenue Accounting to Files, "Re: Bundle Valuation Committee (BVC) - Standalone Selling Price Determination," August 2, 2018 ("August 2, 2018 Memo"); T-Mobile, "BVC - SSP Framework Update.pptx," PowerPoint, August 16, 2018 ("August 16, 2018 PowerPoint"); Memo from Revenue Accounting to Files, "Re: Bundle Valuation Committee- Process for Updating Standalone Selling Prices (SSPs)," August 16, 2018 ("August 16, 2018 Memo"); Deloitte, "T-Mobile USA, Inc.: Revenue Allocation for Business, Accounting, and Tax Compliance and Reporting Purposes," November 30, 2018 ("Deloitte Report").

[34] August 2, 2018 Memo.

[35] ASC 105-10-05.

[36] ASC 105-10-05.

[37] Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting* ("SFAC 8").

[38] "Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter," SEC Release No 33-8221, FR-70.

and other creditors in making decisions about providing resources to the entity such as debt and equity.[39]  To meet that objective:

> General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims.[40]

39.     The Framework highlights two fundamental qualitative characteristics[41] of financial information that are necessary to achieve the objective of financial reporting—"[i]f financial information is to be useful, it must be relevant and faithfully represent what it purports to represent."[42]

40.     Information is relevant if it "is capable of making a difference in the decisions made by users."[43]

41.     Regarding the second fundamental characteristic, faithful representation, the Framework states that:

> QC12. Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. Of course, perfection is seldom, if ever, achievable. The Board's objective is to maximize those qualities to the extent possible.

> QC13. A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. For example, a complete depiction of a group of assets would include, at a minimum, a description of the nature of the assets in the group, a numerical depiction of all of the assets in the group, and a description of what the numerical depiction represents (for example, original cost, adjusted cost, or fair value). For some items, a complete depiction also may entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction.

> QC14. A neutral depiction is without bias in the selection or presentation of financial information. A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be

---

[39] SFAC 8, par. OB2.

[40] SFAC 8, par. OB12.

[41] SFAC 8, par. QC5.

[42] SFAC 8, par. QC4.

[43] SFAC 8, par. QC6.

received favorably or unfavorably by users. Neutral information does not mean information with no purpose or no influence on behavior. On the contrary, relevant financial information is, by definition, capable of making a difference in users' decisions.

QC15. Faithful representation does not mean accurate in all respects. Free from error means there are no errors or omissions in the description of the phenomenon, and the process used to produce the reported information has been selected and applied with no errors in the process. In this context, free from error does not mean perfectly accurate in all respects. For example, an estimate of an unobservable price or value cannot be determined to be accurate or inaccurate. However, a representation of that estimate can be faithful if the amount is described clearly and accurately as being an estimate, the nature and limitations of the estimating process are explained, and no errors have been made in selecting and applying an appropriate process for developing the estimate.[44]

### B.      GAAP Guidance on Allocation of Revenue

42.      One issue that arises in the recognition of revenue under GAAP is how to allocate revenue amongst components of a contract that requires the vendor to provide more than one good or service to the customer for a single stated fee.  This is particularly important when the goods or services are provided to the customer at different times.

43.      During the Relevant Period, the FASB largely replaced previously existing GAAP on revenue recognition with new guidance.  In 2017, MetroPCS followed previous GAAP, which was codified in ASC 605, *Revenue Recognition.*  In 2018, MetroPCS followed the new guidance, codified in ASC 606, *Revenue from Contracts with Customers.*[45]  While the new guidance changed the way many issues in revenue recognition were dealt with, the principles and guidance related to the allocation of revenue amongst components of a contract requiring the provision of multiple goods and services remained largely consistent.

44.      In most cases, the guidance requires that the fee in an arrangement with multiple components be allocated to each component pro rata based on the relative values of the components.  The components are referred to in ASC 605 as either deliverables or units of accounting and are referred to in ASC 606 as either performance obligations or promised goods or services.[46]

45.      To facilitate the allocation, the guidance in both ASC 605 and 606 provides that the value of each component should be assessed based on the price that component would be sold for if it were sold on its own.[47]  These values are referred to as standalone selling prices.

---

[44] SFAC 8, pars. QC12–QC15.

[45] March 2018 Memo, p. 3.

[46] ASC 605-25; ASC 606-10-32.

[47] ASC 605-25; ASC 606-10-32-29.  In some cases, the various components in a contract could not reasonably be sold on their own because the components work together.  In those situations, GAAP generally provides that the

### B.1.    *Allocation Objective*

46.    Consistent with the objective of GAAP discussed above, the goal of the revenue allocation guidance in ASC 605 and 606 is to allocate revenue amongst items in a way that reflects the economics of the transaction.

47.    Specifically, ASC 605-25, *Revenue Recognition--Multiple-Element Arrangements*, addressed "...how to determine whether an arrangement involving multiple deliverables contains more than one unit of accounting, and how arrangement consideration should be measured and allocated to the separate units of accounting in the arrangement."[48]

48.    ASC 606 explains the objective of allocating the price as follows:

The objective when allocating the transaction price is for an entity to allocate the transaction price to each performance obligation (or distinct good or service) in an amount that depicts the amount of consideration to which the entity expects to be entitled in exchange for transferring the promised goods or services to the customer.[49]

49.    Thus, the objective of the allocation is to determine how much of the transaction price – the actual amount received or to be received by the seller – is attributable to each component.

### B.2.    *Relative Selling Price Method*

50.    The method used to allocate revenue amongst components is generally referred to as the "relative selling price method," and its underlying principle is to allocate revenue pro rata based upon the values of the components.  Thus, for example, a component whose value to the customer is 60% of the total value of all components will be allocated 60% of the transaction price.

51.    ASC 605-25 explained the principle as follows:

Arrangement consideration shall be allocated at the inception of the arrangement to all deliverables on the basis of their relative selling price (the relative selling price method)....[50]

52.    ASC 605-25 included several examples illustrating the application of the relative selling price method, the first of which involved wireless phone service:

---

components should be accounted for together, as a single unit of account, rather than separately.  Because MetroPCS is required, in this situation, to separate its voice revenues (and specifically California intrastate voice revenues) from other revenues, this report does not address the guidance that sometimes prohibits allocation of revenues amongst components for financial reporting purposes.

[48] ASC 605-25-05-1.

[49] ASC 606-10-32-28.

[50] ASC 605-25-30-2.

**605-25-55-9**   CellularCo runs a promotion in which new customers who sign a two-year contract receive a free phone. There is a one-time activation fee of $50 and a monthly fee of $40 for the ongoing service. The same monthly fee is charged by CellularCo regardless of whether a free phone is provided. The phone costs CellularCo $100. Further, assume that CellularCo frequently sells the phone separately for $120.

**605-25-55-12**   The total arrangement consideration is $1,010. The selling price of the phone service is $960 ($40 × 24 months), the price charged by CellularCo when sold separately. The selling price of the phone is $120, the price of the phone when sold separately by CellularCo. Without considering whether any portion of the amount allocable to the phone is contingent upon CellularCo's providing the phone service, CellularCo would allocate the arrangement consideration on a relative selling price basis as follows: $112.22 [$1,010 x ($120 ÷ [$120 + $960])] to the phone and $897.78 [$1,010 × ($960 ÷ [$120 + $960])] to the phone service.[51]

53.     ASC 606 includes similar language regarding the relative selling price method:

To meet the allocation objective, an entity shall allocate the transaction price to each performance obligation identified in the contract on a relative standalone selling price basis in accordance with paragraphs 606-10-32-31 through 32-35, except as specified in paragraphs 606-10-32-36 through 32-38 (for allocating discounts)....[52]

A customer receives a discount for purchasing a bundle of goods or services if the sum of the standalone selling prices of those promised goods or services in the contract exceeds the promised consideration in a contract. Except when an entity has observable evidence in accordance with paragraph 606-10-32-37 that the entire discount relates to only one or more, but not all, performance obligations in a contract, the entity shall allocate a discount proportionately to all performance obligations in the contract. The proportionate allocation of the discount in those circumstances is a consequence of the entity allocating the transaction price to each performance obligation on the basis of the relative standalone selling prices of the underlying distinct goods or services.[53]

54.     Allocating any discount pro rata to each of the items in the contract based on their standalone values was determined to be the best method of allocation in large part because it is neutral and objective.  The Basis for Conclusions to Accounting Standards Update No. 2014-09, which added ASC 606 to GAAP, states that the FASB and its international counterpart (the International Accounting Standards Board), "… noted that allocating the transaction price on a relative standalone selling price basis brings rigor and discipline to the process of allocating the transaction price and, therefore, enhances comparability both within an entity and across entities.

---

[51] ASC 605-25-5; ASC 605-25-55-12.

[52] ASC 606-10-32-29.

[53] ASC 606-10-32-36.

Consequently, the Boards decided that the relative selling price method should be the default method for allocating the transaction price."[54]

55.    Both ASC 605 and ASC 606 specify that contractually stated prices for individual items should not be presumed to represent an appropriate basis for allocating revenue.[55]  This is because the buyer and seller in an agreement might not care whether separately stated prices reasonably reflect the values of the individual items, as they would focus on the overall economics of the contract.

56.    Any allocation method other than one based on relative values or stated prices would have necessitated guidance on how to determine which item should be allocated more or less than its relative value.  For example, prior to 2009, there were situations in which GAAP required discounts in an arrangement be allocated to the first item to be delivered.  However, the FASB changed that guidance because, by incorporating a bias towards recognizing revenue slowly, it did not meet the objective of neutrality.[56]

### B.3.      *Standalone Selling Prices*

57.    While the relative selling price method of allocating revenue to components is mechanical in part, it does not obviate the need for judgment.  This is because the allocation requires, as inputs, the standalone selling prices of each of the components, and those prices may not be directly observable if, as is often the case, one or more of the components is not regularly sold separately.[57]  In those cases, judgment is required to estimate the standalone selling price of each item that is not sold separately.  While worded differently, both ASC 605 and ASC 606 provide that the selling prices used in applying the relative selling price method should be determined using the most objective evidence available of the price at which each individual item would be sold if it were sold on its own.

58.    ASC 605-25's guidance included a hierarchy of evidence based on the level of objectivity that evidence could provide in regards to the standalone selling price.

---

[54] Accounting Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, May 2014 ("ASU 2014-09"), par. BC280.  Although many commenters on the proposal that led to ASC 606 suggested other methods of allocating the transaction price to individual items, the FASB and IASB only agreed to prescribe an alternative allocation if it could be objectively supported because:

a.  The entity regularly sells each item in the contract on a standalone basis;

b.  The entity also regularly sells a bundle of some of those items at a discount to the standalone selling prices of the goods or services in each bundle, and

c.  The discount attributable the bundle described in (b) is substantially the same as the discount in the contract, and an analysis of the goods or services in each bundle provides observable evidence of the items to which the entire discount in the contract belongs.  ASC 606-10-32-37.

[55] ASC 605-25-30-7; ASC 606-10-32-32.

[56] Accounting Standards Update No. 2009-13, *Revenue Recognition (Topic 605)*, *Multiple-Deliverable Revenue Arrangements, October 2009*, pp. 1, 2, 4.

[57] ASU 2014-09, pp. 4–5.

When applying the relative selling price method, the selling price for each deliverable shall be determined using vendor-specific objective evidence of selling price, if it exists; otherwise, third-party evidence of selling price ... If neither vendor-specific objective evidence nor third-party evidence of selling price exists for a deliverable, the vendor shall use its best estimate of the selling price for that deliverable … when applying the relative selling price method.

*****

**605-25-30-6A**   Vendor-specific objective evidence of selling price is limited to either of the following:

a.  The price charged for a deliverable when it is sold separately

b.  For a deliverable not yet being sold separately, the price established by management having the relevant authority (it must be probable that the price, once established, will not change before the separate introduction of the deliverable into the marketplace).

**605-25-30-6B**   Third-party evidence of selling price is the price of the vendor's or any competitor's largely interchangeable products or services in standalone sales to similarly situated customers.

**605-25-30-6C**   The vendor's best estimate of selling price shall be consistent with the objective of determining vendor-specific objective evidence of selling price for the deliverable; that is, the price at which the vendor would transact if the deliverable were sold by the vendor regularly on a standalone basis. The vendor shall consider market conditions as well as entity-specific factors when estimating the selling price.[58]

59.     ASC 606 does not include the specific hierarchy, but otherwise has similar guidance regarding how to determine standalone selling prices:

**606-10-32-32**   The standalone selling price is the price at which an entity would sell a promised good or service separately to a customer. The best evidence of a standalone selling price is the observable price of a good or service when the entity sells that good or service separately in similar circumstances and to similar customers. A contractually stated price or a list price for a good or service may be (but shall not be presumed to be) the standalone selling price of that good or service.

**606-10-32-33**   If a standalone selling price is not directly observable, an entity shall estimate the standalone selling price at an amount that would result in the allocation of the transaction price meeting the allocation objective in paragraph 606-10-32-28. When estimating a standalone selling price, an entity shall consider all information (including market conditions, entity-specific factors, and information about the customer or class of customer) that is reasonably available to the entity. In doing so, an entity shall maximize

---

[58] ASC 605-25-30-2; ASC 605-25-30-6A, 6B, 6C.

the use of observable inputs and apply estimation methods consistently in similar circumstances.

**606-10-32-34**   Suitable methods for estimating the standalone selling price of a good or service include, but are not limited to, the following:

a.  Adjusted market assessment approach—An entity could evaluate the market in which it sells goods or services and estimate the price that a customer in that market would be willing to pay for those goods or services. That approach also might include referring to prices from the entity's competitors for similar goods or services and adjusting those prices as necessary to reflect the entity's costs and margins.

b.  Expected cost plus a margin approach—An entity could forecast its expected costs of satisfying a performance obligation and then add an appropriate margin for that good or service.

c.  Residual approach—An entity may estimate the standalone selling price by reference to the total transaction price less the sum of the observable standalone selling prices of other goods or services promised in the contract. However, an entity may use a residual approach to estimate, in accordance with paragraph 606-10-32-33, the standalone selling price of a good or service only if one of the following criteria is met:

> 1.  The entity sells the same good or service to different customers (at or near the same time) for a broad range of amounts (that is, the selling price is highly variable because a representative standalone selling price is not discernible from past transactions or other observable evidence).
>
> 2.  The entity has not yet established a price for that good or service, and the good or service has not previously been sold on a standalone basis (that is, the selling price is uncertain).[59]

60.     To summarize:  If the vendor actually sells the item in question on a standalone basis, the price in those actual standalone sales would provide the appropriate pricing benchmark.  If not, the vendor then looks to other evidence to determine what the item would be sold for if it were sold on its own.  In some cases, the price charged by a competitor that sells a functionally identical item could be the best proxy for the price the vendor would charge.  In the absence of such objective evidence from its own or competitors' standalone sales of an item, the vendor determines its best estimate of the standalone selling price, taking into account all available evidence.

---

[59] ASC 606-10-32-32, 33, 34.

## VII.   ANALYSIS OF METROPCS'S METHODOLOGY IN 2017 AND JANUARY-AUGUST OF 2018

61.     MetroPCS used a methodology based on GAAP for the allocation of revenues amongst voice (and other telecommunications services), text messaging, and broadband data.[60] As noted above, MetroPCS's BVC is responsible for applying this methodology.[61]  The function and operation of the BVC is explained in the March 2018 Memo and the BVC Charter, which is attached as Appendix 1 to the March 2018 Memo.  The BVC includes members from the marketing, revenue accounting, and tax functions.[62]  The March 2018 Memo also explains the methodology used by the BVC to determine how to allocate revenue amongst components in 2017 and January through August 2018.[63]

62.     This section of my report summarizes and considers the decisions made by MetroPCS, as explained in the March 2018 Memo.  For each of the key determinations or judgments, I explain how that decision is consistent with GAAP.  Below, I address the following key decisions explained in the March 2018 Memo:

   A.  Identification of the deliverable/services for which standalone selling prices would be determined

   B.  Standalone selling price:  Voice and Text

   C.  Standalone selling price:  Data (including 2G/3G and 4G data)[64]

   D.  Application of the relative selling price method

63.     As discussed in the March 2018 Memo, the BVC utilizes guidance in GAAP to allocate revenue among the components of a bundle.[65]  Because MetroPCS's prepaid wireless bundles do not include contractual commitments greater than a month, all revenue from a prepaid wireless plan will be recognized over the month of service, regardless of how that revenue is allocated amongst components.  Further, there is no requirement in GAAP to separately report amounts related to different components in the financial statements.  Therefore, MetroPCS did not need to allocate revenue from its prepaid wireless bundles amongst the

---

[60] March 2018 Memo, p. 2.

[61] March 2018 Memo, Appendix 1.

[62] March 2018 Memo, Appendix 1.

[63] March 2018 Memo.

[64] "4G" broadly refers to the fourth generation of mobile telecommunications technology, which allows for faster data transmission speeds than "2G" (second generation) or "3G" (third generation) technology.  "LTE" stands for "Long-Term Evolution," a particular technology that provides 4G.

[65] March 2018 Memo, p. 2.

components of those bundles in order to correctly prepare its financial statements.[66] Nonetheless, the use of GAAP guidance to perform the allocation necessary to determine the revenue base for payment of fees, such as the surcharges collected from customers and remitted to the CPUC pursuant to the Prepaid Act, ensures the allocation is performed in a neutral and unbiased manner.

### A.      Identification of Deliverables/Services

64.      The first step necessary for MetroPCS to allocate the transaction price of its prepaid wireless bundles amongst components is to determine the individual items for which the standalone selling prices need to be estimated.  As described in the March 2018 Memo, the BVC identified the following individual deliverables (or services) that make up its most common plans:[67]

    i.   Unlimited voice and ancillary telecommunications services such as call-forwarding ("Voice");

    ii.  Unlimited text messaging ("Text");

    iii. Unlimited 2G and 3G data service ("2G/3G Data"); and

    iv.  One gigabyte ("GB") of 4G LTE data service ("4G Data").

65.      The BVC determined that it should estimate the standalone selling price for each of the above items (or "building blocks") and then apply the relative selling price method to each prepaid wireless bundle based on which (and how many) of the building blocks were included in that plan.[68]

66.      The BVC further decided the standalone selling prices of Voice, Text, and 2G/3G Data need only be determined on an unlimited basis, which is both logical and reasonable because MetroPCS did not, during the Relevant Period, sell plans that included limited amounts of Voice, Text, or 2G/3G Data.  While selling Voice, Text, and 2G/3G Data on a limited basis (e.g., an allowance of a specific number of voice minutes per month or specified number of text messages) was, of course, technologically possible, such plans were not common in the market at the time, and MetroPCS did not offer any plans with limited monthly amounts of any of those services.[69]

---

[66] March 2018 Memo, p. 9. Although not necessary to prepare its financial statements, MetroPCS maintained separate general ledger accounts in its accounting system for voice, text and data components, using the same allocation methodology.

[67] March 2018 Memo, p. 7.

[68] March 2018 Memo, p. 14.

[69] March 2018 Memo, p. 9.  The wireless industry generally phased out plans with limited voice and text services prior to 2017.  See, e.g., *The Evolution of voice, messaging, and data pricing splits,* presentation dated October 2016 by Current Analysis Group.

67.     As a result, there would not be a need for a standalone selling price of limited amounts of Voice, Text, or 2G/3G Data as an input to the relative selling price method.  Deriving a standalone selling price for a non-existent and theoretical limited service and then building on that notional figure to determine the standalone selling price for greater (or unlimited) amounts of Voice or Text would make the process of estimating the standalone selling prices for the Voice and Text plans that are actually sold needlessly complex and further from market realities. MetroPCS's approach thus reflected the economic reality of the services actually provided.

68.     MetroPCS's decision to instead develop standalone selling prices only for unlimited Voice, Text, and 2G/3G Data is thus reasonable and consistent with GAAP.  As stated directly in ASC 606, and consistent with the principles of ASC 605-25, in developing a best estimate of standalone selling price, entities should maximize the use of observable information.[70]  MetroPCS had more observable information regarding the pricing of unlimited Voice, Text, and 2G/3G Data than limited amounts.

69.     While MetroPCS did not sell Voice, Text, and 2G/3G Data services in limited increments, it did sell prepaid wireless plans including various limited amounts of 4G Data, as well as plans that included unlimited 4G Data.  For prepaid plans sold to customers in 2017, for example, MetroPCS needed to allocate revenue for plans including 1, 2, 3, 5, 6, and 8 GBs of 4G Data, as well as unlimited 4G Data.[71]  However, as each GB of 4G Data access is the same as each other GB of 4G Data, the BVC appropriately and reasonably determined that various quantities of 4G Data did not constitute different "deliverables" (as the term is used in ASC 605) or different "promised services" (as the phrase is used in ASC 606), but instead constituted different quantities of the same item.  That is, 2GB of 4G Data is not a different promised service than 1GB of 4G Data – it is simply delivering 1GB of such data twice.  Therefore, with respect to 4G Data, the BVC needed only to determine the standalone selling price of 1GB of 4G Data and then include the appropriate quantity of that "building block" in its allocation for each plan.[72]

70.     While the result is that only 4G Data was priced based upon the quantity of the service included in the plan, this is consistent with the way the various components were actually sold by MetroPCS, and therefore is appropriate and consistent with GAAP.  Again, it reflects the economic realities of the products sold.  The only additional judgment the BVC needed to make in this regard is how to estimate the amount of 4G Data to be provided in plans including such data on an unlimited basis.  Based on the March 2018 Memo and as reflected in contemporaneous documents, that determination was made based on MetroPCS customers' actual usage data that indicated that, on average, approximately 14GB of 4G data was consumed by users with plans including such unlimited data.[73]  Looking to historical usage data is a reasonable basis on which to estimate the amount of 4G Data to be provided.

---

[70] ASC 606-10-32-33; ASC 605-25-30-2.

[71] Second Barnes Declaration, Exhibit C.

[72] March 2018 Memo, p. 17.

[73] March 2018 Memo, p. 21.  See e.g. Unit Economics August 2017 (Unit Economics_201709).xlsx, Tab "Metro by Rate Plan."

**B.      Standalone Selling Price: Voice and Text**

71.     To estimate standalone selling prices of the four building blocks, MetroPCS first considered whether it sold the items on a standalone basis.  If so, that would constitute vendor-specific objective evidence ("VSOE") under ASC 605 or an "observable price" under ASC 606.[74]  The March 2018 Memo indicates that MetroPCS did not sell Voice, Text, 2G/3G Data, or 4G Data on a standalone basis to cellphone customers.[75]

72.      Next, the BVC considered whether there was third-party evidence of selling prices as defined in ASC 605-25-30-6B (hereinafter referred to as "TPE") of any of the components on a standalone basis.  In practice, it was rare under ASC 605-25 for TPE to be used in determining standalone selling prices.  The FASB noted, in the Basis for Conclusions for Accounting Standards Update 2014-09, that TPE was not a particularly useful part of the hierarchy, explaining that:

> …there is little distinction between third-party evidence and a best estimate of a selling price. For instance, third-party evidence of a selling price might require adjustments to reflect differences in either (a) the good or service (because the third-party price could be for a similar, rather than an identical, good or service) or (b) pricing strategies between the third party and the entity.[76]

73.     The reason that TPE was infrequently the evidence of standalone selling prices is because the definition requires that the product or service sold by the third party be "largely interchangeable."[77]  In practice, that has been understood to be a high hurdle to overcome.  For instance, owing to the fact that cellular networks provide different levels of coverage in different places, it is not clear that service, even if it otherwise offered the same features and was targeted to the same customers, would be largely interchangeable.  The March 2018 Memo notes the differences in networks, targeted customers, and brands as reasons that competitive pricing does not rise to the level of TPE of standalone selling prices.[78]

74.     Without objective evidence from standalone sales or third-party evidence of pricing of "largely interchangeable" sales, the BVC then considered how to develop a best estimate of the standalone selling price of each of the four items identified above.  In doing so, the BVC appropriately looked to information about actual transactions that, while not sufficient to constitute VSOE or TPE, nonetheless was informative as to what the selling price of each item would have been had the item been sold on a standalone basis.[79] This is consistent with the direction in ASC 606 that "[w]hen estimating a standalone selling price, an entity shall consider all information (including market conditions, entity-specific factors, and information about the

---

[74] ASC 605-25-30-2; ASC 606-10-32-32.

