United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

METROPCS CALIFORNIA, LLC,

Plaintiff,

v.

ALICE REYNOLDS, et al.,

Defendants.

Case No.  3:17-cv-05959-JD

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Plaintiff MetroPCS California, LLC (MetroPCS), a provider of prepaid cell phone plans in California, has sued the Commissioners of the California Public Utilities Commission (CPUC) for a declaration that, as applied to MetroPCS, two CPUC resolutions governing the calculation of surcharges on MetroPCS's revenues from intrastate telecommunications service are preempted by federal law.  MetroPCS asks that the CPUC be permanently enjoined from enforcing the contested resolutions against it for the calendar years 2017 and 2018.

This order brings to a close a case that has been litigated for several years before two district judges and the court of appeals.  The parties' most recent cross-motions for summary judgment were denied, Dkt. No. 210, and the Court held a one-day bench trial, Dkt. No. 232.  Both sides presented witnesses and expert testimony, and moved various documents into evidence.  After the close of evidence, the parties filed proposed findings of fact and conclusions of law, and the Court heard closing arguments.  Dkt. Nos. 238, 239, 242.

The Court makes the ensuing findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).  In light of the evidence admitted at trial, the Court's observation of the demeanor, credibility, and candor of the witnesses, and the arguments of the parties, the Court concludes that the CPUC's 2017 and 2018 resolutions are preempted as applied to

MetroPCS because they would impose surcharges on revenues from services that are not subject to surcharge, in violation of federal law.

**BACKGROUND**

**I.      STATUTORY AND REGULATORY FRAMEWORK**

To frame the dispute between the parties, the Court summarizes the relevant statutory and regulatory context, which has been laid out in considerable detail in prior proceedings. *See generally MetroPCS Cal., LLC v. Picker*, 348 F. Supp. 3d 948 (N.D. Cal. 2018) (*MetroPCS I*); *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106 (9th Cir. 2020) (*MetroPCS II*); *MetroPCS Cal., LLC v. Batjer*, No. 17-cv-05959-SI, 2021 WL 4311468 (N.D. Cal. Sept. 22, 2021) (*MetroPCS III*).

**A.      Universal Service**

"The universal availability of critical telecommunications services" -- otherwise known as "universal service" -- "is 'a fundamental goal of federal telecommunications regulation.'" *MetroPCS II*, 970 F.3d at 1110 (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1098 (D.C. Cir. 2009)). The Federal Communications Commission (FCC) has been charged with promoting universal service since its inception in 1934. *See id.* "The FCC initially pursued the universal-service mandate by providing explicit and implicit subsidies." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 778 (6th Cir. 2023). "Opening the [telecommunications] market to competition in the 1980s and 1990s necessitated a new approach to promoting universal service." *Id.* (citing *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999)).

The FCC created the federal Universal Service Fund (USF) "to ease the transition to a competitive market and address universal service in high-cost areas," *id.*, and more broadly "to further the objective of making communication service available to all Americans at reasonable charges," *Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1315 (D.C. Cir. 1988). The USF in its current form traces back to Section 254 of the Telecommunications Act of 1996, which "recognized preexisting and additional priorities of universal service and called for 'specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.'" *Consumers' Rsch.*, 67 F.4th at 779 (quoting 47 U.S.C. § 254(b)(5)). The USF "supports, among other things,

the extension of high-speed internet to rural areas and the provision of discounted phone services to low income consumers." *MetroPCS II*, 970 F.3d at 1111.

Providers of interstate telecommunications services, such as MetroPCS, are required to contribute to the USF. *See* 47 U.S.C. § 254(d) ("Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service."). "These contribution requirements are imposed on revenues the providers derive from their customers' interstate telecommunications." *MetroPCS II*, 970 F.3d at 1109. A provider's USF contributions "'are calculated by applying a quarterly "contribution factor"' to the portion of their surchargeable telecommunications revenues that is interstate." *Id.* at 1111 (footnote omitted) (quoting *Rural Cellular Ass'n*, 588 F.3d at 1099).

Under federal telecommunications law, states play a role in promoting universal service. *See id.* at 1110. "A State may adopt regulations not inconsistent with the [FCC's] rules to preserve and advance universal service." 47 U.S.C. § 254(f). "Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." *Id.* California collects universal service contributions by "impos[ing] surcharges on consumers' use of intrastate telecommunications services and relies on providers to collect those surcharges from their customers." *MetroPCS II*, 970 F.3d at 1109.

This case is principally concerned with two aspects of the federal-state universal service funding framework. The first is that not all the revenues of an interstate telecommunications provider can be subject to state surcharge. As relevant here, revenue from mobile broadband internet service is not surchargeable by the CPUC, as the FCC has deemed broadband internet service as "jurisdictionally interstate" and preempted states from imposing new surcharges on broadband. *In re Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601, 5803 (2015) ("[W]e reaffirm the [FCC's] longstanding conclusion that broadband Internet access service is jurisdictionally interstate for regulatory purposes. . . . [W]e preempt any state from imposing any new state USF contributions on broadband."); *see also In re Restoring Internet Freedom*, 33 FCC

3

Rcd. 311, 429 n.736 (2018) ("We note that we continue to preempt any state from imposing any new state universal service fund contributions on broadband Internet access service.").  The parties have agreed "that if MetroPCS can demonstrate that the CPUC's resolutions assessed a surcharge on broadband revenue, the resolutions would be preempted as applied to MetroPCS." *MetroPCS III*, 2021 WL 4311468, at *3.

The second aspect is the principle of competitive neutrality.  "The FCC has determined that the [statutory] requirement that contributions be imposed 'on an equitable and nondiscriminatory basis' encompasses '[t]he principle of competitive neutrality.'" *MetroPCS II*, 970 F.3d at 1120 (quoting *In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 8801 (1997)).  "The FCC has defined competitive neutrality to mean that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *Id.* (cleaned up). "To the extent a state regulation violates" the requirement of competitive neutrality, "the regulation is preempted -- and one way in which a regulation can impermissibly create an unfair disadvantage is by causing the double assessment of one provider's revenue but not a competing provider's revenue." *Id.* at 1121-22 (cleaned up).

## B.    The California Prepaid Act and the CPUC's Implementing Resolutions

Within this statutory and regulatory framework, in 2014, California adopted the Prepaid Mobile Telephony Services Surcharge Collection Act (Prepaid Act).[1]  The Prepaid Act was

---

[1] The Prepaid Act contained a sunset provision that led to its repeal on January 1, 2020.  *See* Cal. Rev. & Tax. Code § 42024 (2019).  "For ease of reference," the Court does not "note the Prepaid Act's expiration when citing provisions of the Act which are no longer in effect." *MetroPCS II*, 970 F.3d at 1112 n.5.