[75] March 2018 Memo, pp. 16–17.

[76] ASU 2014-09, p. 591.

[77] ASC 605-25-30-6B.

[78] March 2018 Memo, p. 11.

[79] March 2018 Memo, p. 12.

customer or class of customer) that is reasonably available to the entity"[80] as well as ASC 605-25's guidance that "[t]he vendor shall consider market conditions as well as entity-specific factors when estimating the selling price."[81]

75.    While MetroPCS did not (and still does not) sell Voice or Text separately, it did, during the Relevant Period, sell a combined Voice/Text plan (with no 4G Data) for $25, providing objective evidence of a standalone selling price of the bundle of those two items.[82]  As acknowledged in both ASC 605-25 and ASC 606, customers often receive discounts for purchasing multiple items.[83]  Therefore, it is necessary to consider whether embedded in the Voice/Text pricing is a discount for purchasing two items at once.  For example, it could be that the standalone selling prices of Voice and Text, when added together, would be $30, but the customer purchasing Voice/Text gets a discount.  However, the BVC noted that, in fact, it does not believe there is any demand in the market for "Voice" or "Text" without the other.[84]  Thus, there is no reason to believe that there would be a discount for purchasing them together.  In essence, from a market point of view, Voice and Text are not actually separate deliverables because the market does not purchase them separately.  As such, the conclusion that the sum of the standalone selling prices of Voice and Text is $25 is reasonable and consistent with GAAP.[85]

### C.    Standalone Selling Price: Data

76.    As noted above, MetroPCS first considered whether it sold the items on a standalone basis.  If so, that would constitute VSOE under ASC 605 or an "observable price" under ASC 606.  The March 2018 Memo notes that MetroPCS did not sell any of Voice, Text, 2G/3G, or 4G Data on a standalone basis to cellphone customers.

77.    Next, the BVC analyzed whether there was TPE of selling prices of 2G/3G or 4G Data.  As noted above, in practice, it was rare under ASC 605-25 for TPE to be used in determining stand-alone selling prices.  Consistent with the determination regarding Voice and Text, the March 2018 Memo notes differences in networks, targeted customers, and brands as reasons that competitive pricing does not rise to the level of TPE of standalone selling prices for 2G/3G and 4G Data.[86]

---

[80] ASC 606-10-32-33.

[81] ASC 605-25-30-6C.

[82] March 2018 Memo, p. 16.

[83] ASC 605-25-55-44; ASC 606-10-32-6.

[84] March 2018 Memo, p. 16.

[85] The March 2018 Memo states that the allocation between Voice ($20) and Text ($5) is based on data on historical demand.  That would be a reasonable method on which to base the allocation. (Yellow highlighted material in this Report denotes information designated as "Highly Confidential – Attorneys' Eyes Only" under the Protective Order in this case.)  However, for purposes of determining whether the intrastate factors mandated by the CPUC Resolutions result in assessment of the CPUC surcharge on broadband data, it is sufficient to conclude that the sum of the standalone selling prices of Voice and Text is $25.

[86] March 2018 Memo, p. 11.

78.     Without objective evidence from standalone sales or third-party evidence of pricing of "largely interchangeable" sales, the BVC then considered how to develop a best estimate of the standalone selling price of 2G/3G and 4G Data.  As with Voice and Text, the BVC appropriately analyzed information about actual transactions that, while not sufficient to constitute VSOE or third-party evidence (as defined in ASC 605-25-30-6B, discussed above), nonetheless was informative as to what the selling price of each item would have been, had the item been sold on a standalone basis.  This is, again, consistent with the direction in ASC 606 that "[w]hen estimating a standalone selling price, an entity shall consider all information (including market conditions, entity-specific factors, and information about the customer or class of customer) that is reasonably available to the entity,"[87] as well as ASC 605-25's guidance stating "[t]he vendor shall consider market conditions as well as entity-specific factors when estimating the selling price."[88]

79.     The determination of the best estimate of selling price of 2G/3G Data and 4G Data was established by reference to prices paid by subscribers who optionally purchased such services as add-ons to existing voice and text plans.  Specifically, the March 2018 Memo notes that:

> MetroPCS sells a 1GB data "top-up" for $5 for customers who exceed their 4G LTE allotment in a service cycle, but do not want to upgrade on an ongoing basis to a more expensive monthly service plan. Second, before MetroPCS launched its 4G LTE service, it charged $5 for a standalone add-on of unlimited Internet access (at lower, pre-LTE speeds). Together, this is strong evidence both that the Standalone Selling Price for basic Internet access is $5, and that the Standalone Selling Price of high-speed 4G LTE data is $5 per GB.[89]

80.     These optional purchases are not true standalone sales because in order to have the opportunity to purchase these add-ons, a subscriber must have already been a Voice and Text subscriber.[90]  Nonetheless, the transactions provide evidence of amounts that were charged in transactions involving a separate buying decision by the customer, and such information may reasonably provide an indication of what the pricing in a standalone transaction would be.

81.     The March 2018 Memo also shows that the BVC considered information about prices charged for increments of 4G Data in standalone transactions between MetroPCS and customers with tablets, and prices charged by competitors for increments of high-speed data above what is in the customer's prepaid wireless plan.  This alternative data suggests pricing

---

[87] ASC 606-10-32-33; see also paragraph 59 above.

[88] ASC 605-25-30-6C; see also paragraph 58 above.

[89] March 2018 Memo, p. 17.

[90] A standalone sale that would constitute VSOE or "objective evidence" of a standalone selling price is one in which the transaction with the customer includes only the specific good or service being considered.  While MetroPCS customers who subscribed to a prepaid wireless plan could make a separate decision to buy 1GB of 4G Data, those transactions could only take place with customers who were at the time purchasing other services (Voice, Text, and 2G/3G Data) from MetroPCS.

between $5 and $10 per GB of high-speed data.[91]  Of particular interest is the price charged by MetroPCS for data-only plans for tablet users.[92]  The sale of data to a tablet user is a true standalone transaction, as the tablet user would not be required to purchase voice and/or text services in order to obtain the ability to purchase 4G Data.  Looking to this information would yield a standalone selling price for data of $7.50 per GB, in excess of the amount MetroPCS charges for its "top-up" data to those who exceed the data amounts included in their monthly plans.[93]  As such, MetroPCS's assessment of the standalone selling price of $5 might be considered to be conservative in terms of the value assigned to 4G Data.  The March 2018 Memo acknowledges this and explains that "[a]lthough … certain competitors' pricing could support assigning higher values to 1 GB of high-speed data, MetroPCS's estimate of $5 reflects its own network and the cost-conscious customers that it serves."[94]  Given the various data points available, the BVC's estimated standalone selling price of $5 for 1GB of 4G Data is reasonable.

### D.    Application of the Relative Selling Price Method

82.    While the determination of best estimates of selling prices involves judgment (as described above), once those estimates for each component of a prepaid wireless plan have been determined, allocating revenue for the various prepaid wireless plans MetroPCS sold (e.g., unlimited data, 8GB, 6GB, 5GB, 3GB, 2GB, 1GB) is then a straightforward mathematical process.  Simply put, the process involves aggregating the standalone selling prices of each building block included in a prepaid wireless plan and then allocating the actual price charged to each component based on that component's relative portion of the aggregate of the standalone selling prices.[95]

83.    The March 2018 Memo includes several examples of the BVC's application of the relative selling price method, using the standalone selling price described above.  For example, the March 2018 Memo shows, graphically, the standalone selling prices for a prepaid wireless bundle including unlimited Voice, Text, 2G/3G Data, and 3GB of 4G Data:[96]

---

[91] March 2018 Memo, p. 17.

[92] While quantities of 4G Data were sold to users of tablets in true standalone transactions, the BVC reasonably concluded that tablet users represented a different class of customer, given the different capabilities of tablets as compared to phones.  This is consistent with guidance in GAAP that describes VSOE and observable prices.  For example, ASC 606-10-32-32 indicates that "the best evidence of a standalone selling price is the observable price of a good or service when the entity sells that good or service separately in similar circumstances and to similar customers."

[93] March 2018 Memo, p. 17.

[94] March 2018 Memo, p. 18.

[95] March 2018 Memo, p. 14.

[96] March 2018 Memo, p. 20.

[START HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]



[END HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]

84.     The March 2018 Memo then explains that "…the BVC can determine the relative pricing for each major component – voice, text, and data – by simply dividing the Standalone Selling Price of the building block by the total of the plan components' Standalone Selling Prices. So for the GSMMU40 plan, the $20 voice component represents 44.45% [$20/$45], the $5 text messaging component is 11.1% [$5/$45], and the $20 data component is 44.45% [$20/$45]."[97] These percentages are then applied to the actual selling price of each prepaid wireless bundle, resulting in an allocation of the actual selling price based upon the relative standalone selling prices.  For example, if the GSMMU40 plan were sold to a customer for $40, the allocation would be $17.78 to voice (44.45% of $40), $4.44 to text (11.1% of $40), and $17.78 to data (44.45% of $40).[98]

85.     Similarly, the March 2018 Memo shows, graphically, the standalone selling prices for a prepaid wireless bundle including unlimited Voice, Text, and 4G Data (using, as discussed previously, an estimate of 14GB of usage for unlimited 4G Data):[99]

[START HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]



[END HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]

---

[97] March 2018 Memo, p. 20.

[98] March 2018 Memo, p. 23.

[99] March 2018 Memo, p. 21.

86.     Thus, for that plan, MetroPCS allocated 75% of a bundle's price to Data (2G/3G and unlimited 4G); 20% to voice; and 5% to text.  For a plan sold for $60, the result of the relative selling price method would be $45 for Data (75% of $60), $12 for Voice (20% of $60), and $3 for Text (5% of $60).[100]  This is consistent with the relative selling price approach specified by ASC 605 and ASC 606.[101]

87.     As described in the March 2018 Memo, the application of the relative selling price method to the determined standalone selling prices is mechanical, rigorous, objective and neutral.  This is consistent with GAAP and reflects the principles employed in ASC 605-25 and ASC 606.

## VIII.   ANALYSIS OF METROPCS'S METHODOLOGY FROM SEPTEMBER-DECEMBER OF 2018

88.     Throughout 2017 and 2018, MetroPCS's BVC continued to meet regularly, as discussed in the March 2018 Memo, to consider changes to the bundle allocations, taking into account evolving circumstances (including new pricing and cost data) in the market.[102]  In addition, MetroPCS (and its parent company, T-Mobile) continually gathered information about changes in the market and demand for wireless services and its own costs of providing various services.[103]  These efforts and discussions led MetroPCS to change its process for determining standalone selling prices beginning August 31, 2018 (with new allocations reflected in MetroPCS's accounting and tax systems as of September 1, 2018).  As a result, for the remainder of 2018, MetroPCS estimated standalone selling prices based on its incurred costs of providing each service.[104]

89.     The August 2, 2018 Memo describes various "significant changes" that motivated the company's revised process, including the fact that "[d]ata consumption is increasing at a rapid rate in contrast to voice and text" and "the network is primarily for the provision of data services."[105]  MetroPCS has explained that, in 2017 for example, its parent company T-Mobile made significant and increasing investments in the T-Mobile/MetroPCS network, primarily driven by the goal of increasing broadband speed and capacity to meet surging consumer demand

---

[100] March 2018 Memo, p. 23.

[101] For example, it is consistent with the illustration in ASC 605-25-55-9 of wireless carrier "CellularCo."; see also paragraph 52 above.

[102] See, e.g., T-Mobile, "Q2 2017 BVC Formal Meeting Update," June 16, 2017; T-Mobile, "Q4 2017 BVC Formal Meeting Update," December 19, 2017; T-Mobile, "Q1 2018 BVC Formal Meeting Update," March 19, 2018; T-Mobile, "Q3 2018 BVC Meeting," September 24, 2018.

[103] Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," January 2017; Deloitte Report.

[104] See, e.g., August 2, 2018 Memo; August 16, 2018 PowerPoint; August 16, 2018 Memo.

[105] August 2, 2018 Memo, p. 1.  Similarly, the August 16, 2018 PowerPoint deck notes that one of the reasons for the change of approach was that "customers are consuming higher proportions of data." August 16, 2018 PowerPoint, Slide 5.

for that service.[106] Accordingly, it made sense for the BVC to move toward an approach that focused more on these network costs.[107]  In explaining its revised approach, the BVC also noted that demand for plans including only Voice and Text (an important component of the building block approach) was further diminishing, making those plans a less effective indicator of standalone selling price of prepaid wireless plans that included 4G Data.[108]

90.     While this discussion is not meant to be all-inclusive, ASC 606 (the applicable GAAP for revenue recognition in 2018 when MetroPCS changed its approach) explains several methods that may be appropriate for estimating the standalone selling price of a good or service:

a.  Adjusted market assessment approach—An entity could evaluate the market in which it sells goods or services and estimate the price that a customer in that market would be willing to pay for those goods or services. That approach also might include referring to prices from the entity's competitors for similar goods or services and adjusting those prices as necessary to reflect the entity's costs and margins.

b.  Expected cost plus a margin approach—An entity could forecast its expected costs of satisfying a performance obligation and then add an appropriate margin for that good or service.

c.  Residual approach—An entity may estimate the standalone selling price by reference to the total transaction price less the sum of the observable standalone selling prices of other goods or services promised in the contract. However, an entity may use a residual

---

[106] See, e.g., *Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of the Licenses and Authorizations*, FCC WT Docket No. 18-197, Description of Transaction, Public Interest Statement, and Related Demonstrations, Appx. G, Declaration of Dr. David Evans p. 87 (Table 15 (T-Mobile Wireless Capital Expenditures and Investment Activity) & Ex. 13 (T-Mobile Wireless Capital Expenditures and Investment Activity) (filed June 18, 2018), *available at* https://ecfsapi.fcc.gov/file/10618281006240/Public%20Interest%20Statement%20and%20Appendices%20A-J%20(Public%20Redacted)%20.pdf.  The figures for T-Mobile's capital expenditures in 2016 and 2017 included in Ex. 13 do not include the $8 billion T-Mobile expended on spectrum licenses during those periods in connection with the FCC's spectrum auction. See T-Mobile 2017 Form 10-K at 77, available at https://www.sec.gov/Archives/edgar/data/0001283699/000128369918000011/tmus12312017form10-k.htm#sE345D8833D5E54348859808E2AF2A864.  As explained by the FCC, the purpose of the auction was to help meet increasing demand for mobile broadband and video services.  See FCC Announces Results of World's First Broadcast Incentive Auction available at https://www.fcc.gov/document/fcc-announces-results-worlds-first-broadcast-incentive-auction-0.

[107] See, e.g., Deloitte Report, pp. 15–16 ("The exponential increase in demand [for] data compared to the relatively stagnant changes in voice and text service has resulted in significant infrastructure expenses – including updates to 4G compatible network equipment and investment in additional spectrum holdings – tied to offering the fastest data speeds possible….  With the current and forecasted growth in data demand, T-Mobile has recognized the need to implement a revenue allocation methodology that incorporates network usage and costs.").

[108] The August 16, 2018 PowerPoint deck notes that "[n]et adds per month [for Voice and Text plans] decreased from 10K a month to 9K a month" even "when [the] price was lowered from $25 to $20."  Thus, "[l]ow attach[ment] rates on $25/$20 talk & text plans provide weak evidence of standalone selling price."  August 16, 2018 PowerPoint, Slide 5.  Similarly, the August 2, 2018 Memo observes that "[t]he current voice and text plan, that drives much of the allocation, has a very low customer take rate."  August 2, 2018 Memo, p. 1.  Smartphone users—an increasingly important segment of the market—were not even eligible for the Voice and Text plans.

approach to estimate, in accordance with paragraph 606-10-32-33, the standalone selling price of a good or service only if one of the following criteria is met:

> 1.   The entity sells the same good or service to different customers (at or near the same time) for a broad range of amounts (that is, the selling price is highly variable because a representative standalone selling price is not discernible from past transactions or other observable evidence).

> 2.   The entity has not yet established a price for that good or service, and the good or service has not previously been sold on a standalone basis (that is, the selling price is uncertain).[109]

91.     Prior to August 31, 2018, as discussed in Section VII, MetroPCS's building block approach to estimating standalone selling prices was consistent with the "Adjusted market assessment approach"—method "a" above.  From September to December 2018, MetroPCS used the "Expected cost plus a margin approach"—method "b" above.  By August of 2018, for the reasons summarized above, MetroPCS had concluded that changes in the marketplace for wireless services indicated a cost plus margin approach would result in a better estimate of how services would be priced on a standalone basis if they were sold separately to the group of customers that purchased its prepaid wireless bundles.[110]

92.     The new approach to determining standalone selling prices is explained in the August 2, 2018 Memo.  As in the previous section, I analyze several key decisions related to MetroPCS's allocation methodology from September to December 2018.  For each of the key determinations or judgments, I explain how that decision is consistent with GAAP.  The key decisions I considered are:

A.   Explanation of the change in approach;

B.   Identification of deliverables/services;

C.   Standalone selling prices; and

D.   Application of the relative selling price method.

## A.     Change in Approach

93.     ASC 606 provides guidance on accounting for contracts with customers and is meant to be applied on a contract-by-contract basis.[111]  In other words, accounting for one contract with a customer does not affect the accounting for any other contract.  ASC 606 requires that the transaction price in a contract with a customer that provides for the delivery of multiple

---

[109] ASC 606-10-32-34.

[110] T-Mobile, "Q3 2018 BVC Meeting," September 24, 2018, p. 6; August 16, 2018 PowerPoint, Slide 5–6; August 2, 2018 Memo, p. 3.

[111] ASC 606-10-05-4(a).

goods and/or services be allocated at the inception of the contract.[112] Because MetroPCS's prepaid wireless plans do not include any commitments beyond the next month of service, each month's service represents a new contract with the customer.  Thus, proper application of GAAP requires MetroPCS to constantly consider whether its allocation methodology should be updated to reflect changes in circumstances.

94.     For example, Ernst & Young's guide to "Revenue from contracts with customers (ASC 606)" discusses the need to update estimates of standalone selling prices as follows:

Standalone selling prices are determined at contract inception and are not updated to reflect changes between contract inception and when performance is complete. However, an entity needs to update its estimates of standalone selling prices for future transactions to reflect changes in circumstances.

The standard does not directly address how frequently estimated standalone selling prices must be updated. Instead, it indicates that an entity must make this estimate for each distinct good or service underlying each performance obligation in a contract with a customer (suggesting constant updating). In practice, we expect that entities will be able to consider their facts and circumstances in order to determine how frequently they will need to update their estimates. For example, if the information used to estimate the standalone selling price for similar transactions has not changed, an entity may determine that it is reasonable to use the previously determined standalone selling price.

However, so that changes in circumstances are reflected in the estimate in a timely manner, we expect that an entity would formally update the estimate on a regular basis (e.g., quarterly, semiannually). The frequency of updates should be based on the facts and circumstances of the distinct good or service underlying each performance obligation for which the estimate is made. An entity should use current information each time it develops or updates its estimate, and the approach used to estimate standalone selling price should not change.[113]

95.     Consistent with Ernst & Young's recommendation, the BVC meets regularly (at least quarterly) to consider whether changes in circumstances warrant changes in the way

---

[112] ASC 606-10-32-31.

[113] Ernst & Young, "Financial Reporting Developments, A Comprehensive Guide: Revenue from Contracts with Customers (ASC 606)," Revised November 2020, available at https://assets.ey.com/content/dam/ey-sites/ey-com/en_us/topics/assurance/accountinglink/ey-frdbb3043-11-19-2020.pdf?download.  Each of the "Big 4" auditing firms has published a guide to the implementation of ASC 606 in order to help companies understand how to apply the principles in the standard in practice and provide views on frequently asked questions.  These guides are freely available and are widely consulted by companies seeking additional insight into ASC 606.

revenue is allocated amongst components of MetroPCS's prepaid wireless bundles.[114]  This consideration is, as noted above, consistent with the proper application of GAAP.

96.     As explained above, the BVC considered various factors that supported a change of approach to the "Expected cost plus a margin" approach.

97.     In early 2018, T-Mobile engaged Deloitte Advisory ("Deloitte") to conduct an analysis of "(1) customer usage of components on its network and (2) the cost to maintain/improve the network to support component traffic" based on calendar year 2017 information and data (the "Deloitte Study").[115]  The results of the Deloitte Study provided T-Mobile, and therefore MetroPCS, with allocations of costs of providing service amongst broadband data, voice and text.[116]  The Deloitte Study also contained information about how to convert broadband data, voice, and text traffic to a common underlying metric—megabytes ("MB") of bandwidth utilized.[117]  With this information, which it did not previously have, MetroPCS was able to determine a cost per MB of bandwidth used by voice, data, and text traffic on its network.[118]

98.     Reviewing data regarding usage by customers allowed MetroPCS to determine an average amount of bandwidth used by customers for each component and to stratify that data based on the plan the customer had purchased.  Applying the average usage for each component and the cost per MB of each component, MetroPCS was able to determine an estimated cost to provide each component of service for each of the prepaid wireless bundles.[119]

99.     This new information therefore made it possible for MetroPCS to apply the "Expected cost plus a margin approach" with rigor and objectivity for the first time.[120]

100.    While the "Adjusted market assessment approach" was previously considered to reflect the way services would be priced on a standalone basis if they were sold separately, the changes in the marketplace and the receipt of the Deloitte Study data caused the BVC to conclude that standalone selling prices would likely be determined based on costs of providing

---

[114] See, e.g., T-Mobile, "Q2 2017 BVC Formal Meeting Update," June 16, 2017; T-Mobile, "Q4 2017 BVC Formal Meeting Update," December 19, 2017; T-Mobile, "Q1 2018 BVC Formal Meeting Update," March 19, 2018; T-Mobile, "Q3 2018 BVC Meeting," September 24, 2018.

[115] Deloitte Report, p. 4.

[116] Deloitte Report, p. 25.  While the final report was dated November 30, 2018, T-Mobile had received data from the Deloitte Study at earlier dates.  Such data is referenced in the August 16, 2018 PowerPoint.

[117] Deloitte Report, pp. 17–19.

[118] August 16, 2018 PowerPoint, Slide 6.

[119] August 2, 2018 Memo, p. 3.

[120] Prior to the Deloitte Study, MetroPCS relied on information about market pricing, which was the best available data at the time, to estimate standalone selling prices for each bundle component.  See Section VII.B and VII.C above.

service if separate offerings were made in late 2018.  This change appears to be well-supported by new circumstances and information, and therefore is a reasonable application of GAAP.

### B.    Identification of Deliverables/Services

101.    Application of the cost–based approach resulted in a change in the way the "building blocks" were used in the estimation of standalone selling prices.  The BVC determined that standalone selling prices would be estimated by using, as a base, the direct cost of providing MBs of voice, text, and data service.  Applying markups to those costs to account for indirect expenses and profits would provide an estimate of standalone selling price per MB of service for each of voice, text, and data, and the standalone price of each component of a particular prepaid wireless plan could then be estimated based on the expected consumption of the voice, text, and data services included in the plan.[121]

102.    As noted above, the Deloitte Study provided the information necessary to establish a cost per MB of bandwidth used by each of voice, text, and data services.[122]  That cost per MB could then be used to establish a standalone selling price per MB for each item, which could then be used as inputs to the relative selling price methodology for each prepaid wireless plan using information about the expected usage of each service, thus tying the internal cost data to expected customer usage.[123]

### C.    Standalone Selling Prices

103.    After estimating the cost per MB of voice, text, and Data, respectively, MetroPCS then needed to translate those costs into standalone selling prices.  The first step in the BVC's process was to estimate the number of MBs of each service that would be used by customers purchasing each rate plan.  As the August 2, 2018 Memo notes, T-Mobile (including MetroPCS) individually tracks usage information by rate plan for voice, text, and Data, and that information can be converted to MBs (using the conversion factors used in the Deloitte Study).  Multiplying the number of MBs of each service expected to be used by the cost per MB for each service results in the expected cost to provide each component of a rate plan.[124]

104.    With the cost for each service estimated, the BVC needed to determine the "margin" to be used in the "Expected costs plus a margin" approach.  For example, a product that is assigned a 40% margin would be sold for 40% more than its cost.  If that product cost $10 for a company to make, the company would need to sell the product for $14 if it wanted to achieve a 40% margin.