In prior proceedings, the Ninth Circuit examined the question of whether MetroPCS's case became moot with the expiration of the Prepaid Act.  *See MetroPCS II*, 970 F.3d at 1115.  At that time, the CPUC had not yet brought an action against MetroPCS to enforce its 2017 and 2018 resolutions, but the Ninth Circuit held that there was still a live controversy in light of the "possibility that the CPUC will bring an enforcement action against MetroPCS if the resolutions are upheld." *Id.* at 1117.  After the Ninth Circuit's opinion was filed in August 2020, the CPUC issued a letter to MetroPCS demanding payment of over $220 million for unpaid surcharges, fees, and interest from 2017 and 2018, underscoring that a live controversy remains. *See* Trial Exh. 232 at 3.

United States District Court
Northern District of California

inspired by increasing demand for prepaid wireless services and "was intended to 'ensure equitable contributions from end-use consumers of postpaid and prepaid mobile telephony services in [California]' by 'standardiz[ing] . . . the method used to collect communications taxes, fees, and surcharges from end-use consumers of prepaid mobile telephony services.'" *Id.* at 1113 (alterations in original) (quoting Cal. Rev. & Tax. Code § 42002(e)). The Prepaid Act provided that "a prepaid MTS [mobile telephony services] surcharge shall be imposed on each prepaid consumer and shall be collected by a seller from each prepaid consumer at the time of each retail transaction in this state." Cal. Rev. & Tax. Code § 42010(a)(1).

The Ninth Circuit's decision in *MetroPCS II* summarized the relevant features of the Prepaid Act and the CPUC's resolutions implementing the legislation:

> Under the Prepaid Act, a single surcharge rate, which included a component funding state universal service programs, had to be "imposed on each prepaid consumer." *See* [Cal. Rev. & Tax. Code] § 42010(a)(1), (b)(2). . . . The surcharge was required to "be imposed as a percentage of the sales price" of each purchase of prepaid services, *id.* § 42010(a)(1); *see also id.* § 42018(a), using a rate the CPUC would establish each year, *id.* § 42010(b)(2); *see also* Cal. Pub. Util. Code § 319(b)-(c). . . .

> The CPUC issued a series of resolutions implementing the Prepaid Act. The first resolution (the "2016 Resolution") set a surcharge rate of 8.51%, which it stated applied only to "intrastate revenues subject to surcharge." But the 2016 Resolution did not specify how that amount of intrastate revenue was to be determined. . . .

> The CPUC changed course in its next resolution (the "2017 Resolution"). The CPUC explained that, on further study, it had determined that the 2016 Resolution did not comply with the Prepaid Act. The CPUC now believed that the Prepaid Act required that the surcharge rate "be applied to the total sales price" of prepaid services instead of only "the intrastate portion" of the sales price.

> The 2017 Resolution began by setting an initial surcharge rate of 7.0854% using the methods the CPUC had relied on in 2016. Then, because the CPUC had concluded that any surcharge rate had to apply to the "total" prepaid sales price, the CPUC took the further step of adjusting that initial rate by what it called an "intrastate allocation factor." The CPUC calculated an intrastate allocation factor of 72.75% based on the percentages of intrastate revenue reported by prepaid providers. The result was a 5.15% adjusted surcharge rate (7.0854% multiplied by the intrastate allocation factor of 72.75%), which the 2017 Resolution specified applied to the entire sales price.

United States District Court
Northern District of California

Although the 2017 Resolution required applying that *adjusted* surcharge rate to the *entire* sales price, it achieved the same mathematical result as applying the *unadjusted* surcharge rate to the intrastate *portion* of the sales price, as determined by applying the CPUC's intrastate allocation factor. To illustrate using a hypothetical $40 plan, applying the adjusted surcharge rate of 5.15% to the entire price of that plan would have produced a surcharge of $2.06. The same surcharge amount would result from using the 72.75% intrastate allocation factor to determine that $29.10 of that $40 plan was intrastate revenue, and then applying the unadjusted surcharge rate of 7.0854% only to that revenue.

…

The next CPUC resolution (the "2018 Resolution") took the same approach as the 2017 Resolution, but with updated rates. As relevant here, it adopted a new intrastate allocation factor of 69.45% for determining prepaid intrastate revenue subject to surcharge.

*MetroPCS II*, 970 F.3d at 1113-14 (footnote omitted).

The crux of this dispute is the CPUC's decision to adopt an intrastate allocation factor to fix the percentage of each prepaid provider's revenue from intrastate telecommunications services at 72.75% in 2017 and 69.45% in 2018 -- for purposes of calculating state surcharges -- irrespective of an individual provider's actual revenue allocations. MetroPCS asked to modify the 2017 resolution on the ground that direct sellers of prepaid services (such as MetroPCS) should be allowed use revenue-allocation methods recognized by the FCC "to determine intrastate revenue, rather than being required to use the intrastate allocation factor to do so." *Id.* at 1114. The CPUC denied the application and reaffirmed a one-size-fits-all approach, which did not similarly constrain providers of postpaid wireless services. *See id.*

## II.    THE LITIGATION

### A.    Proceedings Through the Ninth Circuit's Remand

In the operative second amended complaint, MetroPCS alleged two claims against the CPUC. *See* Dkt. No. 49 ¶¶ 68-82. Only the first claim, for "violation [of the Supremacy Clause] of Article VI of the United States Constitution," remains at issue in this case.[2] *Id.* at 29. MetroPCS says that the CPUC's Prepaid Act resolutions "conflict with and stand as an obstacle to

---

[2] MetroPCS withdrew at trial the second claim under the dormant Commerce Clause. *See* Trial Tr. at 8:18-9:3.

United States District Court
Northern District of California

1    the fulfilment of federal law" and "are preempted both facially and as applied to MetroPCS." *Id.*

2    ¶ 70.  The prior district judge assigned to this case granted summary judgment to MetroPCS,

3    finding that both of the challenged CPUC resolutions, and the Prepaid Act itself, were facially

4    preempted and unconstitutional:  "the usage of a mandatory intrastate allocation factor conflicts

5    with federal law because it deprives carriers of the ability to treat as intrastate for universal service

6    purposes the same revenues that they treat as intrastate for federal USF contributions." *MetroPCS*

7    *I*, 348 F. Supp. 3d at 962; *see also id.* at 966.