105.    By late 2018, over 98% of MetroPCS customers had a prepaid wireless plan that included Voice, Text, and 4G data, and this was not expected to change, as customers with

---

[121] August 16, 2018 Memo, p. 2; August 2, 2018 Memo, p. 3.

[122] Deloitte Report, pp. 17–19.

[123] August 16, 2018 Memo, p. 2; August 2, 2018 Memo, p. 3.

[124] August 2, 2018 Memo, p. 3.

smartphones were not even offered plans without those three components. Thus, as can be seen in the August 2, 2018 Memo (and the example below, taken from that memo), the BVC determined that each of the services should have the same expected margin.[125] While many companies do intend to realize different margins on different products or services, the BVC concluded that MetroPCS would not, if it were selling each service on a standalone basis, try to achieve different profit margins.[126] This conclusion is reasonable based upon the fact that separate markets for each service really did not exist.

106.    As shown in the excerpt in the next section, the BVC added "margin" to the cost per MB to each service in two steps—the first to show the expected profit over the direct costs of providing each service, and the second to account for the fact that, in order to be profitable, selling prices of services must cover all the company's costs, not just the ones directly involved in providing the service. The BVC estimated the margin necessary to cover these selling, general and administrative costs at 40% and the expected profit margin at 45%.[127]

107.    Having determined that each service would be assigned the same margin percentages, the actual margin percentages used do not actually alter the way the prices of prepaid wireless bundles would be allocated. This is because adding the same margin percentage to each cost base does not alter the relative values for MBs of each service. For example, the sample allocation in the next section, excerpted from the August 2, 2018 Memo, shows an allocation of 95.20% to Data, based upon the relative standalone selling prices (the "Total" line).[128] An allocation based upon cost per MB would yield the same allocations.[129]

## D.    Application of the Relative Selling Price Method

108.    As discussed in Section VII, the application of the relative selling price method is straightforward once standalone selling prices have been determined for each building block. In this case, the process involves aggregating the standalone selling prices of each MB of voice, text, or data service expected to be used by a purchaser of a prepaid wireless plan, and then allocating the actual price charged to the components based on that component's relative portion of the aggregate of the standalone selling prices.

---

[125] August 2, 2018 Memo, p. 3.

[126] August 16, 2018 PowerPoint, Slide 6.

[127] August 2, 2018 Memo, p. 3.

[128] August 2, 2018 Memo, p. 4.

[129] See August 2, 2018 Memo, p. 4. Data costs equal $22.73; voice costs equals $1.12; and text costs equals $0.02 for a total of $23.87. $22.73 of data costs divided by $23.87 total costs equals 95.2%.

109.    The August 2, 2018 Memo provides an example of that process for one plan:[130]

[START HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]

| Magenta | TM One | | $ | 75.00 | MRC | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | **Data** | | **Talk** | | **Text** |
| | Avg MBs per sub per month | | | 13,346 | | 231 | | 5.6 |
| | Cost per MB | | $ | 0.00170 | $ | 0.00486 | $ | 0.00415 |
| | Cost subtotal | | $ | 22.73 | $ | 1.12 | $ | 0.02 |
| | Gross Margin | | | 45% | | 45% | | 45% |
| | Subtotal - Cost + Gross Margin | | $ | 32.96 | $ | 1.63 | $ | 0.03 |
| | SG&A (% revenue) | | | 40% | | 40% | | 40% |
| | Total | | $ | 46.15 | $ | 2.28 | $ | 0.05 |
| | | | | **95.20%** | | **4.71%** | | **0.10%** |

[END HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]

110.    For the illustrated plan, the voice component was allocated 4.71% of the revenue; text was allocated 0.10%; and Data was allocated 95.20%. If such a plan were sold to a customer for $75, the allocation would be $3.53 to voice (4.71% of $75); $0.07 to text (0.10% of $75); and $71.40 to Data (95.20% of $75). This is consistent with the relative selling price approach specified by ASC 605 and ASC 606.

111.    As described in the August 2, 2018 Memo, the application of the relative selling price method to the determined standalone selling prices is mechanical, rigorous, objective and neutral. This is consistent with GAAP and reflects the principles employed in ASC 605-25 and ASC 606.

IX.    **COMPARISON OF RELATIVE SELLING PRICE METHOD TO THE CPUC ALLOCATION FACTORS**

112.    Exhibits C, D, and E to the Second Declaration of John Barnes provide information on the application of the BVC's allocation conclusions to every prepaid wireless plan sold by MetroPCS in 2017 and 2018.[131] This information shows that the CPUC's intrastate factor approach under the 2017 and 2018 Resolutions resulted in an assessment of the CPUC

---

[130] The example included in the August 2, 2018 Memo is a T-Mobile (or "Magenta," referring to the T-Mobile branding) postpaid plan, but the same principles apply to MetroPCS plans under the cost-based approach. August 2, 2018 Memo, p. 4.

[131] Second Barnes Declaration, Exhibits C, D, E. As noted, the exhibits show "active" plans (i.e., plans with at least some California customers) and wireless plans including voice calling—as opposed to tablet-only plans.

surcharge on a substantial proportion of MetroPCS's broadband data (and other non-surchargeable) revenues.

113.    In the case of every plan in Exhibits C, D, and E to the Second Declaration of John Barnes that includes 4G Data (i.e., greater than 97% and 98% of all active plans in 2017 and 2018, respectively),[132] the application of the CPUC's intrastate factors results in an assessment of surcharges on a substantial amount of MetroPCS's revenue from Data and Text service in both 2017 and 2018.

114.    The same Exhibits also include information about the percentage of California customers who purchased each plan, broken down further by the monthly price (including taxes and fees) for each plan.  Using the data in those exhibits, it is possible to calculate the overall percentage of MetroPCS's revenue that is allocated to voice, text, and data under the relative selling price method, as that method was applied by the BVC.  Computing weighted averages based upon the percentages in those Exhibits, MetroPCS's allocation of revenue to broadband data service comes to 55.8% in 2017 and 72.1% in 2018 (see Appendix C to this report).  Based upon the same calculations, Appendix C shows that MetroPCS allocated 44.2% and 27.9% of revenue to Voice and Text services in 2017 and 2018, respectively.

115.    The CPUC's allocation factors were 72.75% in 2017 and 69.45% in 2018 for intrastate voice, leaving only 27.25% and 30.55% for revenue from all non-surchargeable services (including broadband data, text messaging, and interstate voice service) in 2017 and 2018, respectively.  It is therefore clear that the CPUC's allocation factors result in the assessment of the CPUC surcharges on a substantial amount of MetroPCS's revenue that the company properly allocated to broadband data service.  This also means that the CPUC's allocation factors result in the assessment of surcharges on revenue properly allocable to text messaging and to interstate voice service as well.

## X.    COMMENTS ON CERTAIN ASSERTIONS AND CRITICISMS MADE BY THE CPUC

116.    This section of my report addresses various assertions by the CPUC in its submissions to the Court.  In particular, I comment where knowledge of, and insight provided by, GAAP and its application might be informative as to the subject matter in the CPUC's submission.  My analysis is intended to be limited to consideration of the CPUC's assertions in light of GAAP.

### A.    MetroPCS's Allocation Methodology is Consistent with GAAP, and is Not "Arbitrary"

117.    In the CPUC MSJ, the CPUC claims, amongst other things, that "through MetroPCS's Bundle Allocation Methodology, an alternative accounting methodology to those

---

[132] Second Barnes Declaration, Exhibits C, D, and E.

recognized by the Federal Communications Commission ('FCC'), MetroPCS arbitrarily over-allocates its revenues to broadband (data) service…."[133]

118.    MetroPCS's methodology is not arbitrary.  Indeed, as noted above, the FASB and IASB specified the relative selling price method as the default means of allocating the transaction price to components to ensure an organization's process is rigorous and objective. Consistent with the FASB and IASB's guidance, the BVC's application of the guidance in ASC 605 and 606 used existing information to ensure the allocations were done on a neutral basis with rigor and objectivity, and there is no indication that the methodology or MetroPCS's application of it would lead to an "over-allocation" to broadband service.

### B.    MetroPCS's Allocation Methodology is Consistent with GAAP, and Therefore Not "Designed to Reduce its Universal Service Contributions"

119.    The CPUC MSJ also asserts that "MetroPCS's alternative Bundle Allocation Methodology is designed to reduce its universal service contributions…."[134]  However, as discussed throughout this report, and in many of the documents provided during the litigation, including, for example, the March 2018 Memo, MetroPCS did not "design" a methodology to allocate revenues amongst its services.  It instead used an existing—and widely accepted—methodology created for a similar purpose that was designed to be neutral and unbiased.  I understand that MetroPCS uses this methodology for multiple purposes, including keeping its general ledger and calculating federal USF contributions and state and local taxes.[135]

### C.    MetroPCS Appropriately Used Available Evidence to Estimate the Standalone Selling Price of 1GB of 4G Data

120.    The CPUC MSJ criticizes MetroPCS's estimate of $5 as the standalone selling price for 1GB of 4G Data.  The CPUC MSJ notes that MetroPCS explains that the 1GB top-up charge is "for customers who want to avoid a recurring charge for a high data plan."[136]  The CPUC infers that the charge would be less if the customer were agreeing to an ongoing purchase of that additional 1GB of data.  However, if the customer were accepting a recurring charge for 1GB of data, that transaction would not be for a "standalone" sale of 1GB of data.  In searching for objective evidence for the standalone selling price of 1GB of data, the price that does not come along with a recurring charge is the right price.

121.    The CPUC brief goes on to criticize MetroPCS for using the pricing of several competitors, "[a]s secondary support for MetroPCS's 'best estimate of the standalone pricing for the broadband data components of its core plans.'"[137]  The CPUC's criticism appears to be based

---

[133] CPUC MSJ, p. 1.

[134] CPUC MSJ, p. 1.

[135] March 2018 Memo, pp. 8–9.

[136] CPUC MSJ, p. 12.

[137] CPUC MSJ, p. 12.

on the fact that MetroPCS had previously concluded that this competitor data did not rise to the level of "Third-Party Evidence," as that term is used in ASC 605.[138]

122.    The CPUC seems to believe that if competitor data does not constitute TPE, it should be entirely ignored in developing a best estimate of the standalone selling price. However, when developing a best estimate of selling price, GAAP directs a company to consider all available evidence, as it would be illogical to preclude the consideration of information when developing a "best estimate."[139] So, while competitor data did not provide objective evidence of the standalone selling price of MetroPCS's service, owing to differences in networks, customer types, branding, or devices, that evidence may still be informative in consideration of MetroPCS's estimates of standalone selling prices.

123.    For example, the guidance on the application of ASC 605-25 written by Ernst & Young (and attached to the March 2018 Memo) notes that TPE is often deemed not to exist due to the factors discussed above, but also notes that "vendors may conclude that, due to the above factors or other reasons, [Third Party Evidence] of selling price does not exist but that it is appropriate to consider the evidence gathered in making such a determination when estimating the selling price for such an item."[140] Consistent with that comment, Ernst & Young's guidance includes a list of factors that should be considered in developing a best estimate of selling price that includes "What is competitor pricing for a similar or identical product?"[141] This guidance from Ernst & Young is consistent with well-established practice in the application of GAAP.

124.    In this case, the BVC appropriately considered how competitors' pricing information might inform its estimates of the standalone selling prices that MetroPCS would have used had it separately sold 4G Data.  It did not solely rely on such data, as it would have if the data had constituted TPE as that term is used in ASC 605, but instead considered it, along with other data, in developing its best estimate of the standalone selling price.

### D.    The CPUC's Focus on the Aggregated Standalone Selling Price of Individual Blocks of Data Illustrates Why the FASB Chose the Relative Selling Price Method

125.    The CPUC MSJ further critiques MetroPCS's determination of a best estimate of selling price of $75 for unlimited 2G/3G and 4G Data where MetroPCS sold certain prepaid wireless bundles that included unlimited data for $60.[142]  The CPUC MSJ articulates the component to be measured as "Unlimited Data" and argues that the standalone selling price for that component cannot reasonably be more than the standard selling price of a bundle that includes that component along with other services.[143]

---

[138] CPUC MSJ, p. 13.

[139] ASC 605-25-30-2; ASC 606-10-32-32.

[140] March 2018 Memo, Appendix 3, p. 64.

[141] March 2018 Memo, Appendix 3, p. 64.

[142] CPUC MSJ, p. 11.

[143] CPUC MSJ, p. 11.

126.    However, as noted in the March 2018 Memo and discussed above, the building block that MetroPCS used in its allocations regarding high-speed data is 1GB of 4G Data.  This is in contrast to Voice, Text, and 2G/3G Data, which are all based on unlimited service.  As discussed above, this difference is because Voice, Text, and 2G/3G Data were only offered on an unlimited basis as part of prepaid wireless plans at the time by MetroPCS, while 4G Data was included in plans in both limited and unlimited quantities, with 1GB being the smallest increment available.  As 4G Data can be used by the GB, it is appropriate and consistent with GAAP to look to that quantity as the building block (or "deliverable") in considering the components.

127.    Therefore, the $60 Unlimited Data plan cited by the CPUC includes, for the purpose of applying ASC 605 and 606, the following 17 building blocks shown in the March 2018 Memo:[144]

**[START HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]**



**[END HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]**

128.    These 17 items each have a standalone selling price below the $60 price of the plan.  While the CPUC asserts that the standalone selling price of the "data" portion of this plan is unreasonable because it adds up to more than the total selling price of the plan, the same could be said for a combination of blocks that includes Voice, Text, 2G/3G Data, and 8GB of 4G Data.  Indeed, the fact that focusing on different combinations of promised goods or services can make the discount look like it should be allocated differently is exactly the reason that the FASB and IASB decided that the relative selling price method is almost always the right method to use, as it allocates the discount to all items in an arrangement, rather than a subjectively chosen subset.[145]

---

[144] March 2018 Memo, p. 21.

[145] Although many commenters on the proposal that led to ASC 606 suggested other methods of allocating the transaction price to individual items, the FASB and IASB only agreed to prescribe an alternative allocation if:

a.  The entity regularly sells each item in the contract on a standalone basis;

b.  The entity also regularly sells a bundle of some of those items at a discount to the standalone selling prices of the goods or services in each bundle; and

Again, MetroPCS appropriately applied discounts on a pro rata basis, consistent with GAAP—and, specifically, consistent with the illustration in ASC 605-25-55-9 involving the hypothetical wireless carrier "CellularCo."

## XI.    OPINIONS AND CONCLUSIONS

129.    In order to estimate the portions of revenue from its prepaid wireless plans related to voice, text, and data services, MetroPCS utilized and reasonably applied the principles that underlie GAAP.

130.    GAAP is promulgated by the FASB, with oversight from the SEC, and is intended to provide financial information about an entity's transactions in a complete and neutral manner that faithfully reflects the economics underlying the entity's transactions. Information prepared in accordance with GAAP is widely used by investors in the capital markets to make decisions about buying and selling investments. Capital markets could not function smoothly if GAAP were intentionally incomplete or biased in its presentation.

131.    The same principles that make GAAP useful in the capital markets also should make it well suited to building a methodology to allocate revenue amongst the components of MetroPCS's prepaid wireless plans in a neutral, representationally faithful manner.

132.    The March 2018 Memo explains how MetroPCS's BVC applied the principles of GAAP in determining the allocations used in 2017 and the first part of 2018. The explanations indicate that the BVC applied those principles in a reasonable manner consistent with ASC 605 and ASC 606. The application is consistent with the "Adjusted market assessment approach" identified in ASC 606 as an approach that is often suitable for estimating standalone selling prices. While judgment is necessary to make best estimates of standalone selling prices in an environment where individual items are not in fact sold separately, the BVC used reasonable judgment in estimating the standalone selling prices of Voice and Text (together), and of 2G/3G and 4G Data.

133.    The August 2, 2018 Memo and related documents explain how MetroPCS's BVC applied the principles of GAAP in determining the allocations used from September to December 2018. MetroPCS changed its approach to estimating standalone selling prices based on changes in the market and the availability of new information, as is appropriate under GAAP. The new approach is the "Expected cost plus a margin approach" identified in ASC 606 as an approach that is often suitable for estimating standalone selling prices. Based on the new approach, the BVC used reasonable judgment in estimating the standalone selling prices of quantities of voice, text, and data services.

---

c. The discount attributable the bundle described in (b) is substantially the same as the discount in the contract, and an analysis of the goods or services in each bundle provides observable evidence of the items to which the entire discount in the contract belongs.

ASC 606-10-32-37.

As MetroPCS does not regularly sell each of the four building blocks on a standalone basis, these criteria are not met, and the default guidance on allocation of discounts pro rata to all components applies.

134.    The estimated standalone selling prices documented in the March 2018 Memo and the August 2, 2018 Memo were then used to determine the allocation percentages for prepaid wireless plans that MetroPCS sold to customers in 2017 and 2018 (as reflected in Exhibits C, D, and E to the Second Declaration of John Barnes).  When those percentages are applied to actual prices paid by customers, the resulting allocations of revenue are consistent with GAAP and provide a faithful depiction of the amounts due to MetroPCS from customers for each service.

135.    In the case of every plan sold in 2017 and 2018 (as listed in Exhibits C, D, and E to the Second Declaration of John Barnes) that includes 4G Data (i.e., greater than 97% and 98% of all active plans in 2017 and 2018, respectively[146]), the application of the CPUC's intrastate factors results in an assessment of surcharges on a substantial amount of MetroPCS's revenue from broadband data and text service.  Computing averages based upon the percentages in those Exhibits, MetroPCS's allocation of revenue to broadband data service comes to 55.8% in 2017 (substantially more than the 27.25% that the CPUC's 2017 intrastate factor allowed for all non-surchargeable services) and 72.1% in 2018 (substantially more than the 30.55% that the CPUC's 2018 intrastate factor allowed for all non-surchargeble services).  *See* Appendix C to this report.  It is therefore clear that the CPUC's allocation factors result in the assessment of the CPUC surcharges on a substantial amount of MetroPCS's revenue that the company properly allocated to broadband data service.  This also means that the CPUC's allocation factors result in the assessment of surcharges on revenue allocable to text messaging and to interstate voice service as well.

136.    In its MSJ, the CPUC makes several criticisms of MetroPCS's application of the relative selling price method required under GAAP.  Those criticisms, however, reflect misunderstandings of GAAP and the application of the method, and do not demonstrate any failure on MetroPCS's part in the application of the guidance in GAAP.

Executed on this January 21, 2022

*Scott A. Taub*

Scott A. Taub, CPA

---

[146] Second Barnes Declaration, Exhibits C, D, E.

**Appendix A to the Taub Report**
**Resume of Scott A. Taub, CPA**

**Scott A. Taub, CPA**
**Managing Director, Financial Reporting Advisors LLC**
**100 N. LaSalle St, Suite 2215**
**Chicago, IL  60602**
**312-345-9105**
**taub@finra.com**

Scott A. Taub is a Managing Director of Financial Reporting Advisors, LLC (FRA).  Based in Chicago, Illinois, FRA provides consulting services related to accounting and SEC reporting.  FRA specializes in applying generally accepted accounting principles to complex business transactions, offering clients an unbiased assessment of the accounting literature as applied to their situation.  FRA also provides litigation support and expert services, and FRA's partners participate in activities to improve financial reporting and the capital markets.

Mr. Taub is the author of the CCH's *Revenue Recognition Guide*, a 600-page comprehensive guide to accounting for revenue recognition under US GAAP and IFRS, and was a member of the FASB/IASB Joint Transition Resource Group for Revenue Recognition.  He is also a co-author of CCH's *Financial Instruments: A Comprehensive Guide to Accounting and Reporting.* Mr. Taub was a member of the IFRS Interpretations Committee (IFRIC) from 2008-2014, and was an original member of the Financial Accounting Standards Board (FASB) Valuation Resource Group.  Mr. Taub wrote a periodic column for Compliance Week on financial reporting developments from 2007 through 2016.

From September 2002 through January 2007, Mr. Taub was a Deputy Chief Accountant at the Securities and Exchange Commission (SEC), during which time he served as Acting Chief Accountant for 14 months.  He played a key role in the SEC's implementation of the accounting reforms under the landmark Sarbanes-Oxley Act, and was responsible for the day-to-day operations of the Office of the Chief Accountant, including resolution of accounting and auditing practice issues, rulemaking, oversight of private sector standard-setting efforts, and regulation of auditors.

Mr. Taub represented the SEC in many venues, including advisory committees of the FASB and International Accounting Standards Board (IASB), and in front of the House Financial Services Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises.  He also served as the SEC Observer to the FASB's Emerging Issues Task Force (EITF) and as Chair of the Accounting and Disclosure committee of the International Organization of Securities Commissions (IOSCO).  Mr. Taub also was a member of the SEC staff between 1999 and 2001 as a Professional Accounting Fellow.

Prior to September 2002, Mr. Taub was a partner in Arthur Andersen's Professional Standards Group (PSG). The role of the PSG within Andersen was to consult on complex financial reporting matters; establish and disseminate Andersen's policies regarding financial reporting matters; and represent the firm before various standards setters including the FASB, SEC, AICPA, and IASB.  Mr. Taub consulted and authored interpretive guidance for Andersen on a wide variety of reporting issues, including revenue recognition, business combinations and goodwill, compensation arrangements, intangible assets, impairment and investment accounting.  Prior to joining the PSG, he was member of the audit practice in the firm's Detroit office serving publicly held and privately owned companies in a variety of industries.

Mr. Taub is a frequent speaker, having addressed numerous audiences sponsored by a variety of organizations such as the Financial Executives International, the AICPA, the Institute of Management Accountants, the Securities Regulation Institute, and the Practising Law Institute.  He was the primary author of several SEC reports and publications, including the *Report and Recommendations Pursuant to*

*Section 401(c) of the Sarbanes-Oxley Act of 2002 On Arrangements with Off-Balance Sheet Implications, Special Purpose Entities, and Transparency of Filings by Issuers* and the *Study Pursuant to Section 108(d) of the Sarbanes-Oxley Act of 2002 on the Adoption by the United States Financial Reporting System of a Principles-Based Accounting System.*

Mr. Taub received an undergraduate degree in economics in 1990 from the University of Michigan in Ann Arbor.  He won the William A. Paton Award for his performance on the CPA exam.  In 2005 Mr. Taub won the SEC's award for Supervisory Excellence. He is a licensed CPA in Illinois.

**EXPERIENCE**

**Financial Reporting Advisors, LLC**
*Managing Director*                                                                                          *1/07-present*
- Advise clients on application of US GAAP, IFRS and SEC regulations to complex transactions.
- Provide assistance in responding to SEC comment letters and investigations.
- Explain new and novel accounting and reporting guidance to client financial reporting staff.
- Former member of the FASB/IASB Joint Transition Resource Group for Revenue Recognition.
- Former member of the IFRS Interpretations Committee.
- Former member of the FASB's Valuation Resource Group.
- Authored a bi-monthly column on financial reporting for Compliance Week for 9 years.
- Testified as an expert witness in a criminal matter in federal court, and provided deposition testimony in multiple civil cases and arbitration proceedings.
- Submitted expert reports in arbitrations, administrative proceedings, and contractual disputes.

**United States Securities and Exchange Commission (SEC)**
*Deputy Chief Accountant*                                                                                     *9/02-1/07*
*Acting Chief Accountant*                                                                 *5/03-9/03 and 11/05-8/06*
- Led staff in the Office of the Chief Accountant in all accounting interpretive and policy matters.
- Formulated and implemented SEC policies on significant national issues, including accounting for stock options and pensions, fair value accounting, and transparency in reporting.
- Responsible for resolution of issues regarding US and international accounting standards.
- Provided oversight of and input to standard-setting activities of the FASB and IASB.
- Represented the SEC in front of Congress, accounting and auditing standard-setters, auditing firms, and international regulators.
- Developed and implemented strategies to harmonize global financial reporting and regulatory systems as chair of the accounting, auditing, and disclosure committee of the International Organization of Securities Commissions.
- Managed implementation of significant portions of the Sarbanes-Oxley Act of 2002, including the formation and start-up of the Public Company Accounting Oversight Board (PCAOB).
- As Acting Chief Accountant, added oversight of the PCAOB and auditor independence matters.
- Served as primary advisor to the Commission on all accounting, auditing and financial disclosure.
- Managed growth of office from 30 people to over 60.