8          The Ninth Circuit reversed the prior district court's determination that the CPUC

9    resolutions were facially preempted.  Under the rules of a facial preemption challenge, MetroPCS

10   was required to "show that no set of circumstances existed under which the resolutions were

11   valid." *MetroPCS II*, 970 F.3d at 1122 (cleaned up) (citing *Puente Ariz. v. Arpaio*, 821 F.3d 1098,

12   1104 (9th Cir. 2016)).  Put more directly, MetroPCS needed to "demonstrate that every application

13   of the CPUC resolutions caused an unfair disadvantage for prepaid services." *Id.*  MetroPCS did

14   not clear that high bar.  The Ninth Circuit gave the hypothetical example of "a provider that sold a

15   $100 voice-only prepaid plan in California and relied on a traffic study showing 25% interstate

16   traffic and 75% intrastate traffic for its federal universal service contributions." *Id.* at 1124.  In

17   that scenario, the "FCC would have applied its contribution factor to $25, while the CPUC, using

18   its 2017 intrastate allocation factor of 72.75%, would have applied its surcharge rate to another

19   $72.75." *Id.*  "No disadvantageous double assessment would have occurred." *Id.*

20         The Ninth Circuit did not foreclose the possibility that the CPUC resolutions could be

21   preempted as applied to MetroPCS, a question that the district court did not reach in *MetroPCS I*.

22   With respect to an as-applied challenge, the Ninth Circuit stated that "the resolutions would be

23   preempted if applying them to MetroPCS resulted in double assessments on MetroPCS's revenue,

24   which would unfairly disadvantage MetroPCS relative to its competitors -- and thereby conflict

25   with the competitive neutrality requirement." *Id.* at 1126.  "Resolving that as-applied claim

26   requires a largely factual inquiry that is best left to the district court." *Id.*

27         *MetroPCS II* also declined to reach an "alternative ground[] for wholly invalidating the

28   CPUC resolutions," namely that the CPUC's "2017 and 2018 intrastate allocation factors were

1    'based on a fundamentally flawed methodology' and impermissibly 'require[d] a substantial

2    assessment' of non-surchargeable revenue."  *Id.*

3        **B.    Post-Remand Proceedings**

4        On remand to the district court, MetroPCS and the CPUC filed cross-motions for summary

5    judgment directed to as-applied preemption, highlighting the surchargeability issue.  The parties

6    "agree[d] that revenue from broadband data is not surchargeable by the CPUC," and "that if

7    MetroPCS can demonstrate that the CPUC's resolutions assessed a surcharge on broadband

8    revenue, the resolutions would be preempted as applied to MetroPCS."  *MetroPCS III*, 2021 WL

9    4311468, at *3.

10       The prior district judge recognized that resolving this as-applied challenge would require

11   consideration of how to allocate revenues between the different components of MetroPCS's

12   bundled wireless service offerings -- voice, text, and broadband data.  After "review[ing] the

13   voluminous evidence in the record," the district judge could not "determine on summary judgment

14   that the manner in which MetroPCS has allocated its bundled revenue is reasonable as a matter of

15   law," and "determined that . . . it is appropriate to appoint a Special Master pursuant to Federal

16   Rule of Civil Procedure [53] to assist the Court in determining whether MetroPCS's revenue

17   allocation methodology is reasonable (including what evidence is needed to make that

18   determination), and relatedly whether the CPUC's Resolutions impermissibly assess broadband

19   data or other non-intrastate revenue."  *Id.* at *5-6.  The plan to appoint a special master was later

20   abandoned due to the parties' inability to agree on one candidate, *see* Dkt. No. 161, and a bench

21   trial was scheduled for June 2022, *see* Dkt. No. 166.

22       In February 2022, the case was reassigned to this Court.  *See* Dkt. No. 171.  After two case

23   management conferences and discussion about the necessity of a bench trial, *see* Dkt. Nos. 180,

24   181, 185, 190, 197, the parties submitted a plan for a second round of post-remand summary

25   judgment briefing, and jointly represented that were no genuine disputes of material facts that

26   would preclude summary judgment, *see* Dkt. No. 196 at 2.  Even so, the CPUC filed an opposition

27   to summary judgment on the ground that "MetroPCS's proffered facts are subject to dispute."

28   Dkt. No. 205 at 1; *see also id.* at 2 ("Even if the Court were to let [MetroPCS's] new evidence in,

United States District Court
Northern District of California

8

1    though, that new evidence does not entitle MetroPCS to judgment as a matter of law.  It is patently

2    flawed, and patently subject to dispute."); *id.* at 15 ("MetroPCS'[s] main fact witness, Mr. Barnes,

3    is not credible.  His testimony is subject to dispute, as is Taub's.").  Why the CPUC flip-flopped

4    on the question of disputed facts is unknown, but in any event, the Court denied the parties'

5    renewed cross-motions for summary judgment in favor of a trial.  *See* Dkt. No. 210; *FTC v. D-*

6    *Link Sys., Inc.*, No. 17-cv-00039-JD, 2018 WL 6040192 (N.D. Cal. Nov. 5, 2018).

7           The Court held a bench trial on May 30, 2023.  MetroPCS tried two as-applied preemption

8    claims.  The first was that the CPUC, through its 2017 and 2018 resolutions, "imposed surcharges

9    on MetroPCS's revenues . . . from services that are not surchargeable as a matter of federal law, in

10   particular mobile broadband data service."  Dkt. No. 235 at 9:15-18.  The second preemption

11   claim was "that the resolutions subjected MetroPCS to a substantially higher surcharge[] burden

12   than similarly situated post paid carriers were required to pay, and this violates the federal

13   requirement of competitive neutrality."  *Id.* at 10:19-22.  The Court heard closing arguments on

14   July 20, 2023, after the parties had filed proposed findings of fact and conclusions of law.  *See*

15   Dkt. No. 242.

16                                   **FINDINGS OF FACT**

17          1.      During the relevant period of 2017 and 2018, MetroPCS was a provider of prepaid

18   wireless (cell phone) plans in California.  *See* Dkt. No. 235 (Trial Tr.) at 16:8-17:7; *see also* Trial

19   Exh. 225 at 1 ¶ 6.

20          2.      MetroPCS provided only prepaid wireless service.  It did not offer any postpaid

21   plans.  *See* Trial Exh. 225 at 1 ¶ 6.  The main difference between prepaid and postpaid plans is that

22   postpaid plans involve an extension of credit to the consumer.  *See* Trial Tr. at 16:10-19.

23   Consumers enrolled in prepaid plans pay for their wireless service in advance.  *See id.*

24          3.      MetroPCS offered prepaid wireless plans in three categories of service:  voice, text,

25   and data.  *See id.* at 16:10-12, 20-22; *see also* Trial Exh. 7 at 2, 14; Trial Exh. 225 at 2 ¶ 8.

26   "Voice" includes traditional phone calls, calling features, and voicemail.  *See* Trial Exh. 7 at 16.