*Professional Accounting Fellow*                                                                              *6/99-6/01*
- Selected for a highly competitive fellowship at the SEC.
- Developed SEC positions on accounting and auditing interpretive and standard-setting matters.

**Arthur Andersen LLP**

*Professional Standards Group, Partner*                                                         *8/01-8/02*
*Professional Standards Group, Manager*                                                     *7/97-5/99*
*Audit Manager/Senior/Staff*                                                                       *7/90-7/97*

- Advised audit engagement teams and clients on difficult accounting issues.
- Developed Arthur Andersen's positions on the application of accounting standards.
- Became recognized expert in accounting for revenue recognition, business combinations, compensation arrangements, intangible assets, investment accounting.
- Contributed to Arthur Andersen's researchable database of guidance, articles, and Q&A's for use by clients and engagement teams in understanding accounting literature.
- Planned, supervised and executed audits of clients ranging from small owner-operated companies to publicly-traded Fortune 500 entities.
- Led the coordination of global audits of two large multi-national companies.
- Participated in more than 10 public debt and equity offerings.
- Supervised staffs of up to 15 auditors while consistently completing audits on time and on budget.

## TESTIMONY

*U.S. v. Joseph Connors, et al. (Criminal No. 06-189), Eastern District of Pennsylvania* – Expert testimony on behalf of the U.S. Department of Justice

*Securities and Exchange Commission v. Symbol Technologies, et al. (Civil Action No. 04-2276), Eastern District of New York* – Deposition testimony on behalf of the Securities and Exchange Commission

*Securities and Exchange Commission v. Eugene N. Melnyk, et al. (Civil Action No. 08-02979), Southern District of New York* – Deposition testimony on behalf of the Securities and Exchange Commission

*Cucinotta et al v. Deloitte & Touche, LLP et al (Case Number 2:2009cv02135), Nevada District Court* – Deposition testimony on behalf of Deloitte & Touche, LLP.

*LaMonica v. CEVA Group plc, et al., (Case No. 13-11272(JLG)), United States Bankruptcy Court Southern District of New York* – Deposition testimony on behalf of CEVA Group plc

*SESAC Inc. v. iHeart Commmunications Inc. (JAMS arbitration ref. no. 1425028464)* – Arbitration testimony on behalf of iHeart Communications, Inc.

*Radio Music License Committee, Inc. vs. Broadcast Music, Inc. (Case No. 18 Civ. 4420), Southern District of New York* – Deposition testimony on behalf of Radio Music License Committee, Inc.

*Lehigh County Employees' Retirement System, vs. Novo Nordisk A/S, et al (Case No. 3:17-cv-00209-BRM-LHG), United States District Court, District of New Jersey* – Deposition testimony on behalf of Novo Nordisk A/S

**PUBLICATIONS (past ten years)**

*CCH Publications Revenue Recognition Guide* -- Originally written in 2002 and updated annually, a 600 page comprehensive guide to accounting for revenue recognition, the first of its kind for any accounting topic.

*CCH Publications Financial Instruments: A Comprehensive Guide to Accounting and Reporting* – An 800 page guide to accounting for financial instruments (co-author)

*Compliance Week* (bi-monthly columnist 2007-2016) – Columns on a variety of financial reporting topics.

**SELECTED SPEECHES**
(available at www.sec.gov)

- The Future of Financial Reporting (June 8, 2006)
- Looking Forward and Back at Financial Reporting (June 6, 2006)
- Fostering Accuracy and Transparency in Financial Reporting: Testimony before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises (March 29, 2006)
- International Convergence and Public Oversight of Accounting and Auditing (May 20, 2004)
- The SEC Internal Control Reporting Rules and Thoughts on the Sarbanes-Oxley Act (May 29, 2003)

**EDUCATION AND HONORS**

- Bachelors in Economics, with Honors -- University of Michigan, 1990
- Paton Accounting Award – State of Michigan, 1990 (highest score on CPA exam)
- Award for Supervisory Excellence at the Securities and Exchange Commission, 2005

**Appendix B to the Taub Report**

**Corrected Documents Considered**

| No. | Document Title |
| --- | --- |
| | **Legal Documents** |
| 1. | Plaintiff's Notice of Motion and Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Marybel Batjer, et al.*, November 24, 2020 (Dkt. 112) |
| 2. | Defendants' Notice of Motion, Cross-Motion for Summary Judgment, and Opposition to the Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC. vs. Marybel Batjer, et al.*, February 19, 2021 (Dkt. 123) |
| 3. | Plaintiff MetroPCS's Combined Reply in Support of its Motion for Summary Judgment and Permanent Injunction and in Opposition to the CPUC's Cross-Motion for Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 19, 2021 (Dkt. 128) |
| 4. | Defendants' Sur-Reply Brief in Opposition to Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, April 9, 2021 (Dkt 134) |
| 5. | Plaintiff MetroPCS's Response to the CPUC's Sur-Reply Regarding Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, April 19, 2021 (Dkt 137) |
| 6. | Defendants' Supplemental Brief, *MetroPCS California, LLC v. Marybel Batjer, et al.*, May 11, 2021 (Dkt 148) |
| 7. | Plaintiff MetroPCS's Court-Requested Supplemental Brief in Support of its Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Marybel Batjer, et al.*, May 11, 2021 (Dkt. 150) |
| 8. | Order Granting in Part and Denying in Part Motions for Summary Judgment and Providing Notice of Intent to Appoint Special Master and Scheduling Further Status Conference, *MetroPCS California, LLC v. Marybel Batjer*, September 22, 2021 (Dkt. 152) |
| | **Letters, Transcripts, Declarations and Related Exhibits** |
| 9. | Letter from MetroPCS California, LLC to CPUC, "MetroPCS' Response to Supplemental Staff Inquiries re Stand Alone Value Allocations," October 7, 2016 |
| 10. | Declaration of John Barnes in Support of Plaintiff's Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Michael Picker, et al.*, April 5, 2018 (Dkt. 63-39) |
| 11. | Declaration of Daniel Drobac in Support of Plaintiff's Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Michael Picker, et al.*, April 6, 2018 (Dkt. 63-41) |
| 12. | Letter from CPUC to MetroPCS California, LLC, "Demand to MetroPCS California, LLC (U-3079-C) to comply with CPUC Resolutions T-17542 and T-17579 by Paying Outstanding California Telecommunications Public Purpose Program (PPP) surcharges and User Fees for years 2017 and 2018," October 16, 2020 |
| 13. | Second Declaration of John Barnes in Support of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction and Exhibits, *MetroPCS California LLC v. Marybel Batjer, et al.*, November 23, 2020 (Dkt. 112-24) |
| 14. | Declaration of Eric van Wambeke in Support of Defendants' Cross-Motion for Summary Judgment, and Opposition to Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, February 17, 2021 (Dkt. 123-1) |
| 15. | Reply Declaration of John Barnes in Further Support of MetroPCS's Motion for Summary Judgment and Opposition to the CPUC's Cross-Motion for Summary Judgment and Exhibits, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 18, 2021 (Dkt. 128-1) |
| 16. | Declaration of Tracy Fok in Support of Defendants' Sur-Reply Brief, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 29, 2021 (Dkt. 134-1) |
| 17. | Transcript of Proceedings by Zoom Webinar, *MetroPCS California, LLC, v. Marybel Batjer, et al.*, April 23, 2021 (Dkt. 146) |

**Appendix B to the Taub Report**

**Corrected Documents Considered**

| No. | Document Title |
|---|---|
| | **Public Materials** |
| 18. | 47 U.S.C. § 152 |
| 19. | 47 U.S.C. § 254 |
| 20. | Accounting Standards Codification, *Topic 105, Generally Accepted Accounting Principles* |
| 21. | Accounting Standards Codification, *Topic 605, Revenue Recognition Guide* |
| 22. | Accounting Standards Codification, *Topic 606, Revenue from Contracts with Customers* |
| 23. | Accounting Standards Update No. 2009-13, *Revenue Recognition (Topic 605), Multiple-Deliverable Revenue Arrangements*, October 2009 |
| 24. | Accounting Standards Update No. 2014-09, *Revenue Contracts with Customers (Topic 606),* May 2014 |
| 25. | Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting* |
| 26. | Ernst & Young, "Financial Reporting Developments, A Comprehensive Guide: Revenue from Contracts with Customers (ASC 606)," Revised November 2020 |
| 27. | California Public Utilities Commission, "The Prepaid Mobile Telephony Services Surcharge Collection Act," enacted by Assembly Bill 1717, (Chapter 885, Statutes 2014, Perea) |
| 28. | California Public Utilities Commission, "Resolution T-17542," November 16, 2016 |
| 29. | California Public Utilities Commission, "Resolution T-17579," November 16, 2017 |
| 30. | California Public Utilities Commission, "Resolution T-17595," December 8, 2017 |
| 31. | FCC Announces Results of World's First Broadcast Incentive Auction available at https://www.fcc.gov/document/fcc-announces-results-worlds-first-broadcast-incentive-auction-0. |
| 32. | *Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of the Licenses and Authorizations*, FCC WT Docket No. 18-197, June 18, 2018, available at https://ecfsapi.fcc.gov/file/10618281006240/Public%20Interest%20Statement%20and%20Appendices%20A-J%20(Public%20Redacted)%20.pdf |
| 33. | MetroPCS, "$25 Unlimited Talk and Text," [archived], available at https://web.archive.org/web/20160325194804/https://www.metropcs.com/25forall.html |
| 34. | T-Mobile, SEC Form 10-K for the period ended December 31, 2017, filed on February 8, 2018, available at https://www.sec.gov/Archives/edgar/data/0001283699/000128369918000011/tmus12312017form10-k.htm#sE345D8833D5E54348859808E2AF2A864 |
| 35. | "Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter", SEC Release No 33-8221; FR-70 |
| | **MetroPCS Provided Documents** |
| 36. | California Public Utilities Commission, "Staff Report - Part 2: Order Instituting Rulemaking to Update Surcharge Mechanism to Ensure Equity and Transparency of Fees, Taxes and Surcharges Assessed on Customers of Telecommunications Services in California (R.21-03-002)," October 2021. |
| 37. | Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," October 2016 |
| 38. | Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," January 2017 |
| 39. | Deloitte, "Services Related to the Revenue Recognition of Bundled Component Services," May 9, 2018 |
| 40. | Deloitte, "T-Mobile USA, Inc.: Revenue Allocation for Business, Accounting, and Tax Compliance and Reporting Purposes," November 30, 2018 |
| 41. | Email from Neil Gavin to Timothy Dawson, et al., "Q2 BVC Final Summary Minutes & Slides," with attached documents "Q2 2016 BVC Presentation FINAL.pptx" and "2016 Q2 MRC Allocation BVC Control Memo FINAL.docx," July 2, 2016 |

**Appendix B to the Taub Report**

**Corrected Documents Considered**

| No. | Document Title |
|-----|----------------|
| 42. | Email from Neil Gavin to Timothy Dawson, et al., "RE: Q4 BVC formal meeting," with attached document "Q4 2016 BVC Presentation v1.pptx," December 16, 2016 |
| 43. | Email from Jayson Gray to John Barnes, "RE: May 2016 - Usage Stats," with attached document "Unit Economics: August 2017," October 30, 2017 |
| 44. | Email from Marie Harris to John Barnes, "BVC Meeting," January 18, 2018 |
| 45. | Email from Bryan Dean to Henny Widjaja, et al., "FW: Q1 2018 BVC Memo Approval," with attached document "2018 Q1 MRC Allocation BVC Control Memo.docx," April 11, 2018 |
| 46. | Email from Paul McCoy (Deloitte) to Steven King, et al., "RE: Deloitte Deck for Meeting," with attached document "TMUS Draft Slides 5.9.2018," May 9, 2018 |
| 47. | Email from Bryan Dean to John Barnes, "Fwd: BVC Quarterly SOX Control - Approvals," with attached documents "Q3 18 BVC Slides.pptx," "2018+Q3+MRC+Allocation+BVC+Control+Memo.docx," ""BVC - Standalone Selling Price Determinatio1.docx," and "BVC - Process for updating Standalone Selling Prices (SSPs1.docx", November 9, 2018 |
| 48. | Grant Thornton, "MetroPCS Florida, LLC: Performance Audit on Compliance with Federal Universal Service Fund Contributor Rules, USAC Audit No. CR2015CP026," May 2, 2017 |
| 49. | Grant Thornton, "MetroPCS Texas, LLC: Performance Audit on Compliance with Federal Universal Service Fund Contributor Rules, USAC Audit No. CR2015CP022," May 2, 2017 |
| 50. | Memo from Revenue Accounting to Files, "Re: Q2 2015 MRC Allocation Review - BVC Quarterly Control Meeting and Supplemental Discussion / Materials," July 6, 2015 |
| 51. | Memo from Revenue Accounting to Files, "Re: Q1 2016 MRC Allocation Review Minutes- BVC Quarterly Control," March 28, 2015 |
| 52. | Memo from John Barnes (MetroPCS) to Eric Van Wambeke (CPUC), "Re: Application of MTS Surcharge and Local Charges," June 24, 2016 |
| 53. | Memo from Revenue Accounting to Files, "Re: Q2 2016 MRC Allocation Review Minutes- BVC Quarterly Control," June 29, 2016 |
| 54. | Memo from TMUS Accounting Policy to Files, "Re: ASC Topic 606: Identifying Performance Obligations," July 27, 2016 |
| 55. | Memo from Revenue Accounting to Files, "Re: Q4 2016 MRC Allocation Review Minutes- BVC Quarterly Control," January 2, 2017 |
| 56. | Memo from Revenue Accounting to Files, "Re: Q1 2017 MRC Allocation Review Minutes- BVC Quarterly Control," April 1, 2017 |
| 57. | Memo from Revenue Accounting to Files, "Re: Q2 2017 MRC Allocation Review Minutes- BVC Quarterly Control," July 1, 2017 |
| 58. | Memo from Revenue Accounting to Files, "Re: Q3 2017 MRC Allocation Review Minutes- BVC Quarterly Control," September 28, 2017 |
| 59. | Memo from Revenue Accounting to Files, "Re: Q4 2017 MRC Allocation Review Minutes- BVC Quarterly Control," January 5, 2018 |
| 60. | Memo from Revenue Accounting to Files, "Re: Q1 2018 MRC Allocation Review Minutes- BVC Quarterly Control," April 3, 2018 |
| 61. | Memo from Revenue Accounting to Files, "Re: Q2 2018 MRC Allocation Review Minutes-BVC Quarterly Control," July 11, 2018 |
| 62. | Memo from Revenue Accounting to Files, "Re: Bundle Valuation Committee (BVC) - Standalone Selling Price Determination," August 2, 2018 |
| 63. | Memo from Revenue Accounting to Files, "Re: Bundle Valuation Committee- Process for Updating Standalone Selling Prices (SSPs)," August 16, 2018 |
| 64. | Memo from Revenue Accounting to Files, "Re: Q3 2018 MRC Allocation Review Minutes- BVC Quarterly Control," October 7, 2018 |
| 65. | Memo from Revenue Accounting to Files, "Re: Q4 2018 MRC Allocation Review Minutes- BVC Quarterly Control," January 1, 2019 |

**Appendix B to the Taub Report**

**Corrected Documents Considered**

| No. | Document Title |
| --- | --- |
| 66. | "MetroPCS's Bundle Allocation Methodology," Bundle Valuation Committee, March 9, 2018, MPCS000502–664 |
| 67. | MetroPCS, "Tablet Rate Plans" |
| 68. | Q1 2017 Methodology & Calculation of Estimated MRC (T-Mobile MetroPCS Q1 2017 Mob).xlsx |
| 69. | Q4 2016 Methodology & Calculation of Estimated MRC (T-Mobile MetroPCS Q4 2016 Mob).xlsx |
| 70. | T-Mobile, "Standalone Selling Price (SSP): MRC Allocation, Discussion Document," January 2015 |
| 71. | T-Mobile, "Q1 2016 BVC Formal Meeting," March 15, 2016 |
| 72. | T-Mobile, "Q2 2016 BVC Formal Meeting Update," June 24, 2016 |
| 73. | T-Mobile, "Q3 3016 BVC Formal Meeting Update," September 12, 2016 |
| 74. | T-Mobile, "Q4 2016 BVC Formal Meeting Update," December 16, 2016 |
| 75. | T-Mobile, "Q1 2017 BVC Formal Meeting Update," March 23, 2017 |
| 76. | T-Mobile, "Q2 2017 BVC Formal Meeting Update," June 16, 2017 |
| 77. | T-Mobile, "Q3 2017 BVC Formal Meeting Update," September 28, 2017 |
| 78. | T-Mobile, "Q4 2017 BVC Formal Meeting Update," December 19, 2017 |
| 79. | T-Mobile, "Q1 2018 BVC Formal Meeting Update," March 19, 2018 |
| 80. | T-Mobile, "Q2 2018 BVC Formal Meeting Update," June 26, 2018 |
| 81. | T-Mobile, "BVC - SSP Framework Update.pptx," PowerPoint, August 16, 2018 |
| 82. | T-Mobile, "Q3 2018 BVC Meeting," September 24, 2018 |
| 83. | T-Mobile, "Q4 2018 BVC Meeting," December 19, 2018 |
| 84. | T-Mobile, "Unit Economics Snapshot - All Brands, Normalized View," August 2017 |
| 85. | Unit Economics August 2017 (Unit Economics_201709).xlsx |
| | **Discussions with MetroPCS Personnel** |
| 86. | Discussion with John Barnes held on November 17, 2021 |
| 87. | Discussion with John Barnes held on December 3, 2021 |
| 88. | Discussion with John Barnes held on December 13, 2021 |
| | **Expert Reports** |
| 89. | Expert Report of Gregory Rosston, dated January 21, 2022 |

**Note:  Even if not included in this list, I also considered and relied upon any other documents cited in my report or exhibits.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix C to the Taub Report
## Analysis of MetroPCS's Revenue Allocation for California Customers
2017 and 2018

### 2017

| Quantity High Speed 4G LTE | % of Customers With Plan | % of Allocated Revenue | | | Blended Rate | | |
|---|---|---|---|---|---|---|---|
| | | Data % | Text % | Voice % | Data | Text | Voice |
| UNL | 38.7% | 75.0 | 5.0 | 20.0 | 29.0% | 1.9% | 7.7% |
| UNL | 5.0% | 65.9 | 8.6 | 25.6 | 3.3% | 0.4% | 1.3% |
| 8GB | 4.0% | 64.3 | 7.1 | 28.6 | 2.6% | 0.3% | 1.2% |
| 6GB | 4.0% | 58.3 | 8.3 | 33.3 | 2.4% | 0.3% | 1.3% |
| 5GB | 7.5% | 54.5 | 9.1 | 36.4 | 4.1% | 0.7% | 2.7% |
| 3GB | 16.0% | 44.5 | 11.1 | 44.5 | 7.1% | 1.8% | 7.1% |
| 2GB | 3.4% | 44.3 | 13.9 | 41.8 | 1.5% | 0.5% | 1.4% |
| 2GB | 4.6% | 37.5 | 12.5 | 50.0 | 1.7% | 0.6% | 2.3% |
| 1GB | 14.3% | 28.6 | 14.3 | 57.1 | 4.1% | 2.0% | 8.2% |
| NONE | 2.4% | 0.0 | 13.5 | 86.5 | 0.0% | 0.3% | 2.1% |
| **Total 2017** | **100.0%** | | | | **55.8%** | **8.9%** | **35.3%** |

### January - August 2018

| Quantity High Speed 4G LTE | % of Customers With Plan | % of Allocated Revenue | | | Blended Rate | | |
|---|---|---|---|---|---|---|---|
| | | Data % | Text % | Voice % | Data | Text | Voice |
| UNL | 41.5% | 75.0 | 5.0 | 20.0 | 31.1% | 2.1% | 8.3% |
| UNL | 1.6% | 65.9 | 8.6 | 25.6 | 1.0% | 0.1% | 0.4% |
| 8GB | 0.6% | 64.3 | 7.1 | 28.6 | 0.4% | 0.0% | 0.2% |
| 6GB | 2.4% | 58.3 | 8.3 | 33.3 | 1.4% | 0.2% | 0.8% |
| 5GB | 4.0% | 54.5 | 9.1 | 36.4 | 2.2% | 0.4% | 1.5% |
| 3GB | 4.4% | 44.5 | 11.1 | 44.5 | 1.9% | 0.5% | 1.9% |
| 2GB | 1.1% | 44.3 | 13.9 | 41.8 | 0.5% | 0.2% | 0.5% |
| 2GB | 5.5% | 37.5 | 12.5 | 50.0 | 2.1% | 0.7% | 2.7% |
| 1GB | 4.0% | 28.6 | 14.3 | 57.1 | 1.2% | 0.6% | 2.3% |
| NONE | 1.3% | 0.0 | 13.5 | 86.5 | 0.0% | 0.2% | 1.1% |
| **Sub-Total** | **66.4%** | | | | **41.8%** | **4.9%** | **19.7%** |

### September - December 2018

| Quantity High Speed 4G LTE | % of Customers With Plan | % of Allocated Revenue | | | Blended Rate | | |
|---|---|---|---|---|---|---|---|
| | | Data % | Text % | Voice % | Data | Text | Voice |
| UNL | 3.4% | 95.6 | 0.2 | 4.2 | 3.2% | 0.0% | 0.1% |
| UNL | 20.6% | 95.5 | 0.2 | 4.3 | 19.7% | 0.0% | 0.9% |
| 10 GB | 0.4% | 88.4 | 0.6 | 11.0 | 0.4% | 0.0% | 0.0% |
| 8 GB | 0.2% | 88.4 | 0.6 | 11.0 | 0.1% | 0.0% | 0.0% |
| 6GB | 0.8% | 86.4 | 0.6 | 13.1 | 0.7% | 0.0% | 0.1% |
| 5GB | 1.7% | 85.0 | 0.6 | 14.4 | 1.4% | 0.0% | 0.2% |
| 2GB | 4.5% | 81.4 | 0.7 | 18.0 | 3.6% | 0.0% | 0.8% |
| 2GB | 0.0% | 81.4 | 18.0 | 0.7 | 0.0% | 0.0% | 0.0% |
| 3GB | 1.5% | 79.7 | 0.8 | 19.5 | 1.2% | 0.0% | 0.3% |
| NONE | 0.6% | 0.0 | 0.0 | 100.0 | 0.0% | 0.0% | 0.6% |
| **Sub-Total** | **33.6%** | | | | **30.3%** | **0.1%** | **3.1%** |
| **Total 2018** | **100.0%** | | | | **72.1%** | **5.0%** | **22.9%** |

Source: Second Declaration of John Barnes In Support Of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction, Exhibits C, D, and E

Exhibit B

CONTAINS INFORMATION DESIGNATED HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
UNDER THE PROTECTIVE ORDER

METROPCS CALIFORNIA, LLC,

                  Plaintiff,

   v.

ALICE REYNOLDS, President of the
California Public Utilities Commission, in her
official capacity; JOHN REYNOLDS,
Commissioner of the California Public Utilities
Commission, in his official capacity;
GENEVIEVE SHIROMA, Commissioner of
the California Public Utilities Commission, in
her official capacity; DARCIE HOUCK,
Commissioner of the California Public Utilities
Commission, in her official capacity; and
CLIFFORD RECHTSCHAFFEN,
Commissioner of the California Public Utilities
Commission, in his official capacity,

            Defendants.

Case No. 3:17-cv-05959-SI

**REPLY EXPERT REPORT OF
SCOTT A. TAUB**

**Date:  March 24, 2022**

## I.    INTRODUCTION

R1.    I submitted a report, dated January 21, 2022 ("Initial Report"), in regard to a dispute (Case No. 3:17-cv-05959-SI) between MetroPCS California, LLC ("MetroPCS") and the California Public Utilities Commission ("CPUC") regarding the CPUC's implementation of the California Prepaid Mobile Telephony Services Surcharge Collection Act of 2014 ("Prepaid Act") relating to calendar years 2017 and 2018 (the "Relevant Period").