27   "Text" involves standard text messaging services.  *See* Trial Tr. at 29:6-8; *see also* Trial Exh. 7 at

28   14 n.9.  The "Data" category encompasses mobile broadband internet access and data services,

United States District Court
Northern District of California

1    which during the relevant period included high-speed 4G LTE data and slower 3G speeds.  *See*

2    Trial Exh. 7 at 7, 17; Trial Tr. at 30:16-23.

3          4.        During the relevant period, all MetroPCS prepaid wireless plans included unlimited

4    voice -- that is, the ability to make unlimited intrastate and interstate voice calls -- and unlimited

5    text messaging.  *See* Trial Exh. 225 ¶ 16; Trial Exh. 27 at 1.  Most, but not all, of MetroPCS's

6    plans included some data allowance.  *See* Trial Exh. 27 at 1; Trial Tr. at 25:13-17.

7          5.        Each MetroPCS plan provided a "bundle" of voice, text, and where applicable, data

8    services.  MetroPCS allocates revenue from its wireless plans to the different components of each

9    bundle in the ordinary course of business, in order to calculate its federal universal service

10   contributions, state surcharge obligations, and taxes.  *See* Trial Tr. at 20:13-24; Trial Exh. 7 at 2.

11         6.        Since 2010, MetroPCS has relied on a "Bundle Valuation Committee" (BVC) to

12   allocate revenue to the different components of its bundled service offerings.  *See* Trial Tr. at 18:6-

13   22; Trial Exh. 7 at 2.  The BVC is comprised of "members from accounting, revenue accounting

14   specifically, marketing and tax."  Trial Tr. at 18:25-19:6.

15         7.        The BVC developed revenue-allocation methods that applied Generally Accepted

16   Accounting Principles (GAAP) to determine the "relative pricing of the components of its prepaid

17   wireless service plans (e.g., the voice, text messaging, and broadband data components of

18   MetroPCS's 'bundles' of prepaid wireless service)."  Trial Exh. 7 at 2; *see also* Trial Tr. at 19:9-

19   10.  The BVC used GAAP because it was "objective, rational," and "generally used within the

20   accounting world."  Trial Tr. at 19:16-18.

21         8.        MetroPCS's accounting expert, Scott Taub, has approximately 33 years of

22   experience in public accounting, and extensive experience with revenue recognition under GAAP.

23   *See* Trial Tr. at 139:15-140:2; *see also* Trial Exh. 55.  Taub was a credible, knowledgeable expert

24   witness and his testimony within his areas of expertise was persuasive.

25         9.        As Taub testified, "GAAP is intended to provide financial information about [an]

26   entity's transactions in a complete and neutral manner that [faithfully] reflects the economics of

27   those transactions."  Trial Tr. at 141:19-22.  Taub stated that "GAAP is well suited to building a

28

United States District Court
Northern District of California

1    methodology to allocate revenue amongst components of prepaid wireless bundles in a neutral

2    representationally faithful[] manner." *Id.* at 141:23-142:1.

3          10.     GAAP provides guidance for how a company should allocate revenue when it

4    agrees in a single contract to provide two or more goods or services. *See id.* at 142:11-13.

5    Through the end of 2017, the relevant provision of GAAP was ASC 605.[3]  Beginning in 2018, the

6    relevant guidance was found in ASC 606. *See id.* at 142:18-21.

7          11.     The GAAP guidance calls for application of the "relative selling price method." *Id.*

8    at 142:23-24.  This method requires companies to estimate the standalone selling price of each

9    good or service in the bundle. *See id.* at 142:22-143:1-3.  The relative standalone selling price of

10   each bundle component -- or deliverable -- determines how to allocate the transaction price in a

11   bundled transaction. *See id.* at 143:4-9.

12         12.     For example, a company sells services A, B, and C as part of a bundled transaction

13   for $100.  The company determines that the standalone selling prices of A, B, and C are $50, $25,

14   and $75, respectively, for a total of $150.  The $50 discount that the consumer receives (the $150

15   sum of the standalone selling prices, minus the $100 actual transaction cost) for purchasing the

16   bundle is allocated ratably.  The standalone selling price of service C is one half of the three

17   services' combined standalone selling prices, so one half of the $50 bundle discount ($25) is

18   apportioned to service C.  Applying GAAP, the resulting revenue allocation from the $100 actual

19   transaction price is $33 to service A, $17 to service B, and $50 to service C. *See id.* at 153:4-21.

20         13.     The evidence at trial demonstrated that a reliable and accurate valuation of a

21   bundled component's standalone selling price is the price charged for the component when it is

22   sold separately, which is vendor-specific objective evidence under ASC 605; a similar concept

23   appears in ASC 606. *See* Trial Exh. 7 at 4, 6; Trial Tr. at 143:11-24.  If this vendor-specific

24   evidence is unavailable because the component is not sold separately, a company would look to

25   the prices for interchangeable goods or services that a competitor sold separately. *See* Trial Exh. 7

26

27   [3] ASC stands for "accounting standards codification."  Trial Tr. at 142:20-21; Trial Exh. 7 at 3.
     The ASC is authored and approved by the Financial Accounting Standards Board and "serves as
28   the authoritative source" of GAAP.  Trial Exh. 7 at 3.

United States District Court
Northern District of California

1    at 4; Trial Tr. at 143:14.  Beyond that, a company would do its "best based on the information" it

2    has, Trial Tr. at 143:24, to determine a "best estimate of selling price,"[4] Trial Exh. 7 at 4.

3           14.     From January 2017 through August 2018, MetroPCS assigned a standalone selling

4    price of $20 to voice services and $5 to text messaging services.  *See* Trial Tr. at 25:13-17; *see*

5    *also id.* at 77:15-23 (noting that allocation values changed in September 2018).  This allocation

6    was based in part on the fact that MetroPCS offered a $25 wireless plan that had "no data, just talk

7    and text."  *Id.* at 25:16-17.  The decision to allocate $5 to text messaging services specifically

8    "was based off of historical pricing, marketing judgment, and information in the public market."

9    *Id.* at 29:16-17; *see also* Trial Exh. 7 at 15-16.

10          15.     During the same period, MetroPCS assigned a standalone selling price of $5 to

11   unlimited access to basic, lower-speed (less than 4G) internet access.  *See* Trial Tr. at 30:16-31:6;

12   Trial Exh. 7 at 17.  This estimate was based, at least in part, on the fact that "before MetroPCS

13   launched its 4G LTE service, it charged $5 for a standalone add-on of unlimited Internet access."