R2.    My Initial Report: 1) provides conclusions based on United States Generally Accepted Accounting Principles ("GAAP") as to whether MetroPCS used reasonable methods during the Relevant Period to apportion its revenues amongst various services included in its prepaid wireless bundles, and 2) responds to certain arguments made by the CPUC regarding MetroPCS's apportionment methods.[1]

R3.    Consistent with my assignment, at the request of MetroPCS, I have since reviewed the Rebuttal Expert Report of Bert Nuehring ("Nuehring Report"), dated February 24, 2022 and submitted in connection with this matter.[2]  In this report, I provide my reply to certain assertions and conclusions in the Nuehring Report.  Capitalized terms not defined in this report are used as defined in my Initial Report or the Nuehring Report.

R4.    As with the Initial Report, this report is intended solely for use in the matter identified in paragraph 1 (of the Initial Report) and should not be used for any other purposes. This reply report represents my current analysis and opinions, based on the materials I have reviewed and analyzed to date.  I have ascertained the background facts (outlined in Section V of my Initial Report) and gained an understanding of the processes and procedures used by MetroPCS in allocating revenue amongst the components of its prepaid wireless bundles (as discussed in Sections VII and VIII of my Initial Report) from a review of documents and information identified in Appendix D of this report (which includes all documents that were included in Appendix B of my Initial Report).  I have assumed the facts set forth in those documents are true and accurate for purposes of this report and have not sought to independently verify that information.  If different or additional relevant material or information comes to my attention, I reserve the right to withdraw, revise, or supplement this report.  I also reserve the right to respond to the reports or opinions of other expert witnesses in this matter and to modify or supplement my conclusions accordingly.

## II.    SUMMARY OF OPINIONS

R5.    In my Initial Report, I opined that: 1) GAAP is well-suited to building a methodology to allocate revenue amongst the components of MetroPCS's prepaid wireless plans in a neutral, representationally faithful manner; 2) MetroPCS used reasonable judgment when it applied the principles of GAAP in determining its allocations for the Relevant Period; 3) applying the CPUC's mandatory allocation factors to MetroPCS's prepaid wireless plans results

---

[1] Expert Report of Scott A. Taub, January 21, 2022 ("Initial Report"), par. 2.

[2] Rebuttal Expert Report of Bert Nuehring, February 24, 2022 ("Nuehring Report"), par. 2.

in an assessment of surcharges on revenue reasonably allocated under GAAP to broadband data and text service; and 4) the CPUC's criticisms of MetroPCS's application of the "relative selling price" method under GAAP do not demonstrate a failure on MetroPCS's part.[3]

R6.     The Nuehring Report does not appear to dispute that the objectives and concepts that underlie GAAP make it well-suited to building a methodology to allocate revenue for purposes of the FCC Bundling Order.  Nor does Mr. Nuehring appear to dispute the reasonableness of MetroPCS's decision to apply GAAP in allocating revenue amongst components of a wireless service bundle.  Mr. Nuehring appears to indirectly address my responses to certain assertions made by the CPUC in this matter (e.g., MetroPCS's determination of a standalone selling price for unlimited data) but does not challenge my opinion that applying the CPUC's mandatory allocation factors to MetroPCS's prepaid wireless plans results in an assessment of surcharges on MetroPCS's revenue from broadband data, text messaging and interstate voice service.

R7.     Instead, Mr. Nuehring primarily argues that I "[did] not cite any of the types of data that are noted by the FCC as being indications of reasonableness" and asserts that my "entire opinion rests on the decisions made by the MetroPCS BVC."[4]  As an initial matter, this is factually wrong (as described below).  More fundamentally, Mr. Nuehring appears to be questioning the facts relied upon by MetroPCS, as opposed to challenging my analysis of whether MetroPCS's decision to adopt GAAP as a methodology for allocating revenues was reasonable and whether, having adopted GAAP for that purpose, MetroPCS properly applied those principles.

R8.     Mr. Nuehring's criticisms of my report, then, rest largely upon his view that either: 1) I should have presented information in my report based on an audit or examination of the validity of the underlying data shown in certain MetroPCS business records (which the company used to support its allocation of revenue), or 2) that I should have performed such an audit or examination.  However, these positions reflect a misunderstanding of the purpose of my Initial Report.  The purpose of my Initial Report relates to the contentions made by the CPUC that "MetroPCS's revenue allocation is not reasonable, not consistent with GAAP, and that it overestimates the revenue attributable to broadband data at the expense of surchargeable voice revenue."[5]  In my Initial Report, I explained the principles that underlie GAAP,[6] and that a methodology that follows those principles results in an allocation of revenue that is neutral and representationally faithful.[7]  I also reviewed the process used by MetroPCS as explained in the documents provided and concluded that the process, as explained, is indeed consistent with GAAP and reasonable.[8]

---

[3] Initial Report, par. 5–8.

[4] Rebuttal Expert Report of Bert Nuehring, February 24, 2022 ("Nuehring Report"), par. 30.

[5] September 2021 Order, p. 8.

[6] Initial Report, Section VI and par. 130.

[7] Initial Report, par. 131.

[8] Initial Report, Sections VII and VIII, and pars. 130–133.

R9.     It was not the purpose of my Initial Report to audit the accuracy of the underlying information (including information shown in MetroPCS's contemporaneous business records) that was used to apply its revenue allocation methodologies.  Rather, my Initial Report considers the soundness of those methodologies for allocating revenue to the components of MetroPCS's prepaid wireless bundles – specifically, the "building block" methodology that MetroPCS used in 2017 and January to August of 2018, and the "cost plus gross margin" methodology that MetroPCS used in the remainder of 2018.  As described in my Initial Report and reiterated below, I:  1) read descriptions of the methodologies prepared by MetroPCS; 2) reviewed underlying documents (including contemporaneous MetroPCS business records) and data used by MetroPCS in applying the methodologies; 3) relied on sworn declarations of MetroPCS personnel; and 4) spoke with knowledgeable MetroPCS personnel.  I was not retained to perform an audit under generally accepted auditing standards and did not need to perform an audit or verify the accuracy of underlying data used by MetroPCS to form my opinions.

R10.    As described below, each opinion I reached in my Initial Report remains unchanged.

## III.    METROPCS'S 2017 AND JANUARY–AUGUST 2018 ALLOCATION METHOD WAS REASONABLE AND IN ACCORDANCE WITH GAAP

R11.    In my Initial Report, I concluded that from January 2017 through August 2018, MetroPCS used reasonable judgment, consistent with GAAP, in estimating the standalone selling prices of the items included in its prepaid wireless plans, and that MetroPCS's application of the relative selling price method to those standalone selling prices was consistent with GAAP and mechanical, rigorous, objective, and neutral.[9]

R12.    As required under GAAP, MetroPCS allocated revenue amongst the elements of its prepaid wireless plans based upon the relative standalone selling prices of those elements.[10] Both ASC 605 and ASC 606 indicate that the best evidence of the standalone selling price of an element is the price actually charged when that element is sold separately.[11]  However, during 2017 and January–August 2018, MetroPCS did not sell any of the individual elements of prepaid wireless plans separately.[12]  Therefore, consistent with guidance in ASC 605 and ASC 606, MetroPCS made its best estimate of those standalone selling prices. The methodology it determined would result in the best estimate is consistent with one of the methodologies specifically described in ASC 606, the "Adjusted market assessment approach," which is described as follows:

> Adjusted market assessment approach—An entity could evaluate the market in which it sells goods or services and estimate the price that a customer in that market would be willing to pay for those goods or services. That approach also might include referring to

---

[9] Initial Report, pars. 75, 81 and 87.

[10] March 2018 Memo, MPCS000502–664 at 519.

[11] ASC 605-25-30-2; ASC 606-10-32-32.

[12] March 2018 Memo, MPCS000502–664 at 517–518.

prices from the entity's competitors for similar goods or services and adjusting those prices as necessary to reflect the entity's costs and margins.[13]

R13.    After making its best estimate of standalone selling prices for each element (or "building block"), MetroPCS calculated a relative standalone selling price for each prepaid wireless plan it offered to determine revenue amounts allocable to each service in a bundle.[14] For example, for the GSMMU40 plan, "the $20 voice component represents 44.45% [$20/$45], the $5 text messaging component is 11.1% [$5/$45], and the $20 data component is 44.45% [$20/$45]."[15] These percentages are then applied to the actual selling price of each prepaid wireless bundle, resulting in an allocation of the actual selling price based upon the relative standalone selling prices.  For example, if the GSMMU40 plan were sold to a customer for $40, the allocation would be $17.78 to voice (44.45% of $40), $4.44 to text (11.1% of $40), and $17.78 to data (44.45% of $40).[16]

R14.    Mr. Nuehring asserts that my "conclusion that MetroPCS's methodology in 2017 and January–August 2018 is reasonable is erroneous" because "[i]n all of his assumptions, Mr. Taub uses numbers that far overstate the allocation of revenue to data in order to minimize the payment of California universal surcharges."[17]  Mr. Nuehring appears to base his assertion on the claim that MetroPCS's best estimates of standalone selling prices were unsupported by underlying data.  As referenced in my Initial Report and discussed further below, I have reviewed several business records that provide support for the data referenced in the documents explaining MetroPCS's standalone selling price estimates and have seen nothing that would suggest that the estimates are unsupported by underlying data.  In any event, I understand this is a factual issue to be resolved at trial.  Nothing in Mr. Nuehring's report changes my opinions regarding MetroPCS's process for allocating revenues amongst the components of its prepaid wireless plans.

### A.   Response to Mr. Nuehring's Criticism of MetroPCS's Best Estimate of Standalone Selling Price for Voice and Text

R15.    Mr. Nuehring critiques MetroPCS's reliance on its $25 Talk & Text Plans to establish a best estimate of standalone selling price by claiming that I adopted the conclusions of MetroPCS's BVC "without performing any additional supporting analysis"[18] such as "analyzing MetroPCS's actual financial data."[19]  Mr. Nuehring does not claim that such analysis would have revealed information indicating a different estimate should have been made, and thus, this

---

[13] ASC 606-10-32-34(a).

[14] March 2018 Memo, MPCS000502–664 at 516–17, 521.

[15] March 2018 Memo, MPCS000502–664 at 521.  (Yellow highlighted material in this Reply Report denotes information designated as "Highly Confidential – Attorneys' Eyes Only" under the Protective Order in this case.)

[16] March 2018 Memo, MPCS000502–664 at 524.

[17] Nuehring Report, pars. 8, 31.

[18] Nuehring Report, par. 28.

[19] Nuehring Report, par. 30.

criticism amounts to a complaint that I did not audit the underlying information—something I was not retained to do and never claimed to have done.  For similar reasons, there is no basis for Mr. Nuehring's assertion that MetroPCS and I "use[] numbers that far overstate the allocation of revenue to data."[20]  Because Mr. Nuehring never attempts to show what the proper data service allocations for MetroPCS's various prepaid wireless plans should have been (in his opinion), there is no support for his supposition that MetroPCS "overstate[d]" its data service revenues.

R16.    Indeed, Mr. Nuehring does not appear to dispute or provide any supporting documentation that contradicts the fact that MetroPCS sold "Talk and Text" plans (i.e., plans including only voice and text messaging service, and no data service) for $25.[21]  Further, Mr. Nuehring does not challenge the appropriateness of the BVC analyzing historical demand for MetroPCS's wireless plan allocations.  As such, he appears to accept that if MetroPCS did, in fact, determine its best estimate of standalone sales prices based upon historical demand, its allocation would be appropriate.  In that respect, he appears to accept the design of MetroPCS's methodology.

R17.    As noted in my Initial Report, I agreed with MetroPCS's conclusion that basing its estimate of standalone selling price on historical demand would be an appropriate basis on which to allocate amongst the two services.[22]  Contemporaneous business records, including BVC documents, reports from Current Analysis, and sworn declarations from MetroPCS personnel, also support MetroPCS's allocation of $20 to voice and $5 to text for its $25 Talk and Text plan.[23]

---

[20] Nuehring Report, par. 31.

[21] See Initial Report, par. 75; Second Barnes Declaration, par. 19 and Exhibit C, p. 4.  As I explained in my Initial Report, "for purposes of determining whether the intrastate factors mandated by the CPUC Resolutions result in assessment of the CPUC surcharge on broadband data, it is sufficient to conclude that the sum of the standalone selling prices of Voice and Text is $25."  Initial Report, n. 85.

[22] Initial Report, n. 85.

[23] Initial Report, n. 85.  Mr. Nuehring ignores the BVC's analysis of the $20 standalone selling price for voice service and $5 standalone selling price for text messaging service in contemporaneous documents.  See, e.g., Memorandum from Revenue Accounting to Files, "Re: Q2 2016 MRC Allocation Review Minutes-BVC Quarterly Control," June 29, 2016, MPCS0000901–03 at 02.  This memo notes the "$20 value assigned to Voice and … $5 assigned to SMS/SMS" and adds that "[t]his re-alignment in value [from a prior, higher standalone selling Price for text] is keyed off of a $25 base value for the two parts, and is in line with the Current Analysis [i.e., market research report] for the quarter."  Additionally, an October 2016 Current Analysis market research report specifically cited an estimated $5 price for text messaging.  This report (from October 2016) identifies the various prepaid plans offered by wireless carriers, including an estimated price of $5 for text messaging.  Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," October 2016, MPCS0000702–732 at 712.  Similarly, a January 2017 Current Analysis report states that "[h]istorically unlimited messaging monthly feature add-ons were $10 to $20. However, with more emphasis placed on data, messaging has been lowered to $5."  Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," January 2017, MPCS0000733–763 at 743, MPCS0001458–488 at 468.

**B.    Response to Mr. Nuehring's Criticism of MetroPCS's Best Estimate of Standalone Selling Price for Data**

R18.    Mr. Nuehring asserts that my opinion that MetroPCS's estimation of the standalone selling price of 1GB of 4G Data ($5) was reasonable is "arbitrary."[24]  It is not.  As explained in my Initial Report, MetroPCS's conclusion that $5 is the best estimate of the standalone selling price estimate for 1GB of 4G Data was reasonable and consistent with GAAP (specifically, ASC 605 and ASC 606-25).  The conclusion was based on the data points addressed in the March 2018 Memo, including: 1) a contemporaneous consideration of competitor pricing; 2) a $5 "top-up" fee MetroPCS charged customers who exceeded their 4G Data allotment; 3) the $5 MetroPCS charged for 2G/3G Internet access; and 4) MetroPCS's pricing for data-only plans for tablet users.[25]  My Initial Report explained why MetroPCS's $5 estimate of the standalone selling price was reasonable based on the provisions of GAAP and information in the March 2018 Memo.[26]

R19.    Mr. Nuehring criticizes the BVC's reliance on a $5 top-up fee, as if that is the only data point suggesting $5 as a reasonable estimate for 1GB of 4G Data.  It is not, but in any event, Mr. Nuehring's critique of this particular data point is erroneous.  Mr. Nuehring states that "[t]he support provided for an incremental $5 per GB of data is relevant only for selected plans/conditions where the customer is offered an additional GB of service on an incremental basis."[27]  This statement ignores the fact that MetroPCS had no "vendor-specific objective evidence of selling price" (VSOE) or "third-party evidence of selling price" (TPE) for standalone 4G Data.  As a result, MetroPCS had to determine a "best estimate of standalone selling price"— which is just that, an estimate based on all of the available relevant information.[28]

R20.    Further, it appears Mr. Nuehring means to imply that the $5 top-up fee is not relevant for unlimited plans, since this rate applied to certain select plans that included the right to purchase additional GBs on an incremental basis.[29]  However, a GB of data provides the same service whether it is included in the bundle or purchased separately.  Therefore, under GAAP, if 1GB of 4G Data would sell for $5 in a standalone transaction, that is the appropriate standalone selling price to use to allocate revenue in a transaction in which that GB of data is included.

R21.    Mr. Nuehring further challenges MetroPCS's $5 estimate based on references to a $3.75 estimate of the standalone selling price of 1GB of high-speed data in a Q3 2016 BVC

---

[24] Nuehring Report, par. 29.

[25] See Initial Report, pars. 79–81; see also March 2018 Memo, MPCS000502–664 at 518–19.  Mr. Nuehring makes no specific assertion regarding the March 2018 Memo or suggests that the factual information presented in that Memo was incorrect.

[26] Initial Report, pars. 76–81.

[27] Nuehring Report, par. 37.

[28] Initial Report, pars. 76–78.

[29] March 2018 Memo, MPCS000502–664 at 518.

Formal Meeting Update.[30]  In that document, I understand T-Mobile was referring to its estimated standalone selling price for *postpaid* (not prepaid) plans sold under the *T-Mobile* (not MetroPCS) brand.[31]  I understand that there were other differences between those plans and MetroPCS plans, including that T-Mobile plans allowed for "data stash," in which unused data could be carried to the next month, while MetroPCS plans had no such data stash. The $3.75 estimate for 4G Data in plans with different characteristics, offered under a different brand, to a group of customers opting for different payment terms does not indicate that the $5 estimate that the BVC determined for each additional GB of 4G Data included in MetroPCS's prepaid wireless plans was unreasonable.[32]  Referring to the top-up price of 1GB of data charged to MetroPCS customers is reasonable, even if the standalone selling price used in allocations of revenue in some T-Mobile plans was $3.75.

    R22.    Mr. Nuehring also argues that the BVC's estimate of $5 for each additional GB of 4G Data is erroneous because this results in an increasing discount to MetroPCS consumers as data increases (for example, the customer discount is larger on a $60 unlimited data plan than it is for a $50 5GB plan).[33]  However, the fact that discounts grow larger as more items are purchased is not unusual.  GAAP requires that any associated discounts be allocated proportionately across all elements in an arrangement; thus, the fact that MetroPCS offers its prepaid plans at varying price points presents no particular problem or difficulty, nor does it suggest any flaw in the methodology MetroPCS used.

    R23.    In sum, MetroPCS's $5 estimate for 1GB of 4G Data is in no way "arbitrary," as Mr. Nuehring claims.  It was reasonable and in accordance with GAAP.

## C.   Response to Mr. Nuehring's Criticism of MetroPCS's Application of the Relative Selling Price Method

    R24.    As described in my Initial Report, the BVC applied its building block methodology to allocate revenue based on its best estimate of the standalone selling price for voice service, text messaging service, and the quantity of 4G Data included in each of its prepaid plans.  For plans which included unlimited 4G Data, MetroPCS looked to customers' usage data to determine the average quantity of 4G Data consumed.[34]  Mr. Nuehring asserts MetroPCS's

---

[30] Nuehring Report, par. 37 (citing MPCS0001024 at 037–38, under the section "Data Stash Valuation," applicable to T-Mobile, rather than MetroPCS brand, plans).

[31] T-Mobile documents often referred to the T-Mobile brand as "Magenta" (due the magenta color of its logo and other branding), as distinct from the MetroPCS brand for prepaid wireless service.  See T-Mobile, Q3 3016 BVC Formal Meeting Update, September 12, 2016, MPCS0001024–52 at 32, 33.

[32] GAAP notes that a company may have different standalone selling prices for different classes of customer.  For example, ASC 606-10-32-32 states that "[t]he best evidence of a standalone selling price is the observable price of a good or service when the entity sells that good or service separately in similar circumstances and to similar customers."  ASC 606-10-32-33 then goes to state "[w]hen estimating a standalone selling price, an entity shall consider all information (including market conditions, entity-specific factors, and information about the customer or class of customer) that is reasonably available to the entity."

[33] Nuehring Report, pars. 39–40 (citing MPCS0000993 at 1013).

[34] Initial Report, par. 70.

"conclusion that the average user uses 14GB of data for an unlimited plan" is "erroneous and unsupported by data."[35]  Further, Mr. Nuehring challenges the BVC's use of $5 per gigabyte for unlimited plans and disagrees "that a customer would be willing to pay $5 for each GB of high-speed data up to 14GB."[36]

R25.   First, Mr. Nuehring's assertion that MetroPCS's contemporaneous decision to assign 14 building blocks based on customer usage was "unsupported by data" is incorrect.[37]  As cited in my report, MetroPCS considered its customers' usage data, which indicated that, on average, users of unlimited data plans consumed approximately 14GB of 4G data per month.[38]  Mr. Nuehring concedes this point, noting the August 2017 Unit Economics spreadsheet I reviewed "indicates that the GB per Month used by subscribers to MetroPCS's $60 plan (presumably, its unlimited plan) is 14.7."[39]  However, Mr. Nuehring appears to claim that because "[t]his number is hardcoded into the spreadsheet and there is no explanation or description of how this number is calculated," there isn't sufficient support "that 14 GB of data is the appropriate number."[40]

R26.   As previously noted, I was not retained to perform an audit under generally accepted auditing standards, and my Initial Report indicated that I did not seek to verify data used by MetroPCS.  Rather, I was engaged to evaluate the processes and procedures employed by MetroPCS to assess whether they were consistent with the requirements of GAAP.[41]  As such, I reviewed the information used by MetroPCS's BVC when it concluded that 14GB was the average quantity of 4G Data consumed by customers with unlimited data plans.  Given this contemporaneous business record was transmitted within MetroPCS in the ordinary course of business,[42] I had no reason to believe this information was not reliable, nor did I need to audit the underlying usage data to conclude that the methodology applied was reasonable.  My conclusion that looking to historical usage data is reasonable is based on my knowledge and expertise in GAAP.

R27.   Mr. Nuehring further attempts to show that the 14GB estimate is erroneous, and that I should have realized it was erroneous, by claiming that the Deloitte Study "indicates that as of the end of 2017 that average monthly data usage in North America was only 7.2 GB."[43]  However, the passage in the Deloitte Study Mr. Nuehring cites discusses average monthly

---

[35] Nuehring Report, par. 34 (highlighting added).

[36] Nuehring Report, par. 36 (highlighting added).

[37] Nuehring Report, par. 34.

[38] Initial Report, par. 70 (citing Unit Economics August 2017 (Unit Economics_201709).xlsx, Tab "Metro by Rate Plan").

[39] Nuehring Report, par. 34 (highlighting added).

[40] Nuehring Report, par. 34 (highlighting added).

[41] Initial Report, pars. 2, 23.

[42] Email from Jayson Gray to John Barnes, "RE: May 2016 - Usage Stats," with attached document "Unit Economics: August 2017," October 30, 2017, MPCS0000811–12.

[43] Nuehring Report, par. 35 (citing MPCS0000777 at 789).

mobile data traffic per smartphone, without regard to a given user's type of plan or provider.[44] In contrast, the BVC looked at average monthly usage for those MetroPCS users who purchase a prepaid plan that includes unlimited data.[45]  It stands to reason that customers who purchase a plan that includes unlimited data consume more data than those who purchase a plan that includes limited data.

R28.    Mr. Nuehring also opines that MetroPCS's historical pricing for 1GB of 4G Data does not provide a "strong foundation that a customer would be willing to pay $5 for each GB of [4G Data] up to 14GB."[46]  As a threshold matter, neither my Initial Report nor MetroPCS has made such an assertion.  In addition, as noted in GAAP, it is well known that discounts are offered to those who buy more goods or services.[47]  Thus, a conclusion that the standalone selling price of an item is $5 is only a conclusion that one item would be sold for $5 if sold on its own.  It does not equate to a conclusion that a bundle of 14 of those items would sell for $70.  Indeed, because a group of items often sells for less than the sum of the prices the items will sell for individually, GAAP includes guidance on how to allocate discounts to multiple items sold in a single contract.[48]

R29.    Mr. Nuehring also repeatedly asserts that the standalone selling price of $5 per GB cannot be applied to unlimited plans because the $75 total of the standalone selling prices of data elements[49] is higher than the price at which MetroPCS sold several plans that included unlimited data. Mr. Nuehring therefore asserts that, "it is not logical that the estimated standalone value of the data would exceed the overall bundled cost of an unlimited plan."[50]  In making this assertion, he repeats the assertion made previously by the CPUC in its motion for summary judgment,[51] which I addressed in my Initial Report in paragraphs 125 through 128 and summarize below.