14   Trial Exh. 7 at 17.

15          16.     MetroPCS estimated that the standalone selling price for each gigabyte (GB) of 4G

16   LTE data was $5.  *See id.*  The 4G LTE data was valued differently from basic internet access

17   because it "was viewed as a different data experience for the customers," that is, "a better quality,

18   high-speed experience."  Trial Tr. at 31:12-14; *see also* Trial Exh. 7 at 17 n.13 ("'4G' broadly

19   refers to the fourth generation of mobile telecommunications technology.  'LTE' stands for 'Long-

20   Term Evolution,' and refers to a more specific technical standard that allows for high-speed

21   transmission of data on mobile devices.").

22          17.     MetroPCS's estimate of the standalone price of 4G LTE data was derived from

23   multiple sources.  To start, customers on limited high-speed data plans (*e.g.*, 3 GB per month) who

24   ran out of their monthly data allowance could purchase one additional GB of high-speed data -- a

25   "top up" -- for $5.  *See* Trial Tr. at 31:25-32:2.  Three of MetroPCS's competitors sold additional

26

27   ───────────────────
     [4] Under ASC 606, third-party evidence does not necessarily take precedence over other objective
     evidence of the standalone selling price.  *See* Trial Exh. 7 at 7 ("[U]nlike ASC 605, ASC 606 does
28   not require that companies look to third-party evidence of the Standalone Selling Price before
     considering other sources of objective evidence.").

United States District Court
Northern District of California

high-speed data at a price of $5 to $10 for each additional GB.  *See* Trial Exh. 7 at 17; *see also* Trial Tr. at 35:21-36:6.  Additionally, MetroPCS offered data-only plans for tablets, which at the time were $15 per month for 2 GB of high-speed data.  *See* Trial Tr. at 32:3-7; Trial Exh. 7 at 17.

18.    MetroPCS used these standalone selling prices -- $20 for unlimited voice, $5 for unlimited text, $5 for basic internet access, and $5 for each GB of 4G high-speed data -- to allocate revenue between the different components of its core wireless plans, using a "building block" method.  *See* Trial Ex. 7 at 18.

19.    For instance, in 2017, MetroPCS offered a core wireless plan (GSMMU50) -- in which roughly 2 percent of MetroPCS's customers were enrolled, *see* Trial Exh. 4 at 3 -- that included unlimited voice, unlimited text, basic internet access, and 5 GB of high-speed 4G LTE data for $50 per month.  *See* Trial Exh. 7 at 20.  Using MetroPCS's estimates, the sum of the standalone selling prices for the different components was $55.  *See id.*  The following graphic offers an illustration:



*Building Blocks for GSMMU50 (core $50 plan)*

*Id.*

20.    Using this plan as an example, the relative price of data would be roughly 54.5 percent ($30 for data -- basic internet access and 5 GB of 4G LTE -- divided by the combined standalone selling prices of $55).  Consequently, approximately 54.5 percent of the $5 bundle discount would be apportioned to data (~$2.73), resulting in an actual revenue allocation of about $27.27 to data.

21.    For the unlimited high-speed data plans, MetroPCS applied the same "building block" approach, using 14 GB of 4G LTE data as the measure for "unlimited" high-speed data based on internal assessments of the average internet usage by MetroPCS subscribers of such plans.  *See* Trial Exh. 7 at 21; *see also* Trial Tr. at 37:23-38:17; Trial Exh. 15.

22.     The following graphic illustrates the application of the "building block" approach to MetroPCS's core plan with unlimited high-speed data (GSMMU60), in which over 6 percent of customers were enrolled in 2017, *see* Trial Exh. 4 at 1:



*Building Blocks for GSMMU60 (core $60 plan)*

Trial Exh. 7 at 21.

23.     Under this plan, the relative price of data would be 75 percent ($75 for data -- basic internet access and 14 GB of 4G LTE -- divided by the combined standalone selling prices of $100.  Consequently, 75 percent of the $40 bundle discount would be apportioned to data ($30), resulting in an actual revenue allocation of $45 to data.

24.     MetroPCS applied the relative pricing from its core plans to its discounted promotional plans that consisted of the same set of deliverables.  "So if MetroPCS, for instance, offered a $10 discount on the [unlimited high-speed data] GSMMU60 plan, 75% of the revenue from the plan would still be attributable to data, and the percentages attributable to voice and text would remain 20% and 5%."  Trial. Exh. 7 at 23.

25.     In a memo dated March 9, 2018, in which MetroPCS's BVC documented its application of GAAP for revenue-allocation purposes, *see* Trial Tr. at 22:20-23:5, the BVC noted that while it relied on "a usage analysis . . . that analyzes substantially all of MetroPCS's voice traffic to determine the percentage of voice service that is jurisdictionally intrastate vs. interstate vs. international for the purpose of contributing to federal and state universal service funds," it did not rely -- at that time -- on usage to establish the relative pricing of voice, text, and data services, Trial Exh. 7 at 24.

26.     In August 2018, MetroPCS moved to an "expected cost plus margin" approach to allocating revenue between voice, text, and data services, which more closely "align[ed] with customer usage of the T-Mobile wireless network."  Trial Exh. 27 at 3; *see also* Trial Tr. at 51:16-

1   18 (MetroPCS plans run on the T-Mobile network), 16:3-4 (noting that MetroPCS and T-Mobile

2   merged in 2013).  MetroPCS implemented the cost-plus-margin approach in its billing system on

3   September 1, 2018.  *See* Trial Tr. at 49:5-11; *see also id.* at 55:10-18.

4           27.     GAAP authorized use of a cost-plus-margin approach in January 2018 when it

5   adopted ASC 606.  *See id.* at 52:8-22; *see also id.* at 143:25-144:3.  ASC 606 provided, in

6   pertinent part, that an entity could estimate the standalone selling price of a good or service -- for

7   purposes of applying the relative selling price method -- by forecasting "its expected costs of

8   satisfying a performance obligation and then add[ing] an appropriate margin for that good or

9   service."  Trial Exh. 27 at 3 (internal quotations omitted).

10          28.     MetroPCS "engaged Deloitte business and transaction services" to assist it in

11  implementing the cost-plus-margin approach, Trial Tr. at 52:1-6, after realizing that it "needed to

12  change [its revenue-allocation] methodology" because the methodology "was no longer

13  sustainable with the rapid changes in pricing and the dramatic growth in customer data and the

14  massive investments [MetroPCS was] making in [its] business for data," *id.* at 54:13-16.

15          29.     Deloitte prepared a report, titled "T-Mobile USA, Inc. Revenue Allocation for

16  Business, Accounting, and Tax Compliance and Reporting Purposes" (the "Deloitte Report"), the

17  final version of which is dated November 2018.  *See* Trial Exh. 30.  MetroPCS had received a

18  draft report "that was effectively final . . . for all intents and purposes" in August 2018.  Trial Tr.

19  at 55:15-16.