R30.    The fact that the sum of the standalone selling prices of the elements in a bundle exceeds the selling price of the bundle is expected.  That is why GAAP includes guidance on allocating discounts.  The situation Mr. Nuehring appears to assert is "not logical,"[52] where the discount in an arrangement is larger than the standalone selling price of one or more individual

---

[44] Deloitte Report, MPCS0000777–809 at 789.  "Monthly mobile data per smartphone continues to increase in all regions.  North America has the highest usage, reaching 7.2 gigabytes (GB) at the end of 2017."

[45] March 2018 Memo, MPCS000502–664 at 522.  "14GB is an approximation of the average Internet usage by MetroPCS subscribers on plans with 'unlimited' Internet access."

[46] Nuehring Report, par. 36.

[47] Initial Report, par. 53 (quoting ASC 606-10-32-29; ASC 606-10-32-36).

[48] ASC 606-10-32-36.

[49] See Initial Report, pars. 109–110.  The $75 standalone selling price for unlimited data was calculated as: $5 (non-4G Internet access) + 14GB (4G Data) x $5 (per GB of 4G Data).  March 2018 Memo, MPCS000502–664 at 521–522.

[50] Nuehring Report, par. 43.

[51] CPUC MSJ, p. 11.

[52] Nuehring Report, par. 43.

items, is also not unusual.  Mr. Nuehring implies that this is proof that the discount inherent in the unlimited bundle should be allocated in large part to data.  However, it is also possible that those who purchase unlimited data might assign little value to voice – the fact that they wish to have unlimited data shows that their primary usage of the phone is for data service.

R31.    Moreover, Mr. Nuehring's suggestion that more of the discount should be applied to data service is inconsistent with GAAP.  GAAP provides that a subjective allocation (e.g., one based on inferences about the perceived values of different components) of discounts is inappropriate.  Rather, GAAP specifies that discounts must be allocated pro rata to all goods and services in the bundle.[53]  This provides an objective allocation that avoids the need for subjective weighting of different elements.  The Financial Accounting Standards Board (FASB) explained that "…allocating the transaction price on a relative standalone selling price basis brings rigor and discipline to the process of allocating the transaction price and, therefore, enhances comparability both within an entity and across entities."[54]  The FASB also stated that the guidance only rarely allows for discounts to be allocated in any way other than pro rata to all parts of a contract "…to maintain the rigor and discipline of a standalone selling price allocation and, thus, appropriately restrict the situations in which a discount should not be allocated pro rata to all performance obligations in the contract."[55]

R32.    ASC 606 includes an illustration where the discount in an arrangement is larger than the standalone selling price of one of the items in the arrangement.  The arrangement in the example includes three products with standalone selling prices of $50, $25, and $75, and the total consideration in the arrangement is $100.  In this example, the $50 discount is allocated pro rata to each of the three products, despite the discount being greater than the standalone selling price of one of the products.[56]

R33.    Moreover, the BVC's decision to allocate 75% of an unlimited data plan's revenues to data (based on a $75 standalone selling price for unlimited data for a plan with aggregated standalone selling prices of $100 for all service elements) was in line with contemporaneous documents reviewed such as market research, including analyses of competitor offerings.[57]

---

[53] There is one fact pattern where a pro rata application of a discount does not apply; however, that fact pattern does not apply here.

[54] Initial Report, par. 54 (quoting ASU 2014-09, par. BC280).

[55] ASU 2014-09, par. BC 282.

[56] ASC 606-10-55-257 and 55-258.

[57] See Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," October 2016, MPCS0000702–732 at 725.  In 2016, an estimated 56% to 75% is assigned to data for Boost, Straight Talk, T-Mobile, and Virgin Mobile offerings of "Prepaid Smartphone Plans" with "heavy" data usage, including unlimited data plans.  See also Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," January 2017, MPCS0000733–763 at 756, MPCS0001458–488 at 481.

R34.    Finally, Mr. Nuehring criticizes my analysis by asserting that it "focuses on MetroPCS's highest price plan, the $60 per month unlimited data 'core plan' (GSM60)."[58]  This is incorrect.  My analysis does not focus on a particular plan or price point.  Rather, my analysis focuses on the application of GAAP, which requires the determination of standalone selling prices for individual items that make up a bundled arrangement, and the subsequent allocation of the actual price charged to each item based on the relative standalone selling prices of those items.  Standalone selling prices are estimated for each individual item and are used consistently, regardless of the fact that bundles with such components may be sold for different amounts.  Of course, the amount of revenue allocated to each component changes when the price of the bundle changes, but the *relative allocation* stays the same.

R35.    In addition to this inaccurate criticism, Mr. Nuehring makes other misleading statements.  For example, he states that MetroPCS's GSM60 plan "was only used by 1.76% of customers."[59]  While this is true specifically for the GSM60 plan, Mr. Nuehring fails to mention this plan was one of 10 unlimited data plans that sold for $60 in 2017.  In fact, as shown in Exhibit C to the Second Barnes Declaration upon which both Mr. Nuehring and I rely, 12.77% of MetroPCS customers were paying $60 for plans that included unlimited data.  Ignoring this fact allows him to imply that more customers were paying $40 for an unlimited talk, text, and data plan than were paying $60.  However, taking into account all of the relevant information from Exhibit C, only 9.36% of customers were purchasing such a plan for $40 compared to the 12.77% that were purchasing such a plan for $60.[60]

R36.    Mr. Nuehring also refers to certain unlimited plans at lower price points but ignores the specific eligibility conditions required for those promotional rates.  For example, the "4UNL100 plan priced at $25"[61] was, as its name suggests, a special promotion available to customers only "on a 'four lines for $100' basis—i.e., $25 for an Unlimited Data plan only if the customer purchased *four* such plans."[62]  The fact that additional discounts are available for those who purchase multiple plans together, however, says nothing about the reasonableness of the standalone selling prices of the individual elements estimated by the BVC.  And, of course, the fact that the plans are sold for $25 results in a lower amount of revenue being allocated to each part of the plan, consistent with the objective allocation of revenue based on standalone selling prices required by GAAP.

---

[58] Nuehring Report, par. 42.

[59] Nuehring Report, par. 42.

[60] Second Barnes Declaration, Exhibit C, pp. 1–2.

[61] Nuehring Report, par. 42.

[62] Reply Declaration of John Barnes in Further Support of MetroPCS's Motion for Summary Judgment and Opposition to the CPUC's Cross-Motion for Summary Judgment and Exhibits, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 18, 2021 (Dkt. 128-1), par. 48.

### D.   Response to Mr. Nuehring's Opinion that MetroPCS's Methodology Overstates the Allocation of its Revenues to Data for 2017 and January–August 2018

R37.    Mr. Nuehring opines that, based on my "assumptions," MetroPCS's methodology to allocate revenue amongst the components of its prepaid wireless bundles "overstate[s] the allocation of revenue to data in order to minimize the payment of California universal surcharges."[63]

R38.    As a threshold matter, it is unclear what "assumptions" Mr. Nuehring believes I made to reach my opinions.  To the extent Mr. Nuehring is questioning the accuracy of the data used by MetroPCS, that item is, as discussed above, outside the scope of my Initial Report.

R39.    The purpose of my Initial Report relates to the contentions made by the CPUC that "MetroPCS's revenue allocation is not reasonable, not consistent with GAAP, and that it overestimates the revenue attributable to broadband data at the expense of surchargeable voice revenue."[64]  In my Initial Report, I explained the principles that underlie GAAP,[65] and that a methodology that follows those principles results in an allocation of revenue that is neutral and representationally faithful.[66]  I also reviewed the process used by MetroPCS, as explained in documents provided by MetroPCS, and concluded that the process, as explained, is indeed consistent with GAAP.[67]  Mr. Nuehring's "evidence" of overstatement is limited to the items discussed above, all of which were already addressed in my Initial Report.

R40.    Finally, as noted above, the Nuehring Report provides no new information or analysis to support Mr. Nuehring's assertion that MetroPCS over-allocated revenue to data and does not identify the methodology MetroPCS allegedly should have used.  Even if Mr. Nuehring's criticisms of the data points on which the BVC relied had merit (and, as explained above, they do not), it does not follow that MetroPCS "overstate[d]" its data service revenues.[68] I note that Mr. Nuehring does not show what (in his view) MetroPCS's allocations to data service (as distinct from surchargeable intrastate voice service) should have been.  Nor does Mr. Nuehring attempt to demonstrate that the CPUC's intrastate factor (72.75% of all prepaid service revenues attributed to surchargeable intrastate voice or other intrastate telecommunications service) was reasonable.

---

[63] Nuehring Report, par. 31.

[64] September 2021 Order, p. 8.

[65] Initial Report, Section VI and par. 130.

[66] Initial Report, par. 131.

[67] Initial Report, Sections VII and VIII, and par 130–133.

[68] Nuehring Report, pars. 8, 31.

IV.    **METROPCS'S SEPTEMBER–DECEMBER 2018 ALLOCATION METHOD WAS REASONABLE AND IN ACCORDANCE WITH GAAP**

R41.    In my Initial Report, I concluded that for the period from September through December 2018, MetroPCS's application of the relative selling price method for components of MetroPCS's prepaid wireless bundles was consistent with GAAP, and that this method is mechanical, rigorous, objective, and neutral.[69]

R42.    MetroPCS's BVC meets regularly (at least quarterly) to consider whether changes in circumstances warrant changes in the way revenue is allocated amongst components of its prepaid wireless bundles.  As documented in its August 2, 2018 Memo, in 2018, MetroPCS was experiencing various "significant changes," including the fact that "[d]ata consumption is increasing at a rapid rate in contrast to voice and text" and "the network is primarily for the provision of data services."[70]  Considering these events, as well as the availability of new and additional information, MetroPCS concluded that changes in the marketplace for wireless services indicated that a "cost plus gross margin" methodology would be more appropriate to use going forward.[71]  This approach is described in ASC 606 as follows:

> Expected cost plus a margin approach—An entity could forecast its expected costs of satisfying a performance obligation and then add an appropriate margin for that good or service.[72]

R43.    Mr. Nuehring again asserts that my "conclusion that MetroPCS's methodology in September-December 2018 is reasonable is erroneous and overstates MetroPCS's allocation of its revenues to data which understates its payment of California universal surcharges."[73]  As described below, this assertion again is based on criticisms of the data inputs for the methodology, which are misplaced and do not establish that the allocation to data was "overstated."

A.    **Response to Mr. Nuehring's Criticism of Underlying Data for MetroPCS's Cost Plus Gross Margin Approach**

R44.    Mr. Nuehring appears to criticize my opinion that MetroPCS's cost allocation methodology for the period of September 2018 through December 2018 is reasonable because I did not: 1) review and analyze "detailed workpapers and actual cost data" underlying the Deloitte Study; 2) analyze a MetroPCS-specific cost study; or 3) independently calculate MetroPCS's gross margin or Selling, General and Administrative Expenses margin.[74]  As described below, I disagree with Mr. Nuehring's premise that any such analysis (effectively, an audit of the

---

[69] Initial Report, par. 111.

[70] Initial Report, par. 89 and n. 105.

[71] Initial Report, par. 91.

[72] ASC 606-10-32-34(b).

[73] Nuehring Report, par. 8.

[74] Nuehring Report, pars. 45, 48–49.

accuracy of MetroPCS's business records) was required for my opinion in this case, and Mr. Nuehring provides no evidence to suggest that my opinion would change based on such an analysis.

R45.    Mr. Nuehring implies that analyzing "detailed workpapers and actual cost data" was necessary for me to be able to reach the opinions I expressed in my Initial Report. This is not true. I reviewed various contemporaneous business records, including memoranda prepared in the normal course of business by MetroPCS and an analysis prepared by Deloitte, an internationally recognized accounting, auditing, and consulting firm. As a result, I understood the information used by MetroPCS to estimate standalone selling prices and apply the "cost plus gross margin" method. As noted in my Initial Report, verifying the underlying data and information and/or auditing the work performed by Deloitte was outside of the scope of my Initial Report and not necessary for me to reach my conclusions.

R46.    Mr. Nuehring further questions the validity of the Deloitte Study on which MetroPCS relied on the basis that the study was "not specific to MetroPCS nor to the specific portfolio of MetroPCS plan types."[75] Based on discussions with knowledgeable MetroPCS personnel, MetroPCS uses the same network infrastructure as its parent company, T-Mobile. The infrastructure processes information the same way, regardless of what brand (MetroPCS or T-Mobile, for example) the customer has obtained a plan under. Therefore, it is logical to allocate the cost of operating the network evenly across the usage of the two brands.

R47.    Further, contrary to Mr. Nuehring's assertions, when applying the "cost plus gross margin" approach, MetroPCS used data specific to MetroPCS, including information about the company's various individual prepaid wireless plans and historical customer usage. Thus, MetroPCS established distinct revenue allocations for MetroPCS plans and T-Mobile postpaid plans (sometimes referred to as "Magenta" postpaid plans).[76]

R48.    Mr. Nuehring also addresses the margins applied in the "cost plus gross margin" method, noting that I did not, in my Initial Report, attempt to independently calculate or audit the margin percentages, and he asserts that I should not have concluded the methodology was reasonable without doing so.[77] My Initial Report explains why it was not necessary to examine the specific margin percentages in order to evaluate the allocation method. As discussed in paragraphs 105 and 107 of my Initial Report, MetroPCS reasonably concluded that the same margins should be applied to the voice, text and data portions of its prepaid wireless bundles. Therefore, the specific margins applied would not change the allocation of the price of a bundle amongst the voice, text and data portions of the plan because the allocation is based on *relative*

---

[75] Nuehring Report, par. 45.

[76] The "cost plus gross margin" approach includes separate allocations for "MetroPCS" and "Magenta" (i.e., T-Mobile) plans. See, e.g., T-Mobile, "BVC - SSP Framework Update.pptx," PowerPoint, August 16, 2018, MPCS0001244–257 at 249–250, MPCS0001258–271 at 263–264; T-Mobile, "Q3 2018 BVC Meeting," September 24, 2018, MPCS0001272–1301 at 1277–78. The August 16, 2018 Memo notes semi-annual re-evaluations of data inputs and adds that "[a]llocations will be considered by rate plan and each rate plan will be aggregated into cohorts based on the overall voice, text and data features of the rate plans." August 16, 2018 Memo, MPCS0000946–48 at 46, MPCS0001494–496 at 494.

[77] Nuehring Report, par. 49.

selling prices.  Using a different margin would not affect these relative percentages or ratios. The following excerpts from Paragraphs 105 and 107 of my Initial Report explain that point:

105.     By late 2018, over 98% of MetroPCS customers had a prepaid wireless plan that included Voice, Text, and 4G data, and this was not expected to change, as customers with smartphones were not even offered plans without those three components. Thus,…the BVC determined that each of the services should have the same expected margin.   While many companies do intend to realize different margins on different products or services, the BVC concluded that MetroPCS would not, if it were selling each service on a standalone basis, try to achieve different profit margins.  This conclusion is reasonable based upon the fact that separate markets for each service really did not exist.

107.     Having determined that each service would be assigned the same margin percentages, the actual margin percentages used do not actually alter the way the prices of prepaid wireless bundles would be allocated.  This is because adding the same margin percentage to each cost base does not alter the relative values for MBs of each service. For example, the sample allocation in the next section, excerpted from the August 2, 2018 Memo, shows an allocation of 95.20% to data, based upon the relative standalone selling prices (the "Total" line).  An allocation based upon cost per MB would yield the same allocations.

R49.     In sum, my opinion that MetroPCS's allocation methodology for the September 2018 through December 2018 period is consistent with GAAP remains unchanged.

**B.  Response to Mr. Nuehring's Assertion that MetroPCS's Methodology Overstates the Allocation of its Revenues to Data for September–December 2018**

R50.     Mr. Nuehring also asserts that the "cost plus gross margin" approach "serves to significantly understate the value of the voice and text service to the customer" and that "the value of these services within the bundle remains material and significant."[78]  He goes on to say, "that there is still consumer value in the voice and text services provided by MetroPCS," implying that MetroPCS's method does not acknowledge any value in voice and text services.[79] However, the application of the "cost plus gross margin" approach does not assign zero value to voice services; it simply results in a lesser value relative to data service.

R51.     Mr. Nuehring also points to certain data that he appears to believe shows that voice and text should be allocated more revenue than MetroPCS did (though he does not say how much more).  This data—selectively taken from Dr. Rosston's Report—shows that usage of voice and text services remained largely stable since 2010.[80]  Mr. Nuehring uses this data to suggest that the revenue allocated to voice and text therefore should be relatively stable across

---

[78] Nuehring Report, par. 51.

[79] Nuehring Report, par. 53.

[80] Rosston Report, par. 33.

different prepaid wireless plans.[81]  Mr. Nuehring ignores, however, a similar chart for data traffic, also included in the same section of the Rosston Report, immediately preceding the charts Mr. Nuehring does reference, that shows data traffic expanding exponentially.[82]  While voice traffic appears to have increased approximately 5–10% from 2010 through 2018, data traffic increased approximately 7,000% over the same period.[83]  As the allocation of revenues is based on relative values, it stands to reason that the portion of the bundle price that is allocated to voice and text goes down if their use remains stable while data use rises exponentially.  Relative to voice and text, data service is increasingly in demand.

R52.   Mr. Nuehring notes that MetroPCS stated in early 2018 that it was not possible to allocate revenue based upon relative usage of voice, text, and data due to differences in the characteristics of the three services.[84]  As a result, Mr. Nuehring concludes that, "in MetroPCS's own words, this conclusion just is not logical as the services are fundamentally different."[85]

R53.   As my Initial Report previously explained, the Deloitte Study provided new cost information that MetroPCS did not previously have.[86]  As noted in my Initial Report, "this new information therefore made it possible for MetroPCS to apply the 'Expected cost plus a margin approach' with rigor and objectivity for the first time."[87]  With that new information in hand, combined with the changes in the marketplace discussed above (including that the network was primarily geared towards data), MetroPCS reached a different conclusion about the appropriateness of allocating revenue based upon relative usage by late 2018.

R54.   The Nuehring Report provides no information or analysis to support his position that MetroPCS over-allocated revenue to data services.  Instead, he suggests (though provides no further detail or analysis) one alternative allocation for a single voice and text plan (the price of which he misstates).  I discuss Mr. Nuehring's suggested alternative approach in the next section of this reply report.

## V.    COMPARISON OF CPUC ALLOCATION FACTORS TO AN ALLOCATION SUGGESTED IN THE NUEHRING REPORT

R55.   Mr. Nuehring acknowledges that "both parties agreed that revenues from broadband data [are] not surchargeable, and if MetroPCS can demonstrate that the CPUC's resolutions impose a surcharge on broadband revenue, the CPUC Resolutions would be

---

[81] Nuehring Report, par. 53.

[82] Rosston Report, pars. 32–33.  In the Rosston Report, the two tables Mr. Nuehring excerpts are labeled "Figure 2" and "Figure 3" in paragraph 33, while the table Mr. Nuehring does not acknowledge is labeled "Figure 1" in the same paragraph.  When excerpting the tables, Mr. Nuehring eliminated the "Figure 2" and "Figure 3" labels.

[83] Rosston Report, pars. 32–33, Figures 1 and 3.

[84] Nuehring Report, par. 51 (referring to March 2018 Memo, MPCS000502–664 at 527).

[85] Nuehring Report, par. 51.

[86] Initial Report, par. 97.

[87] Initial Report, par. 99.

preempted as applied to MetroPCS."[88]  In addition, the Court's September 2021 Order notes that "[t]he parties also agree that the CPUC may not assess its surcharges or fees on the same interstate-service revenue that is already subject to the FCC's assessments…," and that "MetroPCS could also show a conflict with the FCC's competitive neutrality policy by demonstrating that…prepaid carriers, but not postpaid carriers, were assessed on revenue from text messaging…."[89]

R56.    In paragraphs 112 to 115 (and Appendix C) of my Initial Report, I presented the results of an analysis showing that, using MetroPCS's allocation methods (which I believe are reasonable and in accordance with GAAP), the CPUC's allocation factors result in the assessment of the CPUC's surcharges on revenue properly allocable to broadband data, text messaging, and interstate voice service.  In his Report, Mr. Nuehring does not dispute that the CPUC's intrastate factors (72.75% in 2017 and 69.45% in 2018) resulted in an assessment of the surcharge on at least some of the revenue from MetroPCS's data services (or text messaging or interstate voice service).

R57.    Instead, Mr. Nuehring asserts that "MetroPCS limited its analysis to plans that bundle voice, text, and broadband data services that it labelled 'core' plans."[90]  However, my Initial Report explains that I reviewed Exhibits C–E of the Second Declaration of John Barnes, which includes each MetroPCS prepaid wireless calling plan with customers in 2017 and 2018.  My analysis showed that the CPUC's intrastate factor results in an assessment of the surcharge on data service for almost all of those plans (more than 97% and 98% of all active plans in 2017 and 2018, respectively).[91]  Nothing in the Nuehring Report shows that the methodology that resulted in these calculations was unreasonable or would otherwise fail to comply with GAAP or the FCC's Bundling Order.

R58.    Mr. Nuehring does not propose a methodology that MetroPCS should have used instead of the methodology it implemented.  However, he appears to suggest that a Talk & Text plan (without any data service included) could be used to support the amount allocated to voice and text messaging services.[92]  He notes that if one accepted a Talk & Text plan price as the correct allocation to voice/text, it would result in 26.67% of "the hypothetical $75 plan" being allocated to those (non-data) bundle elements.[93]

R59.    In proposing this alternative allocation, Mr. Nuehring ignores the fact that a purchaser of a bundle including voice, text, and data would expect a discount, and he provides no

---

[88] Nuehring Report, par. 23 (quoting September 2021 Order, p. 4).

[89] September 2021 Order, p. 5.

[90] Nuehring Report par. 13.

[91] Initial Report, pars. 112–115.

[92] Mr. Nuehring incorrectly suggests that MetroPCS sold at least one Talk & Text plan for $20.  Nuehring Report, par. 52 ("[I]n this time period MetroPCS was still selling a talk/text only plan for $20").  In fact, the MetroPCS Talk & Text plans were all sold for $25.  See Second Barnes Declaration, Exhibit C, p. 4; Second Barnes Declaration, Exhibit D, p. 5; Second Barnes Declaration, Exhibit E, p. 5.

[93] Nuehring Report, par. 52.

explanation for why he would allocate no amount of discount to the voice and text portion of the bundled plan. That approach would not be acceptable under ASC 605 or ASC 606. Nonetheless, based on Mr. Nuehring's suggested allocation, I performed an analysis similar to the one included my Initial Report, using the same sales price data that had previously been presented in Exhibits C, D, and E to the Second Declaration of John Barnes. Those exhibits include information about the percentage of California customers who purchased each plan, broken down further by the monthly price (including taxes and fees) for each plan. See Appendix E to this Reply Report.

R60.    In my analysis presented in Appendix E,[94] I used a MetroPCS Talk & Text plan (as suggested by Mr. Nuehring) as a basis for the amounts assigned to the voice and text components of the bundle, with no discount applied to those amounts. MetroPCS has consistently sold such plans for $25 and, during the relevant period, allocated 80% of that value to voice and 20% to text (the $20 standalone selling price for voice service is 80% of the $25 retail price). Therefore, using the allocation suggested by Mr. Nuehring, I assigned $20 to voice in 2017 and 2018, with no discount applied. The amounts allocated to voice are then adjusted by the "intrastate voice factor" calculated by MetroPCS based on its "traffic studies" and previously the subject of an examination (for 2017) by the CPUC.[95]

R61.    As shown in Appendix E, even using Mr. Nuehring's suggestion, which allocates no discount to voice service, the percentage of the bundle price that would be allocated to intrastate voice service in 2017 is an average of 51% and ranges from approximately 29% to approximately 71%. In every case, then, the allocation implied by Mr. Nuehring for surchargeable intrastate voice service is less than the CPUC's mandatory intrastate factor of 72.75% under the 2017 Resolution. On average for 2017, the allocation implied by Mr. Nuehring suggests that the CPUC's 2017 Resolution imposed surcharges on more than 22% of non-surchargeable revenue (including data service revenue) from a bundle.