20          30.     The Deloitte Report "estimated an allocation of voice, text, and data services for T-

21  Mobile's bundled service plans. . . . supported by network usage metrics (i.e., voice minutes of

22  use, data megabytes, and text megabytes) and the costs associated with owning and operating the

23  T-Mobile network."  Trial Exh. 30 at 4.  The cost to T-Mobile to provide voice, text, and data

24  services is relevant to MetroPCS because it uses the same network.  *See* Trial Tr. at 58:3-6.

25          31.     Ordinarily, voice, text, and data are subject to different units of measure.  Voice can

26  be measured in minutes of use, standard text messages by text count, and data by megabytes or

27  gigabytes.  *See id.* at 56:18-22.

28

United States District Court
Northern District of California

1    32.     The Deloitte Report offered MetroPCS a way to convert voice, text, and data into a

2    common unit of measurement -- megabytes -- so that it could determine the cost of delivering each

3    of those services on a megabyte-by-megabyte basis.  *See id.* at 55:19-57:17.

4    33.     Using the Deloitte Report's conversion rates and methodology, the overwhelming

5    share of customer usage of the T-Mobile/MetroPCS network can be attributed to data services, *see*

6    Trial Exh. 30 at 18-19, and up to 95 percent of the revenue from T-Mobile/MetroPCS bundled

7    service plans can be allocated to data, *see* Trial Exh. 27 at 4; Trial Exh. 5 at 6.  This shift in

8    revenue allocation is attributable, in part, to the "exponential increase in demand of data compared

9    to the relatively stagnant changes in voice and text service demand [that] has resulted in

10   significant infrastructure expenses . . . tied to offering the fastest data speeds possible."  Trial Exh.

11   30 at 15.

12   34.     In addition to allocating revenue between its voice, text, and data services,

13   MetroPCS further allocates revenue between interstate voice, which is not surchargeable by the

14   CPUC, and intrastate voice, which is surchargeable.  *See* Trial Tr. at 69:25-70:7.

15   35.     Using traffic studies, MetroPCS estimated that 88.32 percent of its voice traffic was

16   intrastate in 2017 and that 88.47 percent was intrastate in 2018.  *See id.* at 71:15-72:9.  These

17   numbers have not been disputed by the CPUC.

18   36.     In 2017, MetroPCS paid $27,798,240 in surcharges and user fees to the CPUC.  *See*

19   Trial Exh. 232 at 3.  The record indicates that MetroPCS's remittance was based on an allocation

20   of roughly 62 percent of its revenue to data, 8 percent to text, and 29.9 percent to voice, *see* Trial.

21   Tr. at 84:2-12, though there are some minor discrepancies as to the precise breakdown of its

22   revenue allocations, *see* Trial Exh. 232 at 2 n.9 (CPUC representing that MetroPCS reported that

23   31.82 percent of its 2017 revenue derived from voice services).

24   37.     The CPUC has issued a demand letter claiming that MetroPCS owed $71,490,877

25   in surcharges and user fees for 2017.  *See* Trial Exh. 232 at 3.

26   38.     In 2018, MetroPCS paid $21,859,749 in surcharges and user fees to the CPUC.  *See*

27   *id.*  The precise breakdown of MetroPCS's revenue allocations is not disclosed in the record,

28   though with the accelerating demand for data, *see* Trial Tr. at 180:12-181:12, and MetroPCS's

United States District Court
Northern District of California

16

adoption of the cost-plus-margin method for the last four months of 2018, the share of revenue that MetroPCS allocated to data likely exceeded the 2017 allocation.

39.     The CPUC has issued a demand letter claiming that MetroPCS owed $91,107,233 in surcharges and user fees for 2018.  *See* Trial Exh. 232 at 3.

### CONCLUSIONS OF LAW

To prevail on the as-applied preemption claim, MetroPCS has the burden of proving, by a preponderance of the evidence, that the application of CPUC's contested resolutions implementing the Prepaid Act would result in an impermissible surcharge on its 2017 and 2018 revenues from non-surchargeable broadband data services.  *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1118 (9th Cir. 2018) ("A preponderance of the evidence is . . . the default standard in a civil case.") (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983)); *see also* Dkt. No. 238 at 52; Dkt. No. 239 at 20.

The question of how to allocate revenue in the context of bundled telecommunications offerings and carriers' universal service obligations is not new.  The FCC has long permitted carriers to offer "bundled packages of enhanced services" -- encompassing the broadband data at issue here -- and "basic telecommunications at a single price."  *In re Policy and Rules Concerning Interstate, Interexchange Marketplace*, 16 FCC Rcd. 7418, 7419-20, 7441 (2001) (hereinafter *Bundling Order*); *see also* Dkt. No. 238 at 43 (identifying "mobile broadband services" as an enhanced service offering).[5]  The FCC has allowed bundling notwithstanding the fact that when "carriers generate revenues from bundled packages of telecommunications services and [customer premises equipment]/enhanced services . . . the calculation of their universal service contributions becomes more complicated."  *Bundling Order*, 16 FCC Rcd. at 7446.  In the FCC's view, "allowing all carriers to bundle products and services is generally procompetitive and beneficial to consumers."  *Id.* at 7426.

---

[5] The CPUC's request for judicial notice of two FCC orders, Dkt. No. 237, is granted.  *See Winding Creek Solar LLC v. Peevey*, No. 13-cv-04934-JD, 2014 WL 2735015, at *4 (N.D. Cal. June 11, 2014) ("Judicial notice is appropriate for records and reports of administrative bodies.") (internal quotations and citation omitted).  One is the *Bundling Order*.  The other is an order reviewing an audit conducted by the Universal Service Administrative Company, *see* Dkt. No. 237-2, which does not alter the disposition of the as-applied preemption claim here.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The FCC's *Bundling Order* presents two methods that carriers "may use to allocate

2    revenue when telecommunication services and CPE/enhanced services are offered as a bundled

3    package." *Id.* at 7447.  These two allocation methods, which are described as "safe harbors" that

4    are "afforded a presumption of reasonableness in an audit or enforcement context," are:

5
6        First, contributors may elect to report revenues from bundled
         telecommunications and CPE/enhanced service offerings based on the unbundled
7        service offering prices, with no discount from the bundled offering being allocated
         to telecommunications services.  For example, assume that a carrier offers voice-mail
8        service, an enhanced service, as a stand-alone offering for $6.00, and also offers basic
         phone service, a telecommunications service, for $20.00.  The carrier offers the two
9        services for the bundled price of $22.00, resulting in a discount of $4.00.  Under this
         approach, the carrier would report telecommunications service revenue of $20.00 per
10       month (the stand-alone price for the phone service) and non-telecommunications
         revenue of $2.00 per month (the stand-alone price for voice-mail minus the discount
11       from the bundled offering). . . .