R62.    In 2018, using the method suggested by Mr. Nuehring, the percentage of the bundle price that would be allocated to intrastate voice service is an average of 51%, and ranges from approximately 29% to approximately 88%. For over 73% of customers, the allocation suggested by Mr. Nuehring is less than the CPUC's mandatory intrastate factor of 69.45% under the 2018 Resolution. On average for 2018, the allocation implied by Mr. Nuehring suggests that CPUC's 2018 Resolution imposed surcharges on more than 18% of non-surchargeable revenue (including data service revenue) from a bundle.

R63.    To further demonstrate how the CPUC Resolutions imposed surcharges on non-surchargeable revenue, see Figure 1 below, which compares the allocation of revenue to voice

---

[94] By assessing the impact on CPUC surcharge assessments of the allocation that Mr. Nuehring proposes, I do not in any way accept or agree with Mr. Nuehring's analysis (which is flawed for the reasons discussed in this Reply). Nor do I suggest that it would be appropriate to ignore discounts, which is contrary to GAAP. Rather, I include this analysis to illustrate that even the voice service allocation suggested by CPUC's own expert shows that CPUC's intrastate allocation factors (72.75% and 69.45% in 2017 and 2018, respectively) overstate revenue applicable to intrastate telecommunications revenue and therefore impose assessments on non-surchargeable broadband data service.

[95]  Second Barnes Declaration, pars. 33–36; Barnes Reply Declaration, Exhibit A.

between: 1) the analysis in my Initial Report (Appendix C, adjusted for MetroPCS's annual average intrastate factor); 2) my revised analysis based on Mr. Nuehring's flawed assertion that $20 should be assigned to voice; and 3) the CPUC's 2017 and 2018 intrastate factors.

**[START HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]**

**Figure 1**

Comparison of the Percentage of Revenue Allocated to Voice



\* For the purposes of Figure 1, Appendix C has been adjusted to incorporate MetroPCS's annual intrastate factor and the corresponding blended rate for intrastate voice.  No other adjustments have been made to Appendix C.  See Appendix F.

**[END HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]**

## VI.    OPINIONS AND CONCLUSIONS

R64.    After considering and analyzing Mr. Nuehring's Report, I continue to stand by the conclusions in my Initial Report.

R65.    Mr. Nuehring does not dispute several key points addressed in my Initial Report, including:  1) the appropriateness of applying GAAP standards to determine whether MetroPCS used reasonable methodologies for allocating its revenues for its prepaid wireless plans (indeed, the Nuehring Report does not reference GAAP other than in summarizing MetroPCS's approach and my Initial Report); and 2) the validity of (a) MetroPCS's building block allocation methodology for 2017 and from January through August of 2018; or (b) MetroPCS's "cost plus gross margin" methodology from September through December of 2018.

R66.    Instead, Mr. Nuehring makes erroneous claims about an alleged lack of data supporting MetroPCS's application of these methodologies.  Most fundamentally, this misses the point that I am not a fact witness for MetroPCS – and my Initial Report never purported to

analyze the evidentiary basis for data points underlying the BVC's revenue allocations; instead, I am offering my opinion (as an independent expert on GAAP) on the reasonableness of the methodologies MetroPCS used.  In any event, Mr. Nuehring ignores many of the contemporaneous documents that MetroPCS's BVC reasonably considered, and which I also reviewed, discussed with MetroPCS personnel, and cited in my Initial Report.  I saw nothing to suggest either: 1) that the data does not exist, or 2) that it was used erroneously by MetroPCS.

R67.    I conclude in my Initial Report that the principles of GAAP make it well-suited to building a methodology to allocate revenue amongst the components of MetroPCS's prepaid wireless plans in a neutral, representationally faithful manner.  The Nuehring Report does not contest this conclusion.

R68.    I conclude in my Initial Report that MetroPCS's BVC reasonably applied the principles in GAAP in allocating its revenue from prepaid wireless plans amongst voice, text, and broadband data.  The Nuehring Report does not specifically contest this conclusion either. Instead, the Nuehring Report repeats conclusory assertions previously expressed by the CPUC regarding the allocation methodology.

R69.    I addressed both of these points in my Initial Report, and the Nuehring Report provides no new information or analysis to support these positions.  And because he makes no attempt to demonstrate what (in his view) MetroPCS's revenue allocations should have been, his assertion that MetroPCS "overstate[d]" its data service revenues is unfounded.[96]

R70.    My Initial Report includes a comparison of the allocation of revenue under MetroPCS's methodology to the allocation required by the CPUC under its mandatory intrastate factors for 2017 and 2018 (72.75% and 69.45% in 2017 and 2018, respectively), using information previously provided to the CPUC by MetroPCS.  I continue to stand by that comparison.  Mr. Nuehring does not attempt to show that the CPUC's 2017 and 2018 Resolutions did not impose surcharge assessments on at least some of MetroPCS's revenues properly allocated to data service (or other non-surchargeable service).

R71.    Finally, even using Mr. Nuehring's alternative (but flawed) implied allocation based on a single MetroPCS Talk & Text plan, the CPUC's mandatory intrastate factors 1) result in a greater allocation of revenue to intrastate voice service than Mr. Nuehring's suggested allocation, and 2) thus produce a surcharge assessment on broadband data and other non-surchargeable services that MetroPCS included in its prepaid wireless service bundles.

Executed on this March 24, 2022

Scott A. Taub, CPA

---

[96] Nuehring Report, par. 8.

# Appendix D to the Taub Reply Report
# Documents Considered

| No. | Document Title |
|---|---|
| | **Legal Documents** |
| 1. | Plaintiff's Notice of Motion and Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Marybel Batjer, et al.*, November 24, 2020 (Dkt. 112) |
| 2. | Defendants' Notice of Motion, Cross-Motion for Summary Judgment, and Opposition to the Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC. vs. Marybel Batjer, et al.*, February 19, 2021 (Dkt. 123) |
| 3. | Plaintiff MetroPCS's Combined Reply in Support of its Motion for Summary Judgment and Permanent Injunction and in Opposition to the CPUC's Cross-Motion for Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 19, 2021 (Dkt. 128) |
| 4. | Defendants' Sur-Reply Brief in Opposition to Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, April 9, 2021 (Dkt 134) |
| 5. | Plaintiff MetroPCS's Response to the CPUC's Sur-Reply Regarding Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, April 19, 2021 (Dkt 137) |
| 6. | Defendants' Supplemental Brief, *MetroPCS California, LLC v. Marybel Batjer, et al.*, May 11, 2021 (Dkt 148) |
| 7. | Plaintiff MetroPCS's Court-Requested Supplemental Brief in Support of its Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Marybel Batjer, et al.*, May 11, 2021 (Dkt. 150) |
| 8. | Order Granting in Part and Denying in Part Motions for Summary Judgment and Providing Notice of Intent to Appoint Special Master and Scheduling Further Status Conference, *MetroPCS California, LLC v. Marybel Batjer*, September 22, 2021 (Dkt. 152) |
| | **Letters, Transcripts, Declarations and Related Exhibits** |
| 9. | Letter from MetroPCS California, LLC to CPUC, "MetroPCS' Response to Supplemental Staff Inquiries re Stand Alone Value Allocations," October 7, 2016 |
| 10. | Declaration of John Barnes in Support of Plaintiff's Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Michael Picker, et al.*, April 5, 2018 (Dkt. 63-39) |
| 11. | Declaration of Daniel Drobac in Support of Plaintiff's Motion for Summary Judgment and Permanent Injunction, *MetroPCS California, LLC v. Michael Picker, et al.*, April 6, 2018 (Dkt. 63-41) |
| 12. | Letter from CPUC to MetroPCS California, LLC, "Demand to MetroPCS California, LLC (U-3079-C) to comply with CPUC Resolutions T-17542 and T-17579 by Paying Outstanding California Telecommunications Public Purpose Program (PPP) surcharges and User Fees for years 2017 and 2018," October 16, 2020 |
| 13. | Second Declaration of John Barnes in Support of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction and Exhibits, *MetroPCS California LLC v. Marybel Batjer, et al.*, November 23, 2020 (Dkt. 112-24) |
| 14. | Declaration of Eric van Wambeke in Support of Defendants' Cross-Motion for Summary Judgment, and Opposition to Plaintiff's Motion for Summary Judgment, *MetroPCS California, LLC v. Marybel Batjer, et al.*, February 17, 2021 (Dkt. 123-1) |
| 15. | Reply Declaration of John Barnes in Further Support of MetroPCS's Motion for Summary Judgment and Opposition to the CPUC's Cross-Motion for Summary Judgment and Exhibits, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 18, 2021 (Dkt. 128-1) |
| 16. | Declaration of Tracy Fok in Support of Defendants' Sur-Reply Brief, *MetroPCS California, LLC v. Marybel Batjer, et al.*, March 29, 2021 (Dkt. 134-1) |
| 17. | Transcript of Proceedings by Zoom Webinar, *MetroPCS California, LLC, v. Marybel Batjer, et al.*, April 23, 2021 (Dkt. 146) |

## Appendix D to the Taub Reply Report
## Documents Considered

| No. | Document Title |
|---|---|
| | **Public Materials** |
| 18. | 47 U.S.C. § 152 |
| 19. | 47 U.S.C. § 254 |
| 20. | Accounting Standards Codification, *Topic 105, Generally Accepted Accounting Principles* |
| 21. | Accounting Standards Codification, *Topic 605, Revenue Recognition Guide* |
| 22. | Accounting Standards Codification, *Topic 606, Revenue from Contracts with Customers* |
| 23. | Accounting Standards Update No. 2009-13, *Revenue Recognition (Topic 605), Multiple-Deliverable Revenue Arrangements*, October 2009 |
| 24. | Accounting Standards Update No. 2014-09, *Revenue Contracts with Customers (Topic 606),* May 2014 |
| 25. | Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting* |
| 26. | Ernst & Young, "Financial Reporting Developments, A Comprehensive Guide: Revenue from Contracts with Customers (ASC 606)," Revised November 2020 |
| 27. | California Public Utilities Commission, "The Prepaid Mobile Telephony Services Surcharge Collection Act," enacted by Assembly Bill 1717, (Chapter 885, Statutes 2014, Perea) |
| 28. | California Public Utilities Commission, "Resolution T-17542," November 16, 2016 |
| 29. | California Public Utilities Commission, "Resolution T-17579," November 17, 2017 |
| 30. | California Public Utilities Commission, "Resolution T-17595," December 8, 2017 |
| 31. | FCC Announces Results of World's First Broadcast Incentive Auction available at https://www.fcc.gov/document/fcc-announces-results-worlds-first-broadcast-incentive-auction-0. |
| 32. | *Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of the Licenses and Authorizations*, FCC WT Docket No. 18-197, June 18, 2018, available at https://ecfsapi.fcc.gov/file/10618281006240/Public%20Interest%20Statement%20and%20Appendices %20A-J%20(Public%20Redacted)%20.pdf |
| 33. | MetroPCS, "$25 Unlimited Talk and Text," [archived], available at https://web.archive.org/web/20160325194804/https://www.metropcs.com/25forall.html |
| 34. | T-Mobile, SEC Form 10-K for the period ended December 31, 2017, filed on February 8, 2018, available at https://www.sec.gov/Archives/edgar/data/0001283699/000128369918000011/tmus12312017form10-k.htm#sE345D8833D5E54348859808E2AF2A864 |
| 35. | "Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter", SEC Release No 33-8221; FR-70 |
| | **MetroPCS Provided Documents** |
| 36. | California Public Utilities Commission, "Staff Report - Part 2: Order Instituting Rulemaking to Update Surcharge Mechanism to Ensure Equity and Transparency of Fees, Taxes and Surcharges Assessed on Customers of Telecommunications Services in California (R.21-03-002)," October 2021, MPCS0000665–701 |
| 37. | Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," October 2016, MPCS0000702–732 |
| 38. | Current Analysis, "T-Mobile/MetroPCS Wireless Pricing Trend Analysis: The Evolution of Voice, Messaging, and Data Pricing Splits," January 2017, MPCS0000733–763, MPCS0001458–488 |
| 39. | Deloitte, "Services Related to the Revenue Recognition of Bundled Component Services," May 9, 2018, MPCS0000764–776 |
| 40. | Deloitte, "T-Mobile USA, Inc.: Revenue Allocation for Business, Accounting, and Tax Compliance and Reporting Purposes," November 30, 2018, MPCS0000777–809 |
| 41. | Email from Neil Gavin to Timothy Dawson, et al., "Q2 BVC Final Summary Minutes & Slides," with attached documents "Q2 2016 BVC Presentation FINAL.pptx" and "2016 Q2 MRC Allocation BVC Control Memo FINAL.docx," July 2, 2016, MPCS0000810, MPCS0001491 |

# Appendix D to the Taub Reply Report
# Documents Considered

| No. | Document Title |
|---|---|
| 42. | Email from Neil Gavin to Timothy Dawson, et al., "RE: Q4 BVC formal meeting," with attached document "Q4 2016 BVC Presentation v1.pptx," December 16, 2016, MPCS0001489–490 |
| 43. | Email from Jayson Gray to John Barnes, "RE: May 2016 - Usage Stats," with attached document "Unit Economics: August 2017," October 30, 2017, MPCS0000811–12 |
| 44. | Email from Marie Harris to John Barnes, "BVC Meeting," January 18, 2018, MPCS0000813 |
| 45. | Email from Bryan Dean to Henny Widjaja, et al., "FW: Q1 2018 BVC Memo Approval," with attached document "2018 Q1 MRC Allocation BVC Control Memo.docx," April 11, 2018, MPCS0000814–16 |
| 46. | Email from Paul McCoy (Deloitte) to Steven King, et al., "RE: Deloitte Deck for Meeting," with attached document "TMUS Draft Slides 5.9.2018," May 9, 2018, MPCS0000817–830 |
| 47. | Email from Bryan Dean to John Barnes, "Fwd: BVC Quarterly SOX Control - Approvals," with attached documents "Q3 18 BVC Slides.pptx," "2018+Q3+MRC+Allocation+BVC+Control+Memo.docx," ""BVC - Standalone Selling Price Determinatio1.docx," and "BVC - Process for updating Standalone Selling Prices (SSPs1.docx", November 9, 2018, MPCS0000831–32 |
| 48. | Grant Thornton, "MetroPCS Florida, LLC: Performance Audit on Compliance with Federal Universal Service Fund Contributor Rules, USAC Audit No. CR2015CP026," May 2, 2017, MPCS0000833–856 |
| 49. | Grant Thornton, "MetroPCS Texas, LLC: Performance Audit on Compliance with Federal Universal Service Fund Contributor Rules, USAC Audit No. CR2015CP022," May 2, 2017, MPCS0000857–880 |
| 50. | Memo from Revenue Accounting to Files, "Re: Q2 2015 MRC Allocation Review - BVC Quarterly Control Meeting and Supplemental Discussion / Materials," July 6, 2015, MPCS0000881–895 |
| 51. | Memo from Revenue Accounting to Files, "Re: Q1 2016 MRC Allocation Review Minutes- BVC Quarterly Control," March 28, 2015, MPCS0000896–97 |
| 52. | Memo from John Barnes (MetroPCS) to Eric Van Wambeke (CPUC), "Re: Application of MTS Surcharge and Local Charges," June 24, 2016, MPCS0000898–900 |
| 53. | Memo from Revenue Accounting to Files, "Re: Q2 2016 MRC Allocation Review Minutes- BVC Quarterly Control," June 29, 2016, MPCS0000901–03 |
| 54. | Memo from TMUS Accounting Policy to Files, "Re: ASC Topic 606: Identifying Performance Obligations," July 27, 2016, MPCS0000904–923 |
| 55. | Memo from Revenue Accounting to Files, "Re: Q4 2016 MRC Allocation Review Minutes- BVC Quarterly Control," January 2, 2017, MPCS0000924–26 |
| 56. | Memo from Revenue Accounting to Files, "Re: Q1 2017 MRC Allocation Review Minutes- BVC Quarterly Control," April 1, 2017, MPCS0000927–28 |
| 57. | Memo from Revenue Accounting to Files, "Re: Q2 2017 MRC Allocation Review Minutes- BVC Quarterly Control," July 1, 2017, MPCS0000929–930 |
| 58. | Memo from Revenue Accounting to Files, "Re: Q3 2017 MRC Allocation Review Minutes- BVC Quarterly Control," September 28, 2017, MPCS0000931–32 |
| 59. | Memo from Revenue Accounting to Files, "Re: Q4 2017 MRC Allocation Review Minutes- BVC Quarterly Control," January 5, 2018, MPCS0000933–35 |
| 60. | Memo from Revenue Accounting to Files, "Re: Q1 2018 MRC Allocation Review Minutes- BVC Quarterly Control," April 3, 2018, MPCS0000936–38 |
| 61. | Memo from Revenue Accounting to Files, "Re: Q2 2018 MRC Allocation Review Minutes-BVC Quarterly Control," July 11, 2018, MPCS0000939–941 |
| 62. | Memo from Revenue Accounting to Files, "Re: Bundle Valuation Committee (BVC) - Standalone Selling Price Determination," August 2, 2018, MPCS0000942–45 |
| 63. | Memo from Revenue Accounting to Files, "Re: Bundle Valuation Committee- Process for Updating Standalone Selling Prices (SSPs)," August 16, 2018, MPCS0000946–48, MPCS0001494–96 |
| 64. | Memo from Revenue Accounting to Files, "Re: Q3 2018 MRC Allocation Review Minutes- BVC Quarterly Control," October 7, 2018, MPCS0000949–950, MPCS0001492–93 |
| 65. | Memo from Revenue Accounting to Files, "Re: Q4 2018 MRC Allocation Review Minutes- BVC Quarterly Control," January 1, 2019, MPCS0000951–52 |

# Appendix D to the Taub Reply Report
# Documents Considered

| No. | Document Title |
|---|---|
| 66. | "MetroPCS's Bundle Allocation Methodology," Bundle Valuation Committee, March 9, 2018, MPCS000502–664 |
| 67. | MetroPCS, "Tablet Rate Plans," MPCS0000953 |
| 68. | Q1 2017 Methodology & Calculation of Estimated MRC (T-Mobile MetroPCS Q1 2017 Mob).xlsx, MPCS0000954 |
| 69. | Q4 2016 Methodology & Calculation of Estimated MRC (T-Mobile MetroPCS Q4 2016 Mob).xlsx, MPCS0000955 |
| 70. | T-Mobile, "Standalone Selling Price (SSP): MRC Allocation, Discussion Document," January 2015, MPCS0000956–960 |
| 71. | T-Mobile, "Q1 2016 BVC Formal Meeting," March 15, 2016, MPCS0000961–992 |
| 72. | T-Mobile, "Q2 2016 BVC Formal Meeting Update," June 24, 2016, MPCS0000993–1023 |
| 73. | T-Mobile, "Q3 3016 BVC Formal Meeting Update," September 12, 2016, MPCS0001024–052 |
| 74. | T-Mobile, "Q4 2016 BVC Formal Meeting Update," December 16, 2016, MPCS0001053–081, MPCS0001497–1525 |
| 75. | T-Mobile, "Q1 2017 BVC Formal Meeting Update," March 23, 2017, MPCS0001082–1109 |
| 76. | T-Mobile, "Q2 2017 BVC Formal Meeting Update," June 16, 2017, MPCS0001110–137 |
| 77. | T-Mobile, "Q3 2017 BVC Formal Meeting Update," September 28, 2017, MPCS0001138–168 |
| 78. | T-Mobile, "Q4 2017 BVC Formal Meeting Update," December 19, 2017, MPCS0001169–197 |
| 79. | T-Mobile, "Q1 2018 BVC Formal Meeting Update," March 19, 2018, MPCS0001198–1219 |
| 80. | T-Mobile, "Q2 2018 BVC Formal Meeting Update," June 26, 2018, MPCS0001220–243 |
| 81. | T-Mobile, "BVC - SSP Framework Update.pptx," PowerPoint, August 16, 2018, MPCS0001244–257, MPCS0001258–271 |
| 82. | T-Mobile, "Q3 2018 BVC Meeting," September 24, 2018, MPCS0001272–1301 |
| 83. | T-Mobile, "Q4 2018 BVC Meeting," December 19, 2018, MPCS0001302–326 |
| 84. | T-Mobile, "Unit Economics Snapshot - All Brands, Normalized View," August 2017, MPCS0001327–343 |
| 85. | Unit Economics August 2017 (Unit Economics_201709).xlsx, MPCS0001344 |
| | **Discussions with MetroPCS Personnel** |
| 86. | Discussion with John Barnes held on November 17, 2021 |
| 87. | Discussion with John Barnes held on December 3, 2021 |
| 88. | Discussion with John Barnes held on December 13, 2021 |
| **89.** | **Discussion with John Barnes held on March 1, 2022** |
| **90.** | **Discussion with John Barnes held on March 21, 2022** |
| | **Expert Reports** |
| 91. | Expert Report of Gregory Rosston, dated January 21, 2022 |
| **92.** | **Rebuttal Expert Report of Bert Nuehring, dated February 24, 2022** |

**Note: Items in bold are newly considered in my Reply Report in response to statements made in the Rebuttal Expert Report of Bert Nuehring. Even if not included in this list, I also considered and relied upon any other documents cited in my report or exhibits.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix E to the Taub Reply Report
Analysis of MetroPCS Plans
Assuming $20 Revenue Allocation for Voice

| | | | 2017 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | % of Allocated Revenue | | | Comparison of Intrastate Voice to CPUC Factor | | | |
| Quantity High Speed 4G LTE | Monthly Price | % of Customers With Plan | Data % | Text % | Voice % | MetroPCS Intrastate Voice Factor | Implied Intrastate Voice % | Greater Than CPUC Factor of 72.75%? | Blended Rate of Intrastate Voice |
| | | A | | | B | C | D = B x C | | E = D x A |
| *Unlimited Data Plans* | | | | | | | | | |
| UNL | $60 | 10.8% | 62.5% | 4.2% | 33.3% | 88.3% | 29.4% | No | 3.2% |
| UNL | $60 | 1.9% | 59.0% | 7.7% | 33.3% | 88.3% | 29.4% | No | 0.6% |
| UNL | $55 | 2.2% | 59.7% | 4.0% | 36.4% | 88.3% | 32.1% | No | 0.7% |
| UNL | $55 | 0.9% | 56.3% | 7.3% | 36.4% | 88.3% | 32.1% | No | 0.3% |
| UNL | $50 | 10.9% | 56.3% | 3.7% | 40.0% | 88.3% | 35.3% | No | 3.9% |
| UNL | $50 | 1.3% | 53.1% | 6.9% | 40.0% | 88.3% | 35.3% | No | 0.5% |
| UNL | $45 | 0.9% | 49.2% | 6.4% | 44.4% | 88.3% | 39.3% | No | 0.4% |
| UNL | $40 | 9.4% | 46.9% | 3.1% | 50.0% | 88.3% | 44.2% | No | 4.1% |
| UNL | $30 | 1.0% | 31.3% | 2.1% | 66.7% | 88.3% | 58.9% | No | 0.6% |
| UNL | $25 | 4.3% | 18.8% | 1.2% | 80.0% | 88.3% | 70.7% | No | 3.1% |
| *Plans with 8GB* | | | | | | | | | |
| 8GB | $50 | 1.8% | 54.0% | 6.0% | 40.0% | 88.3% | 35.3% | No | 0.6% |
| 8GB | $30 | 2.2% | 30.0% | 3.3% | 66.7% | 88.3% | 58.9% | No | 1.3% |
| *Plans with 6GB* | | | | | | | | | |
| 6GB | $50 | 0.0% | 52.5% | 7.5% | 40.0% | 88.3% | 35.3% | No | 0.0% |
| 6GB | $40 | 1.5% | 43.8% | 6.2% | 50.0% | 88.3% | 44.2% | No | 0.7% |
| 6GB | $30 | 1.6% | 29.2% | 4.2% | 66.7% | 88.3% | 58.9% | No | 1.0% |
| 6GB | $25 | 0.9% | 17.5% | 2.5% | 80.0% | 88.3% | 70.7% | No | 0.6% |
| *Plans with 5GB* | | | | | | | | | |
| 5GB | $50 | 2.9% | 51.4% | 8.6% | 40.0% | 88.3% | 35.3% | No | 1.0% |
| 5GB | $45 | 0.9% | 47.6% | 7.9% | 44.4% | 88.3% | 39.3% | No | 0.3% |
| 5GB | $40 | 0.7% | 42.9% | 7.1% | 50.0% | 88.3% | 44.2% | No | 0.3% |
| 5GB | $36 | 0.2% | 38.1% | 6.4% | 55.6% | 88.3% | 49.1% | No | 0.1% |
| 5GB | $35 | 0.2% | 36.7% | 6.1% | 57.1% | 88.3% | 50.5% | No | 0.1% |
| 5GB | $34 | 0.1% | 35.3% | 5.9% | 58.8% | 88.3% | 52.0% | No | 0.0% |
| 5GB | $30 | 0.1% | 28.6% | 4.8% | 66.7% | 88.3% | 58.9% | No | 0.0% |
| 5GB | $25 | 2.6% | 17.1% | 2.9% | 80.0% | 88.3% | 70.7% | No | 1.8% |
| *Plans with 3GB* | | | | | | | | | |
| 3GB | $40 | 8.6% | 40.0% | 10.0% | 50.0% | 88.3% | 44.2% | No | 3.8% |
| 3GB | $35 | 4.5% | 34.3% | 8.6% | 57.1% | 88.3% | 50.5% | No | 2.3% |
| 3GB | $30 | 2.8% | 26.7% | 6.7% | 66.7% | 88.3% | 58.9% | No | 1.7% |
| 3GB | $25 | 0.0% | 16.0% | 4.0% | 80.0% | 88.3% | 70.7% | No | 0.0% |
| *Plans with 2GB* | | | | | | | | | |
| 2GB | $40 | 0.0% | 38.0% | 12.0% | 50.0% | 88.3% | 44.2% | No | 0.0% |
| 2GB | $35 | 0.0% | 32.6% | 10.2% | 57.1% | 88.3% | 50.5% | No | 0.0% |
| 2GB | $30 | 0.3% | 25.4% | 8.0% | 66.7% | 88.3% | 58.9% | No | 0.2% |
| 2GB | $30 | 2.5% | 25.0% | 8.3% | 66.7% | 88.3% | 58.9% | No | 1.4% |
| 2GB | $25 | 3.0% | 15.2% | 4.8% | 80.0% | 88.3% | 70.7% | No | 2.1% |
| 2GB | $25 | 2.1% | 15.0% | 5.0% | 80.0% | 88.3% | 70.7% | No | 1.5% |
| *Plans with 1GB* | | | | | | | | | |
| 1GB | $30 | 6.9% | 22.2% | 11.1% | 66.7% | 88.3% | 58.9% | No | 4.1% |
| 1GB | $25 | 7.4% | 13.3% | 6.7% | 80.0% | 88.3% | 70.7% | No | 5.2% |
| *Voice/Text plan (no 4G Data)* | | | | | | | | | |
| NONE | $25 | 2.4% | 0.0% | 20.0% | 80.0% | 88.3% | 70.7% | No | 1.7% |
| **Total 2017** | | **100.0%** | | | | | | | **49.2%** |

| | | |
|---|---|---|
| *Minimum Implied Intrastate Voice % 2017* | 29% | |
| *Maximum Implied Intrastate Voice % 2017* | 71% | |
| *Average Implied Intrastate Voice % 2017* | 51% | B |
| *CPUC Factor* | 72.75% | A |
| ***Average Incremental Surcharges on Non-Surchargeable Revenue*** | **22%** | A-B |