12       Alternatively, contributors may elect to treat all bundled revenues as
         telecommunications service revenue for purposes of determining their universal
13       service obligations.  For example, assume that a carrier offers a bundled package of
         voice-mail and basic phone service to end-users at $25.00 per month.  The carrier
14       decides that it cannot distinguish revenue for the basic service (the
         telecommunications service) from voice-mail (the non-telecommunications service).
15       This carrier would report telecommunications revenue of $25.00 per month.
16

17   *Id.* at 7447-48 (footnote omitted).

18       Under the FCC's first safe harbor provision, a large share of MetroPCS's 2017 and 2018

19   plans would necessarily be subjected to an impermissible surcharge on broadband data revenue by

20   the CPUC's resolutions.  This conclusion is readily demonstrated by facts in the record.  For a $60

21   MetroPCS plan with unlimited talk, unlimited text, and unlimited data, no less than $35 (or

22   roughly 58 percent) of MetroPCS's revenue would be allocable to non-surchargeable data given

23   that MetroPCS offered a standalone unlimited talk-and-text plan for $25.[6]  In other words, under

24   _____

25   [6] There is some indication in the record that the $25 unlimited talk-and-text plan did not include
     MMS (multimedia) texting.  *See* Trial Exh. 7 at 16 n.12; Trial Tr. at 29:3-8.  There is also a
26   suggestion that, at some point, MetroPCS offered a separate MMS add-on for $5.  *See* Trial Tr. at
     28:12-14.  This does not undermine the core conclusions here that (1) a substantial share of
27   MetroPCS's 2017 and 2018 plans would necessarily be impermissibly surcharged by application
     of the contested CPUC resolutions to MetroPCS and (2) MetroPCS's good-faith application of
28   GAAP demonstrates a likelihood of an impermissible surcharge burden in the aggregate, across all
     MetroPCS plans during the period.  Moreover, the CPUC's expert did not articulate any concerns

United States District Court
Northern District of California

1    the safe harbor, the maximum amount of revenue from that plan that could be permissibly

2    surcharged by the CPUC -- setting aside the parties' disagreements about whether text messaging

3    services were surchargeable during the 2017-18 period and overlooking MetroPCS's unrebutted

4    evidence that roughly 12 percent of its customers' voice traffic was interstate -- would be $25.

5            The application of the CPUC's 2017 and 2018 intrastate allocation factors would impose a

6    surcharge on a far larger portion of revenues.  The 2017 factor of 72.75 percent would demand a

7    surcharge on $43.65 of the $60 plan, and the 2018 factor of 69.45 percent would demand a

8    surcharge on $41.67 of the $60 plan.  These amounts derived from the CPUC allocation factors

9    necessarily constitute an impermissible surcharge on broadband revenue.

10           The same impermissible result is reached for any plan with a monthly price of $37 or

11   more[7] that provides some combination of unlimited talk, unlimited text, and data.  The evidence

12   before the Court establishes that a majority of MetroPCS's plans from 2017 and 2018 fall into this

13   category, and that roughly half of MetroPCS's customers were enrolled in these plans.  *See*

14   *generally* Trial Exhs. 4, 5.

15           Consequently, using what is effectively the most conservative estimate possible -- one that

16   would allow the CPUC to assess a surcharge on all the revenue it would like to surcharge, and

17   more -- the application of the CPUC's resolutions to MetroPCS would still result in an

18   impermissible surcharge on broadband data revenue in many -- if not most -- instances.[8]  This fact

19   alone is enough for MetroPCS to prevail on the as-applied preemption challenge.

20           To be sure, MetroPCS and other telecommunications providers are not constrained by the

21   FCC's safe harbors.  They may use other allocation methods subject to the advisement in the

22   _____

23   with MetroPCS's estimate of the standalone selling price of voice and text, *see* Trial Tr. at 203:1-
     5, 218:21-219:2, and that estimate was entirely reasonable given the information available to
24   MetroPCS at the time, *see, e.g.*, Trial Exh. 7 at 15-16.

25   [7] Applying the lower of the two intrastate allocation factors, 69.45 percent, to a hypothetical $37
     plan would result in treating more than $25 of the revenue as surchargeable.

26
27   [8] Strictly speaking, MetroPCS could take an even more conservative approach under the other safe
     harbor and "treat all bundled revenues as telecommunications service revenue for purposes of
     determining [its] universal service obligations."  *Bundling Order*, 16 FCC Rcd. at 7447.  But
     resorting to that approach would not be necessary given the availability here of a standalone price
28   for unlimited talk and text.

1    *Bundling Order* that "any other allocation methods may not be considered reasonable, and will be

2    evaluated on a case-by-case basis in an audit or enforcement context." *Bundling Order*, 16 FCC

3    Rcd. at 7448.  "In evaluating the reasonableness of any alternative methods, [the FCC] will apply

4    the standards underlying the [two] safe harbors." *Id.*  The *Bundling Order* does not suggest that

5    reasonableness is judged by the degree to which an alternative allocation method mirrors the

6    outcome of one of the safe harbors.  Instead, the reasonableness of an alternative allocation

7    method depends on whether it "deters carrier gaming while being competitively neutral, easy to

8    administer, and simple to understand." *Id.* at 7447.  Another consideration may be whether the

9    method aligns with the FCC's goal "to maintain stability and predictability in funding the

10   universal service support mechanisms." *Id.*

11          The evidence in the record establishes that the revenue-allocation method recognized by

12   GAAP and used by MetroPCS, namely the relative selling price method, is reasonable.  As

13   MetroPCS's accounting expert testified, GAAP helps to enable entities to provide financial

14   information about their transactions in a neutral manner that faithfully reflects the underlying

15   economics of those transactions.

16          The CPUC has questioned whether GAAP furnishes a reasonable allocation method within

17   this specific regulatory context.  *See* Dkt. No. 238 at 14.  The CPUC relies in part on the testimony

18   of its fact witness, Tracy Fok, who is employed by the CPUC in its utility audit branch and "led,

19   supervised and oversaw" the audit with respect to MetroPCS's Prepaid Act surcharge remittance

20   for calendar year 2016.  Trial Tr. at 229:11-14.  Fok testified that MetroPCS's use of GAAP was

21   insufficient because "GAAP is basically for financial statement reporting purposes, and there's a

22   separate set of rules from regulatory agencies to determine surchargeable intrastate revenue." *Id.*

23   at 236:19-21.