*Percentage of customers with implied voice % less than the CPUC factor (72.75%)*   100.0%

Source: Second Declaration of John Barnes In Support Of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction, Exhibits C; CPUC Resolution T-17542

# Appendix E to the Taub Reply Report
## Analysis of MetroPCS Plans
## Assuming $20 Revenue Allocation for Voice

| | | | January – August 2018 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | % of Allocated Revenue | | | Comparison of Intrastate Voice to CPUC Factor | | | Implied % of Revenue |
| Quantity High Speed 4G LTE | Monthly Price | % of Customers With Plan | Data % | Text % | Voice % | MetroPCS Intrastate Voice Factor | Implied Intrastate Voice % | Greater Than CPUC Factor of 69.45%? | Implied % of Revenue Attributable to Intrastate Voice |
| | | A | | | B | C | D = B x C | | E = D x A |
| *Unlimited Data Plans* | | | | | | | | | |
| UNL | $60 | 7.0% | 62.5% | 4.2% | 33.3% | 88.5% | 29.5% | No | 2.1% |
| UNL | $60 | 0.7% | 59.0% | 7.7% | 33.3% | 88.5% | 29.5% | No | 0.2% |
| UNL | $55 | 0.3% | 59.7% | 4.0% | 36.4% | 88.5% | 32.2% | No | 0.1% |
| UNL | $55 | 0.2% | 56.3% | 7.3% | 36.4% | 88.5% | 32.2% | No | 0.1% |
| UNL | $50 | 12.3% | 56.3% | 3.7% | 40.0% | 88.5% | 35.4% | No | 4.3% |
| UNL | $50 | 0.5% | 53.1% | 6.9% | 40.0% | 88.5% | 35.4% | No | 0.2% |
| UNL | $48 | 0.0% | 54.7% | 3.6% | 41.7% | 88.5% | 36.9% | No | 0.0% |
| UNL | $45 | 0.0% | 52.1% | 3.5% | 44.4% | 88.5% | 39.3% | No | 0.0% |
| UNL | $45 | 0.2% | 49.2% | 6.4% | 44.4% | 88.5% | 39.3% | No | 0.1% |
| UNL | $40 | 4.1% | 46.9% | 3.1% | 50.0% | 88.5% | 44.2% | No | 1.8% |
| UNL | $30 | 6.4% | 31.3% | 2.1% | 66.7% | 88.5% | 59.0% | No | 3.8% |
| UNL | $26 | 0.1% | 21.6% | 1.4% | 76.9% | 88.5% | 68.1% | No | 0.1% |
| UNL | $25 | 11.4% | 18.8% | 1.2% | 80.0% | 88.5% | 70.8% | Yes | 8.1% |
| UNL | $24 | 0.0% | 15.6% | 1.0% | 83.3% | 88.5% | 73.7% | Yes | 0.0% |
| *Plans with 8GB* | | | | | | | | | |
| 8GB | $50 | 0.3% | 54.0% | 6.0% | 40.0% | 88.5% | 35.4% | No | 0.1% |
| 8GB | $30 | 0.3% | 30.0% | 3.3% | 66.7% | 88.5% | 59.0% | No | 0.2% |
| *Plans with 6GB* | | | | | | | | | |
| 6GB | $50 | 0.0% | 52.5% | 7.5% | 40.0% | 88.5% | 35.4% | No | 0.0% |
| 6GB | $40 | 1.2% | 43.8% | 6.2% | 50.0% | 88.5% | 44.2% | No | 0.5% |
| 6GB | $30 | 0.5% | 29.2% | 4.2% | 66.7% | 88.5% | 59.0% | No | 0.3% |
| 6GB | $25 | 0.7% | 17.5% | 2.5% | 80.0% | 88.5% | 70.8% | Yes | 0.5% |
| *Plans with 5GB* | | | | | | | | | |
| 5GB | $50 | 0.8% | 51.4% | 8.6% | 40.0% | 88.5% | 35.4% | No | 0.3% |
| 5GB | $45 | 0.2% | 47.6% | 7.9% | 44.4% | 88.5% | 39.3% | No | 0.1% |
| 5GB | $40 | 2.2% | 42.9% | 7.1% | 50.0% | 88.5% | 44.2% | No | 1.0% |
| 5GB | $36 | 0.0% | 38.1% | 6.4% | 55.6% | 88.5% | 49.2% | No | 0.0% |
| 5GB | $35 | 0.0% | 36.7% | 6.1% | 57.1% | 88.5% | 50.6% | No | 0.0% |
| 5GB | $34 | 0.0% | 35.3% | 5.9% | 58.8% | 88.5% | 52.0% | No | 0.0% |
| 5GB | $30 | 0.3% | 28.6% | 4.8% | 66.7% | 88.5% | 59.0% | No | 0.2% |
| 5GB | $25 | 0.5% | 17.1% | 2.9% | 80.0% | 88.5% | 70.8% | Yes | 0.4% |
| *Plans with 3GB* | | | | | | | | | |
| 3GB | $40 | 2.4% | 40.0% | 10.0% | 50.0% | 88.5% | 44.2% | No | 1.1% |
| 3GB | $35 | 1.2% | 34.3% | 8.6% | 57.1% | 88.5% | 50.6% | No | 0.6% |
| 3GB | $30 | 0.8% | 26.7% | 6.7% | 66.7% | 88.5% | 59.0% | No | 0.5% |
| 3GB | $25 | 0.0% | 16.0% | 4.0% | 80.0% | 88.5% | 70.8% | Yes | 0.0% |
| *Plans with 2GB* | | | | | | | | | |
| 2GB | $40 | 0.0% | 38.0% | 12.0% | 50.0% | 88.5% | 44.2% | No | 0.0% |
| 2GB | $35 | 0.0% | 32.6% | 10.2% | 57.1% | 88.5% | 50.6% | No | 0.0% |
| 2GB | $30 | 0.1% | 25.4% | 8.0% | 66.7% | 88.5% | 59.0% | No | 0.1% |
| 2GB | $30 | 4.4% | 25.0% | 8.3% | 66.7% | 88.5% | 59.0% | No | 2.6% |
| 2GB | $25 | 1.0% | 15.2% | 4.8% | 80.0% | 88.5% | 70.8% | Yes | 0.7% |
| 2GB | $25 | 1.1% | 15.0% | 5.0% | 80.0% | 88.5% | 70.8% | Yes | 0.8% |
| *Plans with 1GB* | | | | | | | | | |
| 1GB | $30 | 1.9% | 22.2% | 11.1% | 66.7% | 88.5% | 59.0% | No | 1.1% |
| 1GB | $25 | 2.1% | 13.3% | 6.7% | 80.0% | 88.5% | 70.8% | Yes | 1.5% |
| *Voice/Text plan (no 4G Data)* | | | | | | | | | |
| NONE | $25 | 1.3% | 0.0% | 20.0% | 80.0% | 88.5% | 70.8% | Yes | 0.9% |
| **Sub-Total** | | **66.4%** | | | | | | | **34.0%** |

Source:  Second Declaration of John Barnes In Support Of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction, Exhibit D; CPUC Resolution T-17579

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix E to the Taub Reply Report
Analysis of MetroPCS Plans
Assuming $20 Revenue Allocation for Voice

| | | | September – December 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | % of Allocated Revenue | | | Comparison of Intrastate Voice to CPUC Factor | | |
| **Quantity High Speed 4G LTE** | **Monthly Price** | **% of Customers With Plan** | **Data %** | **Text %** | **Voice %** | **MetroPCS Intrastate Voice Factor** | **Implied Intrastate Voice %** | **Greater Than CPUC Factor of 69.45%?** | **Implied % of Revenue Attributable to Intrastate Voice** |
| | | A | | | B | C | D = B x C | | E = D x A |
| *Unlimited Data Plans* | | | | | | | | | |
| UNL | $60 | 0.1% | 66.5% | 0.1% | 33.3% | 88.5% | 29.49% | No | 0.02% |
| UNL | $60 | 3.1% | 66.5% | 0.1% | 33.3% | 88.5% | 29.49% | No | 0.92% |
| UNL | $55 | 0.1% | 63.5% | 0.1% | 36.4% | 88.5% | 32.2% | No | 0.0% |
| UNL | $50 | 0.2% | 59.9% | 0.1% | 40.0% | 88.5% | 35.4% | No | 0.1% |
| UNL | $50 | 6.9% | 59.9% | 0.1% | 40.0% | 88.5% | 35.4% | No | 2.4% |
| UNL | $48 | 0.0% | 58.2% | 0.1% | 41.7% | 88.5% | 36.9% | No | 0.0% |
| UNL | $45 | 0.0% | 55.4% | 0.1% | 44.4% | 88.5% | 39.3% | No | 0.0% |
| UNL | $45 | 0.1% | 55.4% | 0.1% | 44.4% | 88.5% | 39.3% | No | 0.0% |
| UNL | $40 | 0.1% | 49.9% | 0.1% | 50.0% | 88.5% | 44.2% | No | 0.0% |
| UNL | $40 | 0.9% | 49.9% | 0.1% | 50.0% | 88.5% | 44.2% | No | 0.4% |
| UNL | $30 | 1.7% | 33.3% | 0.1% | 66.7% | 88.5% | 59.0% | No | 1.0% |
| UNL | $30 | 3.2% | 33.3% | 0.1% | 66.7% | 88.5% | 59.0% | No | 1.9% |
| UNL | $26 | 1.3% | 23.0% | 0.1% | 76.9% | 88.5% | 68.1% | No | 0.9% |
| UNL | $25 | 6.3% | 20.0% | 0.0% | 80.0% | 88.5% | 70.8% | Yes | 4.4% |
| UNL | $24 | 0.0% | 16.6% | 0.1% | 83.3% | 88.5% | 73.7% | Yes | 0.0% |
| *Plans with 10GB* | | | | | | | | | |
| 10GB | $40 | 0.4% | 49.7% | 0.3% | 50.0% | 88.5% | 44.2% | No | 0.2% |
| 10GB | $30 | 0.0% | 33.1% | 0.2% | 66.7% | 88.5% | 59.0% | No | 0.0% |
| *Plans with 8GB* | | | | | | | | | |
| 8GB | $50 | 0.1% | 59.6% | 0.4% | 40.0% | 88.5% | 35.4% | No | 0.0% |
| 8GB | $30 | 0.1% | 33.1% | 0.2% | 66.7% | 88.5% | 59.0% | No | 0.0% |
| *Plans with 6GB* | | | | | | | | | |
| 6GB | $50 | 0.0% | 59.6% | 0.4% | 40.0% | 88.5% | 35.4% | No | 0.0% |
| 6GB | $40 | 0.4% | 49.7% | 0.3% | 50.0% | 88.5% | 44.2% | No | 0.2% |
| 6GB | $30 | 0.2% | 33.1% | 0.2% | 66.7% | 88.5% | 59.0% | No | 0.1% |
| 6GB | $25 | 0.2% | 19.9% | 0.1% | 80.0% | 88.5% | 70.8% | Yes | 0.2% |
| *Plans with 5GB* | | | | | | | | | |
| 5GB | $50 | 0.3% | 59.6% | 0.4% | 40.0% | 88.5% | 35.4% | No | 0.1% |
| 5GB | $45 | 0.1% | 55.2% | 0.4% | 44.4% | 88.5% | 39.3% | No | 0.0% |
| 5GB | $40 | 1.1% | 49.7% | 0.3% | 50.0% | 88.5% | 44.2% | No | 0.5% |
| 5GB | $36 | 0.0% | 44.1% | 0.3% | 55.6% | 88.5% | 49.2% | No | 0.0% |
| 5GB | $35 | 0.0% | 42.6% | 0.3% | 57.1% | 88.5% | 50.6% | No | 0.0% |
| 5GB | $34 | 0.0% | 40.9% | 0.3% | 58.8% | 88.5% | 52.0% | No | 0.0% |
| 5GB | $30 | 0.1% | 33.1% | 0.2% | 66.7% | 88.5% | 59.0% | No | 0.1% |
| 5GB | $25 | 0.2% | 19.9% | 0.1% | 80.0% | 88.5% | 70.8% | Yes | 0.1% |
| *Plans with 3GB* | | | | | | | | | |
| 3GB | $40 | 0.8% | 49.5% | 0.5% | 50.0% | 88.5% | 44.2% | No | 0.4% |
| 3GB | $35 | 0.4% | 42.4% | 0.4% | 57.1% | 88.5% | 50.6% | No | 0.2% |
| 3GB | $30 | 0.3% | 33.0% | 0.3% | 66.7% | 88.5% | 59.0% | No | 0.2% |
| 3GB | $25 | 0.0% | 19.8% | 0.2% | 80.0% | 88.5% | 70.8% | Yes | 0.0% |
| *Plans with 2GB* | | | | | | | | | |
| 2GB | $40 | 0.0% | 49.6% | 0.4% | 50.0% | 88.5% | 44.2% | No | 0.0% |
| 2GB | $35 | 0.0% | 42.5% | 0.3% | 57.1% | 88.5% | 50.6% | No | 0.0% |
| 2GB | $30 | 3.0% | 33.1% | 0.3% | 66.7% | 88.5% | 59.0% | No | 1.8% |
| 2GB | $25 | 1.5% | 19.8% | 0.2% | 80.0% | 88.5% | 70.8% | Yes | 1.1% |
| *Voice/Text plan (no 4G Data)* | | | | | | | | | |
| NONE[1] | $25 | 0.6% | 0.0% | 0.0% | 100.0% | 88.5% | 88.5% | Yes | 0.5% |
| **Sub-Total** | | **33.6%** | | | | *Minimum Implied Intrastate Voice % 2018* | 29% | **Sub-Total** | **17.7%** |
| | | | | | | *Maximum Implied Intrastate Voice % 2018* | 88% | | |
| **Total 2018** | | **100.0%** | | | | *Average Implied Intrastate Voice % 2018* | 51.2%   B | **Total 2018** | **51.8%** |
| | | | | | | CPUC Factor | 69.45%   A | | |
| *Percentage of customers with implied voice % less than the CPUC factor (69.45%)* | | 73.06% | | | | *Average Incremental Surcharges on Non-Surchargeable Revenue* | 18%   A-B | | |

Source:  Second Declaration of John Barnes In Support Of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction, Exhibit E; CPUC Resolution T-17579

Note:

[1] Based on Exhibit E to the Second Declaration of John Barnes, 100% of revenue was allocated to voice services for the Talk & Text plans.  Thus, for the purposes of my analysis, I allocated
     the full "Monthly Price" of $25 to "Voice" rather than the assumed $20.

# Appendix F to the Taub Reply Report

## Analysis of MetroPCS's Allocation for California Customers, Adjusted for MetroPCS's Intrastate Factor 2017 and 2018

### 2017

| Quantity High Speed 4G LTE | % of Customers With Plan | % of Allocated Revenue | | | Blended Rate | | | Blended Intrastate Voice Rate | |
|---|---|---|---|---|---|---|---|---|---|
| | | Data % | Text % | Voice % | Data | Text | Voice | MetroPCS Intrastate Voice Factor | Intrastate Voice |
| UNL | 38.7% | 75.0 | 5.0 | 20.0 | 29.0% | 1.9% | 7.7% | 88.3% | 6.8% |
| UNL | 5.0% | 65.9 | 8.6 | 25.6 | 3.3% | 0.4% | 1.3% | 88.3% | 1.1% |
| 8GB | 4.0% | 64.3 | 7.1 | 28.6 | 2.6% | 0.3% | 1.2% | 88.3% | 1.0% |
| 6GB | 4.0% | 58.3 | 8.3 | 33.3 | 2.4% | 0.3% | 1.3% | 88.3% | 1.2% |
| 5GB | 7.5% | 54.5 | 9.1 | 36.4 | 4.1% | 0.7% | 2.7% | 88.3% | 2.4% |
| 3GB | 16.0% | 44.5 | 11.1 | 44.5 | 7.1% | 1.8% | 7.1% | 88.3% | 6.3% |
| 2GB | 3.4% | 44.3 | 13.9 | 41.8 | 1.5% | 0.5% | 1.4% | 88.3% | 1.2% |
| 2GB | 4.6% | 37.5 | 12.5 | 50.0 | 1.7% | 0.6% | 2.3% | 88.3% | 2.0% |
| 1GB | 14.3% | 28.6 | 14.3 | 57.1 | 4.1% | 2.0% | 8.2% | 88.3% | 7.2% |
| NONE | 2.4% | 0.0 | 13.5 | 86.5 | 0.0% | 0.3% | 2.1% | 88.3% | 1.9% |
| **Total 2017** | **100.0%** | | | | **55.8%** | **8.9%** | **35.3%** | | **31.2%** |

### January - August 2018

| Quantity High Speed 4G LTE | % of Customers With Plan | % of Allocated Revenue | | | Blended Rate | | | Blended Intrastate Voice Rate | |
|---|---|---|---|---|---|---|---|---|---|
| | | Data % | Text % | Voice % | Data | Text | Voice | MetroPCS Intrastate Voice Factor | Intrastate Voice |
| UNL | 41.5% | 75.0 | 5.0 | 20.0 | 31.1% | 2.1% | 8.3% | 88.5% | 7.3% |
| UNL | 1.6% | 65.9 | 8.6 | 25.6 | 1.0% | 0.1% | 0.4% | 88.5% | 0.4% |
| 8GB | 0.6% | 64.3 | 7.1 | 28.6 | 0.4% | 0.0% | 0.2% | 88.5% | 0.2% |
| 6GB | 2.4% | 58.3 | 8.3 | 33.3 | 1.4% | 0.2% | 0.8% | 88.5% | 0.7% |
| 5GB | 4.0% | 54.5 | 9.1 | 36.4 | 2.2% | 0.4% | 1.5% | 88.5% | 1.3% |
| 3GB | 4.4% | 44.5 | 11.1 | 44.5 | 1.9% | 0.5% | 1.9% | 88.5% | 1.7% |
| 2GB | 1.1% | 44.3 | 13.9 | 41.8 | 0.5% | 0.2% | 0.5% | 88.5% | 0.4% |
| 2GB | 5.5% | 37.5 | 12.5 | 50.0 | 2.1% | 0.7% | 2.7% | 88.5% | 2.4% |
| 1GB | 4.0% | 28.6 | 14.3 | 57.1 | 1.2% | 0.6% | 2.3% | 88.5% | 2.0% |
| NONE | 1.3% | 0.0 | 13.5 | 86.5 | 0.0% | 0.2% | 1.1% | 88.5% | 1.0% |
| **Sub-Total** | **66.4%** | | | | **41.8%** | **4.9%** | **19.7%** | | **17.5%** |

### September - December 2018

| Quantity High Speed 4G LTE | % of Customers With Plan | % of Allocated Revenue | | | Blended Rate | | | Blended Intrastate Voice Rate | |
|---|---|---|---|---|---|---|---|---|---|
| | | Data % | Text % | Voice % | Data | Text | Voice | MetroPCS Intrastate Voice Factor | Intrastate Voice |
| UNL | 3.4% | 95.6 | 0.2 | 4.2 | 3.2% | 0.0% | 0.1% | 88.5% | 0.1% |
| UNL | 20.6% | 95.5 | 0.2 | 4.3 | 19.7% | 0.0% | 0.9% | 88.5% | 0.8% |
| 10 GB | 0.4% | 88.4 | 0.6 | 11.0 | 0.4% | 0.0% | 0.0% | 88.5% | 0.0% |
| 8 GB | 0.2% | 88.4 | 0.6 | 11.0 | 0.1% | 0.0% | 0.0% | 88.5% | 0.0% |
| 6GB | 0.8% | 86.4 | 0.6 | 13.1 | 0.7% | 0.0% | 0.1% | 88.5% | 0.1% |
| 5GB | 1.7% | 85.0 | 0.6 | 14.4 | 1.4% | 0.0% | 0.2% | 88.5% | 0.2% |
| 2GB | 4.5% | 81.4 | 0.7 | 18.0 | 3.6% | 0.0% | 0.8% | 88.5% | 0.7% |
| 2GB | 0.0% | 81.4 | 18.0 | 0.7 | 0.0% | 0.0% | 0.0% | 88.5% | 0.0% |
| 3GB | 1.5% | 79.7 | 0.8 | 19.5 | 1.2% | 0.0% | 0.3% | 88.5% | 0.3% |
| NONE | 0.6% | 0.0 | 0.0 | 100.0 | 0.0% | 0.0% | 0.6% | 88.5% | 0.5% |
| **Sub-Total** | **33.6%** | | | | **30.3%** | **0.1%** | **3.1%** | | **2.8%** |
| **Total 2018** | **100.0%** | | | | **72.1%** | **5.0%** | **22.9%** | | **20.2%** |

Source: Second Declaration of John Barnes In Support Of Plaintiff MetroPCS California, LLC's Motion for Summary Judgment and Permanent Injunction, Exhibits C, D, and E

Note:

[1]  For the purposes of Figure 1, Appendix C has been adjusted to incorporate MetroPCS's annual average intrastate factor and the corresponding blended rate for intrastate voice.  No other adjustments have been made to Appendix C.