24          The CPUC's objections to GAAP are not well taken.  While the CPUC now suggests that

25   GAAP does not provide a viable method for determining surchargeable intrastate revenue, it did

26   not object in its 2016 audit report to MetroPCS's use (as opposed to its application) of GAAP.[9]

27

28   _____

     [9] The audit report stated:  "To address MetroPCS'[s] assertion that its pricing allocation process is
     consistent with GAAP and that it relies on an objective data and robust competitive analysis,

United States District Court
Northern District of California

1    *See* Trial Exh. 240 at 22.  In addition, the CPUC's accounting expert, Bert Nuehring, declined to

2    offer an opinion on whether GAAP provides a reasonable methodology for allocating revenues for

3    purposes of the FCC's *Bundling Order*.  *See* Trial Tr. at 218:14-20.  Overall, the CPUC has not

4    identified a single statute or regulation, or even just a good reason, that calls into question the use

5    of GAAP in this context.[10]

6         The remaining issue is whether MetroPCS properly followed GAAP.  In addition to

7    providing substantial and persuasive evidence that GAAP furnishes a reasonable method of

8    allocating revenue to the different components of its wireless plans, MetroPCS has shown that it

9    applied GAAP in a good-faith effort to allocate revenues from its bundled wireless plans.  While

10   some of the inputs that MetroPCS used to allocate revenue -- such as $5 as the standalone selling

11   price of each GB of 4G high-speed data -- may not be perfect, the record before the Court shows

12   that they are reasonable enough.  In deciding how to account for the wide gulf between

13   MetroPCS's estimate of its surchargeable revenue and the share of revenue that the CPUC's blunt

14   one-size-fits-all approach would surcharge, the only tenable conclusion, supported by the evidence

15   adduced at trial, is that the CPUC resolutions would assess impermissible surcharge burdens on

16   MetroPCS's non-surchargeable revenue across the gamut of its bundled service offerings.

---

UAFCB [Utility Audit, Finance & Compliance Branch] determined that the carrier did not provide any supporting documentation to demonstrate that its pricing allocation process relies on objective data and robust competitive analysis.  Because UAFCB cannot verify whether MetroPCS's pricing allocation process is based on [objective] data, the finding stands."  Trial Exh. 240 at 22.

[10] It is worth noting that GAAP is embraced by federal and state agencies in many other contexts. *See, e.g.*, 49 U.S.C. § 11164 ("To obtain expense and revenue information for regulatory purposes, the [Surface Transportation Board] may promulgate reasonable rules for rail carriers . . . prescribing expense and revenue accounting and reporting requirements consistent with generally accepted accounting principles uniformly applied to such carriers."); Cal. Fin. Code § 463(a) ("All references in this code and the Corporations Code to financial statements, balance sheets, income statements, and statements of changes in financial position of a licensee, and all references to assets, liabilities, earnings, retained earnings, shareholders' equity, net worth, and similar accounting items of a licensee, mean those financial statements or those items prepared or determined in conformity with generally accepted accounting principles then applicable in the United States . . . ."); Cal. Rev. & Tax Code § 40043 ("The consumption by an electric utility of purchased electrical energy that is used directly, lost by dissipation or unaccounted for in accordance with generally accepted accounting principles by the electric utility in the process of generation, transmission and distribution of electrical energy is exempt from the surcharge.").

United States District Court
Northern District of California

Contrary to the CPUC's suggestion, *see* Dkt. No. 238 at 44, MetroPCS is not required to prove that its revenue-allocation methods and applications were reasonable in all respects and would withstand an audit in order to demonstrate that the CPUC resolutions are preempted as applied. The CPUC relies on the following language from the FCC's *Bundling Order* and federal regulations applicable to universal service contributions:

> Carriers should realize . . . that . . . other allocation methods [besides the two safe harbors] may not be considered reasonable, and will be evaluated on a case-by-case basis in an audit or enforcement context. . . . Should an audit or enforcement proceeding be initiated, carriers will need to provide evidence that the amount of reported telecommunication revenues that they report reflects compliance with the carrier's obligation to contribute to the universal service support mechanism based on interstate end-user telecommunications revenue.

*Bundling Order*, 16 FCC Rcd. at 7448.

> Any entity required to contribute to the federal universal service support mechanisms shall retain, for at least five years from the date of the contribution, all records that may be required to demonstrate to auditors that the contributions were made in compliance with the [FCC's] universal service rules. These records shall include without limitation the following: Financial statements and supporting documentation; accounting records; historical consumer records; general ledgers; and any other relevant documentation.

47 C.F.R. § 54.706(e).

The CPUC fundamentally misunderstands the nature of this court proceeding. This is not an audit. The salient question is whether MetroPCS has proven by a preponderance of the evidence that the rigid application of the CPUC's 2017 and 2018 Prepaid Act resolutions will necessarily impose an impermissible surcharge on MetroPCS's non-surchargeable revenues from broadband data services. MetroPCS was entitled to prove its case by any relevant, competent evidence. The Court will not don the green eyeshade of an auditor to sift through mounds of granular customer data to resolve this dispute. A good argument can be made that a federal court would exceed its authority and unduly encroach upon the discretion of the CPUC in doing so.

Overall, MetroPCS has presented abundant evidence demonstrating that the use of the CPUC's intrastate allocation factors for 2017 and 2018 would impose an impermissible surcharge on broadband revenue, in violation of federal law. The application of basic economic principles and the FCC's safe harbor methods for allocating bundled revenue indicate that a large share of

MetroPCS's plans would necessarily be subject to an impermissible surcharge under the CPUC's resolutions.  MetroPCS's actual revenue allocations bolster the conclusion that the CPUC's resolutions would impermissibly surcharge revenues from broadband data.

Consequently, the CPUC resolutions from 2017 and 2018 (Resolutions T-17542, T-17568, and T-17579) are preempted as applied to MetroPCS.  The CPUC is permanently enjoined from enforcing the resolutions against MetroPCS.

The next steps, if any, are in the hands of the CPUC.  Nothing in this order precludes the CPUC from conducting audits of MetroPCS's compliance with its state universal service obligations for the years 2017 and 2018.  *See* Cal. Pub. Util. Code § 314.5.  While MetroPCS has provided sufficient evidence to avoid the application of the CPUC's intrastate allocation factors to its total revenues, it bears repeating that this Court has not conducted an audit of MetroPCS.  The CPUC may proceed as the facts and circumstances warrant, so long as any determination of a surcharge to be paid by MetroPCS is wholly independent of an application of the allocation factors.

## CONCLUSION

Judgment is granted for MetroPCS and against the CPUC.  The CPUC may address an audit and related issues in an agency proceeding, as appropriate.  *Cf. Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 994 (N.D. Cal. 2017), *aff'd sub nom. Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019).

**IT IS SO ORDERED.**

Dated:  August 4, 2023

_____
JAMES DONATO
United States District Judge

23